## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| BARBIE SPEAR, in her capacity as trustee of the Alliance Holdings, Inc. Employee Stock Ownership Plan, and ALLIANCE HOLDINGS, INC., a Pennsylvania corporation, in its capacity as a Named Fiduciary of the Alliance Holdings, Inc. Employee Stock Ownership Plan, | |
| **Plaintiffs,** | |
| vs. | Case No. _____ |
| DAVID B. FENKELL, an individual, STONEHENGE FINANCIAL HOLDINGS, INC., a corporation, DBF CONSULTING, LLC, a limited liability company, STUDENT LOAN MANAGEMENT AND RESEARCH SERVICES, LLC, a limited liability company, STUDENT LOAN ADVISORY MANAGEMENT SERVICES, LLC, a limited liability company, JOHN P. WITTEN, an individual, BARRY GOWDY, an individual, RONALD D. BROOKS, an individual, PAUL SEFCOVIC, an individual, LIANNE SEFCOVIC, an individual, and KAREN FENKELL, an individual, | COMPLAINT FOR ERISA VIOLATIONS (29 U.S.C. § 1001 *et seq.*) |
| **Defendants.** | |

## COMPLAINT

Plaintiffs Barbie Spear, not in her individual capacity but solely in her capacity as trustee of the Alliance Holdings, Inc. Employee Stock Ownership Plan (the "ESOP"), and Alliance Holdings, Inc. ("Alliance"), in its capacity as the Plan Administrator and a Named Fiduciary of the ESOP, as those terms are defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), bring this action to remedy violations of ERISA committed by defendants and allege as follows:

## I. INTRODUCTION

1. Shortly after David Fenkell's September 25, 2012 resignation as Alliance's President and CEO, plaintiffs retained an independent investigative legal team and a forensic accountant to begin a review of Fenkell's activities while he was in control of Alliance.  The plaintiffs concluded that since at least 1999, Fenkell has siphoned off millions of dollars from the Alliance Holdings, Inc. Employee Stock Ownership Plan ("ESOP") for his own personal account and for the benefit of himself, his wife, and his business associates/friends.  Fenkell and the other defendants did so, among other ways, by causing Alliance and/or the ESOP to enter into contracts with corporate entities operated by Fenkell's business associates/friends.  Pursuant to those contracts, the corporate entities were purportedly to provide services to Alliance and/or the ESOP in exchange for plan assets when, in reality, the corporate entities provided little or no services at all, but still received payments under the contracts to the benefit of Fenkell and/or his business associates/friends.

2. Fenkell designed and used Alliance's corporate governance structure and the ESOP's administrative structure to fraudulently conceal his ERISA violations and fiduciary breaches detailed in this Complaint.  Although Alliance was identified in the ESOP plan document as the Named Fiduciary, due to Alliance's structure (as designed by Fenkell), no one except Fenkell had fiduciary responsibility with respect to the ESOP since Fenkell was the ESOP's sole trustee.  He was also the sole member of Alliance's Board of Directors and Alliance's President and CEO.  Fenkell further concealed his activities by frequently changing Alliance financial controllers to prevent discovery of his activities and by holding all decision-making authority as to the ESOP, thereby preventing any monitoring, review or challenge of his actions by any other person.

3.      Fenkell's self-assigned roles were calculated to ensure that he had complete control of all matters related to the ESOP, and enabled him to conceal his unfettered and unreviewed ERISA violations with respect to the ESOP until after Alliance undertook an investigation following Fenkell's resignation on September 25, 2012.

## II.      JURISDICTION AND VENUE

4.      This action arises under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*  Plaintiffs sue to remedy defendant David B. Fenkell's ("Fenkell") repeated violations of his fiduciary duties and the prohibited transactions into which Fenkell caused the ESOP to enter while acting as its sole fiduciary.  Specifically, plaintiffs sue Fenkell under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to:

a.      redress the breaches of fiduciary duty by Fenkell alleged herein;

b.      obtain restitution and other relief (including disgorgement of profits) from Fenkell personally under ERISA § 409, 29 U.S.C. § 1109, which provides, *inter alia*, that any person who is a fiduciary with respect to an employee benefit plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA, 29 U.S.C. § 1001 *et seq.*, shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and, additionally, is subject to such other equitable or remedial relief as the court may deem appropriate;

c.      remedy prohibited transactions into which Fenkell caused the ESOP to enter in violation of ERISA § 406(a)(1)(C), 406(a)(1)(D) and 406(b), 29 U.S.C. § 1106(a)(1)(C), 1106(a)(1)(D) and 1106(b);

d.      to enforce the provisions of ERISA § 410, 29 U.S.C. § 1110, by declaring void any indemnification agreements between Alliance and/or the ESOP and Fenkell, including all provisions that purport to indemnify Fenkell for damages that may be assessed against him based on the court's finding of fiduciary misconduct in *Chesemore, et al. v. Alliance Holdings Inc.*, *A.H.I. Inc., David B. Fenkell, et al.*, No. 3:09-cv-00413-wmc, 886 F. Supp. 2d 1007 (W.D. Wis. July 24, 2012) (the "*Chesemore* Case");

e.      enjoin Fenkell from (i) serving as a fiduciary to the ESOP or any ERISA plan in the future, (ii) taking any actions that would diminish the value of the ESOP, (iii) interacting with the ESOP in any manner including, but not

limited to, transacting any business with the ESOP or Alliance or otherwise causing ESOP assets to be distributed or spent, and (iv) receiving monetary or any other benefit from the ESOP;

f.      ordering the defendants to provide an accounting for profits realized in connection with the transactions involving defendants and Alliance or the ESOP in violation of ERISA; and

g.      obtain such other equitable relief, including by surcharge, as may be appropriate to redress the violations of and to enforce the provisions of Title I of ERISA.

5.      Plaintiffs also bring suit against defendants Stonehenge Financial Holdings, Inc., DBF Consulting, LLC, Student Loan Management and Research Services, LLC, Student Loan Advisory Management Services, LLC and individual defendants John P. Witten, Barry Gowdy, Ronald D. Brooks, Paul Sefcovic and Lianne Sefcovic under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3):

a.      to obtain make-whole relief under ERISA § 409, 29 U.S.C. § 1109, and by surcharge for their knowing participation in the fiduciary violations and prohibited transactions perpetrated by Fenkell;

b.      for other appropriate relief, including by surcharge, against these defendants for their participation in transactions with Alliance and the ESOP prohibited by ERISA § 406(a)(1)(C), 406(a)(1)(D) and 406(b), 29 U.S.C. § 1106(a)(1)(C), 1106(a)(1)(D) and 1106(b); and

c.      to trace and recover any and all ESOP assets transferred gratuitously to, or which are now controlled by, these defendants, as well as any proceeds or profits made on those funds, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

6.      Plaintiffs also bring suit against defendant Karen Fenkell, wife of defendant David Fenkell, as a gratuitous transferee of ESOP assets, for relief by surcharge and to trace and recover all ESOP assets transferred gratuitously to her, or which were or are now controlled by her, as well as any proceeds or profits made from those funds, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

7.     This court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which states that the federal district courts shall have exclusive jurisdiction over claims such as those raised herein.

8.     Venue in the Eastern District of Pennsylvania is appropriate pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because at all times relevant to this Complaint, the ESOP was administered within this district.

## III.     THE PARTIES

### A.     Barbie Spear

9.     Plaintiff Barbie Spear is, and has been since July 2, 2012, the ESOP's sole trustee. Spear was a member of Alliance's Board of Directors from September 25, 2012 until February 20, 2013.  At no time prior to July 2, 2012 did Spear function as a trustee of the ESOP.

### B.     Alliance Holdings, Inc. (Alliance)

10.     Plaintiff Alliance Holdings, Inc. is a Pennsylvania corporation incorporated on December 7, 1994.  It has been the ESOP's sponsor since the ESOP's adoption in 1995.  At all times since the ESOP's adoption, Alliance has been the Plan Administrator and a Named Fiduciary of the ESOP.

11.     From the ESOP's adoption in December 1995 until September 1, 2005, all or substantially all of Alliance's outstanding common stock was owned by the ESOP.  Since September 1, 2005, approximately 60 percent of Alliance's outstanding shares have been held by the ESOP and approximately 40 percent have been held by AH Transition Corporation ("AH Transition"), which at all times relevant to this Complaint also has been wholly owned by the ESOP.

12.     At all times relevant to this Complaint:

      a.     no shares of Alliance were publicly traded;

      b.     Alliance was never an investment company registered under the Investment Company Act of 1940;

      c.     Alliance was never an "operating company," as that term is defined in the Department of Labor Regulations interpreting ERISA, 29 C.F.R. § 2510.3-101(c), *i.e.*, it was not an entity that was primarily engaged, directly or through a majority-owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital;

      d.     Alliance was never a "venture capital operating company," as that term is defined in the Department of Labor Regulations interpreting ERISA, 29 C.F.R. § 2510.3-101(d)(1), *i.e.*, has never been an entity that (i) had at least 50 percent of its assets (other than short-term investments pending long-term commitment or distribution to investors), valued at cost, invested in venture capital investments, and (ii) in the ordinary course of its business, actually exercised "management rights" with respect to one or more of the operating companies in which it invested; and

      e.     Alliance was never a "real estate operating company" as that term is defined in 29 C.F.R. § 2510.3-101(e), *i.e.*, has never been an entity that had at least 50 percent of its assets valued at cost (other than short-term investments pending long-term commitment or distribution to investors) invested in real estate which is managed or developed and with respect to which it had the right to substantially participate directly in the management or development activities, and has not in the ordinary course of its business engaged directly in real estate management or development activities.

13.     At all times since December 1, 1995, Alliance's assets were assets of the ESOP for purposes of ERISA, or "plan assets," as that term is defined in ERISA § 3(42), 29 U.S.C. § 1002(42), 29 C.F.R. § 2510.3-101.

**C.     The ESOP**

14.     Alliance, through its sole director Fenkell, established the ESOP effective December 1, 1995.  At all times since it was established, the ESOP has been an employee benefit plan within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3).

15.     At all times relevant to this Complaint, the ESOP—either directly or in conjunction with its wholly owned subsidiary AH Transition—has owned all or substantially all of Alliance's outstanding common stock.  As of December 31, 2011, there were 17,351 participants in the ESOP.

**D.     David B. Fenkell**

16.     Defendant David B. Fenkell served as: (a) the President and CEO of Alliance from its incorporation until September 25, 2012; (b) Alliance's sole director from its incorporation until July 2, 2012; (c) the President and sole director of AH Transition  since its creation on December 2, 2004 through September 25, 2012; and (d) the ESOP's sole trustee from its original effective date of December 1, 1995 until July 2, 2012.

17.     At all times relevant to this Complaint, Fenkell functioned as the sole fiduciary of the ESOP, as that term is defined in ERISA § 3(21), 29 U.S.C. § 1002(21).  At all times relevant to this Complaint, Fenkell was also a "party in interest" to the ESOP, as that term is defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

**E.     Karen Fenkell**

18.     Karen Fenkell is the wife of David Fenkell.  She is a "party in interest" with respect to the ESOP, as that term is defined in ERISA § 3(14)(F), 29 U.S.C. § 1002(14)(F).

19.     As set forth in paragraph 6 above, Karen Fenkell is believed to be a gratuitous transferee of ESOP assets.

**F.     Stonehenge Financial Holdings, Inc and Individual Defendants John P. Witten, Barry Gowdy and Ronald D. Brooks**

20.     Defendant Stonehenge Financial Holdings, Inc. (f/k/a Stonehenge Holdings, Inc.) ("Stonehenge") is an Ohio corporation.

21.     Defendants John P. Witten, Barry Gowdy and Ronald D. Brooks are long-time business associates of Fenkell.  Witten, Gowdy and Brooks formed Stonehenge in April 1999. Prior to forming Stonehenge, Witten, Gowdy and Brooks were employees of BancOne Funding Capital Corporation and had primary responsibility for its relationship with Alliance.

22.     From September 1, 1999 until August 31, 2011, Stonehenge had a series of contractual relationships with Alliance (and/or its subsidiaries or affiliates) and/or the ESOP (the "Stonehenge Contracts") pursuant to which Stonehenge purported to provide services relating to a program to purchase and hold participation interests in investment-receivable portfolios.  As set forth below, Stonehenge provided, at most, only minimal services under the Stonehenge Contracts, but Fenkell caused Alliance and/or the ESOP to pay Stonehenge millions of dollars, at the expense of the ESOP.

23.     At all times relevant to this Complaint, Stonehenge, Witten, Gowdy and Brooks were "parties in interest" to the ESOP, as that term is defined in ERISA § 3(14)(B) and (H), 29 U.S.C. § 1002(14)(B) and (H), knowing participants in fiduciary violations and prohibited transactions orchestrated by Fenkell, and gratuitous transferees of ESOP assets.

**G.     DBF Consulting LLC**

24.     Defendant DBF Consulting LLC ("DBF") is a Pennsylvania limited liability company bearing Fenkell's initials that was formed by Fenkell on or around February 23, 1998. At all times relevant to this Complaint, Fenkell was the sole owner and only employee of DBF.

25.     Fenkell formed DBF for the purpose of funneling to himself money from Alliance transactions.  For example, through a contract between DBF and Stonehenge for purported consulting services, Fenkell caused money to be passed from Alliance to Stonehenge through the Stonehenge Contracts, and then onto himself via DBF.

26.     Upon information and belief, DBF provided no services in consideration for the fees funneled from Alliance through Stonehenge at the expense of the ESOP participants.  To the extent DBF did provide any services to Stonehenge in relation to its work for Alliance, Fenkell was obligated to provide those services to Alliance directly in consideration for his compensation as its President and CEO.

27.     At all times relevant to this Complaint, DBF was a "party in interest" with respect to the ESOP, as that term is defined in ERISA § 3(14)(G), 29 U.S.C. § 1002(14)(G).

**H.     Student  Loan Management and Research Services, LLC; Student Loan Advisory Management Services, LLC and Individual Defendant Lianne Sefcovic**

28.     Defendant Lianne Sefcovic is married to defendant Paul Sefcovic.  Paul Sefcovic is a long-time close personal friend of Fenkell and was a member and the Chair of Alliance's compensation committee from at least 2005 until September 2012.

29.     Defendant Student Loan Advisory Management Services, LLC ("SLAMS") is an Ohio limited liability company created by defendant Lianne Sefcovic in August 2010 and operated by defendants Paul and Lianne Sefcovic.

30.     Defendant Student Loan Management and Research Services, LLC ("SLMRS") is an Ohio limited liability company incorporated by Carl A. Draucker in August 2010 and effectively controlled by defendants Paul and Lianne Sefcovic.  SLAMS possesses a 90 percent membership interest in SLMRS, and a for-profit affiliate of Hiram College possesses the remaining 10 percent.

31.     From September 1, 2010 to September 30, 2012, SLMRS was a party to an Advisory Services Agreement with Alliance pursuant to which Alliance, at the direction of Fenkell, paid SLMRS $660,000 for alleged services to Alliance.  Alliance in fact received no services from SLMRS.

32.     From September 1, 2010 to September 30, 2012, Paul and Lianne Sefcovic caused SLMRS to funnel approximately 90 percent of the payments it received from Alliance to SLAMS, for the direct benefit of Paul and Lianne Sefcovic.

33.     At all times relevant to this Complaint, Lianne Sefcovic was a party in interest with respect to the ESOP, as that term is defined in ERISA § 3(14)(F) and (H), 29 U.S.C. § 1002(14)(F) and (H), because she was married to Paul Sefcovic who was a party in interest (as described in paragraphs 36 through 39 below) and because she held a 90 percent interest in SLMRS.

34.     At all times relevant to this Complaint, SLMRS and SLAMS were "parties in interest with respect to the ESOP, as that term is defined in ERISA § 3(14)(B) and (H), 29 U.S.C. § 1002(14)(B) and (H).

35.     SLMRS, SLAMS and Lianne Sefcovic were also gratuitous transferees of ESOP plan assets and knowing participants in fiduciary violations and prohibited transactions orchestrated by Fenkell.

**I.    Paul Sefcovic**

36.     At all times relevant to this Complaint, Squire Sanders, LLP represented Alliance.

37.     At all times relevant to this Complaint, defendant Paul Sefcovic:

    a.      was a partner at Squire Sanders, LLP;

    b.      had primary responsibility for Squire Sanders, LLP's relationship with Alliance;

    c.      was married to defendant Lianne Sefcovic; and

    d.      was a long-time close personal friend of Fenkell.

From at least 2005 until in or around September 2012, Paul Sefcovic was also a member and the Chair of the Alliance compensation committee formed by Fenkell.

38.     As a member of Alliance's compensation committee with discretion over the use of Alliance's assets, which were actually the ESOP's assets, Paul Sefcovic was a fiduciary of the ESOP.  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

39.     As a fiduciary of the ESOP and because he provided legal services to Alliance, the assets of which were assets of the ESOP, at all times relevant to this Complaint, Paul Sefcovic was a "party in interest" to the ESOP, as that term is defined in ERISA § 3(14)(A) and (B), 29 U.S.C. § 1002(14)(A) and (B).  Paul Sefcovic was also a knowing participant in fiduciary violations and prohibited transactions orchestrated by Fenkell and a gratuitous transferee of ESOP assets.

## IV.     FENKELL'S ESTABLISHMENT AND CONTROL OF ALLIANCE AND THE ESOP

40.     Fenkell organized Alliance to take advantage of the tax benefits afforded to companies owned by employee stock ownership plans under Section 133 of the Internal Revenue Code of 1986 (the "Code").

41.     Fenkell appointed himself as Alliance's sole director, as well as its President and CEO.  When the ESOP was formed in 1995, Fenkell appointed himself its sole trustee.

42.     Alliance's bylaws provide that directors are to be elected at annual shareholder meetings.  The ESOP's trust agreement provides that all employer securities held by the ESOP (that is, shares of Alliance) shall be voted by the trustee. Fenkell, as sole trustee, never voted the ESOP's shares to elect a director other than himself.

43.     Alliance's bylaws provide that its Board of Directors (which, at all relevant times, consisted only of Fenkell) has the authority to determine the number of directors.  Through July 2, 2012, Fenkell remained the sole member of Alliance's Board of Directors.

44.     The ESOP's trust agreement provides that the Board of Directors has the power to change the number of trustees and to appoint additional trustees to fill vacancies caused by any such increase.  At all relevant times, Fenkell, as sole director, never increased the number of trustees, ensuring that he remained the ESOP's sole trustee until July 2, 2012.

45.     Pursuant to the ESOP's trust agreement, the power to remove a trustee lay only with the Board of Directors, which consisted at all relevant times only of Fenkell.  Through July 2, 2012, Fenkell remained the ESOP's sole trustee.

46.     By establishing Alliance and the ESOP in the manner described above, Fenkell created a closed system in which, as sole trustee, he could and did ensure that he would remain sole director and in which, as sole director, he could and did ensure that he would remain sole trustee of the ESOP and CEO of Alliance.

47.     By ensuring that he remained Alliance's CEO and sole director and sole trustee of the ESOP, Fenkell sought to conceal and did conceal the violations of ERISA described herein.

48.     As President and CEO of Alliance, Fenkell created a culture of fear and intimidation to dissuade employees from questioning his actions or decisions.  This culture included Fenkell frequently referencing *The Godfather* and paraphrasing one of its quotes by saying, "you never talk outside the family," often telling Alliance employees that "the cemetery is filled with indispensible people," and sharing with Alliance's employees that he had completely cut off all contact with one of his oldest friends because he believed that friend "betrayed" him.  This culture intimidated accounting department employees from questioning Fenkell about the contracts discussed herein.  In addition, Alliance had at least six individuals who served as Alliance's Controller or in a similar role since Alliance was formed.  Fenkell's rotation of Controllers in and out of Alliance limited the chance that Alliance's Controller would

gain the knowledge necessary to understand and question the contracts discussed herein.

Nonetheless, at least one Controller did question the consulting contract between DBF and

Stonehenge (although not directly to Fenkell).  That Controller was fired thereafter.  Fenkell took

these and other actions to conceal the violations of ERISA alleged herein.

## V.   ALLEGATIONS SPECIFIC TO ERISA VIOLATIONS

**A.   Fenkell Violated ERISA by Causing Alliance and/or the ESOP to Enter into Agreements with Stonehenge, a Party in Interest to the ESOP, Whereby Stonehenge Was Paid Extraordinary Fees for Which No or Minimal Services Were Provided, at the Expense of the ESOP Participants.**

49.     Prior to its repeal in 1996, Code Section 133 allowed financial institutions that

loaned money to employee stock ownership plans to exclude from their taxable income 50

percent of the interest that they received on those loans.  Because of the reduced taxation on

interest received from loans covered by Code Section 133 ("Section 133 Loans"), many financial

institutions offered lower interest rates for ESOPs than for comparable loans not covered by

Code Section 133.

50.     Following the ESOP's establishment in 1995 and preceding the repeal of Code

Section 133 in 1996, Fenkell, as the ESOP's sole trustee, caused the ESOP to borrow $500

million from BancOne Capital Funding Corporation and BancOne Capital Holdings Corporation

(jointly "BancOne").

51.     The loans made by BancOne to the ESOP (the "ESOP Loans") satisfied the

requirements of Code Section 133.  Therefore, BancOne was required to pay tax on only 50

percent of the interest it received on the ESOP Loans.  BancOne shared the tax savings with the

ESOP.

52.     After the repeal of Code Section 133 in 1996, BancOne continued to be able to

exclude 50 percent of the interest it received on the ESOP Loans because loans made pursuant to

Code Section 133 before its repeal remained eligible for the 50-percent interest exclusion for the remainder of their terms.

53.     As its sole trustee, Fenkell caused the ESOP to use funds from the ESOP Loans to purchase Alliance stock from Alliance.  Alliance made cash contributions to the ESOP sufficient to enable the ESOP to repay the interest on its loans from BancOne.  Alliance and its special purpose entity A.H.III, Inc. used the funds from the ESOP's purchase of Alliance's stock to fund the purchase of participation interests in investment-receivable portfolios (the "Participation Interests") from BancOne LLC.

54.     From 1996 through August 31, 1999, Alliance and its affiliates held the Participation Interests, which were purchased and held pursuant to the terms of a Receivables Participation Agreement between A.H.III, Inc. and/or other Alliance entities and BancOne LLC (the "BancOne LLC Receivables Participation Agreement").

55.     Beginning in 1996, Alliance and its affiliates received interest payments on their Participation Interests.  These interest payments exceeded the amounts that Alliance contributed to the ESOP to fund the payments due on the BancOne Loans, resulting in a net profit, or "spread."

56.     In 1997 and 1998, the BancOne LLC Receivables Participation Agreement was amended and the loans and receivable pools were modified.  In early 1999, BancOne LLC and Alliance began work on restructuring the loans and receivables pools again, with BancOne LLC looking at consolidating several Alliance entities into one.  Witten, Gowdy and Brooks worked on this restructuring as employees of BancOne Funding Capital Corporation up until July 30, 1999.

57.     On September 1, 1999, Fenkell caused A.H.III, Inc. to terminate the BancOne LLC Receivables Participation Agreement and enter into the first of a series of Receivables Participation Agreements with BancOne Texas and BancOne Arizona.  Upon information and belief, the Receivables Participation Agreements that A.H.III, Inc. entered into with BancOne Texas and BancOne Arizona covered the same or substantially the same pool of receivables that had been covered by the BancOne LLC Receivables Participation Agreement.

58.     On August 27, 1999, Fenkell, in his capacities as Alliance's President, CEO and sole director, and in his capacity as the ESOP's sole trustee, caused Alliance, A.H.III, Inc. and/or the ESOP to enter into a contract with Stonehenge, renewed annually (the "Stonehenge Contracts").

59.     Prior to forming Stonehenge, Witten, Gowdy and Brooks were employees of BancOne Funding Capital Corporation and had primary responsibility for its relationship with Alliance.

60.     Pursuant to the terms of the Stonehenge Contracts, Stonehenge purportedly was to provide to Alliance and/or the ESOP advice regarding, or assistance in evaluating, the Receivables Participation Agreements with BancOne Texas and BancOne Arizona.  *See* Aug. 27, 1999 Letter Agmt. (attached hereto as Exhibit 1); Sept. 1, 1999 Agmt. (attached hereto as Exhibit 2); Amendment to Sept. 1, 1999 Agmt. (attached hereto as Exhibit 3).

61.     Because there was no substantial change in the investment pool covered by the Receivables Participation Agreements with BancOne Texas and BancOne Arizona from that covered by the prior BancOne LLC Receivables Participation Agreement, Alliance, A.H.III, Inc. and/or the ESOP did not require Stonehenge's assistance in evaluating the Receivables

Participation Agreements with BancOne Texas and BancOne Arizona, and in fact, no services or only minimal services were provided.

62.     From September 1, 1999 through August 31, 2011, Alliance and/or the ESOP paid Stonehenge fees in excess of $32 million under the Stonehenge Contracts, in violation of ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D).  These payments, which were made pursuant to an initial fee agreement and the amendments thereto, with each amendment containing its own fee arrangements, contingencies, and other terms, were not based on services provided by Stonehenge but, rather, were based on negotiated percentages of the cash flows received by Alliance under the Receivables Participation Agreements with BancOne Texas and BancOne Arizona.  These unlawful payments both transferred plan assets to Stonehenge and siphoned off profits of Alliance, thereby diluting the value of the Alliance stock held by the ESOP.

63.     For the reasons set forth in paragraphs 11 and 12 above, Alliance's assets were assets of the ESOP for purposes of ERISA, or "plan assets," as that term is defined in ERISA § 3(42), 29 U.S.C. § 1002(42), 29 C.F.R. § 2510.3-101.

64.     At all times relevant to this Complaint, Stonehenge was a party in interest with respect to the ESOP because it had a contract to provide services to the ESOP and/or Alliance, whose assets were assets of the ESOP.  ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).  At all times relevant to this Complaint, defendants Witten, Gowdy and Brooks also were parties in interest with respect to the ESOP pursuant to ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

65.     ERISA provides an exemption from the prohibition on the furnishing of services between an employee benefit plan and a party in interest for "reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the

establishment or operation of the plan, if no more than reasonable compensation is paid therefore."  ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

66.     Fenkell, Stonehenge, and Stonehenge's principals concealed the fact that no services "necessary for the establishment or operation of the [ESOP]" were actually performed by Stonehenge.  Moreover, to the extent that any minimal services "necessary for the establishment or operation of the [ESOP]" might actually have been rendered by Stonehenge to Alliance and/or the ESOP, the payments to Stonehenge were far in excess of "reasonable compensation" for the services actually rendered.

67.     Therefore, the exemption contained in ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), does not apply.

68.     By causing Alliance and/or the ESOP to enter into the Stonehenge Contracts, Fenkell breached his fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, and caused Alliance and/or the ESOP to enter into transactions that constituted a direct or indirect furnishing of services between the plan and a party in interest or a transfer of assets of the plan to a party in interest prohibited by ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), for which no exemption from the prohibited-transaction rules applies.

69.     Fenkell's actions as described above also constituted prohibited transaction violations of ERISA § 406(b), 29 U.S.C. § 1106(b), which prohibits a plan fiduciary from dealing with the assets of the plan in his own interest or for his own account.  By causing Alliance and/or the ESOP to enter into the Stonehenge Contracts, Fenkell caused the ESOP to enter into prohibited transactions with a party in interest that resulted in the siphoning off of Alliance's assets, which were assets of the ESOP, to his close friends who owned and operated Stonehenge and to himself (as explained in Section V.B below).  By the conduct described

above, defendants Stonehenge, Witten, Gowdy and Brooks, as parties in interest to the ESOP,

knowingly participated with Fenkell in fiduciary violations by causing the ESOP to enter into

prohibited transactions, which purportedly called for the furnishing of services and the transfer of

plan assets between the ESOP and a party in interest in violation of ERISA § 406(a)(1)(C) and

(D), 29 U.S.C. § 1106(a)(1)(C) and (D), and for which no exemption from the prohibited-

transaction rules is available.

70.     These transactions improperly benefited Fenkell, Stonehenge, Witten, Gowdy

and Brooks at the expense of the ESOP participants and beneficiaries.

71.     Stonehenge, Witten, Gowdy and Brooks also are gratuitous transferees of ESOP

assets as they received proceeds traceable to payments from the ESOP's assets without providing

value in exchange (*i.e.,* without being bona fide purchasers for value).

**B.     Fenkell Further Violated ERISA by Benefiting Personally from the Stonehenge Contracts Through  Contracts Between Stonehenge and DBF.**

72.     On August 7, 1999, in anticipation of the first Stonehenge Contract, Fenkell

arranged for his own company, DBF, to enter into a contract with Stonehenge for "consulting

services" (the "DBF Contract").  *See* Aug. 7, 1999 DBF Consulting Agmt. (attached hereto as

Exhibit 4).  The DBF Contract provided that Stonehenge would pay DBF a base consulting fee

of $20,000 per month, regardless of whether DBF performed any work.  *Id*. § 4(a).  The DBF

Contract also provided that, over and above the $20,000 monthly consulting fee, DBF would also

be compensated for any consulting services actually provided to Stonehenge.  *Id*. § 4(b).  Upon

information and belief, the DBF Contract was later renegotiated so that DBF received a base

consulting fee of $500,000 annually.

73.     From September 1, 1999 through August 31, 2011, Stonehenge made payments to

DBF pursuant to the DBF Contract in excess of $3,770,000.

74.     No services were ever performed by DBF for Stonehenge and, therefore, the DBF Contract was not "necessary for the establishment or operation of the [ESOP]." To the extent that any minimal services were rendered by DBF to Stonehenge, and to the extent that those services were "necessary for the establishment or operation of the [ESOP]," the payments made were in excess of "reasonable compensation" for the services rendered.

75.     Fenkell orchestrated the DBF Contract as a way to receive compensation from Alliance above and beyond that allowed pursuant to his compensation agreement with Alliance.

76.     By causing DBF to enter into the DBF Contract, Fenkell, as a fiduciary to the ESOP, violated ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), by receiving consideration for his personal use from Stonehenge, a party dealing with Alliance and the ESOP in a transaction involving the ESOP's assets. No exemption from the prohibited-transaction rules is applicable or available for these prohibited transactions.

77.     By arranging for Stonehenge to pass on a portion of the plan assets it received to his wholly owned company, DBF, pursuant to the DBF Contract, Fenkell's conduct in relation to the Stonehenge Contracts (described in paragraphs 49 through 71 above) also constituted a violation of ERISA § 406(a)(1)(B) and (b), 29 U.S.C. § 1106(a)(1)(B) and (b). The DBF Contract ensured that the funds siphoned from Alliance and the ESOP to Stonehenge flowed not only to Fenkell's friends, but also to Fenkell. No exemption from the prohibited-transaction rules is applicable or available for these prohibited transactions.

**C.      Fenkell, Paul Sefcovic and Lianne Sefcovic Violated ERISA by Causing Alliance to Enter into Prohibited Transactions with SLMRS.**

78.     Fenkell, in his capacity as the President and sole director of Alliance, Lianne Sefcovic, in her capacity as owner and operator of SLAMS (which possessed 90 percent of the membership interest in SLMRS), and Paul Sefcovic caused Alliance and SLMRS to enter into an

Advisory Services Agreement, effective September 1, 2010 (the "SLMRS Agreement").  Upon entering into the SLMRS Agreement, SLMRS became a party in interest with respect to the ESOP pursuant to ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

79.      The SLMRS Agreement obligated Alliance to make payments to SLMRS (the "SLMRS Payments") in amounts of $27,500 per month (for a total of $330,000 per year).  In 2011, the SLMRS Agreement was extended for an additional year.  From September 1, 2010 to September 30, 2012, Alliance made payments to SLMRS of $660,000, and SLMRS in turn transferred approximately 90 percent of the SLMRS Payments to SLAMS for the benefit of Lianne and Paul Sefcovic.

80.      Neither SLMRS nor SLAMS actually provided any services to Alliance, and the work they were purportedly being contracted to provide was being provided by others.  Even if SLMRS or SLAMS did provide some services to Alliance, those services were minimal, such that the compensation paid was not reasonable.

81.      Defendants Fenkell and Paul Sefcovic sought to (and did) conceal the nature of the SLMRS Payments.  In addition, after Fenkell had begun considering resigning as Alliance's President and CEO, Sefcovic sought to alter the SLMRS agreement to increase the chances it would not be detected.  Specifically, Sefcovic wanted to alter it so it would not require annual negotiation and would continue unless terminated by one of the parties.  On or around September 12, 2012, Sefcovic left Fenkell a voicemail, discussing "the college thing," a phrase he used to refer to the SLMRS Agreement.  Sefcovic suggested that the Advisory Services Agreement between SLMRS and Alliance be renewed with a provision that it could be terminated each year with 30 days notice.  Sefcovic said that this would allow Fenkell to "not be involved in the future," and added, "if no one sees it or does anything with it, it continues...."

82.     For the reasons set forth in paragraphs 11 and 12 above, Alliance's assets were assets of the ESOP for purposes of ERISA, or "plan assets," as that term is defined in ERISA § 3(42), 29 U.S.C. § 1002(42), 29 C.F.R. § 2510.3-101.

83.     At all times relevant to this Complaint, Paul Sefcovic was a party in interest with respect to the ESOP because he provided legal services to Alliance, the assets of which were "plan assets."  ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).  At all times relevant to this Complaint, Lianne Sefcovic was a party in interest with respect to the ESOP, as that term is defined in ERISA § 3(14)(F) and (H), 29 U.S.C. § 1002(14)(F) and (H), because she was married to Paul Sefcovic, who was a party in interest, and because she (through SLAMS) held a 90 percent ownership interest in SLMRS.

84.     By causing Alliance and SLMRS to enter into the SLMRS Agreement, Fenkell, Paul Sefcovic and Lianne Sefcovic caused Alliance and SLMRS to enter into prohibited transactions for which no exemption from the prohibited-transaction rules is applicable or available.  These prohibited transactions resulted in the siphoning off of Alliance's assets, which were assets of the ESOP, to Paul Sefcovic by means of payments to parties in interest (SLMRS and SLAMS) owned by Paul Sefcovic's wife, defendant Lianne Sefcovic.  These activities and transactions improperly benefited Fenkell and the Sefcovics at the expense of the ESOP participants and their beneficiaries.

85.     Through the actions taken by SLMRS, SLAMS and Paul and Lianne Sefcovic, these defendants all knowingly participated in Fenkell's ERISA violations and engaged in prohibited transactions in violation of ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D).

86.     Fenkell's actions as described above, and taken in his capacity as a fiduciary of the ESOP, constitute violations of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), which require the fiduciary of an employee benefit plan to act prudently to discharge his duties with respect to the plan solely in the interests of the participants in and beneficiaries of the plan and for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries.

87.     Fenkell's actions as described above, and taken in his capacity as a fiduciary of the ESOP, also constituted violations of ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), which prohibit a fiduciary of an employee benefit plan from causing the plan to engage in a transaction that constitutes a direct or indirect furnishing of services between the plan and a party in interest or a transfer of assets of the plan to a party in interest; and of ERISA § 406(b), 29 U.S.C. § 1106(b), which prohibits a fiduciary of an employee benefit plan from dealing with the assets of the plan in his own interests or for his own account.  No exemption from the prohibited-transaction rules is applicable or available for these prohibited transactions.

**D.     Fenkell and Paul Sefcovic Violated ERISA by using DBF Consulting to Circumvent the Alliance Compensation Process.**

88.     Beginning in 2000, Alliance had a compensation committee, whose responsibility was to oversee Alliance's executive compensation program.  At all times relevant to this Complaint, there were two or three members of the compensation committee besides Fenkell. These members were selected by Fenkell and included at various times Paul Sefcovic, William W. Vogelgesang, Kenneth H. Terkel, David Cooper and Eliot Hermanson.   Paul Sefcovic was the Chair of Alliance's compensation committee from at least 2005 until in or around September 2012.

89.     The compensation committee set Fenkell's compensation at levels it believed would be acceptable to the United States Department of Labor ("DOL").  The compensation committee employed the consulting firm Mercer to set reasonable annual compensation benchmarks for Fenkell.

90.     For the years 2001 to 2011, Fenkell's combined salary and bonus was between $766,390 and $910,000 annually.  The compensation committee also awarded Fenkell $3,125,000 in cash grants between 2008 and 2011.  Except for Paul Sefcovic, the compensation committee was unaware of Fenkell's illegal activities, as described herein, when authorizing this compensation.

91.     Fenkell also received remuneration from phantom stock and incentive plans.  Between 2001 and 2011, Fenkell received at least $27,796,973 in official earnings from Alliance and its transactions.  At the same time, Fenkell was siphoning off money from Alliance and the ESOP for his friends, business associates and himself.

92.     During Fenkell's tenure as Alliance's President, neither he nor Paul Sefcovic disclosed to the other compensation committee members or Mercer that Fenkell had received $3,770,000 in payments funneled from Alliance to Stonehenge under the Stonehenge Contracts, from Stonehenge to DBF under the DBF Contract, and then in turn from DBF to Fenkell.  Fenkell used DBF to circumvent his compensation levels set by the compensation committee based on the Mercer reports.  Compensation within the levels indicated by the Mercer reports avoided review of Fenkell's compensation by the DOL and others, which might have led to the discovery of the illegal arrangements described herein.

93.     The Alliance-originated undisclosed DBF payments had the effect of vastly increasing Fenkell's compensation, making it unreasonable and excessive, and harmed the ESOP

participants and beneficiaries by reducing the value of the Alliance stock held for them in the ESOP.  Fenkell's compensation was also unreasonable and excessive because instead of rendering loyal service to Alliance, Fenkell was siphoning from the company millions of dollars to himself, his friends, and his business associates.

94.     By dealing with Alliance's assets in this fashion, which were assets of the ESOP, in connection with Fenkell's compensation in their own interests, ESOP fiduciaries Fenkell and Paul Sefcovic violated ERISA § 406(b), 29 U.S.C. § 1106(b) and ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).  No exemption from the prohibited-transaction rules is applicable or available for these prohibited transactions.

95.     Moreover, neither Fenkell nor Paul Sefcovic disclosed to the other compensation committee members or Mercer that Fenkell was diverting Alliance assets to Paul Sefcovic through SLMRS, SLAMS and Lianne Sefcovic.

**E.      Karen Fenkell Has Received Assets of the ESOP as a Gratuitous Transferee.**

96.     By reason of her marriage to defendant David Fenkell, defendant Karen Fenkell is a party in interest with respect to the ESOP under ERISA § 3(14)(F), 29 U.S.C. § 1002(14)(F).

97.     Defendant David Fenkell is a named defendant in *Chesemore, et al. v. Alliance Holdings Inc., A.H.I. Inc., David B. Fenkell, et al.*, No. 3:09-cv-00413-wmc, 886 F. Supp. 2d 1007 (W.D. Wis. July 24, 2012) (the "*Chesemore* Case").  The court in that case ruled that Fenkell violated ERISA, breaching his fiduciary duties of loyalty and care to the ESOP and causing the ESOP to engage in prohibited transactions in connection with Alliance's 2007 sale of its subsidiary Trachte Building Systems, Inc. ("Trachte") to a newly created Trachte Building

Systems Employee Stock Ownership Plan (the "Trachte Sale").[1] Prior to the spin-off of their

accounts to the new Trachte Building Systems Employee Stock Ownership Plan during the

Trachte Sale, the employees of Trachte were participants in the ESOP.

98.     In connection with the Trachte Sale, David Fenkell received a payment of

approximately $2.9 million (the "Trachte Funds") under a phantom stock plan that Fenkell had

caused Trachte to establish to benefit certain Alliance employees.  The court in the *Chesemore*

Case found that this payment constituted the receipt by David Fenkell of consideration in

connection with a transaction involving assets of the ESOP in violation of ERISA § 406(b)(1)

and (3), 29 U.S.C. § 1106(b)(1) and (3).

99.     The plaintiffs in the *Chesemore* Case discovered that defendant David Fenkell

transferred the Trachte Funds to accounts solely in the name of defendant Karen Fenkell and that

Karen Fenkell did not pay or provide anything of tangible value to David Fenkell in exchange for

this transfer of funds.  Therefore, the court in the *Chesemore* Case has permitted the plaintiffs in

that case to amend their complaint to state a new cause of action alleging that Karen Fenkell is

liable as a gratuitous transferee of assets of the ESOP in violation of ERISA § 406(b)(1) and (3),

29 U.S.C. § 1106(b)(1) and (3), pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

100.    Plaintiffs are concerned that defendant David Fenkell has transferred funds in

addition to the Trachte Funds to accounts solely in Karen Fenkell's name for no consideration,

including funds he wrongfully obtained in violation of ERISA in connection with the activities

described in this Complaint.  If so, Karen Fenkell would be liable as a gratuitous transferee of

---

[1]     Final judgment has not been entered in the *Chesemore* Case and the court in that case is
considering damages issues.  Alliance expects to appeal the *Chesemore* decision and any
findings of the court that could be applied to find liability or damages against it or the ESOP.

proceeds derived from additional transactions prohibited by ERISA.  Plaintiffs seek discovery of

ESOP assets that may have been transferred to Karen Fenkell.

**F.**     **Fenkell's Employment Agreements and the ESOP Trust Agreement Contain Indemnification Provisions that are Unenforceable Under ERISA With Respect to the *Chesemore* Case and the ERISA Violations Alleged Herein.**

101.     Since at least 2003, David Fenkell's employment agreements with Alliance have

purported to indemnify Fenkell for his ERISA violations.  *See* 2003 Employment Agreement at §

1(d), attached hereto as Exhibit 5.  In addition, on September 25, 2012, as a condition to his

resignation from Alliance's Board of Directors and the boards of its affiliates and as an officer of

Alliance and its affiliates, Fenkell caused Alliance to amend the employment agreement then in

effect between himself and Alliance so as to indemnify him for any personal liability that he

might incur in connection with the *Chesemore* Case, in which the court found that he had

"orchestrated" fiduciary violations of ERISA.  *See* July 1, 2012 Employment Agreement,

attached hereto as Exhibit 6, and 2012 Amendment to Employment Agreement at § 7, attached

hereto as Exhibit 7.

102.     Because Alliance is wholly owned by the ESOP, and because Alliance's assets

constitute assets of the ESOP, the provisions of Fenkell's employment agreements that purport to

indemnify him for breaches of his fiduciary duties under ERISA—either the breaches at issue in

the *Chesemore* Case or the breaches at issue in this litigation—violate ERISA § 410(a), 29

U.S.C. § 1110(a), and are unenforceable.

103.     In addition, Section 4.1(e) of the ESOP trust agreement provides for

indemnification by Alliance of prospective costs and expenses for trustees.  However,

indemnification is disallowed "where the litigation is occasioned by the fault of the Trustee or

involves a question of the Trustee's fault."  Therefore, Fenkell has no right to indemnification

under this provision with respect to the breaches alleged in the *Chesemore* Case or for the

breaches alleged herein since both are based on and/or question his fault as a trustee.  To the extent that Fenkell is entitled to indemnification under this provision, the provision is void and unenforceable under ERISA § 410(a), 29 U.S.C. § 1110(a).

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(AGAINST DEFENDANT DAVID FENKELL
FOR VIOLATIONS OF ERISA § 404, 29 U.S.C. § 1104)**

104.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

105.    Pursuant to ERISA § 404, 29 U.S.C. § 1104, a fiduciary of an employee benefit plan is required to discharge his duties solely in the interest of the participants and beneficiaries of the plan, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.  Fenkell as sole trustee owed the ESOP's participants and beneficiaries all of the duties prescribed in ERISA § 404.

106.    In addition, Fenkell, as Alliance's sole board member, had the authority to appoint the ESOP's trustee.  As such, he owed undivided loyalty to the ESOP's participants not only while acting as sole trustee, but he also had a duty to monitor the actions of the ESOP's sole trustee (himself) to ensure that the trustee was acting in the best interests of the ESOP.

107.    Fenkell failed to discharge his duties solely in the interests of the participants in and beneficiaries of the ESOP and for the exclusive purpose of providing benefits to participants and their beneficiaries, and failed to discharge his duties prudently but, rather, acted in his own

self-interest, at the expense and to the detriment of the ESOP participants and beneficiaries,

thereby breaching his fiduciary duties by:

a. causing Alliance and/or the ESOP to enter into the Stonehenge Contracts, pursuant to which Alliance paid excessive fees to Stonehenge when no or only minimal services were provided, resulting in the unwarranted transfer of plan assets to Stonehenge and the dilution in the value of the Alliance stock held by the ESOP;

b. causing DBF to enter into the DBF Contract with Stonehenge and thereby siphoning off ESOP assets for his own personal use, resulting in dilution in the value of the Alliance stock held by the ESOP;

c. causing Alliance and/or the ESOP to enter into contracts with SLMRS, pursuant to which Alliance paid excessive fees to SLMRS when no or only minimal services were provided, resulting in the unwarranted transfer of plan assets to SLMRS and the dilution in the value of the Alliance stock held by the ESOP;

d. causing Alliance to pay excessive compensation to himself, thereby diluting the value of the Alliance stock held by the ESOP; and

e. arranging for employment agreement provisions with Alliance which impermissibly purported to indemnify him for his ERISA fiduciary violations.

## SECOND CLAIM FOR RELIEF

### (AGAINST DEFENDANT DAVID FENKELL FOR VIOLATIONS OF ERISA § 406(a), 29 U.S.C. § 1106(a))

108.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 107 as if fully set forth herein.

109.   Pursuant to ERISA § 406, 29 U.S.C. § 1106, a fiduciary of an employee benefit

plan is prohibited from causing the plan to engage in a transaction if he knows or should know

that the transaction constitutes a direct or indirect furnishing of services between the plan and a

party in interest, ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), or a direct or indirect

transfer to a party in interest of any assets of the plan, ERISA § 406(a)(1)(D), 29 U.S.C. §

1106(a)(1)(D).

110.     In his capacity as a fiduciary of the ESOP, Fenkell violated ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), by causing the ESOP and Alliance to enter into contracts for services with Stonehenge, a party in interest to the ESOP, which resulted in the transfer of plan assets to a party in interest, and thereafter to DBF and Fenkell, thereby causing the ESOP and Alliance to engage in prohibited transactions.  No exemption is applicable or available for these prohibited transactions.

111.     In his capacity as a fiduciary of the ESOP, Fenkell violated ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), by causing Alliance and/or the ESOP to enter into contracts for services with SLMRS, a party in interest to the ESOP, resulting in the transfer of plan assets to a party in interest, thereby causing Alliance to engage in prohibited transactions. No exemption is applicable or available for these prohibited transactions.

## THIRD CLAIM FOR RELIEF

### (AGAINST DEFENDANT DAVID FENKELL
### FOR VIOLATIONS OF ERISA § 406(b), 29 U.S.C. § 1106(b))

112.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 111 as if fully set forth herein.

113.     Pursuant to ERISA § 406(b), 29 U.S.C. § 1106(b), a fiduciary of an employee benefit plan is prohibited from dealing with the assets of the plan in his own interest or for his own account and from receiving any consideration for his own personal account from any party dealing with the plan in connection with a transaction involving the assets of the plan.

114.     Fenkell violated ERISA § 406(b), 29 U.S.C. § 1106(b), by causing his wholly owned company, DBF, to enter into the DBF Contract with Stonehenge.  The DBF Contract provided for Fenkell to receive from Stonehenge, a party dealing with the ESOP, consideration

for his own personal account in connection with a transaction involving Alliance's assets, which were assets of the ESOP.  No exemption is applicable or available for this prohibited transaction.

115.    Fenkell further violated ERISA § 406(b), 29 U.S.C. § 1106(b), by deceiving the compensation committee (except Paul Sefcovic, who conspired with him to conceal Fenkell's receipt of Stonehenge payments from the independent committee members) and Mercer by arranging for Stonehenge payments to DBF and then to himself.  This resulted in Fenkell taking compensation authorized by the committee and Mercer and taking undisclosed compensation round-tripped from Alliance, to Stonehenge, to DBF, to Fenkell that resulted, in combination, with Alliance paying Fenkell excessive compensation from the assets of the ESOP.  No exemption is applicable or available for these prohibited transactions.

**FOURTH CLAIM FOR RELIEF**

**(AGAINST DEFENDANTS DAVID FENKELL AND PAUL SEFCOVIC
FOR VIOLATIONS OF ERISA § 406(b), 29 U.S.C. § 1106(b))**

116.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 115 as if fully set forth herein.

117.    Fenkell further violated ERISA § 406(b), 29 U.S.C. § 1106(b), by causing Alliance and/or the ESOP to enter into the SLMRS Agreement.  No exemption is applicable or available for this prohibited transaction.

118.    As a member of the compensation committee with discretion over the use of Alliance's assets, which were assets of the ESOP, Paul Sefcovic was a fiduciary of the ESOP. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

119.    Paul Sefcovic violated ERISA by allowing Alliance's assets, which were assets of the ESOP, to be used to pay excessive compensation to Fenkell through the Stonehenge/DBF contracts and to himself through the SLMRS transactions.  These constituted the use of the

ESOP's assets in Paul Sefcovic's own interest and for his own account, in violation of ERISA §

406(b)(1), 29 U.S.C. § 1106(b)(1), for the following reasons:  (a) because Fenkell was a close

personal friend of Paul Sefcovic; (b) because Fenkell controlled Alliance, which was a major

client of Paul Sefcovic; and (c) because Paul Sefcovic and Lianne Sefcovic funneled substantial

funds through the SLMRS Agreement as payment for Paul Sefcovic's assistance to Fenkell in

carrying out his illegal activity.  No exemption is applicable or available for this prohibited

transaction.

120.     Paul Sefcovic also violated ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), because

he received consideration for his own personal use from SLMRS (through SLAMS and his wife),

a party dealing with Alliance in a transaction involving the ESOP's assets.  No exemption is

applicable or available for this prohibited transaction.

121.     The Stonehenge Contracts, DBF Contract and SLMRS Agreement siphoned off

profits from Alliance to Stonehenge, DBF and SLMRS for the benefit of Fenkell and Paul and

Lianne Sefcovic at the expense of the ESOP participants and beneficiaries.

## FIFTH CLAIM FOR RELIEF

**(AGAINST DEFENDANTS STONEHENGE, DBF, SLMRS, SLAMS, JOHN P. WITTEN, BARRY GOWDY, RONALD BROOKS, PAUL SEFCOVIC AND LIANNE SEFCOVIC FOR VIOLATIONS OF ERISA § 406, 29 U.S.C. § 1106)**

122.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 121 as if fully set forth herein.

123.     Pursuant to the terms of the Stonehenge Contracts, Alliance and/or the ESOP

transferred plan assets to Stonehenge.  Because Stonehenge, Witten, Gowdy and Brooks were

parties in interest to the ESOP, and because no substantial services were actually performed by

Stonehenge, this transfer of plan assets to Stonehenge was a violation of ERISA § 406(a)(1)(C)

and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), for which no exemption is applicable or available.

124.     Pursuant to the terms of the DBF Contract, Stonehenge made payments to DBF which benefited Fenkell personally as the sole owner of DBF.  These payments were made in violation of ERISA § 406(b)(1) and (b)(3), 29 U.S.C. § 1106(b)(1) and (b)(3), and no exemption from the prohibited transaction rules is applicable or available.

125.     Pursuant to the terms of the SLMRS Agreement, Alliance paid for, but did not actually receive, services from SLMRS, which was a party in interest with respect to the ESOP. These payments were arranged by SLMRS, Paul Sefcovic and Lianne Sefcovic and constituted transfers of Alliance's assets, which were assets of the ESOP, in violation of ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D).  No exemption is applicable or available for these prohibited transactions.

## SIXTH CLAIM FOR RELIEF

**(AGAINST DEFENDANTS STONEHENGE, DBF, SLMRS, SLAMS, KAREN FENKELL, JOHN P. WITTEN, BARRY GOWDY, RONALD BROOKS, PAUL SEFCOVIC AND LIANNE SEFCOVIC FOR KNOWING PARTICIPATION IN FENKELL'S FIDUCIARY BREACHES AND PROHIBITED TRANSACTIONS)**

126.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.     Stonehenge, DBF, SLMRS, SLAMS, Karen Fenkell, Witten, Gowdy, Brooks, Paul Sefcovic and Lianne Sefcovic each knowingly participated in and profited from David Fenkell's ERISA violations as set forth herein.

**SEVENTH CLAIM FOR RELIEF**

**(AGAINST DEFENDANTS STONEHENGE, DBF, SLMRS, SLAMS, JOHN P. WITTEN, BARRY GOWDY, RONALD BROOKS, PAUL SEFCOVIC, LIANNE SEFCOVIC AND KAREN FENKELL FOR LIABILITY AS GRATUITOUS TRANSFEREES OF ESOP ASSETS UNDER ERISA § 502, 29 U.S.C. § 1132)**

128.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 127 as if fully set forth herein.

129.    Stonehenge, DBF, SLMRS, SLAMS, Karen Fenkell, Witten, Gowdy, Brooks, Paul Sefcovic and Lianne Sefcovic received assets of the ESOP in connection with agreements and transactions which they knew or should have known violated ERISA.

130.    Alliance and the ESOP received little or nothing of tangible value from these defendants in exchange for the ESOP assets that were transferred to them.

131.    As a result, none of these defendants was a *bona fide* purchaser for value with respect to the ESOP assets transferred to them.  Therefore, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), these defendants are subject to surcharge and otherwise obligated to disgorge these assets in their possession, as well as the proceeds and profits made on these assets.

**EIGHTH CLAIM FOR RELIEF**

**(AGAINST DEFENDANT DAVID FENKELL
FOR VIOLATION OF ERISA § 410, 29 U.S.C. § 1110)**

132.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 131 as if fully set forth herein.

133.    ERISA § 410(a), 29 U.S.C. § 1110(a), provides that any provision in an agreement purporting to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under Part 4 of Title I of ERISA shall be void as against public policy.

134.     Since at least 2003, Fenkell's employment agreements with Alliance have purported to indemnify Fenkell for his ERISA violations.  *See* 2003 Employment Agreement at § 1(d), attached hereto as Exhibit 5.

135.     In addition, on September 25, 2012, as a condition to his resignation from Alliance's Board of Directors, the boards of its affiliates, and his position as an officer of Alliance and its affiliates, Fenkell caused Alliance to amend the employment agreement then in effect between himself and Alliance so as to specifically indemnify him for any personal liability that he might incur in connection with the *Chesemore* Case, in which the court found that Fenkell had "orchestrated" fiduciary violations of ERISA.  *See* July 1, 2012 Employment Agreement, attached hereto as Exhibit 6, and 2012 Amendment to Employment Agreement at § 7, attached hereto as Exhibit 7.

136.     Because Alliance is wholly owned by the ESOP and AH Transition (which is wholly owned by the ESOP), and because Alliance's assets constitute assets of the ESOP, the provisions of Fenkell's employment agreements purporting to indemnify him for his ERISA reaches are void and unenforceable under ERISA § 410(a), 29 U.S.C. § 1110(a).

137.     In addition, Section 4.1(e) of the ESOP trust agreement provides for indemnification by Alliance of prospective costs and expenses for trustees.  However, indemnification is disallowed "where the litigation is occasioned by the fault of the Trustee or involves a question of the Trustee's fault."  Therefore, Fenkell has no right to indemnification under this provision with respect to the breaches alleged in the *Chesemore* Case or for the breaches alleged herein since both are based on and/or question his fault as a trustee.  To the extent that Fenkell is entitled to indemnification under this provision, the provision is void and unenforceable under ERISA § 410(a), 29 U.S.C. § 1110(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for the following relief:

A. That the Court hold defendant David Fenkell liable to restore to the ESOP all losses resulting from his breaches of fiduciary duty and from his participation in transactions prohibited by ERISA, including restoration of the following amounts to the ESOP:

  1. all amounts determined by the Court to constitute excessive compensation paid by Alliance or any of its subsidiaries or affiliates to Fenkell;

  2. amounts equal to those paid by Alliance or any of its subsidiaries or affiliates to Stonehenge pursuant to the Stonehenge Contracts;

  3. all amounts paid by Stonehenge to DBF pursuant to the DBF Contract; and

  4. amounts equal to those paid by Alliance or any of its subsidiaries to SLMRS pursuant to the SLMRS Agreement.

B. That the Court hold defendant Stonehenge, together with defendants David Fenkell, John P. Witten, Barry Gowdy and Ronald D. Brooks, jointly and severally liable to restore to the ESOP all amounts paid by Alliance, any of its subsidiaries or affiliates, or by the ESOP to Stonehenge pursuant to the Stonehenge Contracts.

C. That the Court hold defendant DBF, together with defendant David Fenkell, jointly and severally liable to pay to the ESOP all payments received by DBF and Fenkell from Stonehenge pursuant to the DBF Contract.

D. That the Court hold defendants SLMRS and SLAMS, together with defendants David Fenkell and Paul and Lianne Sefcovic, jointly and severally liable to return to Alliance for all losses to Alliance, including the return to Alliance of all fees and other payments received by SLMRS and SLAMS  from Alliance or from any subsidiaries or affiliates of Alliance.

E. That the Court grant other appropriate equitable relief to the ESOP including, but not limited to: (a) ordering the defendants to pay to the ESOP all sums that would be available at

equity through surcharge; (b) ordering the defendants to provide an accounting for profits realized in connection with the transactions involving defendants and Alliance or the ESOP in violation of ERISA; (c) imposing on defendants constructive trusts or equitable liens on any funds wrongfully obtained or held by any of the defendants in connection with any transactions involving defendants and Alliance or the ESOP in violation of ERISA; and (d) issuing an injunction barring Fenkell from serving as a fiduciary to the ESOP or any ERISA plan in the future, from taking any further actions that would diminish the value of the ESOP, from interacting with the ESOP in any manner including, but not limited to, transacting any business with the ESOP or Alliance or otherwise causing ESOP assets to be distributed or spent, from receiving monetary or any other benefit from the ESOP or Alliance.

      F.      That, in accordance with the July 25, 2012 order in the *Chesemore* Case (Exhibit 8 hereto), Karen Fenkell's assets be frozen to the extent she is determined to be a gratuitous or wrongful transferee of assets of the ESOP with respect to the matters alleged in this Complaint.

      G.      That, to the extent any assets held by any other defendants are found to be gratuitous or wrongful transferees of assets of the ESOP, the Court also order the assets of those defendants to be frozen.

      H.      That the Court declare all provisions purporting to indemnify Fenkell for ERISA violations, including indemnification provisions set forth in Fenkell's employment agreements with Alliance and in the ESOP trust agreement, are inapplicable and/or are null and void under ERISA § 410, 29 U.S.C. § 1110.

      I.      That the Court award plaintiffs their reasonable attorneys' fees and expenses as available under applicable law, including ERISA § 502(g), 29 U.S.C. § 1132(g);

      J.      That the Court order defendants to pay prejudgment interest; and

K.      That the Court award such other and further relief as it deems equitable and just.[2]

Respectfully Submitted,                         Date:   May 1, 2013

GROOM LAW GROUP, CHARTERED           MORGAN, LEWIS & BOCKIUS LLP


By:   /s/ Edward J. Meehan                  By:  /s/ William J. Delany
      Edward J. Meehan                           William J. Delany
      Lars C. Golumbic (*pro hac vice*           Benjamin H. Field
      application to be filed)                    1701 Market Street
      Sarah A. Zumwalt (*pro hac vice*           Philadelphia, PA 19103
      application to be filed)                    Telephone:  215.963.5000
      1701 Pennsylvania Ave. NW                   Facsimile:  215.963.5001
      Washington, DC  20006                       wdelany@morganlewis.com
      Telephone:  202.857.0620                    bfield@morganlewis.com
      Facsimile:  202.659.4503
      emeehan@groom.com                           Charles C. Jackson (*pro hac vice*
      lgolumbic@groom.com                         application to be filed)
      szumwalt@groom.com                          Christopher A. Weals (*pro hac vice*
                                                  application to be filed)
      *Counsel for Plaintiff Barbie Spear*        Emily A. Glunz  (*pro hac vice*
                                                  application to be filed)
                                                  77 West Wacker Drive
                                                  Chicago, IL  60601
                                                  Telephone:  312.324.1000
                                                  Facsimile:  312.324.1001
                                                  charles.jackson@morganlewis.com
                                                  cweals@morganlewis.com
                                                  eglunz@morganlewis.com

                                                  *Counsel for Alliance Holdings, Inc.*

---

[2]      Pursuant to ERISA § 502(h), a copy of this Complaint will be served upon the Secretary of Labor and the Secretary of the Treasury by certified mail.