# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SPEAR, et al.** | : | **CIVIL ACTION** |
| v. | : | |
| **FENKELL, et al.** | : | **NO. 13-02391** |

RICHARD A. LLORET  June 19, 2015
U.S. MAGISTRATE JUDGE

## MEMORANDUM

### I. Background

By motion filed April 29, 2015 defendant David B. Fenkell sought production of documents that plaintiffs Alliance and Barbie Spear claim are privileged. Doc. No. 365. Mr. Fenkell also sought to re-open the depositions of Barbie L. Spear and Kenneth J. Wanko, and to depose Erin Turley, Esq. out of time. Finally, Mr. Fenkell sought sanctions for failure to respond to discovery. Plaintiffs filed a response on May 20, 2015. Doc. No. 385. Fenkell filed a reply on May 29, 2015. Doc. No. 400. The matter is ripe for disposition.

### II. Legal Standards

Plaintiffs have withheld documents under claims of attorney-client and work-product privilege. They provided a privilege log, which is attached as Exhibit "I" to defendant's brief. Doc. No. 365. Mr. Fenkell argues that these privilege claims should be rejected, for various reasons. Plaintiffs disagree.

The attorney-client privilege protects (1) communications (2) between "privileged persons" (3) made in confidence (4) intended to receive or give legal assistance. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007), as amended (Oct. 12,

2007) (quoting *Restatement (Third) of the Law Governing Lawyers* § 68 (2000)). "Privileged persons" are the client, the attorney, and "any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* (citing to § 70 of the *Restatement*). The purpose of the privilege is to encourage "full and frank" communication between the client and attorney. *Id.*, at 360 (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)). Sound legal advice depends on full information, and proper legal advice serves the public interest in promoting compliance with the law. *Id.* Too narrow a scope to the attorney-client privilege makes it difficult for an attorney to formulate sound advice, and "threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law." *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981). Particularly where a client must comply with a "vast and complicated array of regulatory legislation," the client should be encouraged, not discouraged, to seek legal counsel. *Id.*, at 392-93.

*Upjohn* teaches that the privilege cannot be applied "mechanically." *Teleglobe*, 493 F.3d at 361. This teaching

> does not counsel in favor of applying the privilege anytime it might increase the flow of information; rather, *Upjohn* counsels a more nuanced inquiry into whether according a type of communication protection is likely to encourage *compliance-enhancing* communication that makes our system for resolving disputes more operable.

*Id.*

The work-product privilege protects the confidentiality of documents prepared "by or on behalf of an attorney in anticipation of litigation." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).The privilege directly promotes the administration of justice by permitting attorneys to prepare a case without fear their work will be used against their clients. *Id.* (citing to *Hickman v. Taylor,* 329

U.S. 495, 510–11 (1947), *United States v. AT & T,* 642 F.2d 1285, 1299 (D.C. Cir.1980).

Privilege issues are preliminary questions decided by the court. Fed. R. Evid. 104(a). In deciding a privilege issue I am not bound by the rules of evidence, except the privilege rules themselves. *Id.* The party asserting the privilege bears the burden of proving that it applies. *See In re Grand Jury,* 705 F.3d 133, 160 (3d Cir.2012) (citing to *In re Grand Jury Empanelled February 14, 1978,* 603 F.2d 469, 474 (3d Cir.1979) (alterations omitted) (quoting *United States v. Landof,* 591 F.2d 36, 38 (9th Cir.1978)). A party asserting waiver of the privilege bears the burden of proving the waiver. *See Sampson v. Sch. Dist. of Lancaster*, 262 F.R.D. 469, 478-79 (E.D. Pa. 2008).

## III. Discussion

### A. ERISA fiduciary exception

Mr. Fenkell argues that many of the disputed documents are not protected by attorney-client privilege because they are subject to the ERISA fiduciary exception to the attorney-client privilege. *See* Doc. No. 365-1, at 11 (citing to *Washington-Baltimore Newspaper Guild, Local 35 v. The Washington Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982); *Wachtel v. Health Net, Inc.*, 482 F.3d 225 (3d Cir. 2007)). Alliance argues that the ERISA fiduciary exception does not apply, because there had been a divergence of interests between Fenkell and the fiduciary at the time of the communications with counsel. *See* Doc. No. 385, at 4 (citing to *Wachtel*, 482 F.3d at 234; *Cottillion v. United Refining*, 279 F.R.D. 290, 303 (W.D. Pa. 2011)).

The Court of Appeals, in *Wachtel*, declined to decide whether the fiduciary exception applies in the Third Circuit, holding that even if it did it would not have applied in that case because of a clear divergence of interest between the fiduciary and the beneficiary. *See Wachtel*, 482 F.3d at 230, 236. The Court identified four factors

3

that it considered when deciding whether to apply the fiduciary exception to an insurance company providing health insurance policies to an ESOP: (1) unity of ownership and management, (2) conflicting interests regarding profits, (3) conflicting fiduciary obligations, and (4) payment of counsel with the fiduciary's own funds. *Id.,* at 227, 236. All of these factors focused on whether there was a legitimate and substantial divergence of interests between the insurer/fiduciary and the beneficiaries. For instance, the Court pointed out that the insurer actually owned the assets it was using to pay claims, rather than holding it in trust for beneficiaries, which pointed to a legitimate need for advice about the potential conflict between its own interest in these assets and paying claims by its beneficiaries. *Id.*, at 234-35. "[A]s a fiduciary's conflicts with its beneficiaries increase, the beneficiaries' ability to claim that they are the real clients of counsel retained by the fiduciary must diminish." *Id.,* at 235. The presence of a conflict is not absolutely determinative, but "it is a factor that weighs in favor of retaining the evidentiary privilege." *Id.* "*Complete* mutuality" of interests "is not a requirement for the fiduciary exception to apply." *Id.,* at 235, n.4 (emphasis in the original). Instead, *Wachtel* requires a "case by case" evaluation of the severity of the conflicts on a "sliding scale[.]" *Id.*

  It is difficult to conceive of a more pronounced conflict of interest between a fiduciary and a beneficiary than in this case. The fiduciaries – Alliance and Ms. Spear – were put on notice at least at the time of the *Chesemore* decision of fiduciary violations by Mr. Fenkell, the former Trustee of the ESOP and CEO of Alliance. That Mr. Fenkell is a beneficiary does not erase the fact that he was also a fiduciary whose alleged misconduct the Alliance Parties were bound to investigate and pursue in litigation, if their investigation revealed actionable malfeasance. His status as an ESOP participant

does not extinguish the stark divergence of interests between him and the Alliance Parties. Under the circumstances I find that the presence of this conflict weighs decisively in favor of rejecting the fiduciary exception and "retaining the evidentiary privilege." *Id.*

None of the cases cited by defendant involved the plan fiduciaries in the extraordinary task of investigating and then litigating against a former trustee accused of fiduciary violations, who also happened to be an ESOP participant. Doc. No. 365-1, at 11-13. The cases all involve beneficiaries appearing only in their capacity as ESOP participants. *See Washington-Baltimore Newspaper Guild, Local 35*, 543 F. Supp. at 907 (a suit by ESOP participants over the disposition of plan assets); *Solis v. Food Employers Labor Relations Ass'n*, 644 F.3d 221, 227 (4th Cir. 2011) ((investigation of fiduciaries by DOL in the context of the ESOP's $10 million loss in the Bernie Madoff scheme); *Everett v. USAir Grp., Inc.*, 165 F.R.D. 1, 3-4 (D.D.C. 1995) (suit by ESOP participants over the calculation of benefits); *Koch v. Exide Corp.*, No. CIV. A. 88-4755, 1989 WL 49515, at *1 (E.D. Pa. May 10, 1989) (suit by participants over the calculation of benefits); *Lewis v. UNUM Corp. Severance Plan*, 203 F.R.D. 615, 616-17 (D. Kan. 2001). *Lewis*, the linchpin of defendant's argument, was a straightforward suit over the denial of benefits. *Id.; see* Doc. No. 365-1, at 13. None of these cases offer insight about what to do when a party is both a beneficiary and a fiduciary being sued for breaching his ERISA obligations to the ESOP.

In his reply brief Mr. Fenkell insists that "[u]ntil the ERISA fiduciary *must defend itself personally*" the privilege belongs to the beneficiaries. Doc. No. 400, at 7 (emphasis in the original). This is not so. The dividing line identified in *Wachtel* does not focus on whether a fiduciary is a defendant or plaintiff, or whether the fiduciary

must "defend itself personally." Rather, the Court in *Wachtel* explained that

> the attorney-client privilege [] remain[s] intact for an ERISA fiduciary when its interests diverge sufficiently from those of the beneficiaries that the justifications for the fiduciary exception no longer outweigh the policy underlying the attorney-client privilege. The beneficiaries are no longer the real clients, and disclosure of attorney-client communications is no longer an obligation.

482 F.3d at 234. The fact that this rationale most often applies under the so-called "liability exception" does not persuade me that the mechanical test defendant proposes controls: if a fiduciary is suing someone, she/he/it has no attorney-client privilege, but if the fiduciary is sued, the attorney-client privilege applies. Doc. No. 400, at 6-7. *Teleglobe* explicitly instructs me not to mechanically apply (or refuse to apply) the privilege. 493 F.3d at 361. All fiduciary circumstances are not alike, when it comes to considering the contours of the attorney-client privilege. *See Wachtel*, 482 F.3d at 234 ("ERISA fiduciaries, however, come in many shapes and sizes, and we do not believe that the logic underlying the fiduciary exception applies equally to all.") In ordinary circumstances the availability of the attorney-client privilege does not depend on whether one is a plaintiff or defendant, or being sued as an individual or in some other capacity.[1] Nor is the circumstance of a fiduciary facing personal liability as well as fiduciary liability the only one in which the interests of a fiduciary can diverge from those of a beneficiary. If the fiduciary has to contemplate suing a beneficiary, as opposed to being sued, the change in perspective does not eliminate the divergence of interest. In any event, a limitation to circumstances in which the fiduciary faces "personal liability" is chimerical. A fiduciary is in the singular position of facing potential liability for failing to pursue a claim. The third-party complaint's tenth and eleventh causes of action illustrate the point. Doc. No. 214, at 48, 54. Ms. Spear and Alliance are facing a

---

[1] In this case both parties play both roles.

shareholder derivative claim and a failure to monitor claim for not suing themselves. Consulting with counsel over whether to pursue a claim may be every bit as "defensive" in nature as "offensive."

Mr. Fenkell asks me to adopt a rule in which his status as a beneficiary trumps the obvious and profound conflicts created by his role as a former fiduciary whose interests appear to be diametrically opposed to the ESOP and the current fiduciaries. The case law does not support this rule, and neither does common sense. *Wachtel* instructs differently, and that settles the matter.

The alternative rationale for application of the fiduciary exception is not compelling in this case, either. A fiduciary generally has an obligation to "disclose to beneficiaries the advice of counsel retained by the trust." *Id.,* at 236. But the duty has its logical limit when the attorney is advising the fiduciary about potential claims that may have to be pursued against a fiduciary/beneficiary. "The need for the attorney-client privilege is at its height where the law with which the client seeks to comply is complicated and the penalties for noncompliance are great." *Id.,* at 237 (citing to *Upjohn,* 449 U.S. at 391). "ERISA is an enormously complicated statute," and the legal complexities in this case are fiendishly difficult. *Id.* Investigating and then ousting an ERISA fiduciary for malfeasance poses profound problems over and above the inherent complexities of ERISA. "An entity's ability to secure confidential legal advice should not be at its lowest when complex legal obligations are at their highest." *Id.* "[H]ard cases should be resolved in favor of the privilege, not in favor of disclosure." *United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999). "An uncertain privilege . . . is little better than no privilege at all." *Upjohn,* 449 U.S. at 393 (quoted in *Mett*, 178 F.3d at 1065).

Finally, this holding does not foreclose Mr. Fenkell from discovering information,

just attorney-client communications. *See Wachtel,* at 237-38 (citing *Upjohn*, 449 U.S. at 395). "[A]lternate paths of discovery are not closed," and indeed they have been zealously pursued. *Wachtel*, 482 F.3d at 234.

I find that there was a clear divergence of interests between Fenkell and the fiduciaries, certainly as of the time of the issuance of the *Chesemore* decision.[2] The interests of the Alliance parties and Fenkell had diverged to the point that the "justifications for the fiduciary exception," at least *vis a vis* Mr. Fenkell, had all but vanished. *See Wachtel*, 482 F.3d at 234. Mr. Fenkell bears the burden of demonstrating facts that prove the fiduciary exception to the attorney-client privilege should apply. *See Sampson,* 262 F.R.D. 469, 478-79. I find that he has not borne this burden, nor has he convinced me of the legal merits of his position. The ERISA fiduciary exception to the attorney-client privilege, to the extent it applies in the Third Circuit at all, does not apply to communications between Alliance, Wanko, the ESOP, Barbie Spear, and their lawyers after the *Chesemore* opinion on July 24, 2012.

For the same reasons I find that the deposition of Erin Turley, Barbie Spear's lawyer at K&L Gates, would be inappropriate.

B.   *Application of the "common-interest" exception*

The attorney-client privilege may be defeated if the communications are disclosed to a non-privileged third party. *Teleglobe*, 493 F.3d at 365.[3] The common interest doctrine is an exception to this rule. *Id.* Mr. Fenkell argues that the doctrine has been waived, and that even if not waived, it should not apply, since Alliance and

---

[2] *See Chesemore v. Alliance Holdings, Inc.,* 886 F. Supp. 2d 1007 (W.D. Wis. 2012) (filed July 24, 2012).
[3] Fenkell bears the burden of demonstrating that third party disclosure waived the attorney-client privilege. *See Sampson,* 262 F.R.D. 469, 478-79

8

the ESOP had adverse interests at the time the opinion issued in *Chesemore*. See Doc. No. 400, at 4-5.

During the *Chesemore* litigation Alliance and the ESOP were aligned as defendants, although the ESOP was only nominally a defendant. *Chesemore,* 886 F. Supp. 2d at 1007. The opinion found that Alliance and Fenkell had committed several fiduciary breaches. Fenkell breached duties of loyalty and care, while Alliance breached through Fenkell, who was the CEO of Alliance and Trustee of the ESOP. *Id.,* at 1054-55. Alliance also breached by not properly monitoring Fenkell: "Alliance (albeit through Fenkell's authority) failed to adopt any system for monitoring Fenkell's actions as the trustee of the Alliance ESOP." *Id.,* at 1007. It may be, as Mr. Fenkell argues, that Alliance and the ESOP had adverse interests concerning the judgment in the *Chesemore* case.[4] But the question is not whether the parties have *all* issues in common. The point is whether there was a common interest in "the subject matter of a communication between an attorney and a client concerning legal advice." *Teleglobe,* 493 F.3d at 365.[5] There was: the investigation and ultimate litigation against Fenkell.

I find that the common-interest exception extends, in this case, to communications between Alliance, the ESOP, Barbie Spear, and Kenneth Wanko pertaining to the investigation of, and litigation with, Fenkell. As against Fenkell, they

---

[4] I question the genuine adversity of interests. A judgment against Alliance by the *Chesemore* plaintiffs was effectively a loss to the Alliance ESOP, since the ESOP's assets consisted of shares of Alliance. Nevertheless, I will assume there was a level of adversity between Alliance and the ESOP over the judgment in *Chesemore.*

[5] In a similar vein, *Wachtel* explicitly rejected a test that would require "complete mutuality" between a fiduciary and beneficiary before they are sufficiently non-adverse to warrant sharing of attorney-client communications. *See Wachtel v. Health Net, Inc.*, 482 F.3d at 235 n.4. By the same logic, the test for whether the common-interest doctrine applies should not hinge on a mechanical "all or nothing" analysis of common interest.

all had a common interest in identifying potential fiduciary violations by Fenkell and making difficult decisions about what to do about them.

    C.    *Waiver of the "common-interest" exception*

Mr. Fenkell claims that Alliance, by failing to mention the "common-interest" exception in its privilege logs, has waived it. Doc. No. 400, at 3. Mr. Fenkell does not cite to any authority for this proposition in either his reply brief or in his initial brief. *Id.*; *see* Doc. No. 365-1, at 6-8 (referenced as the location of discussion of the issue). His argument is unconvincing. The "common-interest" exception is not a "separate" privilege from the attorney-client privilege. Fenkell quotes from *Serrano v. Chesapeake Appalachia, LLC,* 298 F.R.D. 271 (W.D. Pa. 2014) to support his argument. Doc. No. 400, at 4. That quote itself illustrates the fallacy of his position: "In order to invoke the *common interest exception . . .*" *Id.* (quoting *Serrano,* 298 F.R.D. at 284) (emphasis supplied). The common-interest doctrine is an exception to an exception. The third-party disclosure rule provides that sharing an ostensibly privileged communication with a non-privileged third party waives the privilege. The common-interest exception provides that information shared among those with a common interest in a litigating position does not waive the privilege. The underlying privilege that protects the Alliance documents is the attorney-client privilege. This privilege was asserted in the privilege log. The privilege log did not have to spell out a potentially applicable exception (third-party disclosure) and then mention the applicable rebuttal (the common-interest doctrine). A sanction ordering disclosure of privileged communications is strong medicine, and may "be imposed only if the District Court finds bad faith, wilfulness, or fault." *Teleglobe,* 493 F.3d at 386 (citation omitted). I find there was no bad faith, willfulness, or fault, and therefore there will be no sanction.

*D. Deloitte communications*

Fenkell argues that communications with Deloitte are not privileged. He is incorrect. Deloitte was hired by Ballard, Spahr, counsel for Alliance, to conduct an internal investigation into Mr. Fenkell's conduct. *See* Doc. No. 385-13, Exhibit "L." The investigation required high level forensic accounting expertise. Deloitte supplied the need to Ballard, Spahr. *See* Doc. No. 385, at 14. Deloitte acted as Ballard, Spahr's agent, and communications with Deloitte in connection with the investigation are protected by the attorney-client privilege. *See Cottillion,* 279 F.R.D. at 299 (citing *United States v. Antolini*, 271 Fed.Appx. 268, 271 n.1 (3d Cir. 2008).

*E. Specificity about Ms. Spear's "settlor" capacity*

Mr. Fenkell argues that the Alliance and Spear privilege logs do not provide him with enough specificity to "ascertain from the Privilege Logs whether Ms. Spear was acting in a settlor capacity or in an ERISA fiduciary capacity with respect to the withheld communications." Doc. No. 365-1, at 8. The argument is predicated on the assumption that Fenkell is entitled to documents if Spear was acting in her ERISA fiduciary capacity. *Id.*, at 12-14. I have rejected this argument, and held that Fenkell is not entitled to documents generated in Spear's fiduciary capacity because the ERISA fiduciary exception does not apply in this particular case. Since specificity about whether Ms. Spear was acting in a settlor versus fiduciary capacity do not control whether documents are or are not privileged in this case, the specificity argument is irrelevant.

*F. Specificity of particular log entries*

The Spear log entries, and the majority of the Alliance entries, are sufficiently specific. The log entries fall mainly into three categories: (1) documents bearing on

"potential legal claims and defenses,"[6] (2) documents "regarding insurance coverage issues," and (3) documents bearing on "corporate governance, compensation, and employment matters." The first category clearly falls within the core of the adversity between Fenkell and the Alliance Parties, because it is related to the internal investigation into Fenkell's alleged improprieties.

    *1. "Corporate governance, compensation, and employment matters"*

It is not clear whether the third category of entries comes under the attorney-client privilege.[7] "Corporate governance, compensation, and employment matters" may or may not relate directly or indirectly to the adverse interests between Fenkell and the Alliance Parties. Given the attorneys who were consulted, and the time frame, it is safe to assume that the "matters" concerned Mr. Fenkell's relationship with Alliance. Nevertheless, I choose not to rely on such an assumption. Whether these "matters" actually concerned a potentially adverse relationship with Fenkell is crucial to the question whether the attorney-client privilege applies. Given the "nuanced," "case by case," "sliding scale" inquiry required under *Wachtel* and *Upjohn*, it is important to know for certain.

Alliance privilege log entries Priv-061, 063-069, 072-107, 360 concern communications regarding "corporate governance, compensation, and employment matters." Doc. 365-1, Exhibit "I." I will require that the Alliance Parties to prepare a revised privilege log, with respect to these entries, containing a more detailed description of the documents. The revised privilege log must spell out the "corporate

---

[6] All of the Spear entries fall into this category. All are sufficiently specific.
[7] As neither party has focused on this narrow issue, I will give both the opportunity to do so. Establishing that the privilege exists in the first place is the Alliance Parties' burden. *See In re Grand Jury,* 705 F.3d at 160.

governance, compensation, and employment matters" with sufficient detail so that defendant and I can discern whether the subject involved divergent interests between Fenkell and the Alliance Parties.

### 2. "Insurance coverage issues"

The second categorical description, "insurance coverage issues," generally explains why the privilege should apply. Insurance coverage issues resulted in a related lawsuit, *Spear v. Westfield Insurance Company*, Civil No. 15-cv-00582, in which some of Fenkell's alleged improprieties formed the basis of an insurance claim. The requisite adversity seems obvious. Nevertheless, Alliance must explain why communications regarding insurance coverage before the July 24, 2012 opinion in *Chesemore* concerned a divergence of interest between Fenkell and the Alliance Parties. *See* Doc. 365-1, Exhibit "I," Priv-108 to 126, 148-150. Alliance must explain, in its memorandum, why the attorney-client privilege is triggered, *vis a vis* Mr. Fenkell, and why it is not covered by the fiduciary exception. It is not clear to me that a sufficient divergence of interests existed at the time the documents were transmitted.

The entries for Priv-108, 111, 113, and 116 state that Mr. Fenkell was copied on the communication. This would seem to eliminate any privilege, certainly as to these particular emails, and also suggest that during this time period there was not a divergence of interests sufficient to warrant application of the attorney-client privilege. Each of these entries pertained to communications between Alliance management and Blank, Rome regarding insurance coverage before the July, 2012 opinion in *Chesemore*. At least as to these emails, Alliance must explain in its memorandum why any privilege, if it existed, was not waived by disclosure to Mr. Fenkell. As Mr. Fenkell bears the burden of demonstrating waiver of the privilege, and

this issue was not addressed explicitly in the parties' briefs, I will withhold ordering disclosure until I hear from the parties via supplemental memoranda.

Finally, while I understand there may be a claim of attorney-work product privilege *vis a vis* the insurance carrier, I am not clear why the work-product privilege would apply *vis a vis* Fenkell during the period before the *Chesemore* opinion. *See, e.g.,* Doc. No. 365, Exhibit "I," Priv-113, dated 2/28/2012. As far as I can tell Fenkell was still in control of Alliance at this point and at least nominally responsible for managing the insurance claim process. The Alliance Parties must explain why the work-product privilege applies, *vis a vis* Fenkell, for any insurance coverage issues before the *Chesemore* opinion issued on July 24, 2012.

### 3. Inadequate descriptions

The description for Priv-290, which says only "privileged emails," is inadequate. The same applies to Priv-398, which says only "task list." Several entries concern presentations to the Alliance Board of Directors. There is no description about the subject of the presentation, hence no way to determine whether either attorney-client or work-product privileges apply. Priv-391, 392, 393, 394, 400. While I assume, based on the persons conducting the presentation, that they concerned investigation and potential litigation with Fenkell, neither defendant nor I should be required to make assumptions.

Several other entries indicate consultation on "corporate matters," "corporate transaction," or "compensation matters." Priv-286, 362, 367, 368, 389. These descriptions do not convey the information necessary to make a decision about whether a privilege applies.

Each of these inadequate descriptions must be revised to provide a basis for

14

concluding the document is privileged. Alliance should address its privilege claim for each document in its memorandum.

   G.  *Additional depositions*

Fenkell asks to re-depose, or depose new witnesses, based on his claim that the documents identified in the privilege logs were wrongfully withheld. I will deny the motion, for the most part, and grant leave to renew the motion only with respect to those documents, if any, that I conclude were improperly withheld, after conclusion of supplemental briefing.

   H.  *Motion for additional engagement letters*

Mr. Fenkell has asked for engagement letters for more attorneys. Doc. No. 365-1, at 5. I previously granted his request for engagement letters from several attorneys in an Order dated April 17, 2015. Doc. No. 356. Mr. Fenkell made the request after examining the Alliance and Spear logs. Doc. No. 365-1, at 5. I have reviewed Mr. Fenkell's letter of April 6, 2015. Mr. Fenkell requested engagement letters for "Ballard Spahr, Blank Rome, K&L Gates, and Deloitte." He did not request "all engagement letters from all attorneys." The Alliance Parties supplied the engagement letters Mr. Fenkell requested. Mr. Fenkell claims that Alliance's failure to include engagement letters for other attorneys means that I should infer that "none of the communications with such parties are confidential." Doc. No. 365-1, at 5. I see no reason to make this inference, which amounts to a sanction against the Alliance Parties for a discovery violation. Instead, I make an inference from the sequence of events that (a) Mr. Fenkell had a chance to review the logs (b) he determined that engagement letters for Ballard Spahr, Blank Rome, K&L Gates, and Deloitte were the most important to obtain, (c) sought and received a court order to obtain them, and (d) did not think it

worthwhile to get engagement letters for the other attorneys. I find this decision to have been quite reasonable, given the deep involvement of those four firms in the investigation of Fenkell's alleged fiduciary violations.

I find there was no discovery violation, hence, no reason to sanction the Alliance Parties. Based on the sequence of events, I find that the additional discovery sought is quite insignificant. Mr. Fenkell does not lay out a basis for believing otherwise in his brief, which focuses exclusively on his sanction theory as a basis for getting the additional documents. Therefore, I find no good cause to order additional disclosures outside the time for completion of discovery.

I. *Discrepancies between the Spear log and Alliance log*

Mr. Fenkell points out that there are a number of documents identified in the Spear log that are not identified in the Alliance log. Doc. No. 365-1, at 21-22. He asserts that these discrepancies "make it clear that neither log provides a comprehensive accounting of responsive documents." *Id.* The example he provides is that the Alliance log identifies no responsive documents between January 1, 2013 and September 13, 2013, while the Spear log identifies 183 emails during that same period. *Id.,* at 22. The Alliance parties answer this in one sentence: "the Alliance and ESOP logs differ because the subpoenas to Ballard Spahr, Blank Rome, and Deloitte differed from the one issued to K&L Gates." Doc. No. 385, at 16. In his reply brief, Mr. Fenkell argues that differences in the subpoenas were irrelevant: "if Alliance wanted to assert privilege over the e-mails . . . they needed to be identified in the Privilege Logs." *Id.*, at 10.

I disagree that the subpoenas make no difference. If the documents produced in response to the K&L Gates subpoena would not have been responsive to the

subpoenas issued to other attorneys, there was no obligation to produce, and hence, no obligation to assert a privilege as a reason not to produce. Nevertheless, the laconic response from Alliance is not helpful. Without an analysis of the subpoenas and the documents produced (or not produced) I have no way of telling if the Alliance explanation holds water. Accordingly, I direct the Alliance Parties to produce copies of the four subpoenas and to explain why each of the documents referenced in the Spear log were either (1) not in the possession of Alliance, Kenneth Wanko, or their attorneys, or (2) not subject to production based on the language of the other subpoenas. If this exercise uncovers documents that should have been included in Alliance's log and were not, Alliance must also explain why their privilege, such as it is, has not been waived. Whether the explanation is simple or complicated, it needs to be made in a convincing way. That has not happened yet.

Mr. Fenkell's protestations of bad faith are premature. If and when it is clear that documents subject to a subpoena to Ballard Spahr, Deloitte, or Blank Rome were not identified in the Alliance privilege log, there will be time enough to consider a remedy.

## IV. Conclusion

The Alliance Parties will file a supplemental memorandum on or before July 2, 2015, addressing the deficiencies identified in section (F) and (I).[8] The plaintiffs also must revise the privilege logs to respond to the deficiencies identified. The

---

[8] The following documents in the Alliance log must be addressed, with respect to the issues addressed in section (F): Priv-061, 063-069, 072-107, 360; Priv-108 to 126, 148-150; Priv-290; Priv-398; Priv-391, 392, 393, 394, 400; Priv-286, 362, 367, 368, 389. All documents in the Spear log must be addressed with respect to the issues identified in section (I).

memorandum should detail who paid for the legal fees generated by the documents identified in section (F). *See Wachtel*, 482 F.3d at 235-36 (whether the ESOP paid the attorney's fees is potentially significant). Mr. Fenkell may supply a response on or before Thursday, July 9, 2015. Neither memorandum may exceed 15 pages.

    I will deny defendant's motion with respect to all the documents identified in the Spear log. I also will deny defendant's motion with respect to all Alliance documents except those identified in section (F) and (I) of this memorandum. I will reserve decision on the documents identified in section (F) and (I) until I review the revised log and both sides' supplemental memoranda. Finally, I will deny the defendants' motion to reopen depositions at this time, without prejudice to renewing the motion after I decide what documents, if any, must be turned over.

                                                   BY THE COURT:

                                                   *s/Richard A. Lloret*
                                                   RICHARD A. LLORET
                                                   U.S. MAGISTRATE JUDGE