**Page 1**

```
 1
 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF PENNSYLVANIA
 3    -------------------------------------
      BARBIE SPEAR, et al.,
 4
                  Plaintiffs,
 5                                  Civil Action No.
        -against-                   CV-02391-JLS
 6
      DAVID B. FENKELL, et al.,
 7
                  Defendants.
 8    -------------------------------------
 9         VIDEO DEPOSITION OF PAUL SHELDON, the Witness
10    herein, taken by Plaintiff, at the offices of Morgan,
11    Lewis & Bockius, LLP, 101 Park Avenue, New York, on
12    Tuesday, October 28, 2014, at 9:14 a.m., before
13    Patricia Guarino, a Shorthand Reporter and notary
14    public, within and for the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1
 2    A P P E A R A N C E S:
 3    GROOM LAW GROUP
              Attorneys for Barbie Spear
 4    1701 Pennsylvania Avenue, NW
      Washington, D.C. 20006-5811
 5
      BY:  LARS C. GOLUMBIC, ESQ.
 6         ANDREW SALEK-RAHAM, ESQ
 7
      JACKSON LEWIS, P.C.
 8            Attorneys for Defendants
              David B. Fenkel, DBF Consulting, LLC,
 9            Student Loan Advisory Management Services,
              LLC, Karen Fenkell, Paul Sefcovic and
10            Lianne Sefcovic
      725 South Figueroa Street, 25th floor
11    Los Angeles, California 90012
12    BY:  DAVID R. JOHANSON, ESQ.
13
      HANGLEY ARONCHICK SEGAL PUDLIN SCHILLER
14            Attorney for Defendant
              Stonehenge Financial Holdings
15    One Logan Square, 27th Floor
      Philadelphia, Pennsylvania 19103
16
      BY:  JOHN S. STAPLETON, ESQ.
17
18    ALSO PRESENT:
19         DAVID FENKELL
20         PAUL SEFCOVIC
21         KENNETH WANKO
22         ANDREW RITCHIE, Videographer
23                              * * *
24
25
```

**Page 3**

```
 1
 2
 3         IT IS HEREBY STIPULATED AND AGREED that
 4    all objections, except as to the form of the
 5    questions, shall be reserved to the time of the
 6    trial;
 7         IT IS FURTHER STIPULATED AND AGREED that
 8    the within examination may be subscribed and sworn to
 9    before any notary public with the same force and
10    effect as though subscribed and sworn to before this
11    court.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2        P R O C E E D I N G S
 3        VIDEOGRAPHER:  This is tape number 1 of
 4   the videotaped deposition of Paul Sheldon being taken
 5   in the matter of "Barbie Spear versus David D.
 6   Fenkell, et al."  It's being heard before the United
 7   States District Court for the Eastern District of
 8   Pennsylvania, Case Number 13-CV02391, JLS.
 9        This deposition is being held at 101
10   Park Avenue, New York, New York on October 28, 2014.
11   The time is approximately 9:14 a.m.
12        My name is Andrew Ritchie.  I'm the
13   videographer.  The court reporter is Patricia
14   Guarino.
15        Counsel, please introduce yourselves and
16   your affiliations, and the witness will be sworn.
17        MR. GOLUMBIC:  Lars Golumbic and Andrew
18   Salek-Raham, Groom Law Group on behalf Barbie Spear,
19   as Trustee and individually, and with us is Ken Wanko
20   of Alliance Holding.
21        MR. JOHANSON:  David Johanson
22   representing the Sefcovics, the Fenkels, SLAMS, and
23   DBF Consulting.
24        Just briefly, Mr. Golumbic, we'll make
25   the same objection to your representation at this
```



Page 5

Sheldon

1 deposition, as we've made in all other proceedings in
2 this matter based upon our motion to disqualify the
3 Groom Law Group chartered, and we reserve all rights.
4
5     MR. STAPLETON:   John Stapleton,
6 Hangley, Aronchick, Segal, Pudlin & Schiller. I'm
7 here representing Stonehenge Holdings, Inc., John
8 Witten, Barry Gowdy and Ronald Brooks.
9     MR. GOLUMBIC:   Mr. Johanson, do you
10 want to just for the record introduce who is with you
11 today?
12     MR. JOHANSON:   I don't, but if you
13 would like.
14     MR. GOLUMBIC:   Okay.  Well, then I'll
15 just note for the record Mr. Sefcovic and Mr. Fenkell
16 are also here present.
17     MR. JOHANSON:   Thank you.
18     Whereupon,
19     PAUL SHELDON,
20 after having been first duly sworn, was examined and
21 testified as follows:
22 EXAMINATION BY MR. GOLUMBIC:
23     Q.   Mr. Sheldon, hi.  My name is Lars
24 Golumbic.  I'm with the Groom Law Group.  We
25 represent Ms. Spear in this matter.  We're going to

Page 6

Sheldon

1
2 ask you some questions today, and I want to just make
3 sure you understand you're under oath.  So your job
4 today is to answer questions as completely and
5 truthfully as you can.
6     Do you understand that?
7     A.   Yes.
8     Q.   Have you ever had your deposition taken
9 before?
10     A.   I have.
11     Q.   When was the last time -- on more than
12 one occasion?
13     A.   Once.
14     Q.   When was that?
15     A.   Maybe January of this year.
16     Q.   Generally speaking, what did the matter
17 involve?
18     A.   I'm the president of a gas company.  We
19 were suing a tenant.
20     Q.   It's been pretty recent, but just do you
21 have a sense as to what it means to have your
22 deposition taken, but let's just go over a few ground
23 rules so we both understand what's expected of you
24 today.
25     In terms of a question, I'm going to ask

Page 7

Sheldon

1
2 you questions.  Give me time to answer the question
3 -- excuse me, to say the question and then you give
4 your responses back so we don't talk over each other.
5 Okay?
6     And you're nodding your head.  This is
7 being video recorded, but just for the purposes of
8 the court reporter if you could just give audible
9 answers, yes or no.
10     A.   Okay.
11     Q.   And if you realize later in the course
12 of your deposition that an answer you gave was
13 incomplete or inaccurate, feel free to go back and,
14 you know, clarify the record, even if I haven't
15 prompted that.
16     A.   Okay.
17     Q.   Is there any reason today why you can't
18 give complete and accurate testimony?
19     A.   No.
20     Q.   Just for the record, could you state
21 your full name?
22     A.   Paul B. Sheldon.
23     Q.   What is your age?
24     A.   62.
25     Q.   Where do you currently reside?

Page 8

Sheldon

1
2     A.   1410 Wolver Hollow Road, Oyster Bay, New
3 York.
4     Q.   Could you briefly go over your
5 educational background, you know, starting with when
6 you graduated from high school and then anything
7 beyond that?
8     A.   Okay.  Graduated from high school in
9 1971.  Went to the University of Massachusetts,
10 graduated in 1975.  Went to Columbia Business School,
11 graduated 1978.
12     Q.   Did you have a concentration at business
13 school?
14     A.   Finance.
15     Q.   Do you hold any other degrees besides
16 the MBA and your undergrad?
17     A.   BBA undergraduate.  MBA graduate.
18     Q.   Got it.
19     Let's go over your work experience.  Did
20 you work in between college and business school?
21     A.   No.
22     Q.   When you graduated from business school,
23 what was your first job?
24     A.   My first job was in a real estate firm
25 here in New York.  The name of the firm was Whitbread



Page 9

Sheldon

1  Nolan, W-H-I-T-B-R-E-A-D, Nolan, N-O-L-A-N.
2
3      Q.   How long did you work for Whitbread
4  Nolan?
5      A.   I think approximately one year, one or
6  two years, approximately one to two years.
7      Q.   Again, that time frame would have been
8  approximately when?
9      A.   '78 to '79.
10      Q.   What were your duties and
11  responsibilities with the real estate firm?
12      A.   It was regarding originating financing
13  for companies, mortgage financing and venture
14  financing for companies.
15      Q.   Then what was your next job after
16  Whitbread Nolan?
17      A.   A firm by the name of Herbert J. Sims,
18  which was a firm downtown where I did approximately
19  the same thing for about one year.
20      Q.   One year ago again.
21          And then, so now we're up to 1980.  What
22  was your next job after that?
23      A.   I joined Chase Manhattan Bank, now JP
24  Morgan.
25      Q.   What was your position at Chase

Page 10

Sheldon

1
2  Manhattan?
3      A.   I joined them as a second vice
4  president.
5      Q.   What were your duties as a second vice
6  president?
7      A.   Thinking about and calling on clients
8  who might hire us to underwrite bonds.
9      Q.   How long did you work at Chase
10  Manhattan?
11      A.   Ten years, 1981 to 1991, as I recall.
12      Q.   Did you hold the same position through
13  that ten-year period?
14      A.   I rose to the rank of managing director
15  in the late '80s.
16      Q.   Did your responsibilities change as
17  managing director?
18      A.   As managing director, I was more
19  involved in running the business, but still retaining
20  clients and executing transactions.
21      Q.   So that's -- we're up to 1991.  Did you
22  change positions in '91?
23      A.   I joined Smith Barney Harris Uphman
24  (sic), U-P-H-M-A-N, I think.
25      Q.   So 1991 you joined Smith Barney.  What

Page 11

Sheldon

1
2  title did you assume at Smith Barney?
3      A.   I joined as a vice president and became
4  a managing director about two years later.
5      Q.   What were your responsibilities?
6      A.   Similar.  Retaining clients, executing
7  transactions as a managing director, managing the
8  business.
9      Q.   Did any of this work with Smith Barney
10  involve student loans?
11      A.   I began specializing in student loans in
12  1981 at Chase Manhattan.
13      Q.   Just briefly explain what that work
14  involved.
15      A.   Stop me if this is more detailed than
16  you want, but in 1981 Chase Manhattan Bank was a bank
17  that had few underwriting opportunities, underwriting
18  of debt.  One opportunity it had to underwrite debt
19  was in the field of student loans because there was a
20  loophole in the Glass Steagall Act which allowed
21  national banks to underwrite bonds relating to
22  education.  We got the comptroller of the currency to
23  tell us that a student loan bond was an education
24  bond, and so that and housing was available to the
25  young investment bankers who worked at Chase

Page 12

Sheldon

1
2  Manhattan.  I became interested in student lending.
3  Interest rates were high.  They required support from
4  a bank in underwriting a bond and so we developed a
5  product that utilized both my underwriting group and
6  the bank's credit facilities.
7      Q.   So this work began when you were at
8  Chase Manhattan or --
9      A.   Yes.
10      Q.   And then you continued this type of work
11  at Smith Barney?
12      A.   Yes.
13      Q.   Did Smith Barney undergo a corporate
14  change at some point while you were there?
15      A.   Yes.  Smith Barney was headed by Sandy
16  Weill, who famously purchased a number of companies,
17  Solomon Brothers being one of the more notable ones,
18  Citigroup being an even more notable, and my firm
19  morphed into Citigroup.
20      Q.   Do you know approximately when that
21  occurred.
22      A.   We bought Shearson in 1993.  We bought
23  Solomon Brothers in '97 or so, Citigroup in '98 or
24  '99 or so.
25      Q.   With these corporate changes, did you



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
13–16

Page 13

1          Sheldon
2  continue to do this work that you described?
3      A.  Same work, yes.
4      Q.  Did it change in any way over time?
5      A.  No.  Same function.  The business grew
6  very significantly so that our -- my group's
7  production or revenue, whatever you want to call it,
8  became enormous compared to what it was in 1981, but
9  otherwise it was the same business.
10      Q.  For how long were you at Smith Barney in
11  its corporate -- with all the corporate changes?
12      A.  I left in 2007 -- 1991 to 2007.
13      Q.  When you left, what did you do next?
14      A.  I formed Student Loan Capital
15  Strategies.
16      Q.  What is Student Loan Capital Strategies?
17  What is their business model?
18      A.  It is an advisory firm.  As its name
19  suggests, it advises student loan entities or
20  entities involved in the student loan business.
21      Q.  Did you form -- if I refer to your --
22  this firm as SLCS, would that make sense to you?
23      A.  Yes.
24      Q.  Did you form SLCS with anyone else?
25      A.  I formed the firm with one other

Page 14

1          Sheldon
2  individual, Patrick Belica, B-E-L-I-C-A.  It was the
3  two of us for approximately one year.  In 2008, my
4  former colleague from Citigroup, Mark Weadick,
5  W-E-A-D-I-C-K, joined us, and today we are a group of
6  eight people.
7      Q.  Okay.  What is Mr. Belica's role at
8  SLCS?
9      A.  Mr. Belica is in charge of analytical --
10  the analysis of various things for our clients.  Our
11  business is a very technical business, very complex
12  business.  The heart of all of our business is
13  analyzing cash flows, predicted cash flows, and so
14  Patrick is an instrumental part of our business.
15      Q.  What about Mr. -- is it Weadick?
16      A.  Mr. Weadick --
17      Q.  Weadick.
18      A.  -- co-headed the Citigroup with me.  He
19  was a managing director there and at our firm, and
20  did and does the same thing that I do.
21      Q.  Which is?
22      A.  Find clients to help advise on student
23  loan matters, execute transactions.
24      Q.  When you say to advise clients on
25  student loan matters, does that involve primarily

Page 15

1          Sheldon
2  acquisition opportunities or is it more than that?
3      A.  Since I founded the firm in 2007, we've
4  advised 71 entities.  Some of them are M&A type
5  transactions.  Some of them were restructuring
6  transactions during the financial crisis.  Some of
7  them were New York Stock Exchange companies involved
8  in the business in one way or another.  And most of
9  those 71 clients involved just pure advisory and
10  work-out arrangements, et cetera, but some were
11  involved in advising on the issuance of new debt.
12      Q.  Why did you form SLCS?  Why at that
13  time, based on your long tenure at Smith Barney, why
14  did you decide to go out on your own?
15      A.  Wall Street was getting a little bit
16  different than it had been.  My group was moved into
17  the capital markets area, a move I had fought since
18  we bought Solomon Brothers, and when they finally got
19  us, it wasn't the same for us.
20          In addition to that, the financial
21  crisis was starting to come into the picture, and I
22  guess you could say it wasn't quite as much fun as it
23  had been.
24      Q.  I know it may be a biased question, but
25  in your view what is SLCS's reputation in the student

Page 16

1          Sheldon
2  loan community?
3      A.  I believe we're the recognized expert in
4  the field of student loans.  I don't know of anybody
5  that would say that there's a firm more experienced
6  in student loans than we are.
7      Q.  Does SLCS have competitors?
8      A.  Not really.  I shouldn't be quite that
9  bold.  There are firms smaller than ours.  We do
10  several types of things from pure financial advice to
11  acting as a back-up administrator of firms -- of
12  student loan entities.  And so we have one and
13  two-man shops that compete with us.  We don't have
14  100 percent market share, but they all are sort of
15  smaller and less experienced than we are.
16      Q.  Can you name a few?
17      A.  First Southwest is a two-man shop in
18  Dallas, Texas that is a financial advisor.
19          Randy Behm heads a administrative
20  services company that -- I forget the name of their
21  firm.  No other sort of administrator is coming to
22  mind.
23      Q.  Anyone else that you can think of?
24      A.  If you gave me a few minutes, I might,
25  but nothing comes to mind.



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
17–20

Page 17

Sheldon

2    Q.  Do you know Paul Sefcovic?
3    A.  I do.
4    Q.  When did you first meet Mr. Sefcovic?
5    A.  In the '80s sometime.  It might have
6  been the mid '80s -- '86, '87, '88, something like
7  that.
8    Q.  In what context did you meet Mr.
9  Sefcovic?
10    A.  He served as underwriter's counsel.
11  Wait.  Have I got this right?  I'm going to come back
12  to the date.
13        When I met him it was because he was
14  serving as underwriter counsel to us.  And it wasn't
15  at Chase.  It must have been the mid '90s, early to
16  mid '90s.  I get my decades mixed up every once in a
17  while.
18    Q.  What's your understanding of the work
19  that Mr. Sefcovic has done related to the student
20  loan industry?
21    A.  He served as our counsel for many years.
22  He was underwriters' counsel on numerous transactions
23  that I did at Citigroup.
24    Q.  Was Mr. Sefcovic with a law firm?
25    A.  Squire, Sanders & Dempsey.

Page 18

Sheldon

2    Q.  When he was performing work for Smith
3  Barney, it was in his capacity as an attorney for
4  Squire Sanders?
5    A.  Yes.
6    Q.  Do you know Lianne Sefcovic?
7    A.  I do.
8    Q.  When did you first meet Ms. Sefcovic?
9    A.  2000 and -- I don't have a crisp
10  recollection, but in the late 2008, '09, '10,
11  something like that.
12    Q.  At the time you met Ms. Sefcovic, what
13  did you know, what did you learn about her
14  professional background or work experience?
15    A.  I met her as Mr. Sefcovic's wife and
16  knew her to be a lawyer.
17    Q.  Did you know in what field she was an
18  attorney?
19        MR. JOHANSON:  Excuse me.
20        Just objection as to form.
21        Thanks.
22    Q.  You can go ahead and answer.
23    A.  She had told us anecdotes about some of
24  her cases, none of which are coming to mind, but
25  maybe family practice.  I don't have a crisp

Page 19

Sheldon

2  recollection of her exact field.
3    Q.  Did you believe at the time that you met
4  her that Ms. Sefcovic had experience in the student
5  loan industry?
6        MR. JOHANSON:  Objection as to form.
7    A.  No.
8    Q.  At the beginning of the deposition you
9  indicated that you currently reside in Oyster Bay,
10  correct?
11    A.  Yes.
12    Q.  Do you also own a home or did you own a
13  home in Arizona?
14    A.  I don't own a home in Arizona.  I rent a
15  home in Arizona.
16    Q.  Rent a home.  Okay.
17        And where is that located?
18    A.  In a development called Desert Mountain,
19  Northern Scottsdale.
20    Q.  When did you first rent your home in
21  Desert Mountain?
22    A.  We've been renting in North Scottsdale
23  for four or five years.  We first rented in Desert
24  Mountain a year ago.
25    Q.  Did you know that the Sefcovics own a

Page 20

Sheldon

2  home in the Scottsdale area?
3    A.  I do.
4        MR. JOHANSON:  Objection as to form.
5    Q.  Do you belong to a golf club out in
6  Desert Mountain or the Scottsdale area?
7    A.  I do.
8    Q.  What is the name of that golf club?
9    A.  Desert Mountain Club.
10    Q.  Did the Sefcovics belong to the same
11  golf club?
12    A.  They do.
13        MR. JOHANSON:  Objection as to form.
14        Mr. Sheldon, I'm sorry.  I have to make
15  certain objections.  I'm not going to instruct you
16  not to answer, but I'm going to make objections.
17    Q.  And I should have said this at the
18  outset.  People may make objections on the record,
19  and that's just to preserve their objections.  Unless
20  someone tells you differently, you're permitted to
21  answer afterwards.
22        Did you socialize with the Sefcovics
23  over the years?
24    A.  I did.
25    Q.  When was the last time you saw the



Page 21

1                    Sheldon
2  Sefcovics socially?
3        A.  Probably about a year ago.  I don't have
4  a crisp recollection, but about a year ago.
5        MR. GOLUMBIC:  Dave, do we want to
6  start from the beginning?
7        MR. JOHANSON:  It's fine with me.
8  Whatever you decide to do.
9        MR. GOLUMBIC:  I don't know what number
10  we're up to.
11        MR. JOHANSON:  I'm all right with just
12  having --
13        MR. GOLUMBIC:  Number 1.
14        MR. JOHANSON:  -- number 1.
15        MR. GOLUMBIC:  Number 1.
16        (Exhibit 1 so marked
17        for identification.)
18        Q.  Mr. Sheldon, I'm handing to you what the
19  court reporter has marked as Plaintiff's Exhibit 1.
20        Can you take a look at the e-mail?
21  Usually with these e-mail strings, you need to start
22  from the bottom and then go up.  And let me know when
23  you're done.  I'll ask you a couple questions about
24  it.
25        MR. JOHANSON:  I do object as to the

Page 22

1                    Sheldon
2  instruction.
3        A.  Okay.
4        Q.  Let me direct you to the first e-mail
5  from Mr. Sefcovic to you and it's dated December 14,
6  2006, and the subject line reads "Re:  Please sit
7  down."
8        Do you recognize this e-mail?
9        A.  Not really.  Only very -- maybe very
10  vaguely.  I mean, it sounds very like the type of exchange
11  we might have.
12        Q.  Do you have any reason to believe that
13  you did not receive this e-mail?
14        A.  No.
15        Q.  Let me direct you to the second sentence
16  in the body of the e-mail.  It says, "You know how
17  frugal I am since I met Lianne."
18        Do you know what Mr. Sefcovic meant by
19  that sentence?
20        A.  Let me see where that is again.
21        MR. JOHANSON:  Objection.  I object.
22        Q.  Up top.
23        Go ahead.
24        MR. JOHANSON:  I object as to form.
25        And it seems like you're asking him for

Page 23

1                    Sheldon
2  a state of mind of a particular person.
3        Go ahead.
4        Q.  It's at the top of the page.  If you
5  look underneath the From, To, Sent, Subject, there's
6  two sentences.
7        A.  Yes.
8        Q.  And I'm asking in the second sentence,
9  if you understand what Mr. Sefcovic meant by "You
10  know how frugal I am since I met Lianne"?
11        A.  I don't know.  No.
12        Q.  Did Mr. Sefcovic ever discuss financial
13  difficulties he was having?
14        MR. JOHANSON:  Objection as to form.
15        Assumes facts not in evidence.
16        A.  Mr. Sefcovic is a frugal man, as I know
17  him.  We often would have fee discussions, as my
18  counsel.  He's a tenacious lawyer and would often
19  seek as high a fee as he could get.  I would say I'm
20  pretty much the same way with my clients, but other
21  than that, I don't...
22        Q.  But you're are not aware of any
23  discussions regarding any sort of personal financial
24  difficulties he was having?
25        A.  Well, at this time?

Page 24

1                    Sheldon
2        Q.  Yes.
3        A.  No.  At this time -- you might want to
4  ask me a question about that later.  But at this time
5  I think he was a prominent attorney at Squire
6  Sanders.  Right?  I mean 2006, pretty much in the
7  heart of his private practice.
8        Q.  Did something happen between 2006 and
9  later?  You mentioned that was 2006 you knew him to
10  be a prominent lawyer within his firm.  Did some
11  events occur after that point?
12        A.  He lost one of his big clients and that
13  I believe, based on our friendship and that with his
14  wife, caused them some consternation with respect to
15  finances.
16        Q.  Who was the client that he lost?
17        A.  Brazos Higher Education Authority,
18  B-R-A-Z-O-S, Higher Education Authority.
19        Q.  Did Mr. Sefcovic mention losing any
20  other clients?
21        A.  I would have to think about that for a
22  minute.  Brazos was a huge client of both mine and
23  Mr. Sefcovic.  We both made a lot of money in
24  connection with Brazos Higher Education Authority.
25  When he lost it, it would impact him personally, as



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
25–28

Page 25

1          Sheldon
2  it would me as well.
3      Q.  Mr. Sheldon, have you heard the name
4  Student Loan Management and Research Services?
5      A.  Well, if I've got it right, that is the
6  firm listed in the -- one of the complaints in this
7  matter.
8      Q.  Is that the first time you had heard
9  that name before?
10     A.  It is.
11     Q.  What about student loan -- I'm going to
12 refer to that as SLMRS, S-L-M-R-S or SLMRS, and just
13 any other question I ask about this.
14        MR. JOHANSON:  Mr. Golumbic, just to
15 have a clean record, since we have SLAMS, do you want
16 to call that SLMRS?
17        MR. GOLUMBIC:  Sure.
18        MR. JOHANSON:  Does that work with you?
19        MR. GOLUMBIC:  Yes, that's fine.
20        MR. JOHANSON:  It will be a better
21 record.
22     Q.  I'm going to refer, just to be clear
23 then, Student Loan Management Research Services in
24 any subsequent questions that I have or Mr. Johanson
25 has, we'll refer to that as SLMRS.

Page 26

1          Sheldon
2        MR. JOHANSON:  Thank you.
3      Q.  Student Loan Advisory Management
4  Services, when did you -- when did you first hear
5  that name?
6      A.  Again, there were two firms listed in
7  the complaint that I'm talking about.  And I think
8  there's more than one complaint on the table here.
9  But I read that lawsuit and found two names.  I
10 wouldn't swear that those are the two names, but it
11 sounds like it, and that's where I learned of those
12 two new names.
13     Q.  And I will in subsequent questions, I
14 will refer to Student Loan Advisory Management
15 Services as SLAMS.
16     A.  Okay.
17     Q.  Do you have any understanding of the
18 work that SLMRS performed?
19     A.  I don't.
20     Q.  What about SLAMS?
21     A.  No.
22     Q.  As a friend of the Sefcovics, did you
23 ever discuss SLMRS or SLAMS with them?
24     A.  No.
25     Q.  Did they ever mention SLMRS or SLAMS to

Page 27

1          Sheldon
2  you?
3      A.  Not that I recall.
4      Q.  Have you discussed SLMRS or SLAMS with
5  Mr. Sefcovic or Ms. Sefcovic since you learned about
6  their existence in the complaint?
7      A.  No.
8      Q.  Let's talk about your relationship --
9  SLCS's relationship with Alliance.
10        Do you know a David Fenkell?
11     A.  I do.
12     Q.  When did you first meet him?
13     A.  This e-mail --
14     Q.  Referring to Plaintiff's Exhibit 1?
15     A.  Yes.  I knew that Mr. Sefcovic had a
16 client, David Fenkell, and knew roughly about what
17 they did since the late -- mid to late '90s because
18 there were some matters that were brought, I think,
19 by Mr. Sefcovic to our firm that I didn't handle
20 relating to Alliance, is my best recollection.  So I
21 knew of Alliance and Mr. Fenkell for some time, may
22 have socialized with Mr. Fenkell at a football game.
23 I kind of forget.
24     Q.  Okay.
25     A.  I knew generally about them, but I kind

Page 28

1          Sheldon
2  of forget when I met Mr. Fenkell.
3      Q.  How did SCLS come to work with Alliance?
4      A.  Mr. Sefcovic introduced us to Alliance
5  to -- because of our business, I believe Mr. Sefcovic
6  and Mr. Fenkell thought that Alliance could obtain
7  investments in the student loan space and thought it
8  was a natural to work with us -- I'm inferring.  I
9  believe this is what happened.  I believe that they
10 thought that it was a natural for them to team or
11 hire us to identify student loan investments.
12     Q.  We'll get into the specifics, but in
13 general terms, can you describe the type of work that
14 SLCS performed for Alliance?
15     A.  Yes.  There's sort of two things we did.
16 One, we identified potential target acquisitions.
17 And if they turned out to be sort of active, we
18 analyzed the cash flow prospects of that entity in
19 order to obtain a valuation that Alliance might pay
20 for a certain cash flow stream or a certain company.
21        (Exhibit 2 so marked
22        for identification.)
23     Q.  Mr. Sheldon, I'm handing you what's been
24 marked as Exhibit 2.
25        Take a look at the document, read



Page 29

1                        Sheldon
2  through it and let me know when you're done.
3        A.   Okay.
4        Q.   Do you recognize what's been marked as
5  Exhibit 2?
6        A.   I do.
7        Q.   What is it?
8        A.   It's a press release that Alliance put
9  out 2010, announcing their business plan for
10  acquiring student loan entities.
11        Q.   If you look at the second full
12  paragraph, the second sentence that begins "We have
13  put together a strong team," do you see that?
14        A.   Yes.
15        Q.   "We have put together a strong team
16  including Paul Sefcovic, Partner, of Squire Sanders &
17  Dempsey, and Paul Sheldon, Managing Director, of
18  Student Loan Capital Strategies, to assist us in
19  achieving our investment objectives."
20             Were there any other individuals or
21  entities that you're aware of that were part of this
22  new Alliance Student Loan Management Inc. team, other
23  than the ones listed here in the press release?
24        MR. JOHANSON:   Objection as to form.
25        A.   I think you're asking firms as opposed

Page 30

1                        Sheldon
2  to people.
3        Q.   Yes.  Was there anyone else besides Paul
4  Sefcovic at Squire and you at SLCS who were part of
5  this group that was going to be the Alliance Student
6  Loan Management team?
7        A.   Yes.  There were individuals at both
8  Squire Sanders and Student Loan Capital Strategies
9  involved in the business.
10        Q.   What about outside those two firms?
11        A.   As far as firms go, no, I don't have a
12  recollection of other firms involved in this budding
13  business plan to acquire student loans.
14        Q.   Was SLMRS part of that group, that team?
15        A.   No.
16        Q.   What about SLAMS?
17        MR. JOHANSON:   Objection as to form.
18  Go ahead.
19        A.   No.
20        Q.   So this press release is put out in
21  2010.  Was that around the time that SLCS began to
22  perform work for Alliance?
23        A.   Yes.  I don't have a crisp recollection
24  of when this all started.  I believe that that
25  meeting Mr. Fenkell predates August 2010.  Well, it

Page 31

1                        Sheldon
2  obviously does because the partnership is being
3  announced here.  I don't have a crisp recollection.
4  I'm guessing that it's several months before August
5  of 2010.
6        Q.   Okay.
7             What was the fee structure for the work
8  that SLCS -- for the work that SLCS performed for
9  Alliance?  What was the fee structure?
10        A.   The structure was that if a target was
11  identified, that we would talk about it.  Student
12  Loan Capital Strategies would lay out who they are,
13  what they do, our background with them, which was
14  usually, you know, many years.  And if Alliance was
15  to proceed with the target, my recollection is that
16  we would normally negotiate a fee, $20,000, $40,000,
17  $10,000, to obtain data from the target and analyze
18  it.
19             If both Alliance and the target seemed
20  like they were interested, that you could take the
21  process to another step, my recollection is that
22  there would be another sort of negotiation about a
23  fee because the analysis would become more evolved.
24             I believe that if a letter of intent was
25  signed, we would structure a success fee, if I recall

Page 32

1                        Sheldon
2  correctly.  And if transaction was successfully
3  completed, a fee neighborhood of -- a larger fee,
4  neighborhood of 75 to $125,000, something like that,
5  would be made.
6             I kind of forget the question.  Did
7  that...
8        Q.   You answered.  Thanks.
9             (Exhibits 3 and 4 were so marked
10             for identification.)
11        Q.   Mr. Sheldon, I'm handing to you what the
12  court reporter has marked as Exhibit 3 and Exhibit 4.
13  Take a look at both exhibits.  Start with Exhibit 3
14  and take a look at both, and then I'm going to ask
15  you questions about both in a minute.
16        A.   Did you want me to look at both now or?
17        Q.   Yes, why don't you?
18        A.   Okay.
19        Q.   If you can turn back to Exhibit 3, let
20  me start with that exhibit.
21             They're a series of e-mails.  The first
22  is an e-mail from you to David Fenkell, Mr. Sefcovic,
23  dated February 10, 2010.  Subject:  Prospect list.
24             Do you recognize that e-mail?
25        A.   Yes.



Page 33

1         Sheldon
2     Q.  What is it?
3     A.  This is a stab of just listing some
4  potential targets for Alliance.
5     Q.  And it's dated February 10th.  Feel free
6  to go back if you want, but the Exhibit 2 that we
7  looked at before, the website press release, is dated
8  August 2010.  So this is, as you testified before,
9  several months earlier, correct?
10    A.  Yes.
11    Q.  So you were beginning to do work before
12  the official sort of press release for Alliance?
13    A.  Yes.
14    Q.  Can you just explain for us, there's the
15  categories that you had grouped here, the small
16  Players, Large Players, Banks and Current and Former
17  Non-Profits and their significance?
18    A.  I don't think there's overwhelming
19  significance of the way they're listed.  I think that
20  my colleagues and I sat around at our own internal
21  meeting, who would be interested in -- who would
22  Alliance be interested in?  And we would have gotten
23  that data from separate places.  Let's talk about
24  banks.  What banks are in business that Alliance
25  might contact?  We would go to a list of banks.  What

Page 34

1             Sheldon
2  new players are there?  We might go to a list of an
3  association directory or something like that.  That's
4  my recollection of why these are categorized.
5         I think that's what you asked me.
6     Q.  Yes.  And the last grouping was Current
7  or Former Non-Profits.
8         Why that designation?
9     A.  Same answer.  Sitting around a table
10  internally, the not-for-profits were exceedingly
11  challenged during these years, expected to liquidate.
12  If they did liquidate or in some fashion try to
13  obtain financing, they would be prime targets for
14  Alliance.
15    Q.  Just looking at that last category, the
16  current or former non-profits, there's names and
17  numbers listed.  Are those names within each
18  non-profit?
19    A.  These are the executive directors of the
20  not-for-profit.
21    Q.  Those are your points of contact?
22    A.  Yes.
23    Q.  Is that the same with respect to all the
24  other groupings.  There's a -- for example, banks
25  there is listed Suntrust, Key, Wachovia, Wells Fargo

Page 35

1         Sheldon
2  and JPM, which I believe is JP Morgan --
3     A.  Yes.
4     Q.  -- with names and numbers.  Those are
5  the contacts?
6     A.  Yes.  I believe those are the people who
7  ran the student loan division of the bank, although
8  Mark Thomas is the only name that I recognize.  I
9  believe these are the executives who run the student
10  loan business and who you would call if you were
11  interested in obtaining information about a potential
12  investment.
13    Q.  So if you look at the e-mail at the top
14  on the first page of Exhibit 3, it's from Mr.
15  Sefcovic to you and Mr. Fenkell.  And it reads, "I
16  suggest a call Thursday afternoon or Friday."  Was
17  there -- do you recall that there was a follow-up
18  call to discuss the prospect list?
19    A.  I don't recall having a call.  We
20  spoke -- my best recollection is that we spoke often
21  about the subject.  It was a very important line of
22  business for my firm.  And my recollection is we
23  spoke often, Mr. Sefcovic, Mr. Fenkell.  And this
24  list of names that I saw somewhere became, you know,
25  John Reppucci, of course Mr. Wanko, Mr. Springer.

Page 36

1         Sheldon
2  The group got larger and we had, as I recall,
3  frequent conversations.
4         No, I don't recall whether there was a
5  call on a Thursday afternoon.
6     Q.  That's fine.
7         What came of the prospect list?
8     A.  I think that Student Loan Capital
9  Strategies, divvied up, if you will, the names.  And
10  it would be odd -- it's not the best way to go to a
11  business, just call out of blue, pick one name and
12  call out of blue.  Sometimes it would be okay.  But
13  sometimes that can be done in connection with other
14  matters that make the call a little bit more
15  fruitful.  So I believe that my partner, Mark
16  Weadick, and my partner, Patrick Belica, and I
17  divvied up -- well, who wants to cover who to try to
18  obtain, you know, a potential target.
19    Q.  Let's turn to the next exhibit, Exhibit
20  4.  And this is series of e-mails with an attachment
21  to it.  Going from the bottom, at the very bottom of
22  the first page, page 1 of the e-mail chain, from John
23  Reppucci to himself, Patrick Belica, Paul Sefcovic,
24  yourself and Donald Hughes, with CC's to David
25  Fenkell, Ken Wanko, Chris Springer, John Kolla and TJ



Page 37

1              Sheldon
2  Haas.  It's dated February 28, 2011.  The subject is
3  Student Loan Call tomorrow at 10:00 a.m.
4          Do you recognize the e-mail?
5      A.   I can't say that I do, no.
6      Q.   You're copied on -- it's to you and
7  others.  Any reason that you believe you did not
8  receive this e-mail?
9      A.   No.
10     Q.   This is a year later from exhibit --
11  roughly a year, a little over a year later from the
12  e-mail chain in Exhibit 3.
13     A.   Yes.
14     Q.   Do you have a general idea about what
15  this call, this was about?
16     A.   Let me read it again, because I...
17     Q.   Sure.
18     A.   Well, I believe that what this is, is --
19  there was a periodic and sort of a diligent process
20  to try to identify targets, and so I think that this
21  group was formed.  There were periodic and diligent
22  calls.
23          I believe the -- I have a rough
24  recollection that Mr. Reppucci did a nice job of
25  creating a spreadsheet about various targets, yeah,

Page 38

1              Sheldon
2  had -- right.  As I said before, we had internally
3  sort of divvied up names, and he's got those listed
4  here probably for accountability.
5      Q.   By "here," you're referring to the
6  attachment on Exhibit 4?
7      A.   The attachment, correct.
8      Q.   For the record, who is John Reppucci?
9      A.   John Reppucci was a young associate at
10  Alliance.
11     Q.   Let's look at the attachment.  And it
12  reads "Alliance Student Loan Management
13  Marketing/Opportunity Tracking."
14          This is the tracking spreadsheet that
15  Mr. Reppucci had put together?
16     A.   I believe it was Mr. Reppucci.  But yes,
17  that's what I recall.
18     Q.   So this spreadsheet on the left side it
19  reads "Opportunity Tracking," and then a header of
20  "Target," and then there's a list of names.
21          Do you see that?
22     A.   Yes.
23     Q.   And then going from left to right
24  there's a heading "Contact at Target" and then a list
25  of names.

Page 39

1              Sheldon
2          Do you see that?
3      A.   Yes.
4      Q.   And then to the right "ASLM
5  Responsibility"?
6      A.   Yes.
7      Q.   And then "Update," that's the final
8  heading?
9      A.   Yes.
10     Q.   So the Target names here are listed
11  Access, CoStep, Montana, New Hampshire, Educational
12  Service Foundation, GOAL, GCO, Key Bank and Iowa.
13          Those are the target entities that --
14  can you explain what that is?
15          MR. JOHANSON:   Excuse me, Mr. Sheldon.
16          Mr. Golumbic, I do have an objection
17  because you're reading off of this.  You read a
18  partial number of names from this list.  I would ask
19  that you ask him questions about it rather than
20  reading into the record.  It confuses the document.
21          Thank you.
22     Q.   Can you explain what ALC -- can you
23  explain what the target header means?
24     A.   These are entities that were identified
25  to approach for potential investments.

Page 40

1              Sheldon
2      Q.   There's sort of subheadings within that
3  full heading.  Another one is "Other
4  Initiatives/Meetings."
5          Do you see that?
6      A.   Yes.
7      Q.   Those are another list of targets for
8  other initiatives and meetings; is that --
9      A.   Correct.
10     Q.   Those names are NelNet, Sallie Mae,
11  Brazos,  PHEAA, Great Lakes and Discover.
12          And then the final subheading is
13  "Dead/on-hold."  I'll just list the names and then
14  I'll ask you a question about that.  CIT, North
15  Texas, EdSouth and Brazos.
16          So Dead/on-hold, does that mean what I
17  think it means?
18          MR. JOHANSON:   Before you answer, same
19  objection.  Completeness.  Go ahead.
20          The document speaks for itself.
21     A.   Dead or on-hold, I would take to mean
22  it's not likely that there's a target here.  Probably
23  not worth a call.  Let's study it a little further.
24  Maybe something will happen.
25     Q.   Under the header "ASLM Responsibility,"



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
41–44

Page 41

1            Sheldon
2  what does that heading mean?
3       A.  That heading is sort of an
4  accountability heading.  Who is accountable to -- who
5  on the team is accountable to try to develop this
6  into a target.
7       Q.  And you mentioned before Mark Weadick
8  who's with your firm.  There's another couple other
9  names here.  Taige Thornton, do you know Mr.
10 Thornton?
11      A.  Yes.  The first successful transaction
12 that we did was acquiring an entity by the name of
13 Northstar Servicing -- I forget the exact name of the
14 company.  Taige Thornton was the head of that entity
15 that was acquired by Alliance.  And although I don't
16 recall this, he became sort of a team participant
17 trying to develop further business for Alliance.
18      Q.  John Kolla, do you know John Kolla?
19      A.  John Kolla is currently an employee of
20 Alliance, and I assume he was an employee of Alliance
21 at this time.
22      Q.  Then John Hupalo, H-U-P-A-L-O?
23      A.  So it's a little surprising to see
24 John's name here, but we had introduced Alliance to
25 Deutche Bank.  The student loan group was headed by

Page 42

1            Sheldon
2  John Hupalo, a long-time associate of mine.  It looks
3  like Deutche Bank had a financial arrangement with
4  Alliance that would stand to be used if targets,
5  successful targets were to be identified.  And so I'm
6  inferring here, but I think John Hupalo was enlisted
7  to help us develop business in various places where
8  others didn't have a good call.  But that's an
9  inference.
10      Q.  Sure.
11          You said that John Hupalo was a
12 long-time associate of yours.  Does that mean that
13 you had worked with him in Deutche Bank for a long
14 time or was it a different relationship?
15      A.  He worked at Smith Barney Harris Upham.
16      Q.  Just put those away for now.  We may go
17 back to it later.
18          (Exhibit 5 so marked
19           for identification.)
20          Mr. Sheldon, I'm handing to you what the
21 reporter has marked as Exhibit 5.
22          Can you take a look at the document and
23 then read through it, and let me know when you're
24 ready and I'll ask you some questions about it.
25      A.  Well, this is very familiar to me.  I

Page 43

1            Sheldon
2  don't know if you want me to read it entirely or --
3       Q.  No.  Just look through it and let me
4  know if you're familiar with the document.
5          This is Exhibit 5.  Do you recognize the
6  document?
7       A.  I do.
8       Q.  What is it?
9       A.  This is an engagement agreement with
10 Alliance, between Student Loan Capital Strategies and
11 Alliance, with respect to a target that we had
12 identified that my recollection would be we went
13 through those first couple steps that I mentioned
14 earlier, and this was an engagement mostly to set
15 forth the fees that we would be paid.  I think this
16 was a success fee, maybe.  Let me just read this.
17          Okay.  Could you repeat the question,
18 please?  Is there a question on the table?
19      Q.  I don't think there is.
20          You had asked yourself a question about
21 whether there was a success fee involved.  I was
22 looking at page 2 of the agreement.  So was there a
23 success fee involved?
24      A.  We had identified this as a target.  It
25 went -- we got to first base with it.  I think there

Page 44

1            Sheldon
2  was a letter signed, and we were paid $40,000 when we
3  signed this engagement, which sort of comports with
4  my earlier description of our business plan.  And
5  then if and when the transaction contemplated was
6  completed, we'd be paid another sum.  And then there
7  was an earn out and we stood to make a little bit
8  more money if that was earned out.
9       Q.  You said earlier that "we had identified
10 an opportunity for Alliance."  By "we," do you mean
11 SLCS?
12      A.  Yes.
13      Q.  So it was SLCS who identified this
14 Northstar opportunity?
15          MR. JOHANSON:  Objection as to form.
16      A.  I had called -- we earlier spoke of
17 Taige Thornton.  I had called his associate, Jamie
18 Wolfe, described what we were up to.
19          To digress a little bit, the primary
20 business plan was to acquire stable cash flows to
21 utilize Alliance's net operating loss carry forward.
22 And so they wanted to acquire very secure cash flows.
23 That did not go anywhere at Northstar.  However,
24 Jamie asked me would they want to buy the servicing
25 company, the servicing entity at Northstar.  I said I



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
45–48

Sheldon

1          Sheldon
2 didn't know.  I would ask.  We asked, and we
3 obviously pursued that transaction.
4          Q.   What is Northstar Capital Market
5 Services or what was it at the time of this fee
6 engagement?
7          A.   There's a student loan company by the
8 name of Northstar -- I forget their exact name --
9 that's composed of a board that has issued debt to
10 finance a pool of student loans.  That is the entity
11 that we initially sought to make an investment in, if
12 one would be available.
13          Northstar Capital Market Services, as I
14 recall, is the entity that stood in between the board
15 -- not in between the board, but the entity that
16 basically administered the board's duties.  Northstar
17 was paid a fee for those services.  Those fees were
18 relatively secure because they derived from an
19 extremely secure cash flow within the bond trust and
20 so represented a fairly secure, albeit not exactly
21 what Alliance was originally looking for, but a
22 fairly secure investment, and they came to the
23 conclusion that that would be something they would
24 want to take a look at.
25

1          Sheldon
2          (Exhibit 6 so marked
3          for identification.)
4          Q.   Mr. Sheldon, the court reporter has
5 marked the next document which is Exhibit 6.  Take a
6 look at the e-mail and let me know when you're ready.
7          A.   Okay.
8          Q.   So this is an e-mail from you to Mr.
9 Fenkell and Mr. Sefcovic dated February 19, 2010 with
10 a CC to Patrick Belica.  Subject:  Update.
11          Do you recognize the e-mail?
12          A.   I can't say verbatim, but it looks like
13 an e-mail that I would have written.  I'm sure it's
14 my e-mail.
15          Q.   Do you know what the subject is about,
16 particularly under Number 2, Northstar?
17          A.   Yes.  It's exactly what I was just
18 talking about.
19          Q.   And this predates the previous exhibit,
20 Exhibit 5, the fee agreement dated March 15, 2010.
21          A.   Okay.  So we were still in the fishing
22 mode.
23          Q.   Right.  And that turned into the fee
24 agreement later, a month later?
25          A.   Yes.

1          Sheldon
2          Q.   You can put that down, Mr. Sheldon.
3          (Exhibit 7 so marked
4          for identification.)
5          Q.   Mr. Sheldon, the court reporter has
6 handed to you what's been marked as Exhibit 7.  Take
7 a look at the document, read through it and let me
8 know when you're ready.
9          A.   Can I ask a question?
10          Q.   Sure.
11          A.   Is this one of the names in the
12 complaint, SLMRS and SLAMS you were talking about?
13          Q.   You're referring to the header?
14          A.   Yes.
15          Q.   You're referring to the first paragraph?
16          A.   Yes, the header.
17          Q.   Yes.  SLMRS, that's what we were
18 referring to as SLMRS.
19          A.   Okay.
20          MR. JOHANSON:  I do object.  I haven't
21 heard your questions yet, but foundation.  This is
22 between Mr. Stephen Jones at SLMRS to Henry
23 Hockemier, Jr., Partner at Ballard Spahr.  I don't
24 see a copy to Mr. Sheldon on here.
25          If he's going to read this, that's going

1          Sheldon
2 to taint his testimony.  We object to that.
3          VIDEOGRAPHER:  Counsel, we have about
4 two minutes left on tape.
5          MR. GOLUBMIC:  Do you want to go ahead
6 and switch?
7          VIDEOGRAPHER:  The time now is 10:36
8 a.m.  This marks the end of tape number 1.
9          Going off the record.
10          (Recess.)
11          VIDEOGRAPHER:  The time now is 10:49
12 a.m.  This marks the beginning of tape number 2.
13          We're back on the record.
14          Q.   Mr. Sheldon, before we went off the
15 record, I handed to you what was marked as Exhibit 7.
16 Have you had a chance to review the document?
17          A.   Yes.
18          Q.   Exhibit 7 is a letter dated November 20,
19 2012 from Stephen Jones to Henry Hockeimer.  It's the
20 letterhead of Student Loan Management and Research
21 Services, LLC.
22          Do you recognize the letter?
23          A.   No, I don't.
24          Q.   Have you ever seen the letter before?
25          A.   No.



Page 49

1              Sheldon
2       Q.   If you go to the -- one, two, three,
3   fourth paragraph of the first page beginning with
4   "The relationship between Alliance," do you see that
5   paragraph?
6       A.   Yes.
7       Q.   If you go to the second sentence.  It
8   reads, "Earlier in 2010, SLMRS members introduced
9   Alliance to Northstar Capital Markets Services,
10  ('NCMS') and arranged a meeting followed by dinner
11  between Alliance and management team members and NCMS
12  management team members."
13          Do you see that?
14      A.   Yes.
15      Q.   Do you have an understanding that SLMRS
16  did these things in 2010?
17          MR. JOHANSON:   I object as to form,
18  also foundation.  He already said he doesn't
19  recognize the document.  He's never seen this.
20      A.   It's a surprising statement.  I believe
21  none of what I hear and half of what I see.  So who
22  knows?  But this is a surprising statement.
23      Q.   Do you know the name Stephen Jones, the
24  person who signed this letter?
25      A.   I don't.

Page 50

1              Sheldon
2       Q.   You've never met Stephen Jones before?
3       A.   Not that I know of, no.
4       Q.   Have you ever heard his name before?
5       A.   No.
6       Q.   Let's put this down for a minute.  I'll
7   be coming back to it.
8          (Exhibit 8 so marked
9           for identification.)
10      Q.   Mr. Sheldon, the court reporter has
11  handed to you what's been marked as Exhibit 8.  Can
12  you take a look at the document and just read through
13  it and let me know when you're ready, and I'll ask
14  you some questions.
15      A.   Okay.
16      Q.   Just before I ask you questions about
17  this exhibit, just going back to the Northstar, did
18  the Northstar -- was there a Northstar transaction
19  that closed?
20      A.   There was.
21      Q.   When did that occur, approximately?
22      A.   Well, it occurred prior to the e-mail
23  where Taige Thornton was listed to be involved in
24  developing new business.  I don't have a crisp
25  recollection of chronology here.

Page 51

1              Sheldon
2       Q.   Turning back to Exhibit 8, do you
3   recognize the document?
4       A.   I do.
5       Q.   What is it?
6       A.   This is an engagement of Student Loan
7   Capital Strategies by Alliance in connection with the
8   Panhandle proposed transaction.
9       Q.   What is the -- the engagement reads
10  Panhandle Plains Service Center.  What is Panhandle
11  Plains Service Center?
12      A.   It's a similar entity as the Northstar
13  service company.  It's the entity that administers
14  Panhandle Plains Higher Education Authority debt.
15      Q.   What was SLCS's sort of involvement with
16  this proposed transaction?  What services did it
17  perform for Alliance?
18      A.   We identified Panhandle as a potential
19  target.  Panhandle had been my client since 1981 at
20  Chase Manhattan, and I knew them for 30 years and
21  knew that the Panhandle Plains Service Center had
22  been converted to a for-profit entity.  The owners
23  were now older people and wanted to sell.  Since
24  Alliance had done the deal with Northstar, this was
25  almost -- as I recall off the top of my head as I'm

Page 52

1              Sheldon
2   testifying here -- an identical deal.  And so my best
3   recollection is that I spoke to Jimmy Parker, the
4   executive director, and suggested that Alliance would
5   be -- probably told him about Northstar and would you
6   have any interest in talking to Alliance?
7       Q.   What happened with respect to the
8   proposed transaction?  Did the transaction
9   consummate?
10      A.   It did.
11      Q.   This engagement is dated June 20, 2010.
12  Do you know approximately when the transaction
13  closed?
14      A.   It would be a guess.
15      Q.   That's okay.
16          (Exhibit 9 so marked
17           for identification.)
18      Q.   Mr. Sheldon, the reporter has hand you
19  what's been marked as Exhibit 9.  Can you take a look
20  at it and let me know when you're ready?
21      A.   Okay.
22      Q.   This is a letter dated January 19, 2010
23  from you to David Fenkell.  Do you recognize the
24  document?
25      A.   I do.



Page 53

```
1                  Sheldon
2      Q.   What is it?
3      A.   It's an engagement agreement regarding
4  the U.S. Education Loan matter.
5      Q.   Who is U.S. Education Loan?
6      A.   U.S. Education Loan is an entity in
7  Miami, Florida that owns a pool of student loans,
8  headed by a gentleman by the name of Henry Howard,
9  who I've known since the late '80s in the student
10 loan business.
11     Q.   How did you first come to know Mr.
12 Howard?
13     A.   He originated student loans, which were
14 later sold to Brazos Higher Education Authority, a
15 name that's already come up today.
16     Q.   What became of -- what services did SLCS
17 provide in connection with the proposed transaction
18 services U.S. Education Loan?
19     A.   My best recollection is that this got to
20 first base in terms of we identified it as a client
21 -- as a target, excuse me.  I believe that
22 information was received, information about their
23 student loan portfolio.  I think that analysis was
24 made and -- I'm just reviewing this for status of the
25 transaction, when this agreement was signed.  But it
```

Page 54

```
1                  Sheldon
2  was beyond the fishing.  It looked like we had a real
3  deal.  I think there was a meeting with Mr. Howard,
4  although I may be mistaken about that.
5      Q.   Okay.  You can put that down.
6          (Exhibit 10 so marked
7           for identification.)
8      Q.   Mr. Sheldon, the reporter's handed you
9  what's been marked as Exhibit 11.  Take a look at the
10 e-mail and let me know when you're ready.
11     A.   Okay.
12     Q.   This is an e-mail from Patrick Belica to
13 Mr. Fenkell, Kenneth Wanko, Mr. Sefcovic, yourself,
14 Chris Springer, John Reppucci, TJ Hass.  The subject
15 line is SLCS.
16          Do you see that?
17     A.   Yes.
18     Q.   Do you recognize the e-mail?
19     A.   Again, I don't have a crisp recollection
20 of this being sent, but it looks like something that
21 Patrick would have sent and it looks very familiar.
22     Q.   I'm not sure if this name came up
23 before, but Chris Springer, do you know that name?
24     A.   Yes.
25     Q.   Who is Mr. Springer?
```

Page 55

```
1                  Sheldon
2      A.   He works for Alliance.  I believe he's
3  the gentleman responsible for -- or at this time.  I
4  haven't had recent contact with him.  But at this
5  time I believe he was the gentleman responsible for
6  overseeing investments and reviewing investments.  He
7  might have sat on the board of targets once acquired.
8  But that's my recollection.
9      Q.   TJ Haas, do you recognize that name?
10     A.   I vaguely recall that perhaps Alliance
11 hired a young man that they called TJ, but no, I
12 don't really recognize TJ Haas.
13     Q.   The subject line is SLFC.  Do you know
14 what refers to?
15     A.   Student Loan Finance Corporation.
16     Q.   What is SLFC?
17     A.   They are a -- formerly a not-for-profit
18 that turned into a for-profit bond issuer in South
19 Dakota, a client of ours since 2007, and we worked
20 with them since the mid '80s.
21     Q.   Mr. Belica's e-mail reads, "Norg
22 Sanderson, CEO, would like to set up a call to meet
23 Alliance and discuss a possible transaction."
24          Did SL -- a lot of acronyms here.  Did
25 SLCS work with Alliance on identifying and proceeding
```

Page 56

```
1                  Sheldon
2  with a possible transaction involving SLFC?
3      A.   Yes.  Mr. Belica covers, if you will,
4  SLFC.  His dad was on the board of SLFC for many
5  years.  I'm not sure whether he still was.  But Mr.
6  Belica has a very strong rapport with Mr. Sanderson
7  and SLFC.
8      Q.   Did the work on a possible transaction
9  involving SLFC get beyond first base?
10     A.   Yes.  My recollection of this one is
11 that there was going to be a loan between Alliance
12 and SLFC.  It got beyond first base.  I believe SL --
13 Alliance asked for some information from SLFC, and I
14 believe the transaction got bogged down in developing
15 the package to substantiate the agreement.  I'm not
16 sure if any fees were ever paid.
17          That's my recollection.  Maybe you're
18 going to hand me an engagement agreement.
19     Q.   No.
20          If you can go back to Exhibit 3,
21 and on the second page of the exhibit is a list of
22 current or former non-profits.
23          Do you see that?
24     A.   Yes.
25     Q.   At this bottom of the list is an entity
```



Page 57

Sheldon

1  called Access.  Do you see that?
2  A.  Yes.
3
4  Q.  What is Access?
5  A.  Access is a company that derives from
6  the Law Access, the people who give the tests for law
7  students, LSAT and LSAC.  I helped LSAS form a
8  student loan company in the mid '80s that developed
9  into a very robust company.  At some time it branded
10  itself in order to go beyond the law school space,
11  developing student loans, into all graduate
12  education.  I believe that caused it to rebrand
13  itself to Access.
14  Chris Chapman was hired.  Chris was a
15  former colleague of my partner, Mark Weadick, at
16  Student Loan Funding Corp. in Cincinnati where Mark
17  and Chris worked.  Mark and Chris had a strong
18  relationship.  We serve as advisor to Access now.
19  And I wouldn't be surprised to see if Mark was the
20  responsible entity -- responsible person to cover
21  Access.
22  Q.  And did SLCS perform work related to a
23  possible Access transaction for Alliance?
24  A.  I don't have a crisp recollection of
25  that getting to any stage, no.  I just don't know.

Page 58

Sheldon

1
2  Q.  Okay.  If you go to the first page of
3  that same exhibit, Exhibit 3.  Under the heading
4  "Large Players," do you see that?
5  A.  Yes.
6  Q.  There's an entity called NelNet.
7  A.  Yes.
8  Q.  What is NelNet?
9  A.  NelNet is a company that has been --
10  NelNet or its successors have been in the business
11  since the '70s.  In the '80s, its business plan was
12  to roll up the not-for-profits, acquire them and
13  become -- it actually stood for National Education
14  Loan Network, and is today a very prominent student
15  loan entity and ranks with Sallie Mae as the two
16  bellwether student loan companies.
17  Q.  Did SLCS provide any work or do any work
18  related to a possible NelNet transaction for
19  Alliance?
20  A.  I don't have any recollection that we
21  did.  It would not surprise me if Mr. Weadick or I
22  spoke to Jeff Noordhoek about the possibility, but I
23  don't have any recollection of that.
24  (Exhibit 11 so marked
25  for identification.)

Page 59

Sheldon

1
2  Q.  Mr. Sheldon, the reporter has handed to
3  you what's been marked as Exhibit 11.  Take a look at
4  it and let me know when you're ready.
5  A.  Okay.
6  Q.  This is an e-mail from you to Mr.
7  Fenkell, Mr. Sefcovic, with a CC to Mr. Belica, with
8  the subject Alliance?
9  Do you recognize the e-mail?
10  A.  Not crisply, but vaguely.
11  Q.  It's dated February 12, 2012.  There's a
12  reference to an entity CLC.
13  Do you know CLC?
14  A.  Yes.
15  Q.  What is that?
16  A.  CLC is what we would refer to as a
17  for-profit student loan company.  It was formerly
18  known as College Loan Corporation, I believe.  They
19  were a direct marketer in the space during the
20  consolidation boom of the turn of the century.  Paul
21  Wozniak was a managing director at UBS, UBS Bank, and
22  was my primary competitor as a banker at Citigroup.
23  He now is the chairman, at this time and currently he
24  was the chairman of CLC.
25  Q.  So you knew Mr. Wozniak --

Page 60

Sheldon

1
2  A.  Wozniak.
3  Q.  -- through -- as competitors?
4  A.  Yes.
5  Q.  Was it SLCS that identified CLC as a
6  possible opportunity for Alliance?
7  A.  I assume so.  I don't have a crisp
8  recollection of how that developed.  They're on the
9  list of -- they're in the February 10th e-mail, I
10  believe.
11  Q.  Right.
12  A.  As a small player.
13  Q.  Right.  You're referring back to Exhibit
14  3.  They're listed as a small player.
15  What about CIT, do you recognize that?
16  A.  CIT is a speciality finance company.
17  They were in dire straights at this time.  My
18  colleague at Student Loan Capital Strategies, Dan
19  Blighe, had worked at CIT and we -- David Finn was
20  his boss at CIT, as I recall.  So I called David
21  Finn.
22  There's a misspelling here, "Thian,"
23  former Goldman Sachs managing director, former New
24  York Stock Exchange company CEO, went to CIT to save
25  it, if you will.  And I believe that Finn said, hey,



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
61–64

Page 61

Sheldon

1  listen, we're not doing anything yet, but keep in
2  touch because after Thian's done reorganizing us, who
3  knows?
4      Q.  If you refer back to Exhibit 3.  CIT is
5  listed as one of the large players that was
6  identified --
7      A.  Yes.
8      Q.  -- in the prospect list?
9      A.  Mm-hmm.  John Thain, right.
10      Q.  What became of the pursuit of those
11  opportunities with CLC and CIT?
12      A.  CLC, there was a round of telephone
13  calls, I believe, with Mr. Wozniak and Alliance
14  personnel.  I think, yes, we did receive what we
15  referred to as a tape of information, which is
16  basically the portfolio of student loans,
17  electronically transmitted to us.  Mr. Belica would
18  take that, quote, "tape," and analyze the cash flows
19  of their various trusts.  My best recollection is
20  that we received the tape.  I don't recall being
21  paid, that there be an engagement agreement --
22  although, again, you may hand me one in a second --
23  but I don't think we sort of got to first base.
24          Did you ask about CIT?

Page 62

Sheldon

1      Q.  Yes.  I did ask about CIT as well.
2      A.  I believe that nothing came of CIT.  I
3  believe we made that initial call.  I believe John
4  Thain did come in and clean house, and then I think
5  he sold CIT, and so nothing developed.
6      Q.  If you go back to Exhibit 3, the
7  prospect list that we've been looking at.  If you go
8  to the second page of that exhibit under the heading
9  Current or Former Non-Profits, Brazos is listed
10  there?
11      A.  Yes.
12      Q.  What is Brazos?
13      A.  Brazos is a not-for-profit company that
14  sells tax exempt bonds to finance student loans, a
15  client of mine since 1981 and a client of Mr.
16  Sefcovic's -- well, sorry -- yes, I guess that's
17  right.  Mr. Sefcovic served as underwriter's counsel
18  for us in mid '90s and later became a central legal
19  figure at the Brazos Education Authority acting as
20  what we call bond counsel.
21      Q.  Brazos is identified as a possible
22  opportunity.  What became of that?
23      A.  Nothing.  I'm sure that I spoke to Mr.
24  Watson about it in probably one or maybe two, but

Page 63

Sheldon

1  probably one conversation.  He had no interest in
2  pursuing anything.  Unlike the Panhandle transaction
3  which is analogous, the Panhandle administrator was a
4  for-profit entity with stockholders.  And Brazos,
5  that entity was a not-for-profit, and there was just
6  no interest in getting to a second phone call, as I
7  recall.
8      Q.  Did Mr. Sefcovic provide any services
9  related to the possible Brazos opportunity for
10  Alliance?
11          MR. JOHANSON:  Objection as to form.
12      A.  Not that I know of, but he had reason to
13  talk to Mr. Watson day in and day out, so I just have
14  no knowledge of what he might or not might have said.
15      Q.  If you go to page 1 of Exhibit 3, same
16  exhibit.
17      A.  Right.
18      Q.  Under Small Players, there's an entity,
19  GCO.
20      A.  Yes.
21      Q.  What is GCO?
22      A.  GCO is a student loan player.  Had been
23  a -- I believe it was Student Loan Capital
24  Strategies' first client.  They owned several trusts,

Page 64

Sheldon

1  several student loan trusts, and was -- is a
2  subsidiary of Greystone Financial and someone I think
3  we identified as a prime candidate for Alliance,
4  given that Greystone is not a student loan company
5  and would be wanting to shed this entity, is my
6  recollection.
7      Q.  It says "Alliance has this covered" next
8  to it.  Do you know what that refers to?
9      A.  I believe that we introduced Alliance to
10  GCO and that there was discussion -- I kind of forget
11  this one.  There was discussion, maybe, and because
12  there was already a dialogue, Alliance personnel had
13  regular conversations with GCO is my best
14  recollection.
15      Q.  On the same exhibit, page 1, under the
16  heading Banks, do you see that?
17      A.  Yes.
18      Q.  And so in terms of the objective, what
19  was -- how were the banks involved here in terms of
20  your prospect list?  What role would they be playing?
21      A.  Unclear.  I don't recall them as being
22  primary targets.  There was a -- at this time even
23  banks were having extreme financing difficulties and
24  the thinking was that perhaps a bank would be



Page 65

Sheldon

1 interested in a whole loan sale, in other words, a
2 sale of the actual student loans and maybe there'd be
3 an opportunity to team Alliance with someone else,
4 Alliance's role to finance some of that purchase of
5 whole loans with someone else.  But my best
6 recollection is that these banks would not be selling
7 a cash flow stream to Alliance and so -- that's my
8 best recollection.  But he did develop into a little
9 something.
10     Q.   And Key is listed here.  Explain, what
11 did Key develop into?
12     A.   Key -- this was late in the process.  I
13 think this was one of the last things we worked on.
14 Key had two trusts, two or three.  My best
15 recollection is that we got data on those trusts and
16 performed some analysis.  I forget exactly what the
17 proposed transaction was to be.  It got to first base
18 and I believe we were paid a small fee, neighborhood
19 of $10,000, but it dried up for some reason.
20     Q.   Among the other banks listed here is JPM
21 or JP Morgan.  Do you know what, if anything,
22 happened with respect to the development of that
23 possible opportunity?
24     A.   No.  I don't have any recollection of

(line numbers 1–25)

Page 66

Sheldon

1 either JP Morgan or Wells Fargo even being
2 approached.  I don't recall anything at all.
3     Q.   Okay.
4         (Exhibit 12  so marked
5         for identification
6     Q.   Mr. Sheldon, the court reporter has
7 handed to you what's been marked as Exhibit 12.  Take
8 a look at the e-mails and let me know when you're
9 ready.
10     A.   Okay.
11     Q.   So this is a series of e-mails, the
12 first is an e-mail from you to Mr. Fenkell and Mr.
13 Wanko dated November 11, 2010, Subject:  Graduate
14 Leverage.  And then an e-mail the next day, November
15 12, 2010 from Mr. Fenkell to you with the same
16 subject line.
17         Do you recognize the e-mails?
18     A.   Yes.
19     Q.   What is this about?
20     A.   Well, as it says, Dan Thiebault -- I'll
21 mostly be parroting this back, but Dan Thiebault was
22 a --
23     Q.   Let me just ask you then what is
24 Graduate Leverage?

(line numbers 1–25)

Page 67

Sheldon

1     MR. JOHANSON:   Excuse me, were you
2 finished with your answer there?
3     I do object to --
4     THE WITNESS:  No, I'm not finished.
5 It's just a point of order that if you want me to
6 describe what this is about, it's fairly
7 self-explanatory.
8     MR. JOHANSON:   My only objection was I
9 think Mr. Golumbic stopped you in the middle of your
10 answer.  So that was my objection.
11     THE WITNESS:  Okay.
12     Q.   Unless you have something else you want
13 to say about my prior question, which was just
14 open-ended, what is Graduate Leverage?
15     A.   Graduate Leverage is a very dynamic
16 company that entered our space in the '90s.  Dan
17 Thiebault is a very impressive man.  Citigroup lent
18 him upwards of 3, $4 billion to develop his
19 portfolio.  We were hired by Graduate Leverage as one
20 of our first -- in the first month or two of
21 developing Student Loan Capital Strategies, we were
22 hired by Graduate Leverage to talk about a sale of
23 the company.  It's coming back to me.  That was in
24 the fall of 2007.  And the walls came down on the

(line numbers 1–25)

Page 68

Sheldon

1 business, so that went away.  And by November of
2 2010, having a large pool of loans and being involved
3 in a number of things, I thought that it would be a
4 great time for Mr. Fenkell to meet Mr. Thiebault to
5 see what would happen.
6     Q.   Did a meeting ever take place between
7 Mr. Fenkell and Mr. Thiebault?
8     A.   I don't recall that it did.  I don't
9 have a recollection.  He may be able to trip my
10 memory, but I don't have a recollection of anything
11 happening past this e-mail.
12         (Exhibit 13 so marked
13         for identification.)
14     Q.   Mr. Sheldon, the reporter has handed to
15 you what's been marked as Exhibit 13.  Take a look at
16 the two e-mails and let me know when you're ready.
17     A.   Okay.
18     Q.   These are two e-mails.  The first is
19 from you dated August 31, 2010 to Mr. Sefcovic, Mr.
20 Wanko, Mr. Fenkell.  The subject line is Montana.
21 And then on the same day, an e-mail back from Mr.
22 Sefcovic to you Mr. Wanko and Mr. Fenkell.
23         Do you recognize the e-mails?
24     A.   Again, I don't have a crisp recollection

(line numbers 1–25)



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
69–72

Page 69

1              Sheldon
2  of sending it, but yes, I have a general familiarity
3  and remembrance of the subject matter.
4      Q.   The subject line is Montana.  What is
5  Montana?
6      A.   Montana is a similar company, if you
7  will, as the other not-for-profits.  This is a
8  company in Montana which issued debt to finance
9  student loans.  It was a banking client at Smith
10  Barney, then Citigroup for 15 years.  Jim Stipich is
11  a -- is the long time executive director since it
12  started I think in the early '80s.  Still is.  He's
13  established many innovative participants in the
14  student loan business.  His servicing company
15  actually serviced all of Dan Thiebault's billions of
16  dollars worth of student loans.  And again, from my
17  e-mail, I recall that just like everyone else he was
18  short of capital, had these new enterprises starting,
19  and here's Alliance looking to buy pieces of
20  businesses.  They all ought to get together.
21      Q.   Had you dealt with Mr. Stipich in
22  Montana when you were at Smith Barney and Citigroup?
23      A.   My colleague covered it, but someone in
24  my group covered Montana for the business.
25      Q.   Okay.  So the e-mail describes the

Page 70

1              Sheldon
2  possibility of Alliance purchasing Montana's master
3  servicing business.  What did -- were there further
4  discussions about the matter?
5      A.   I don't recall this going anywhere.  Jim
6  Stipich had several, you know, entities, as I said.
7  And the thought, I believe, as I recall, was that if
8  he sold some of the cash flow coming off his bond
9  issues and going to service loans which was now --
10  service the bond issues, if you will -- I could
11  explain what that means if you'd like me to.  This
12  was something -- this was all line business, maybe
13  he'd like to sell that cash flow stream so he could
14  use the proceeds in one of his new endeavors.
15      Q.   What does it mean to service the bond
16  issues?
17      A.   You have -- you usually have a board and
18  in all of the cases that we've talked about, the
19  Montana board, the Northstar board, the Panhandle
20  board, you have a board that has issued hundreds,
21  perhaps millions of dollars worth of bonds.  Usually
22  they would contract with a separate entity to
23  administrator that program.
24      Q.   Okay.
25      A.   And as I stated in connection with the

Page 71

1              Sheldon
2  Northstar business, whereas we started looking for
3  residual interests and actual bond issues, we got
4  success in acquiring master servicing businesses at
5  Northstar, Panhandle, and we were trying to produce
6  the same result here in Montana.
7      Q.   Okay.
8          You can go back to Exhibit 3, the
9  prospect list again, and under Small Players there is
10  an entity, Next.  Do you see that?
11      A.   Yes.
12      Q.   What is Next?
13      A.   Next is similar to CLC and GOAL and K-2.
14  As I said, there came a time in the student loan
15  business where direct marketing to existing student
16  loan borrowers for the purpose of consolidating their
17  loans became an extremely lucrative business.  Next
18  was a Phoenix company which was a successful player
19  in that game.
20      Q.   So Next is identified by you as a
21  prospect.  Do you know what became of that, the
22  pursuit of that opportunity?
23      A.   I don't.  I'm pretty sure Next became a
24  client of ours.  I don't recognize the name Brent
25  Carlson.  There are other individuals there that we

Page 72

1              Sheldon
2  know and I would have thought would be there.  But I
3  don't think that Next became a target here.
4      Q.   Okay.  And then this may be my final
5  question on this exhibit.  I'm sure you'll be happy
6  about that.
7          The second page of the exhibit under
8  that heading Current or Former Non-Profits, there's
9  is a reference to PHEAA.  Do you see that?
10      A.   Yes.
11      Q.   What does that refer to, PHEAA?
12      A.   Pennsylvania Higher Education Assistance
13  Agency, otherwise known as PHEAA, is a state agency
14  in Pennsylvania, a very significant player in the
15  student loan space -- in the student loan industry, a
16  client at this time and currently a client of Student
17  Loan Capital Strategies.
18          Jim Preston, like -- I have a mental
19  block -- the gentleman at CLC, Paul Wozniak, was a --
20  Jim Preston worked for Paul Wozniak at UBS and got a
21  job at PHEAA to run it and is currently the executive
22  director of PHEAA.
23      Q.   Did you or others at SLCS reach out to
24  Mr. Preston and others to seek out this potential
25  opportunity for Alliance?



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
73–76

Page 73

1              Sheldon
2       A.  I don't have a crisp recollection of
3  that.  My partner, Mr. Weadick, covers PHEAA, if you
4  will.  And I assume that he mentioned the concept,
5  but I don't have a crisp recollection of that.  I
6  don't believe I spoke to Mr. Preston about it.
7       Q.  I lied.  I have a couple more questions
8  on this exhibit.
9           If you could go back to the first page.
10  If you look at under the Large Players, Sallie Mae?
11      A.  Yes.
12      Q.  And There's a reference to Jack Remondi.
13  Do you know Jack Remondi?
14      A.  Yes.  Jack Remondi was a client at Smith
15  Barney at an entity that we helped sell to Sallie
16  Mae.  At this time, Jack was the CFO of Sallie Mae
17  and has since become the CEO of Sallie Mae.  I spoke
18  to Jack about this, and he was not overly impressed.
19  He thought that the hedge funds were pretty good
20  competitors of Alliance.  At this time he was also
21  struggling with capital.
22      Q.  Right.
23      A.  And we had a lovely conversation, but it
24  went nowhere.
25      Q.  Okay.  Above Sallie Mae there is a

Page 74

1              Sheldon
2  reference to STU.  Do you see that?
3       A.  Where is it?
4       Q.  It's right above the Sallie under Large
5  Players.
6       A.  STU.
7       Q.  Yes.  What is STU?
8       A.  STU was the student loan business of
9  Citigroup.  It had been a division of Citicorp.
10  Again, Smith Barney actually did the IPO to create
11  STU in the mid '90s.  STU then became a company, but
12  as I recall, Citicorp retained a majority interest in
13  STU.  Mike Reardon was the head of -- well, he was
14  the CEO of Student Loan.  STU stood for Student Loan
15  Corporation.  STU was the ticker of the stock, STU.
16      Q.  Did you or others from SLCS reach out to
17  Mr. Reardon or others?
18      A.  I did not.  I'm not sure if Mr. Weadick
19  did.  I recall that we worked at Citigroup, Mr.
20  Weadick and I, and I don't know that we did contact
21  STU.
22      Q.  Under Small Players there's a reference
23  to GOAL.  Do you see that?
24      A.  Yes.
25      Q.  What is GOAL?

Page 75

1              Sheldon
2       A.  GOAL is very similar to CLC, K-2 and
3  Next, obtained its success in the consolidation
4  business, direct marketing, and just like those
5  others.
6       Q.  Did you or others from SLCS reach out to
7  any contacts at GOAL?
8       A.  Again, Mr. Weadick has the best
9  relationship with GOAL, and so I don't know whether
10  we did or not.
11      Q.  Okay.  You can put that exhibit away,
12  hopefully for the last time.
13      A.  Okay.
14          (Exhibit 14 so marked
15           for identification.)
16      Q.  Mr. Sheldon, the court reporter has
17  handed you what's been marked as Exhibit 14.  It's
18  two e-mails.  Take a look at them and let me know
19  when you're ready.
20      A.  Okay.
21      Q.  Looking from the bottom up to the top,
22  the first is an e-mail from Mr. Fenkell to Mark
23  Weadick, a copy to Mr. Sefcovic, with a subject line
24  "Upcoming Student Loan Conference."
25          And above that the same day, Mr. Weadick

Page 76

1              Sheldon
2  responds to Mr. Fenkell and copied you on the
3  response, with a CC to Paul Sefcovic.
4       Do you recognize the e-mail chain?
5       A.  I do.
6       Q.  And the Re line is "Upcoming Student
7  Loan Conference."
8          What is the e-mail about?
9       A.  There are many student loan conferences
10  attended by most participants.  So they're a good way
11  to go meet, meet and greet, in this case, targets for
12  Alliance.  I forget the name of this particular
13  conference being held in Washington, D.C., but my
14  best recollection is that I did intend to go to it
15  and Mark Weadick was going to it.  And so my best
16  recollection here is that Mr. Fenkell wanted to make
17  sure that Mark had topics in mind that we want to
18  meet people, we want to do business, et cetera.
19      Q.  Particularly the e-mail discusses -- it
20  says that "I was also hoping that you would be able
21  to make some introductions on our behalf of potential
22  lenders for our Northstar transaction."  And in the
23  top e-mail Mark Weadick responds and identifies
24  possible new candidates, including Morgan Stanley,
25  Cross Point Capital.  Then he says "remaining usual



PAUL SHELDON                                    October 28, 2014
SPEAR VS. FENKELL                                      77–80

                        Sheldon
1
2   suspects -- BAML, Citi, Credit Suisse and JPM."
3          Do you recall if Mr. Weadick helped make
4   some introductions for Mr. Fenkell at this
5   Washington, D.C. conference?
6          MR. JOHANSON:   Objection as to form.
7   Foundation.
8          A.   I don't have a crisp recollection of
9   that, I believe that Scott Kaysen may have been
10  introduced in person at this conference because there
11  were follow up conversations with Mr. Kaysen.
12         Q.   Kaysen is with Morgan Stanley; is
13  that right?
14         A.   No.  He was with -- this sentence is not
15  artfully written.  I believe Mr. Kaysen is with Cross
16  Point Capital.  Mr. Kaysen had worked with us at
17  Chase Manhattan -- at Smith Barney, and I believe --
18  I'm nearly certain he was not with Morgan Stanley.  I
19  think he was with Cross Point Capital and had just
20  done a similar piece of business.  And I think that
21  that went one or two steps with Scott Kaysen.
22         (Exhibit 15 so marked
23          for identification.)
24         Q.   Mr. Sheldon, the court reporter has
25  handed to you what's been marked as Exhibit 15.  It's

                        Sheldon
1
2   an e-mail from you to Mr. Fenkell.  Subject line is
3   Chris Cronk.
4          Do you see that?
5          A.   Yes.
6          Q.   Who is Mr. Cronk?
7          A.   Mr. Cronk is the head of the student
8   loan investment banking group at Bank of America,
9   sort of my counterpart when I was at Citigroup.
10         Q.   And there's a -- the e-mail discusses
11  Mr. Cronk coming in earlier in the week and that
12  there's a possibility for lunch.
13         Do you see that?
14         A.   Yes.
15         Q.   Did a lunch take place with Mr. Fenkell
16  and Mr. Cronk?
17         A.   I don't believe so.  I don't recall
18  there being a follow-up to this e-mail.  I don't have
19  a recollection of them meeting.
20         Q.   But you tried to make the introduction?
21         A.   Right -- oh, hold on.  I do remember
22  joining Mr. Fenkell at Bank of America's building.
23  We saw the new Lehman CEO in the hallway, which
24  tripped my memory about it.
25         So we had a meeting at their building,

                        Sheldon
1
2   attended ed by Chris Cronk and -- mental block about
3   his colleague's name.  I think we had lunch and
4   chatted about the things that Alliance was anxious to
5   do.  Brian Moynihan had been made CEO that week, and
6   we saw him in the hallway.
7          (Exhibit 16 so marked
8           for identification.)
9          Q.   The court reporter has handed you what's
10  been marked as Exhibit 16.  It's a series of e-mails.
11  Please review them and let me know when you're ready.
12         A.   Okay.
13         Q.   So this is a series of e-mails beginning
14  with an e-mail from Mr. Wanko to Patrick Belica from
15  SLCS.  The subject line is Norg.  Who is Norg?
16         A.   We spoke about him this morning.  Norg
17  Sanderson is the executive director or CEO of Student
18  Loan Finance Corporation in South Dakota, a client
19  that Mr. Belica covers for our firm.
20         Q.   So the discussion of the e-mail is about
21  a possible meeting with Mr. -- is it Anderson you
22  said?
23         A.   Sanderson.
24         Q.   Sanderson, excuse me.  Mr. Sanderson and
25  Steve Kohles, the CFO.

                        Sheldon
1
2          You're copied on the e-mail.  If you
3   look at the first page, the second to the top is an
4   e-mail on the -- I'm looking at the actual first page
5   of the exhibit itself.  There's an e-mail from Mr.
6   Wanko to Mr. Belica and you, copying Mr. Fenkell,
7   talking about a Thursday morning meeting at Squire
8   Sanders.
9          A.   If it's important, you need to point --
10         Q.   Sure.  I'm looking at the actual first
11  page of the exhibit.
12         A.   Okay.  Yes.
13         Q.   Mr. Wanko says, "Also, Paul -- since
14  David and I are going to be in NYC, do you think you
15  could try to set up a meeting or two with some of the
16  financing services you mentioned (Deutsche Bank,
17  Credit Suisse and UBS)?
18         Do you see that?
19         A.   Yes.
20         Q.   Do you recall trying to set up a meeting
21  with those financing source?
22         A.   Well, in particular, Deutsche Bank --
23  that's John Hupalo -- which later became successful.
24  We met Mr. Hupalo at Deutsche Bank on Wall Street,
25  and that developed into a financing source for



Page 81

1              Sheldon
2    Northstar to purchase, I think, Panhandle and
3    refinance some financing for Northstar, if I recall
4    correctly.
5         Q.   You can put this one down.
6              Are you familiar with the entity RBC
7    Capital Markets?
8         A.   Yes.
9         Q.   Did you do any work for Alliance related
10   to RBC Capital Markets?
11        A.   I don't have a crisp recollection of
12   this, but I believe that we thought to approach our
13   RBC as a financing source similar to the Deutsche
14   Bank.  However RBC was also a very prominent student
15   loan investment banking group and had issued letters
16   of credit and at the time had numerous difficulties
17   in the student loan space because of the client that
18   they had helped during the financial crisis.  RBC had
19   a -- still does -- has a broad footprint in the
20   student loan space, but I believe the thought was
21   that they might be a financing source.
22        Q.   Do you know what became of any of those
23   sort of initial discussions?
24        A.   I don't have a crisp recollection.  We
25   at Student Loan Capital Strategies all knew the

Page 82

1    players at RBC very well.  There could have been a
2    number of calls made from any one of us to a number
3    of them.  I don't have a crisp recollection of that
4    happening.
5         Q.   Okay.
6              (Exhibit 17 so marked
7              for identification.)
8         Q.   What's been marked as Exhibit 17 is an
9    e-mail from you dated February 25, 2010 to Taige
10   Thornton, Jamie Wolfe and Mark Lindgren, with CC's to
11   Mr. Fenkell and Mr. Sefcovic.  The subject line is
12   "Logistics."
13             Do you recognize the document?
14        A.   Vaguely.
15        Q.   What is it, to the best of your
16   recollection?
17        A.   I believe there were two meetings in
18   Phoenix with similar entertainment.  I believe the
19   first one occurred as we were trying to make a deal
20   with Northstar.  And then I believe the second one
21   was around the closing of the transaction weeks, if
22   not months later.  I think this was the first one.
23        Q.   You had identified I believe before
24   Taige Thornton as being someone from Northstar.  Is

Page 83

1              Sheldon
2    Jamie Wolfe and Mark Lindgren, are they also
3    Northstar people?
4         A.   Jamie Wolfe is the one that I identified
5    this morning as my initial contact into Northstar
6    that led to this transaction.  He was the CFO.
7         Q.   Okay.  And then Taige Thornton and Mark
8    Lindgren are also from Northstar?
9         A.   Mark was the legal general counsel.
10   Taige was the CEO.  And the three of them and others,
11   as I recall, owned the servicing enterprise that was
12   purchased by Alliance.
13        Q.   Your e-mail discusses a meeting at
14   Squire Sanders office followed by a dinner at Mr.
15   Sefcovic's favorite restaurant.
16             Do you see that?
17        A.   Yes.
18        Q.   Did you help coordinate the logistics
19   regarding the meeting?
20             MR. JOHANSON:   Objection as to form.
21        A.   I don't have a crisp recollection.  I
22   would have been the one probably -- telling probably
23   Jamie where we're going to meet.  But no, I don't
24   have a crisp recollection of setting this up.
25        Q.   Do you know who paid for the meeting?

Page 84

1              Sheldon
2         A.   When you say "meeting," the actual
3    office?
4         Q.   Well, the e-mail indicates that there's
5    going to be sandwiches and brownies served, and then
6    there's going to be a dinner at a restaurant in the
7    evening.  Do you know who paid for those meals?
8         A.   Well, I feel certain that the lunch,
9    which I believe was held at Squires Sanders &
10   Phoenix, which would have been paid by Squire
11   Sanders, perhaps reimbursed.  I don't know.
12        Q.   Okay.
13        A.   As to dinner, I may have hosted it.  Mr.
14   Sefcovic may have hosted it.  Mr. Fenkell may have
15   hosted it.  I don't recall.
16             My guess, if you're interested in a
17   guess, is that Mr. Fenkell paid for it.
18        Q.   That's okay.  You don't need to guess.
19   Just what you know.
20        A.   Okay.
21        Q.   What role did you play at the meeting at
22   Squire Sanders' office?
23        A.   Normal role of an advisor trying to
24   develop a transaction.
25             Again, I believe this was the meeting



Page 85

1              Sheldon
2    where we were developing the transaction as opposed
3    to closing the transaction.  And if I'm correct with
4    that assumption, then I would have been -- Patrick
5    Belica would have been there, too, I'm fairly
6    certain.  I don't see his name here of, but I would
7    be surprised if he wasn't at this meeting.
8         Q.   Mr. Sefcovic is copied on the e-mail.
9    On whose behalf was Mr. Sefcovic attending the
10   meeting?
11        A.   Squire Sanders.
12        Q.   Did Ms. Sefcovic play any role in
13   arranging the meeting or the dinner or golf?
14        A.   Who?
15        Q.   Lianne Sefcovic.
16        A.   No, not that I'm aware of.
17             (Exhibit 18 so marked
18             for identification.)
19        Q.   Mr. Sheldon, the court reporter has
20   handed you what's been marked as Exhibit 18.  It's --
21   let me know when you're done.
22        A.   Okay.
23        Q.   These are a series of e-mails.  The
24   first is dated January 14, 2011 from Mr. Fenkell to
25   you, to Mark Weadick, John --

Page 86

1              Sheldon
2         A.   Hupalo.
3         Q.   -- Hupalo and Mr. Sefcovic, with a CC to
4    Mr. Wanko, followed by a response e-mail from you on
5    the same date to Mr. Fenkell and the rest of parties
6    listed in the initial e-mail.
7              Do you recognize these e-mails?
8         A.   Vaguely, yes.
9         Q.   In the first e-mail from Mr. Fenkell he
10   makes reference to an EFC conference?
11        A.   Yes.
12        Q.   What is EFC conference?
13        A.   So, as I mentioned earlier, there are a
14   couple of different entities that sponsor these
15   conferences.  Education Finance Council is an
16   association which has as its member base the
17   not-for-profit segment of our business.
18             Listed here are prominent CEO's of
19   various not-for-profits, some of whom we talked about
20   already earlier this morning.  They have an annual
21   meeting.  I think this was the annual meeting in
22   Seattle.
23             VIDEOGRAPHER:  Counsel, four minutes
24   left on tape.
25             MR. GOLUMBIC:  Okay.

Page 87

1              Sheldon
2         Q.   If Mr. Fenkell's e-mail, the initial
3    e-mail, he indicates that -- he says "It is our
4    thinking that the invitation to this dinner would not
5    come from us.  The concern is that Chris Chapman may
6    be uncomfortable meeting with us in this setting if
7    the invitation is from us."
8              Did you understand the nature of the
9    sensitivity issue that Mr. Fenkell raised?
10        A.   Let me just see who's saying what here.
11        Q.   It's at the end of the e-mail chain.
12        A.   I don't have a crisp recollection of the
13   sensitivities that Chris may have had.  I could
14   speculate, but won't speculate.
15        Q.   That's okay.
16             In your e-mail responding to Mr. Fenkell
17   about the possibility of a cocktail property, you
18   indicate -- you say "Wonderful idea.  SLCS could
19   pretty easily be the host for this dinner."
20             Do you recall if there was a dinner that
21   was held after the EFC conference?
22        A.   There was.  And the reason that this was
23   very easy for us to do was that we would very often
24   have a dinner such as this.  Clients of ours and
25   long-time friends -- just looking at this list, it's

Page 88

1              Sheldon
2    a list of people that I had known and had similar
3    dinners with for 10, 15 years.  So I believe what I
4    was conveying, hey, no problem, we do this all the
5    time.  And we can create that sort of comfortable
6    environment.
7         Q.   Mr. Fenkell writes out an invitee list,
8    if you see.  Was that -- was that generally the
9    people who attended the dinner that was held?
10        A.   I don't think the dinner was all that
11   successful in terms of getting many people there.  I
12   believe that Pat Beard and her colleague, Adam
13   Gonzalez, who were clients of ours, were there.  I'm
14   not sure.  Mr. Stipich may have been there.
15        Q.   Did Mr. Sefcovic play any role in
16   organizing the dinner?
17             MR. JOHANSON:  Objection as to form.
18        A.   I don't have a recollection of that.
19   Not to say he didn't, but I don't have a recollection
20   that he did.
21        Q.   What about Lianne Sefcovic?  Did she
22   have any role in organizing the dinner?
23        A.   No, I --
24             MR. JOHANSON:  Same objection.
25        A.   No, I don't think so.



Page 89
1                    Sheldon
2        Q.   What about SLMRS, did they play any role
3    in organizing the dinner?
4        A.   I had no recollection -- I had no
5    knowledge of SLMRS, and I would say no.  It doesn't
6    make sense to me.
7        Q.   What about SLAMS, did they have any role
8    in organizing the dinner?
9        A.   Same answer.
10       MR. JOHANSON:   Same objection to this
11   line of questions.
12       VIDEOGRAPHER:   We're about to run out.
13       MR. GOLUMBIC:   We can stop.
14       VIDEOGRAPHER:   The time now is 12:13
15   p.m.  This marks the end of tape number 2.
16       Going off the record.
17       (Discussion held off the record.)
18       (Recess.)
19       (Exhibits 19 and 20 were so marked
20       for identification.)
21       VIDEOGRAPHER:   The time now is 1:06
22   p.m. This marks the beginning of tape number 3.
23       We're back on the record.
24       Q.   Mr. Sheldon, the court reporter has
25   handed to you what's been marked as Exhibits 19 and

Page 90
1                    Sheldon
2    20.
3        Have you had a chance to review those?
4        A.   I have.
5        Q.   Let's start with Exhibit 19.  It's a
6    series of e-mails with an attachment.
7        Do you recognize -- well, you're not
8    listed on these e-mails, correct?
9        A.   Correct.
10       Q.   The e-mails concern a golf outing at
11   Firestone?
12       MR. JOHANSON:   I do object.
13       He says he's not copied on it.  He
14   doesn't have any recollection of it.  And I object to
15   your description of it.  Foundation, form.
16       Q.   The e-mails refer to an event at
17   Firestone.  Do you know what that involved, Firestone
18   Country Club?
19       A.   I don't know what that involved, no.  I
20   don't recall there being an outing.  Mr. Sefcovic
21   entertained me and other people at Firestone many
22   times over the years, but I don't have a recollection
23   of one directed to this group.  You could rekindle my
24   recollection, but I don't recall it, no.
25       Q.   Okay.  Let's go to Exhibit 20 then.

Page 91
1                    Sheldon
2        Have you had a chance to look at Exhibit
3    20?
4        A.   No.
5        Q.   Why don't you look at it and let me know
6    when you're ready.
7        A.   Okay.
8        Q.   Exhibit 20 is a series of e-mails.  Just
9    go to the furthest one.  It's an e-mail from Mr.
10   Sefcovic dated September 28, 2011, copying Richard
11   George, yourself, Mr. Belica and Mr. Wanko, with CC's
12   to Vincent Cimino, Mark Weadick and Taige Thornton.
13       Do you see that?
14       A.   Yes.
15       Q.   And the subject is "Firestone Vans."
16       Do you recognize the e-mail?
17       A.   Yes.  It does rekindle my recollection
18   of the Firestone outing, and I do recognize not the
19   e-mails themselves, but the subject matter.
20       Q.   The e-mail is from Mr. Sefcovic to the
21   names -- who is Richard George?
22       A.   He's the CEO of Great Lakes, a student
23   loans guarantor and servicer.
24       Q.   And Taige Thornton I think you've
25   mentioned him before.  He's with Northstar; is that

Page 92
1                    Sheldon
2    right?
3        A.   He was the CEO of Northstar, and that
4    company was acquired by Alliance.
5        Q.   Right.  So this was an outing at
6    Firestone Country Club in Akron?
7        A.   Yes.
8        Q.   And the people copied on these e-mails,
9    and this e-mail from September 28, 2011, were those
10   the attendees of the outing?
11       A.   Mr. George, yes, myself.  I don't have a
12   crisp recollection of Mr. Wanko being there.  Mr.
13   Cimino, Mr. Weadick, my partner, Mr. Thornton I do
14   recall being there.
15       Q.   Okay.  Who paid for the event, the event
16   at Firestone?
17       A.   I read it quickly, but I believe that
18   this was an event where we all paid our own way,
19   so-called Dutch treat.  I thought I saw that
20   somewhere, but that's my recollection of how this
21   went.  There might have been some charges that were
22   not conducive to that, that either Mr. Sefcovic paid
23   or someone else.  I don't know.  But I think that by
24   and large we all paid our own way.
25       Q.   Did Lianne Sefcovic attend this event?



Page 93

Sheldon

2    A.  No.
3    Q.  Did anyone from SLMRS attend this event?
4    A.  I don't know that firm.
5    Q.  What about SLAMS, did anyone attend from
6  SLAMS?
7    A.  Same answer.
8        (Exhibit 21 so marked
9         for identification.)
10   A.  Okay.
11   Q.  Mr. Sheldon, the court reporter has
12  handed to you what's been marked as Exhibit 21.  It's
13  two e-mails, the first from Mr. Fenkell to Mr.
14  Sefcovic dated February 27, 2012.
15       The second e-mail from Mr. Sefcovic on
16  the same date, back to Mr. Fenkell with the subject
17  line reading "Scottsdale."
18       The discussion in the e-mails is
19  regarding a dinner following an EFC conference.
20  Do you recall a dinner around that time frame --
21   A.  Yes.
22   Q.  -- in Scottsdale?
23   A.  Yes.
24   Q.  Mr. Sefcovic indicates that -- well, he
25  says, quote, "Sheldon and I are hosting several

Page 94

Sheldon

2  student loan types for golf on Tuesday followed by
3  dinner at my home."
4        Do you recall that golf event in
5  Scottsdale?
6    A.  I do.
7    Q.  Mr. Sefcovic indicates that it's
8  yourself, Mr. Weadick and Mr. Belica from your firm,
9  Chris Cronk from Bank of America and Vince Sampson,
10  head of EFC, and Mr. Wanko and perhaps Mr. Cimino
11  from RBC Capital Markets.
12       Do you recall those individuals
13  attending the golf outing?
14   A.  I do.
15   Q.  Did Mr. Cimino also attend?
16   A.  I believe that he did.  He's a member of
17  that course and I believe that he did, but I don't
18  have a crisp recollection of him being there.  I
19  remember him at dinner, but not...
20   Q.  What was the purpose of this event in
21  Scottsdale?
22   A.  Are you speaking of the EFC conference
23  or the golf or the dinner?
24   Q.  Following -- we'll start with the
25  conference.  Did you attend the conference?

Page 95

Sheldon

2    A.  Yes.  This was a run-of-the-mill EFC
3  conference in the winter of this year where all of
4  these people would normally be there.  Mr. Sampson is
5  the executive director of the entity putting on the
6  meeting, and we were all attending in the normal
7  course of our business.
8    Q.  Okay.  Who paid for the golf?
9    A.  I believe I paid for the -- or I know I
10  paid for the golf for Chris Cronk and Vince Sampson.
11  As I say, I don't remember Mr. Wanko being there, so
12  I can't speak to him.  Mr. Cimino is a member who
13  would have paid for himself.  And I believe Mr.
14  Weadick and Mr. Belica would have reimbursed me.
15   Q.  Who paid for the dinner following golf?
16   A.  The dinner was at Mr. Sefcovic's house
17  and as such, I assume that he paid for it.
18   Q.  Mr. Sheldon, I'm going to go back to
19  Exhibit 7, which is a previously marked exhibit.  If
20  you don't mind I'll see if I can find it for you.
21       Here you go.
22       (Handing.)
23       If I can direct your attention to the
24  second page of the letter?  If you could, since it's
25  been since this morning, can you read the second full

Page 96

Sheldon

2  paragraph to yourself?
3    A.  Beginning with "Alliance"?
4    Q.  Correct.
5        MR. JOHANSON:  Where are you?
6        MR. GOLUMBIC:  I'm on the page 2 of
7  Exhibit 7, the second full paragraph.
8        MR. JOHANSON:  Starting with "Once"?
9        MR. GOLUMBIC:  Correct.
10       MR. JOHANSON:  Thanks.
11   A.  Okay.
12   Q.  Okay.  I'm going to read part of this
13  into the record.  So the paragraph reads, "Once
14  Alliance entered into the Agreement, SLMRS" -- or
15  SLMRS as we've been referring to it -- "immediately
16  set about providing the student loan knowledge and
17  expertise and education lacking at Alliance.  SLMRS
18  also continued to introduce Alliance management to
19  other student loan companies and trade organizations.
20  These contacts include but are not limited to,
21  introductions to Panhandle Plains Management
22  Servicing Corporation, U.S. Education Loan, Inc.,
23  Access Group, Inc., Student Loan Finance Corporation,
24  NelNet, Inc., College Loan Corporation, Great Lakes
25  Higher Education Student Loan Corporation, the Brazos



Page 97

1         Sheldon
2  Group, GCO and others.  In each case, there developed
3  further discussions or negotiations regarding the
4  interest of Alliance in purchasing the entities
5  themselves or purchasing portfolios of student loans
6  or residual interests in or servicing of such student
7  loans."
8         Mr. Sheldon, what work did Lianne
9  Sefcovic perform for Alliance concerning the
10  Panhandle transaction?
11         MR. JOHANSON:   Objection as to form and
12  foundation.
13     A.  I'm not aware of any.
14     Q.  What work did SLAMS or SLMRS perform for
15  Alliance related to the Panhandle transaction?
16     A.  I'm not aware any.
17         MR. JOHANSON:  Excuse me.  Same
18  objection.
19     Q.  What work did Lianne Sefcovic perform
20  for Alliance in connection with U.S. Education Loan,
21  Access Group, Student Loan Finance Corporation,
22  NelNet, College Loan Corporation, Great Lakes Higher
23  Education Student Loan Corporation, the Brazos Group
24  or GCO?
25         MR. JOHANSON:   Objection as to form,

Page 98

1         Sheldon
2  foundation.  Asked and answered.
3     A.  I'm not aware of any.
4     Q.  What work did SLMRS or SLAMS perform for
5  Alliance related to Panhandle -- excuse me, with
6  respect to U.S. Education Loan, Access Group, Student
7  Loan Finance Corporation, NelNet, College Loan
8  Corporation, Great Lakes Higher Education Student
9  Loan Corporation, the Brazos Group or GCO?
10         MR. JOHANSON:  Objection to form,
11  foundation.  Also asked and answered.
12     A.  I'm not aware of any.
13     Q.  Mr. Sheldon, can you look at the next
14  full paragraph beginning with "SLMRS also arranged
15  for meetings or telephone conferences"?
16         Let me know when you've read it.
17     A.  Okay.
18     Q.  Okay.  This paragraph reads, "SLMRS also
19  arranged meetings or telephone conferences for the
20  purpose of introducing Alliance management to
21  investment bankers and bankers who were active in the
22  student loan industry.  These bankers include, but
23  are not limited to, Morgan Stanley, Citi, Key Bank,
24  Deutsche Bank, RBC Capital Markets, Bank of America,
25  Merrill Lynch, JP Morgan and others.  The purpose of

Page 99

1         Sheldon
2  these contacts was to procure financing for
3  Alliance's student loan initiative and to use the
4  bankers' contacts to provide for additional student
5  loan opportunities to Alliance."
6         Mr. Sheldon, what work did Lianne
7  Sefcovic perform for Alliance in connection with
8  Morgan Stanley, Citi, Key Bank, Deutsche Bank, RBC
9  Capital Markets, Bank of America, Merrill Lynch or JP
10  Morgan?
11         MR. JOHANSON:   Same objection as to
12  form, foundation.  Asked and answered.
13     A.  I'm not aware of any.
14     Q.  What work did SLMRS perform for Alliance
15  in connection with Morgan Stanley, Citi, Key Bank,
16  Deutsche Bank, RBC Capital Markets, Bank of America
17  or JP Morgan?
18         MR. JOHANSON:   Same objection as to
19  form, foundation.  Asked and answered.
20     A.  Same answer.  I'm not aware of any.
21     Q.  What work did SLAMS perform for Alliance
22  in connection with Morgan Stanley, Citi, Key Bank,
23  Deutsche Bank, RBC Capital, Bank of America or JP
24  Morgan?
25         MR. JOHANSON:   Objection as to form,

Page 100

1         Sheldon
2  foundation.  Asked and answered.
3     A.  I'm not aware of any.
4     Q.  If you go to the next to the last
5  paragraph on page 2 of the letter?
6     A.  Beginning "some of "?
7     Q.  Correct.  It reads, "Some of the student
8  loan contacts and introductions to Alliance were made
9  through golf outings and dinners hosted by SLMRS.
10  These golf outings and dinners were provided by SLMRS
11  at no cost to Alliance and included active
12  participation by various members of the Alliance
13  management team."
14         Are you aware of Lianne Sefcovic
15  providing work to Alliance related to student loan
16  contacts and introductions through golf outings and
17  dinners?
18         MR. JOHANSON:   Objection to form,
19  foundation.  Ask and answered multiple times.
20     A.  No.
21     Q.  What about with respect to SLMRS?  Are
22  you aware of them making student loan contacts and
23  introductions on behalf of Alliance through golf
24  outings and dinners?
25         MR. JOHANSON:   Objection as to form and



Page 101

1              Sheldon
2 foundation.  Asked and answered several times.
3        A.  No.
4        Q.   What about SLAMS, are you aware of SLAMS
5 providing student loan contacts and introductions to
6 Alliance through golf outings and dinners?
7            MR. JOHANSON:   Objection as to form and
8 foundation.  Asked and answered several times.
9        A.  No.
10           MR. GOLUMBIC:  I need to concur with
11 Andrew.
12           MR. JOHANSON:   Fine, take your time.
13           MR. GOLUMBIC:  Can we take five
14 minutes?
15           MR. JOHANSON:  Yes.  Take ten if you
16 want.
17           MR. GOLUMBIC:  We'll take five minutes
18 and we'll be right back.
19           VIDEOGRAPHER:   1:28 p.m.
20           Going off the record.
21           (Recess.)
22           VIDEOGRAPHER:   The time now is 1:31
23 p.m.
24           We're back on the record.
25        Q.   Mr. Sheldon, I have no further questions

Page 102

1              Sheldon
2 for you at this time.  Thank you.
3        A.  Okay.
4            MR. JOHANSON:  We'll just get up and
5 rotate, if you don't mind.  I'd rather sit by him for
6 a minute.
7            MR. GOLUMBIC:  Yes, that makes sense.
8            VIDEOGRAPHER:   The time now is 1:31
9 p.m., going off the record.
10           (Recess.)
11           VIDEOGRAPHER:   The time now is 1:34
12 p.m.
13           We're back on the record.
14 BY MR. JOHANSON:
15       Q.  Good afternoon.
16       A.  If I could ask a question first?  Are
17 you asking these questions of me as a third-party
18 witness?
19       Q.  You can't ask questions, but I'm going
20 to answer that anyway.
21       A.  Okay.
22       Q.  Just to identify myself like I did
23 earlier.  I'm asking questions on behalf of the
24 Fenkells, Mr. and Mrs. Fenkell, David Fenkell, Karen
25 Fenkell and DBF Consulting LLC.  And I'm also asking

Page 103

1              Sheldon
2 questions on behalf of the Sefcovics, Paul and
3 Lianne, as well as an entity called SLAMS.
4        A.  Okay.  And are you treating me as a
5 third-party witness?
6        Q.  I'm not going to answer any more
7 questions at this point.  Do you want me to come back
8 another day and do this?  Do you want me to send
9 another subpoena?
10       A.  Okay.  Well, it's unclear why you can't
11 answer that, but go ahead.
12       Q.  I'm not trying to be rude at all.  I
13 just -- I've got some questions to ask you and I'd
14 like to do so today.
15       A.  Okay.
16       Q.  May I proceed?
17       A.  Sure.
18       Q.  Thank you.
19           Do you have counsel today?
20       A.  No.
21       Q.   Did you consult with counsel before you
22 came here?
23       A.  No.
24       Q.   Are you being indemnified at all by
25 Alliance Holdings in connection with this deposition?

Page 104

1              Sheldon
2        A.  No.
3        Q.   Have you spoken to Alliance Holdings or
4 any of its agents in advance of this deposition?
5        A.  Yes.
6        Q.  Who have you spoken with?
7        A.  I spoke to counsel for Alliance, but I
8 forget the firm's name.
9        Q.  Does Will Delaney ring a bell?
10       A.  No.
11       Q.   Does Charles Jackson ring a bell?
12       A.  No.
13       Q.   When did you speak with them?
14       A.  Months ago, three or four or five months
15 ago.
16       Q.  Where did the meeting occur?
17       A.  In New York City.
18       Q.  Did they call you?
19       A.  Yes.
20       Q.   And you don't remember the name of the
21 person who you spoke with?
22       A.  I do not.
23       Q.   Do you know what office they were from?
24       A.  It's a Philadelphia law firm whose firm
25 I know well.  I just can't remember the name.



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
105–108

Page 105

Sheldon

1
2      Q.   So was it Ballard Spahr -- S-P-A-H-R, I
3  think.
4      A.   I believe they served as general counsel
5  to Alliance, if that helps.
6      Q.   Does Ballard Spahr ring a bell at all?
7      A.   Only because I know that firm very well,
8  but I couldn't say for sure that that was it.
9      Q.   Was it -- looking at that exhibit, if
10 you could, the one that's got -- Exhibit 7, could you
11 look at that for a minute?
12     A.   Yes.
13     Q.   Is that person's name -- it's Henry E.
14 Hockeimer, I think.  Does that ring a bell?
15     A.   No.
16     Q.   Does the firm name Blank Rome,
17 B-L-A-N-K, R-O-M-E?
18     A.   No.  I want to say that it begins with
19 G.
20     Q.   G?
21     A.   Yes.
22     Q.   So when did they call you the first
23 time?
24     A.   This is a guess.  Six months ago.
25     Q.   And you don't recall if it was Ballard

Page 106

Sheldon

1
2  Spahr or Blank Rome or some other firm?
3      A.   I don't recall.  I know the Ballard firm
4  very well.  And I'm inclined to say it wasn't
5  Ballard, but it could have been.  It was a
6  Philadelphia firm.
7      Q.   And you don't recall the name of the
8  person?
9      A.   I do not.
10     Q.   Was this the first time they'd ever
11 spoken with you?
12     A.   Yes.
13     Q.   And you didn't have any other meetings
14 with them?
15     A.   No.
16     Q.   Did you have any other meetings with
17 this counsel to Alliance Holdings other than the one
18 that occurred six months ago.
19     A.   No, I did not.
20     Q.   What did they say the purpose of the
21 meeting was?
22     A.   My best recollection is that they were
23 serving as counsel to Alliance in connection with the
24 matter that has developed into this, and asked me
25 questions about the role that I played with Alliance.

Page 107

Sheldon

1
2      Q.   How long did the meeting last?
3      A.   I'm going to say an hour.
4      Q.   Did anybody record any of that?
5      A.   No.
6      Q.   Was there electronic recording at all?
7      A.   No.
8      Q.   Did they take notes at the meeting?
9      A.   I don't have a crisp recollection of
10 them taking notes, but it would be normal that they
11 would.
12     Q.   Could you tell me just -- and I'll let
13 you go on as long as you like for this purpose.  Can
14 you tell me what you talked about with them?
15     A.   I talked about similar things with them
16 that I spoke with this group this morning, what I did
17 for Alliance.
18     Q.   By "this group," you mean Mr. Golumbic?
19     A.   Everyone around this table.
20     Q.   Well, this morning Mr. Golumbic was the
21 only one questioning, correct?
22     A.   Yes.
23     Q.   And so by that you mean the answers to
24 his deposition questions that he asked you this
25 morning?

Page 108

Sheldon

1
2      A.   The subject matter of that meeting was
3  similar to the thrust of the questions being asked
4  this morning.
5      Q.   Can you summarize that for me, just the
6  topic areas, please?
7      A.   What did Student Loan Capital Strategies
8  do for Alliance.
9      Q.   What else?
10     A.   I believe that's what it was.
11     Q.   What did you tell them?   That was the
12 only topic you covered, was what you did -- what your
13 entity did for Alliance?
14     A.   I don't have a crisp recollection of the
15 meeting, but I believe that the interplay of
16 Alliance, Squire Sanders, what we did was the thrust
17 of what they were asking about.
18     Q.   Do you remember what -- so the interplay
19 of Alliance and Squire Sanders?
20     A.   Yes.
21     Q.   Anything else?  Anything other than the
22 interplay of Alliance and Squire Sanders?
23     A.   No.  I don't recall.
24     Q.   And it lasted an hour, correct?
25     A.   Correct.



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
109–112

Sheldon

2    Q.   Is there anything else you recall that
3  you shared with them at that meeting other than what
4  S -- is it SLCS?
5       A.   Correct.
6       Q.   -- did for Alliance, and the interplay
7  of Alliance and Squire Sanders?
8       A.   No.
9       Q.   Were there any other details you
10  remember about that day and the interview and what
11  you shared with them?
12      A.   No.
13      Q.   Did they make any kind of commitments to
14  you of any kind?
15      A.   No.
16      Q.   Did they say anything to you other than
17  ask you questions about what you've already testified
18  about here today?
19      A.   No.
20      Q.   Who all was present?  How many people
21  were present?
22      A.   I believe there were three people
23  present.
24      Q.   But you don't remember any of their
25  names?

Sheldon

2    A.   I do not.
3    Q.   Did you keep any notes?
4    A.   I did not.
5    Q.   Did you get any e-mails in advance of
6  that meeting?
7    A.   I don't recall how they contacted me,
8  but it's likely that I got an e-mail.  I don't
9  recall.
10   Q.   How far in advance of the meeting did
11  they contact you?
12   A.   I don't have any recollection.
13   Q.   Anything else you remember about that
14  meeting?
15   A.   It was held in a building at 42nd and
16  Sixth.
17   Q.   Do you know whose offices?
18   A.   I don't.
19   Q.   So -- I don't want to duplicate, but I
20  just want to make sure I got the questions -- or the
21  answers correct.  Did you prepare for your deposition
22  today?
23   A.   I reviewed my engagement agreements and
24  some internal schedules regarding the payment of our
25  fees.

Sheldon

2    Q.   Anything else?
3    A.   That's it.
4    Q.   How long did that take you?
5    A.   Twenty minutes.
6    Q.   Did you speak with anybody else in
7  preparation for today?
8    A.   No.
9    Q.   Have you worked -- let me go back one
10  second.  On the meeting with the counsel for Alliance
11  that you described, what time frame did you share
12  information with them about, what period of time?
13   A.   I don't have a crisp recollection of
14  what period of time I spoke to them about.  I assume
15  it's the time frame that we're talking about here,
16  but I don't recall a time frame.
17   Q.   What period of time do you -- and when I
18  say "you" here, I'll talk about either you, yourself,
19  or your entity SLCS, or anybody, you know, who you
20  might be aware of at your entity who worked with
21  Alliance.  What period of time have you had a
22  commercial relationship with Alliance?
23   A.   I don't -- I wouldn't have known the
24  dates very well at all prior to this morning, but
25  approximately October of 2010 to the fall of 2012.

Sheldon

2    Q.   Did you do anything for -- and by "you,"
3  again, I use that broad definition, you, your
4  colleagues at SLCS or your entity.  To your
5  knowledge, did you do any work for Alliance after the
6  fall of 2012?
7    A.   Yes.
8    Q.   What did you do?
9    A.   In inverse chronological order, we are
10  working on a matter right now.  And --
11   Q.   Could you tell me about that matter
12  before you go on?
13   A.   Okay.  There's a company by the name of
14  GOAL, G-O-A-L, which asked Alliance to participate in
15  a particular transaction and we assessed -- put a
16  valuation on that transaction.
17   Q.   What was the purpose of assessing and
18  putting a valuation on that transaction?
19   A.   For Alliance to use and assess in their
20  interest in executing a transaction.
21   Q.   Does that assist Alliance in
22  establishing the purchase price?
23   A.   Yes.
24   Q.   Do you issue a fair market value and
25  fairness opinion letter about it?



Page 113

Sheldon

2    A.   We would in a more formal arrangement.
3  This was informal, given the early stage of the
4  proposed transaction.
5        Q.   What did you get paid?  And again, by
6  "you," I'm talking about your entity and the
7  individuals connected to your entity.  What did you
8  get paid for that service?
9        A.   We haven't been paid yet.  We expect to
10  be paid in the neighborhood of $5,000.
11        Q.   Anything more than that?
12        A.   No.
13        Q.   Do you expect anything if the deal goes
14  forward?  Do you get any other fees?
15        A.   As I understand it, the deal is dead.
16  If it went forward, we'd probably get a little bit
17  more, but it's a very minor transaction.
18        Q.   Was that work related to just simply
19  acquiring that entity or any other services
20  contemplated?
21        A.   Simply purchasing a piece of a proposed
22  new LLC.
23        Q.   And after that point, your -- and by
24  "your," I mean again the definition we're using for
25  "you" and "your" today -- your involvement would end?

Page 114

Sheldon

2        A.   Presumably, yes.
3        Q.   So that's the most recent one, correct?
4        A.   Yes.
5        Q.   Could you work us back from there to the
6  time -- to the fall of 2012?
7        A.   I believe that we did something similar.
8  And if you give me the rest of the day, I could
9  probably remember it, but I can't -- it's not coming
10  to me right at the moment.
11        Q.   Okay.  Just one something similar or
12  more than one something similar?
13        A.   Probably one.
14            If you'd like to give me a minute,
15  I'll --
16        Q.   Yes.  I'm not in a hurry.  I didn't mean
17  to rush you.  Take your time.
18        A.   It's not coming to me.  I have a vague
19  recollection that we did something.  I'm certain we
20  didn't get paid for it.  But I think we discussed a
21  transaction that didn't go anywhere, and I would need
22  to jog my memory to bring any more up.
23        Q.   Do you recall at all if there's more
24  than one of those things that might have occurred?
25        A.   If I was -- if I had to utter a number,

Page 115

Sheldon

2  I would say one.
3        Q.   How did that engagement come about?
4        A.   John Kolla likely would have called us
5  up and told us about something that he's working on.
6        Q.   Would he have called you or would he
7  have called somebody else?
8        A.   He likely would have called me, but he
9  could call Mr. Belica.
10        Q.   I know it's an odd way to communicate,
11  but let me finish before.  It's an unusual form of
12  communication we're doing here today.
13            So I didn't hear that.  Could you tell
14  me how that would have --
15        A.   Maybe you could ask the question again.
16        Q.   How would it have developed that
17  Alliance contracted with you or your firm to do this
18  additional work within the last few months?
19        A.   Okay.  There wouldn't have been a
20  contract.  If there was a contract, I would remember.
21  John Kolla likely would have called us, "Paul,
22  something's come across my desk.  We may have a shot
23  at some business here."  He might have said, "What do
24  you think?"  Or we might have spoken informally about
25  it, but it would have been in the nature of a fishing

Page 116

Sheldon

2  expedition.  I'm relatively certain and can tell you
3  that there was not any concrete transaction that we
4  would have signed an engagement for since around
5  2012.
6        Q.   Do you know why that is?
7        A.   The timing of what we did for Alliance
8  occurred in connection with the financial crisis, and
9  so if you had money to spend to buy things, there
10  were plenty of people to sell things.  With the
11  financial crisis being substantially over by 2012,
12  that didn't exist.  And at the same time, there were
13  plenty of people coming into the business, hedge
14  funds and the like, doing the same thing as Alliance.
15        Q.   Was there any reach out from your group,
16  you or your group or SLCS to Alliance after the fall
17  of 2012?
18        A.   I don't have a crisp recollection of
19  that, but there would have been some reach out.  By
20  the time Mr. Fenkell left, it disrupted the normal
21  sort of conversation chain.  I imagine that we would
22  have talked to Mr. Wanko.  "What's the latest?"  He
23  would have said to us -- I believe that Mr. Wanko may
24  have called and said, "Don't forget we're still in
25  this business and we want to see deals if anything



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
117–120

Page 117

Sheldon

1  comes across your desk," that sort of thing.
2  Q.  When would you mostly have received that
4  type of a communication from Mr. Wanko?
5  A.  Quite some time ago, twelve months ago.
6  It's a guess.
7  Q.  Okay.  Did anybody else from Alliance
8  reach out to you during that period of time?
9  A.  I don't recall anybody, no.
10  Q.  Other than Mr. Kolla and Mr. Wanko?
11  A.  Correct.
12  Q.  What's your specific role at SLCS?
13  A.  I formed the firm.  I'm the managing
14  director.
15  Q.  What does that mean, to be a managing
16  director?
17  A.  It's a title commonly used on Wall
18  Street.  It means -- it connotes a senior position.
19  I'm an owner of the firm with my other three
20  partners.
21  Q.  Are you all equal shareholders or
22  members?
23  A.  We are.
24  Q.  You said you had eight -- was it eight
25  employees?

Page 118

Sheldon

2  A.  There are four partners and four
3  employees or consultants.
4  Q.  What are the tasks that the four
5  partners typically handle?
6  A.  Originating transactions, originating
7  assignments for financial advisory.  In the case of
8  Mr. Belica, analyzing the substance of a proposed
9  transaction.
10  Q.  Is that the sum total?
11  A.  There are management responsibilities.
12  We have ongoing services that are managed.
13  Q.  What are those services?
14  A.  We serve as backup administrator for
15  various asset-backed securities transactions.
16  Q.  What are the nature of those services?
17  A.  We stand ready to service -- to
18  administer a bond issue in the event that the
19  administrative agent is no longer prepared to do
20  that.
21  Q.  Do you get paid for standing ready?
22  A.  Yes.
23  Q.  How much do you get paid for standing
24  ready?
25  A.  It varies.

Page 119

Sheldon

1  Q.  And I'm using your -- I don't know your
3  business the way you do.  So I'm just using your
4  terms.
5  A.  It varies from client to client.
6  Q.  Could you give me a couple of examples,
7  please?  And I don't need the client names.  I just
8  want to know the types of services --
9  A.  For a major bank we stand ready to step
10  into the administrative role for $28,000 per quarter.
11  Q.  Did you say 28?
12  A.  $28,000 per quarter.
13  Q.  Thanks.  I'm getting older.  I'm having
14  a hard time hearing.
15  A.  Me, too.
16  Q.  Sorry about that.
17  28 per quarter.  Okay.  And any other
18  services where you stand ready to do something that
19  you get paid for?
20  A.  Not currently, no.
21  Q.  Do you have services that you pitch
22  where you stand ready and you do get paid for that?
23  A.  No.
24  Q.  What other services do you -- do you do
25  other than the ones you've mentioned so far?

Page 120

Sheldon

2  A.  I believe that covers it.
3  Q.  So that's the universe?
4  A.  Yes.
5  Q.  So the post closing -- a lot of your --
6  sorry.  Let me back up.
7  A lot of your services relate to
8  closing -- originating and closing transactions,
9  correct?
10  A.  Correct.
11  Q.  And advisory services related thereto?
12  A.  Correct.
13  Q.  And then of the post-closing services,
14  you do for major banks stand ready to serve as an
15  administrator for asset-backed securities, correct?
16  A.  Correct.
17  Q.  And you get paid for that?
18  A.  Yes.
19  Q.  And nothing else you can recall that you
20  do on a post-closing basis?
21  A.  Correct.
22  Q.  Okay.  Who would you consider as your
23  competitors?
24  A.  Our competitors would be advisory firms.
25  I said this morning that First Southwest is a



Page 121

1            Sheldon
2   financial advisory firm in Dallas which competes with
3   us.
4        Q.   Do you know of any others?
5        A.   There's a firm in Albany, First Albany,
6   I believe is still the name.
7        Q.   Is that in New York?
8        A.   Sorry.  Those people went to a small
9   firm and they have an advisory assignment in
10  Massachusetts.
11       Q.   Do you consider investment bankers to be
12  competitors sometimes for the type of work you do?
13       A.   No.
14       Q.   So there aren't any investment bankers
15  who originate deals and get paid to close deals in
16  your area of expertise?
17       A.   We are advisors.  The investment banks
18  are principals in underwriting transactions.
19       Q.   Do the investment banks sometimes do
20  some -- conduct some of the services that you
21  provide?
22       A.   For many of our clients which are
23  municipal entities, we're a registered -- we're
24  registered with the SEC and the MSRB.
25       Q.   Are you a registered investment advisor?

Page 122

1            Sheldon
2        A.   No.  We're a registered municipal
3   advisor.  Investment banks cannot give advice to
4   municipal entities and underwrite their securities.
5   And so as to municipal entities, the investment banks
6   are not our competition.
7            As to other entities, the investment
8   banks tend to not be in it for the advice, as opposed
9   to the underwriting and the like.
10       Q.   Are they ever in it for the fee to
11  originate a deal and close a deal?
12       A.   They're always in it for a fee to
13  originate, let's say, an underwriting, perhaps an M&A
14  transaction.  In the M&A space we do directly compete
15  with investment banks.
16       Q.   What do you consider to be the M&A
17  space?
18       A.   Where a client is either buying or
19  selling a property.
20       Q.   A property or a business?
21       A.   Could be either.
22       Q.   Or both?
23       A.   We would refer to a business as a
24  property.
25       Q.   And you assisted Alliance in buying some

Page 123

1            Sheldon
2   properties, correct?
3        A.   Correct.
4        Q.   Using your definition.
5            Do you consider the introductions you
6   make -- do you consider that you're the only one who
7   could make introductions to companies like Alliance?
8        A.   No.
9        Q.   I know this may be difficult to answer,
10  but I'll ask it anyway.
11           During the period of time when you
12  started -- when did you start working with Alliance?
13       A.   I believe in the spring of 2010.
14       Q.   From that point until the fall of 2012,
15  can you make an estimate of how much Alliance paid
16  you for your services, the pre-transaction and
17  transaction services?
18       A.   Approximately $575,000.
19       Q.   Did they pay you for any
20  post-transaction services?
21       A.   The number I just gave you is the sum
22  total of what they paid us to date.  I don't -- I
23  can't recall something that might be characterized as
24  a post-transaction engagement.
25       Q.   Okay.  You can't think of anything, any

Page 124

1            Sheldon
2   service you might have provided?
3        A.   Post transaction?
4        Q.   Correct.
5        A.   Nothing is occurring to me, no.
6        Q.   Okay.  Thanks.
7            What are your specific duties with --
8   focusing now just on the Alliance relationship as
9   you've testified about, what are your specific duties
10  in that relationship?
11       A.   Are you talking about currently or
12  during the time frame that we're talking about?
13       Q.   Let's first consider spring of 2010
14  through the fall of 2012.
15       A.   What is my personal?
16       Q.   Yes.  What did you do personally?
17       A.   Interface with Mr. Fenkell, Mr. Wanko,
18  identifying goals of Alliance, targets for
19  acquisition, conversation with respect to particular
20  transactions, formulating the terms of a potential
21  engagement agreement, managing the process of
22  creating a valuation for a target into transactions
23  which closed, facilitating the execution and
24  successfully closing it.
25       Q.   Anything else?



Page 125

1            Sheldon
2      A.  I believe that's covers the substance of
3  my role in the Alliance relationship.
4      Q.  Did you assist at all with the terms of
5  the deals of the purchasing of the properties?
6      A.  Yes.  That's what I mentioned in helping
7  execute the transaction.
8      Q.  Okay.  I didn't understand that.
9  Thanks.
10         Who else at your company had involvement
11 in the Alliance deals?
12     A.  Mr. Weadick, my partner, and Mr. Belica,
13 my partner.
14     Q.  Could you contrast what they did
15 relative to what you did for a moment?
16     A.  Mr. Weadick did things similar to me.
17 You could list those functions that I mentioned for
18 my own role as the same for Mr. Weadick.
19         Mr. Belica is different.  He has a very
20 specialized knowledge of analyzing cash flows.  He is
21 the head of our analytics, if you will, and his role
22 would be to receive data about a transaction and make
23 a prediction about the cash flows of that transaction
24 to assist in helping come up to a valuation.
25     Q.  Would you consider that to be due

Page 126

1            Sheldon
2  diligence that you assist Alliance with in preparing
3  to execute on a deal?
4      A.  No.  That's not due diligence.  It's
5  fundamental analysis of valuation.
6      Q.  Okay.  Does that go into the fundamental
7  terms of the deal then?
8      A.  The fundamental terms of the deal would
9  be more in my bailiwick.  Patrick would -- given the
10 fundamental terms of the deal, Patrick would -- Mr.
11 Belica would assess the cash flows that are likely to
12 develop given the portfolio of student loans, and
13 would develop a cash flow stream that could then be
14 discounted.  We would jointly -- Mr. Belica and Mr.
15 Weadick and myself would jointly come to an
16 appropriate discount rate, for example, to discount
17 the cash flows at.  We might -- Mr. Belica would also
18 have an impact in assessing how a rating agency might
19 assess the transaction in order to predict the terms
20 that Alliance might, or whoever, might get when it
21 came time to financing, let's say, a pool of loans.
22     Q.  So then how was that information
23 typically used by Alliance after Mr. Belica
24 accomplishes this analysis?
25     A.  All of that analysis would be sent to

Page 127

1            Sheldon
2  the Alliance team.  There would be follow-up
3  telephone calls about how Mr. Belica ran the cash
4  flows.  There would be conversation about how should
5  we stretch cash flows, and then Mr. Belica would redo
6  the cash flows, given various stresses that we want
7  to put on the transaction.
8      Q.  Other than that, Mr. Belica, yourself
9  and Mr. Weadick --
10     A.  Yes.
11     Q.  You've described everything the three of
12 you do, correct, with respect to the Alliance
13 relationship?
14     A.  I believe so, yes.
15     Q.  Now, you've got four other folks there?
16     A.  Yes.
17     Q.  What have those folks done for Alliance
18 during the relevant time period?
19     A.  I can't think of a time that those
20 people were involved on the Alliance matter.
21     Q.  Okay.  Those people, those four, what
22 other types of services do they provide for your
23 organization and for your clients, the clients of
24 your organization?
25     A.  Two are involved in the back-up

Page 128

1            Sheldon
2  servicing arrangements that we already discussed.
3      Q.  Is that with the big banks, the large
4  banks?
5      A.  Various types of clients.  I gave you an
6  example as a big bank.  There are other clients which
7  are not big banks.  And two do rudimentary work in
8  preparation for Mr. Belica to do his work.
9      Q.  Anything else?
10     A.  No.
11     Q.  That backup, other than the one --
12 because we went into that one where you stood ready
13 to do the backup servicing, correct?  Remember that
14 testimony?
15     A.  Yes.
16     Q.  What other types of backup servicing
17 agreements do those folks work on other than the
18 standing ready?
19     A.  We -- when you do a bond issue, you have
20 to prepare statistical information about that bond
21 issue for reporting to the rating agencies, and we do
22 that work for several clients.
23     Q.  Do you know how many?
24     A.  In total, I believe it's six clients.
25     Q.  Did you ever do any of that work for



PAUL SHELDON                                    October 28, 2014
SPEAR VS. FENKELL                                      129–132

Page 129
Sheldon
1    Alliance?
2        A.  I don't believe so, no.
3        Q.   What types of entities do you work with,
4   just summarizing -- again, to the extent -- I'm
5   trying not to duplicate.  I may duplicate a little
6   bit, so bear with me.
7            So what types of entities do you
8   generally -- you and your team generally provide
9   services to?
10       A.   The not-for-profit sector.  I would be
11  glad to describe what that is.
12           We have some clients involved in the
13  insuring of bond issue, bond insurance companies.
14           We have advised a number of for-profit
15  student loan participants.
16           We have 71 clients.  I'm trying to think
17  of the names of those clients as I do this.
18       Q.   That's fine.  Thanks.
19           Anything else you want to add there?
20       A.  No.
21       Q.   What is -- you testified this morning
22  about a student loan entity.  What is the definition
23  of a student loan entity, you being the expert?
24       A.   A student loan entity is an entity that

Page 130
Sheldon
1   participates in the student loan industry.
2        Q.   What is the student loan industry again?
3   What does that comprise of in a short nutshell?
4        A.   The making of student loans to students.
5        Q.   How many of those entities exist?  I
6   mean, you might not know exact, but...
7        A.   Some that are in that industry make the
8   loans.
9        Q.   Yes.
10       A.   Some insure bonds that finance those
11  loans.  There's lots of different prongs for the
12  industry.
13       Q.   Yup.
14       A.   There might be 200.
15       Q.   Okay.  Thanks.
16           How do you go about -- I think you
17  testified that you said you got involved in this
18  industry in the early '80s; is that correct?
19       A.  Yes.
20       Q.   1981?
21       A.  Yes.
22       Q.   How does one go about meeting people in
23  the industry?  Now we'll call it the student loan
24  industry.  When I say "industry," I'm using your

Page 131
Sheldon
1    definition.  How does one go about doing that?
2        A.   There's probably a number of ways to go
3   about doing that, looking up a list of, let's say,
4   issuers and going to meet them.
5        Q.   What other ways?
6        A.   Attend conferences where they might be
7   present.
8        Q.   What conferences typically are held in
9   this industry?
10       A.   There are several.  Education Finance
11  Council, NCHER, Asset-Backed Securities conference.
12  There's a student loan conference.  There's probably
13  a student loan conference held ten times per year.
14  You can pretty much meet everybody you want to meet
15  by attending those ten conferences.
16       Q.   Is it a close universe of people?
17       A.  Yes.
18       Q.   How many people do you estimate?
19       A.   In the entire industry?
20       Q.  Yes.
21       Q.   Are you talking about executive level
22  or?
23       Q.   No.  The ones that go to these
24  conferences.

Page 132
Sheldon
1        A.   Okay.  250.
2        Q.   Do you see the same folks at each
3   conference?
4        A.   Pretty much.
5        Q.   Have you seen -- you testified you know
6   Mr. Sefcovic, correct?
7        A.  Yes.
8        Q.   And you know of Lianne Sefcovic,
9   correct?
10       A.  Yes.
11       Q.   Have you seen them at these conferences?
12       A.  Yes.
13       Q.   Have you seen presentations that Mr.
14  Sefcovic has made, or have you witnessed
15  presentations he's made at these conferences?
16       A.  Yes.
17       Q.   And you said -- I think you've described
18  him as being your attorney, you know, a couple of
19  times during your testimony.
20       A.   Many times -- oh.  I referred to him as
21  my counsel a couple times this morning in connection
22  with many transactions.
23       Q.   Did you come to hire him or did he
24  approach you?  How did that work out the first time?



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
133–136

Page 133

Sheldon

1
2     A.  I believe that we were working for an
3  Ohio based company and that Ohio based company
4  suggested that Squire Sanders be our counsel.
5     Q.  Was there then a referral from that Ohio
6  based company specifically to Mr. Sefcovic?
7     A.  Yes.
8     Q.  And do you recall anything about the
9  first time you met Mr. Sefcovic?
10    A.  No.
11    Q.  Do you remember when it was,
12  approximately?
13    A.  It would have been in the early '90s.
14  Let's call it 1993 or so.
15    Q.  Did he and his firm provide opinion
16  letters to you or your clients?
17    A.  Opinion letters to my firm, Citigroup.
18    Q.  Okay.  And to other entities that you
19  worked at, Smith Barney?
20    A.  Same entity.  Smith Barney morphed into
21  Citigroup.
22    Q.  Okay.
23    A.  But underwriters' counsel would give
24  opinion on various matters to the company that hired
25  them.

Page 134

Sheldon

1
2     Q.  Did you review Mr. Sefcovic's work in
3  that respect when he issued those opinion letters?
4     A.  We would typically have internal counsel
5  that would review the opinion.  I wouldn't typically
6  have overseen the subject matter of his opinions.
7  It's extremely -- the expertise is high, and I never
8  have held myself out as a securities lawyer or a
9  lawyer of any kind.
10    Q.  Did you find Mr. Sefcovic to have the
11  necessary expertise to issue those types of opinion
12  letters?
13    A.  Very much so, yes.
14    Q.  And you worked with him how long, or do
15  you still work with him?
16    A.  Many years.  We haven't worked together
17  for some time, but in rough numbers, 1993 to
18  2005-ish.
19    Q.  How many deals would you have worked on?
20    A.  Numerous.
21    Q.  What size transactions did you work on
22  with him?
23    A.  They might range from $100 million to a
24  billion dollars or more.
25    Q.  Did you ever express any concern to Mr.

Page 135

Sheldon

1
2  Sefcovic about the work product he gave you during
3  that time period?
4     A.  No.
5     Q.  So you talked about attending
6  conferences, right?  To develop these contacts within
7  your industry, correct?
8     A.  Yes.
9     Q.  And did you --
10    A.  Well, if I could --
11    Q.  Yes, sure.
12    A.  -- respond to that?
13    Q.  I'm not trying to misstate what you
14  said.
15    A.  Your question was how do you meet
16  people?
17        My response was, well, you could call
18  them up.  You could go meet them at their office or
19  you could attend a conference where their presence is
20  available to you.
21    Q.  Is that pretty standard fair in your
22  industry?
23    A.  If you're new to the industry, that's
24  what you would do to try to get yourself into the
25  industry.

Page 136

Sheldon

1
2        The reason I'm carrying this
3  distinction, I've been in the industry since 1981,
4  and you meet people by transacting with them.  It's a
5  little bit of a different slant on --
6     Q.  No problem.
7     A.  -- something you were getting into.
8     Q.  Would you associate yourself with
9  someone within the industry who was recognized as an
10  expert?
11    A.  Please repeat that.
12    Q.  Would you associate yourself with
13  someone within the industry who's recognized as an
14  expert, if you were trying to develop business in
15  that area?
16    A.  Sure.  You may.
17    Q.  Did you do that at one point?
18    A.  No.  I don't think so.
19    Q.  Did you associate with people like Mr.
20  Sefcovic who did the technical legal work on
21  transactions?
22    A.  I wouldn't say I associated with him.
23  He served as counsel to Citigroup in numerous ways,
24  but I wouldn't call it an association.
25    Q.  I don't mean to say you were partners or

PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
137–140

Sheldon

1  anything. I'm just saying is it useful in your
2  industry to have different forms of legal and other
3  expertise that you associate yourself with?
4      A. Very much useful. Mr. Sefcovic referred
5  I would say -- I wouldn't say numerous, but certainly
6  more than one situations that panned out into fine
7  transactions for me. And when I say "me," I really
8  mean by firm.
9      Q. In terms of meeting people and really
10  getting yourself involved in your industry and
11  developing business, do you attend functions as well,
12  other than conferences?
13      A. I can't think of any, but if you could
14  make that more pointed, it might --
15      Q. So, for example, could you host a
16  dinner, for example?
17      A. Sure.
18      Q. Could you host a golf outing?
19      A. Yes.
20      Q. And other types of entertainment
21  functions that might bring people who are interested
22  in doing a deal with you to the table?
23      A. Yes.
24      Q. You were engaged in -- you have been

Sheldon

1  engaged in those activities since 1981, correct?
2      A. Correct.
3      Q. So did you say -- I want to make sure I
4  understood this. Citigroup morphed -- I'm sorry, I
5  don't remember the way it changes. But Citigroup
6  morphed into Smith Barney or --
7      A. The other way around.
8      Q. The other way around.
9      A. Smith Barney Harris Upham morphed into
10  Citigroup.
11      Q. Okay. Would you consider Mr. Sefcovic a
12  business acquaintance?
13      A. Yes.
14      Q. Were you one of his clients at some
15  point?
16      A. My firm was.
17      Q. Do you consider him a friend?
18      A. Yes.
19      Q. Did you have an occasion to use Mr.
20  Sefcovic's services for student loan securitizations
21  for student loan entities that you talked about
22  earlier?
23      A. My firm used him as underwriters'
24  counsel in connection with asset-backed securities

Sheldon

1  issues.
2      Is that responsive to your question?
3      Q. Is that similar to or the same as a
4  student loan securitization --
5      A. Yes.
6      Q. -- for a student loan entity?
7      A. Yes.
8      Q. Using your definitions of the term
9  "student loan entity."
10      Where did you typically -- where were
11  the clients located where you typically did that work
12  in connection with Mr. Sefcovic?
13      A. Ohio, Texas, Maine.
14      Q. And were those multiple transactions in
15  all of those locations?
16      A. Yes.
17      Q. Was Mr. Sefcovic your counsel of choice
18  for those transactions?
19      A. I think you mean as opposed to being
20  forced on us by a client or something like that.
21      Q. I'm not even going that far. I'm just
22  saying would you typically use him or did you use a
23  bunch of other people?
24      A. We used other firms as well, but Mr.

Sheldon

1  Sefcovic did a lot of work for our firm.
2      Q. Did he do more work for your firm than
3  other attorneys?
4      A. I believe so, yes.
5      Q. Did you introduce or refer Mr. Sefcovic
6  to your other colleagues in your industry or clients
7  of yours?
8      A. I believe due to his prominence, the
9  whole industry knew him. It's likely that my
10  colleagues and I at Citigroup referred him to others.
11  And as you mentioned that, yes, my firm after leaving
12  Citigroup referred Mr. Sefcovic to an entity.
13      Q. One entity or multiple ones?
14      A. Like your hearing, mine doesn't work
15  like it used to be. But one in particular in
16  Arizona, we referred Mr. Sefcovic to a bond insurance
17  company that was our client. So I would say on
18  numerous occasions or certainly more than two over a
19  fifteen-year period, we either referred Mr. Sefcovic
20  or said nice things about him to third-party clients.
21      Q. Did Mr. Sefcovic make introductions of
22  you and your firm and the folks in your group to
23  other student loan entities or potential business
24  opportunities?



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
141–144

Page 141

1              Sheldon
2      A.   Alliance is certainly a prime example of
3  one, and I believe that there -- I could create a
4  list of several referrals that he made that may or
5  may not have led to business.
6      Q.   Do you remember any of the names of
7  those entities?  You don't have to, but I'm just
8  saying.
9      A.   None are coming immediately to mind.
10      Q.   But you were successful in landing some
11  business as a result of including the Alliance
12  business as a result --
13      A.   Well, Alliance would be a prime example.
14  I believe, in the sum total of my firm's relationship
15  with Mr. Sefcovic, we probably referred more business
16  to him than him to us.  But he certainly had us in
17  mind -- top of mind when he thought about introducing
18  an investment banking firm or an advisor.
19      Q.   Do you have any idea how much in the way
20  of revenues your firm generated -- business and/or
21  revenues that your firm generated from the
22  relationship with Mr. Sefcovic?
23      A.   And when you say my firm, are we talking
24  about Student Loan Capital Strategies now or --
25      Q.   Let's break it down.  So Student Loan

Page 142

1              Sheldon
2  Capital Strategies first and then back it up, if we
3  could.
4      A.   Okay.  For Student Loan Capital
5  Strategies, it's the Alliance matter.
6      Q.   Which is the roughly 5 --
7      A.   $575,000.
8      Q.   Any others you can think of there?
9      A.   None are coming to mind.
10      Q.   How about backing up now with the other
11  entities that you were involved in, Citigroup, Smith
12  Barney, et cetera?  Do you want to break that down
13  for the record?
14      A.   This would have occurred ten years ago
15  and longer, and I just don't have any crisp examples
16  that are coming immediately to mind.
17      Q.   How about the revenues that were
18  generated by the end result of the work that was
19  accomplished where Mr. Sefcovic was underwriters'
20  counsel?
21      A.   Do you mean regardless of who introduced
22  who to that business?
23      Q.   Yes, that work.
24      A.   Mr. Sefcovic probably served as
25  underwriters' counsel in connection with 15

Page 143

1              Sheldon
2  transactions that my firm at Citigroup executed.  And
3  I would say his fee was neighborhood of 100,000 to
4  $150,000, maybe approaching $200,000 on the larger
5  ones, maybe 150,000 times 15.
6      Q.   How about the other way around?  When
7  your entities -- when you were involved at Citigroup
8  or Citibank and Smith Barney, how much in the way of
9  revenues did your firm generate from those
10  transactions that occurred?
11      A.   As I testified to a minute ago, I can't
12  think of any crisp assignments that were introduced.
13  My gut instincts is that Mr. Sefcovic was important
14  in getting us some business.  I just can't remember
15  any particular.  I'm sure he's sitting thinking,
16  "Paul, come on.  Don't you remember?"  But I'm sorry,
17  I don't have a crisp recollection.
18      Q.   I'm not trying to push you there, but
19  okay, so now let's say it's not as a result of his
20  introduction, but the two of you are working
21  together, you at Citigroup or Smith Barney and him at
22  Squire and you're doing a deal and there's 15 of
23  those transactions.  What kind of level of revenues
24  are generated in those types of transactions for a
25  group like Citigroup?

Page 144

1              Sheldon
2      A.   For the underwriter?
3      Q.   Yes.
4      A.   Order of magnitude, $15 million.
5      Q.   Per deal?
6      A.   No, no.  Total.
7      Q.   15 million?
8      A.   I'm multiplying 15 transactions times a
9  million dollars, as extreme -- extremely rough, just
10  to answer your question.
11      Q.   Do you make any money after the deal
12  closes?
13      A.   Many, many of those transactions, almost
14  most of those transactions had a type of structure
15  called auction rate securities where the firm would
16  continue to act as broker-dealer.  I'll explain what
17  that means if you care.  But there would be revenues
18  that would last indefinitely.
19      Q.   And that would be a revenue stream that
20  would go to Citigroup or Smith Barney, for example --
21      A.   Correct.
22      Q.   -- in connection with the underwriting.
23  So there's a fee at the closing and then there's an
24  ongoing fee?
25      A.   Correct.



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
145–148

Page 145

1                   Sheldon
2       Q.   Or revenue stream?
3       A.   Correct.
4       Q.   Was that substantial?
5       A.   Very substantial.
6       Q.   Can you estimate the kind of magnitude
7   that -- what does "very substantial" mean per deal?
8       A.   Well, per deal per year it would
9   typically be around 25 basis points times the amount
10  of debt involved, one quarter of one percent.  But as
11  you did numerous transactions and continued to get
12  annual fees, it mounted up significantly.
13          VIDEOGRAPHER:   Five minutes left on
14  tape, counsel.
15          MR. JOHANSON:   Thanks.
16      A.   It might be -- it might approach $50
17  million.
18      Q.   Per deal?
19      A.   No.  In total.
20      Q.   For 15 or for one?
21      A.   For all 15.
22      Q.   Okay.
23      A.   If your question is how much did you
24  make in transactions where Mr. Sefcovic served as
25  your underwriters' counsel, the order of magnitude is

Page 146

1                   Sheldon
2   $50 million.
3       Q.   All told or one year?
4       A.   All told.
5       Q.   Okay.  Who introduced you to Mrs.
6   Sefcovic, Mrs. Lianne Sefcovic?
7       A.   I'm pretty sure it would have been Mr.
8   Sefcovic.
9       Q.   Did you have any -- and I'm not
10  saying -- this might sound strange, but what was your
11  relationship with Mrs. Sefcovic?
12      A.   Mrs. Sefcovic?
13      Q.   Yes.
14      A.   My wife and I had, I would say, numerous
15  dinners and the like with the Sefcovics.  And Mr.
16  Sefcovic and Mrs. Sefcovic and I often played golf.
17      Q.   Did you -- have you been involved in any
18  business transactions with Mrs. Sefcovic?
19      A.   No.
20      Q.   Did you socialize with the Sefcovics?
21      A.   Yes.
22      Q.   How often?
23      A.   Well, they live in Phoenix.  I spend a
24  week here and there, maybe a total of six weeks in
25  the year in Phoenix.  And over the years since Mr.

Page 147

1                   Sheldon
2   Sefcovic and Mrs. Sefcovic were married, I may play
3   golf with them once or twice or three times during
4   that week, if that's responsive to your question.
5       Q.   Over a six-week period of time?
6       A.   I would go out for a week.  We might
7   play golf three times.  About a week, four weeks
8   later we might play golf three times again.
9       Q.   Who else -- other than Mr. and Mrs.
10  Sefcovic, who else would join you periodically for
11  those golf outings?
12      A.   A name that came up this morning, Mr.
13  Cimino, also in our business, also a member of our
14  golf club, might join us.
15      Q.   Is Mr. Cimino in the student loan
16  business?
17      A.   Yes.
18      Q.   Or student loan industry.
19          Does he work with a student loan entity
20  or is he on the financing side?
21      A.   He's very much like me.
22      Q.   Did he work for you in the past?
23      A.   He did.
24      Q.   When did that cease, that relationship?
25      A.   2000 and -- 2002 maybe.  I don't have a

Page 148

1                   Sheldon
2   crisp recollection on that.
3       Q.   Do you remember when you met Mrs.
4   Sefcovic?
5       A.   Date wise?
6       Q.   Yes.  Year wise.
7       A.   No.  I don't.
8       Q.   Did you -- you attended dinner meetings
9   at their home, correct?
10      A.   Yes.
11      Q.   You testified earlier?
12      A.   Yes.
13      Q.   Did other people in the student loan
14  industry attend those meetings?
15      A.   Sometimes they did.  Sometimes it would
16  be the four of us.
17      Q.   "Four of us" being your wife, you, the
18  Sefcovics?
19      A.   Yes.  And I likely attended dinner at
20  the Sefcovics by myself as well, maybe after golf and
21  the like.
22      Q.   And with other people in the student
23  loan industry?
24      A.   Correct.
25          VIDEOGRAPHER:   Down to about a minute,



Page 149

1           Sheldon
2 counsel.
3           MR. JOHANSON:   Want to take a break and
4 change it?
5           VIDEOGRAPHER:   The time now is 2:35
6 p.m. This marks the end of tape number 3.
7           Going off the record.
8           (Recess.)
9           VIDEOGRAPHER:   The time now is 2:45
10 p.m. This marks the beginning of tape number 4.
11           We're back on the record.
12      Q.   Mr. Sheldon, did you stay at the
13 Sefcovics' home in Arizona at any point?
14      A.   I think I spent a night there, yes,
15 sometime ago, not the current home but the previous
16 home. I believe that my wife and I stayed there, but
17 I don't have a crisp recollection of that.
18      Q.   Did your wife stay at their home apart
19 from you ever?
20      A.   I can't recall an instance, no.
21      Q.   And you mentioned a golf outing. What
22 was it called? The Firestone golf outing?
23      A.   Yes.
24      Q.   There were student loan entities and/or
25 potential clients at that golf outing, correct?

Page 150

1           Sheldon
2      A.   The Firestone outing, of which there
3 were several over my relationship with Mr. Sefcovic,
4 would have been a very controlled and small group,
5 usually existing clients. That's an expensive outing
6 and it's not something that you would do for just any
7 old person in the industry that you hope to do
8 business with some day. A few exceptions to that,
9 but...
10      Q.   At this outing, did you discuss the
11 student loan industry?
12      A.   Of course.
13      Q.   And different strategies for
14 accomplishing transactions?
15      A.   Yes.
16      Q.   Et cetera?
17      A.   Yes.
18      Q.   Anything else? I'm talking about from a
19 business perspective.
20      A.   No. In common would be the student loan
21 industry, so that would be the subject of dinner and
22 breakfast and tea time conversation.
23      Q.   Who is Dick George from Great Lakes?
24      A.   Dick George is the CEO of a significant
25 student loan enterprise, Madison Wisconsin, primarily

Page 151

1           Sheldon
2 involving guaranteeing student loans and servicing
3 student loans.
4      Q.   Did Alliance do work with him or did --
5      A.   I believe that Alliance had them as a
6 target in many ways, but there was a significant
7 relationship between Great Lakes and Northstar
8 personnel like Taige Thornton, and so Mr. George was
9 an associate of Taige and also someone that I knew
10 of, done business with and played golf with on
11 numerous occasions over 10 to 15 years.
12      Q.   You said that was a significant
13 relationship, I think you said, about Mr. George and
14 Great Lakes?
15      A.   I believe so, yes. I don't have a crisp
16 understanding of the relationship, but I believe that
17 perhaps Northstar personnel worked for Great Lakes
18 over the course of their career.
19      Q.   And that could have generated
20 substantial revenues for your firm, for Alliance or
21 others, correct?
22      A.   Are we talking about Mr. George?
23      Q.   Mr. George and his company, Great Lakes.
24      A.   Generally the future of -- there could
25 have been, still could be significant business

Page 152

1           Sheldon
2 relations between our firm and Great Lakes, yes.
3      Q.   Similar with Alliance Holdings and Great
4 Lakes?
5      A.   No, not similar with Alliance Holdings.
6 Other types of business.
7      Q.   What types of business?
8      A.   Advising them in an acquisition or
9 divestiture, not with the same sort of business plan
10 as Alliance.
11      Q.   But Alliance -- is it fair to say that
12 Alliance would have an interest in generating a good
13 relationship with Great Lakes, as well your entity?
14      A.   Sure.
15      Q.   And that's for profit reasons and
16 revenue reasons?
17      A.   Yes.
18      Q.   And that type of a relationship was
19 fostered at places like the Firestone golf outings
20 periodically?
21      A.   Among other venues, yes.
22      Q.   And dinners, meetings, conferences?
23      A.   All of that.
24      Q.   And Mr.-- would you typically see Mr.
25 and Mrs. Sefcovic at these type of events?



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
153–156

Page 153

Sheldon

1
2    A.   Mrs. Sefcovic attended many events with
3  Mr. Sefcovic, yes.
4    Q.   And you know -- I'm not going to try to
5  go over -- but you know Mr. Fenkell, correct?
6    A.   Yes.
7    Q.   Briefly again, how did you get to know
8  him initially?
9    A.   I knew of him by talking to Mr. Sefcovic
10  over the years because Mr. Sefcovic worked with him
11  in a space other than the student loan space and so
12  we didn't have reason to have a good knowledge of
13  what Mr. Sefcovic and Mr. Fenkell did together.  But
14  generally speaking, I knew Mr. Sefcovic to serve Mr.
15  Fenkell as counsel, and my understanding was it was a
16  robust role serving Mr. Fenkell.
17    Q.   Do you know of any other attorneys at
18  Squire Sanders who were involved in that role?
19    A.   Outside of the student loan --
20    Q.   Yes, yes.
21    Okay.  I'm sorry.
22    A.   I believe --
23    Q.   I misunderstood your question.  So you
24  were focusing on Mr. Sefcovic and Mr. Fenkell's
25  relationship in the student loan industry?

Page 154

Sheldon

1
2    A.   No.  I was getting to -- the substance
3  of your question is how did I get to know Mr.
4  Fenkell.
5    Q.   Yes.
6    A.   I had a vague understanding of him
7  through Mr. Sefcovic because Mr. Sefcovic worked
8  closely with Mr. Fenkell.
9    There came a time after I left Citigroup
10  and joined Student Loan Capital Strategies that Mr.
11  Sefcovic made formal introductions to Mr. Fenkell.
12  We may have even seen an e-mail on that subject.  And
13  the thought of Student Loan Capital Strategies
14  helping Mr. Fenkell with his business plan to make
15  investments in the student loan industry became a
16  major client for us.
17    Q.   Do you recall the reputation of Alliance
18  in the student loan industry at the time that you
19  first met Mr. Fenkell?
20    A.   I don't think that they had any
21  reputation in the student loan industry.  The concept
22  of getting in the student loan industry, as I
23  understand it was pretty fresh when I made the scene.
24  When I say "I," I mean our firm.
25    Q.   Do you know Barbie Spear?

Page 155

Sheldon

1
2    A.   I met Barbie once.  We held a seminar of
3  sorts to introduce Alliance and their people to
4  student loans.  I think we called it Student Loans
5  101.
6    Q.   Do you recall when that was?
7    A.   It was held at Mr. Sefcovic's office in
8  New York at Rockefeller Center.  It was early on in
9  the process, but it wasn't at the beginning of our
10  relationship.  If you made me give you a date, I
11  would say it was in the spring of 2011.
12    Q.   And prior to that point were you aware
13  of any knowledge that Mrs. Spear had about the
14  student loan industry?
15    A.   No.  Mrs. Spear, as I recall, was in the
16  human relations function and she came to that meeting
17  for, I suppose, general information.
18    Q.   Did you work with her at all after that
19  meeting?
20    A.   No.  I don't recall.  My sense is that
21  Alliance was a very small firm, and she might have
22  been helpful locating Mr. Fenkell or the like, but
23  not in the substance of the business plan.
24    Q.   Were you aware of any knowledge she had
25  about the student loan industry other than what you

Page 156

Sheldon

1
2  taught her on that one occasion?
3    A.   I wouldn't -- I have no sort of basis of
4  making a comment one way or the other there.
5    Q.   But you didn't interact with her on --
6    A.   No.
7    Q.   -- the student loan industry?
8    A.   No.
9    Q.   Correct?
10    A.   Correct.
11    Q.   Do you know Mr. Wanko?
12    A.   I do.
13    Q.   Kenneth J. Wanko?
14    A.   Yes, I do.
15    Q.   How do you know him?
16    A.   He was introduced to me as part of the
17  working group at Alliance.  He worked for Alliance at
18  the time.
19    Q.   When you became familiar with Alliance,
20  were you aware of any reputation that Mr. Wanko would
21  have had for student loan business or expertise at
22  that time?
23    A.   No knowledge.
24    Q.   No knowledge?
25    A.   I have no knowledge of his knowledge of



Page 157

1            Sheldon
2  student loans.
3       Q.  Did he attend that educational session
4  that you presented?
5       A.  I believe he did.  I'm not certain he
6  did, but I believe he did.
7       Q.  Do you remember ever talking with him
8  about the student loan business?
9       A.  We had numerous telephone conversations
10  about all these transactions.
11       Q.  About all which transactions?
12       A.  Well, the transactions that were the
13  subject of the engagement agreements that we went
14  through this morning.
15       Q.  And what types of -- what types of
16  things were you aware of that Mr. Wanko did in
17  connection with the student loan business while you
18  were working with Alliance?
19       A.  My best recollection is that Mr. Wanko
20  worked for Houlihan Lokey, an investment banking
21  firm, and had -- and has an investment banking
22  background, and he was astute at pulling out "Well,
23  how did you come to this valuation?  And what about
24  that?  Is this a risk?  Is that a risk?"  Et cetera.
25       Q.  Was it a specific expertise that he had

Page 158

1            Sheldon
2  in valuations or in student loan entity valuations?
3       A.  I would say a general expertise in
4  investment banking and how you get to a valuation
5  which is sort of common to all.  Discounting cash
6  flow and how that cash flow may vary as sort of the
7  nucleus of valuation.
8       Q.  How did you come to work -- how much
9  work did you do with Mr. Wanko, just approximately
10  during that period of time, 2010 through the fall of
11  2012?
12       A.  Well, my sense is that he was either
13  involved directly, for example, on a phone call or
14  indirectly, for example, was briefed on the phone
15  call and was involved in the general thrust of the
16  business plan as a sort of full participant, is my
17  recollection.
18       Q.  Did Mr. Fenkell ask you to work with Mr.
19  Wanko or did it come about some other way?
20       A.  Well, it was clearly through Mr. Fenkell
21  that Mr. Wanko was involved.  There may be a fee
22  discussion.  Mr. Fenkell would say, "Let me see what
23  Mr. Wanko would say about that?"  Sometimes Mr.
24  Fenkell would defer the fee conversation to Mr.
25  Wanko.  In general, I would call it a very strong

Page 159

1            Sheldon
2  partnership between Mr. Fenkell and Mr. Wanko.
3       Q.  You had a number of opportunities to
4  observe their interactions during that two-year
5  period of time?
6       A.  Yes.
7       Q.  You mentioned the -- I may go back on a
8  couple of these.  Bear with me.  I've got the
9  agreements, and I know that Mr. Golumbic had you go
10  through some agreements.  So bear with me.  We may
11  talk about them and then come back to the actual
12  agreements.
13       A.  Okay.
14       Q.  Let's refer to the Northstar agreement
15  first.  Okay?
16       A.  When you say "the agreement"?
17       Q.  Did you have an agreement -- your entity
18  have an agreement with --
19       A.  The engagement agreement.
20       Q.  Yes.
21       A.  The engagement was between us and
22  Alliance.
23       Q.  Yes.
24       A.  Yes.
25       Q.  Correct.

Page 160

1            Sheldon
2       A.  And I think we read it this morning.
3       Q.  I'm just talking about using
4  Northstar -- not that you had an agreement with
5  Northstar, but I'm referring to the Northstar deal
6  and an agreement that your firm and you had with
7  Alliance.
8       A.  A copy of it is right here.
9            (Indicating.)
10       Q.  So I'm not going to refer to the
11  agreement right now.  I'm just looking for your
12  memory of it right now.  It's not a memory contest.
13  I'm just looking for your information.
14       A.  Okay.
15       Q.  Do you recall what the services that
16  SLCS was going to provide in connection with the
17  Northstar deal?
18       A.  Yes.  By the time the engagement
19  agreement was signed, we had already identified the
20  target and in broad brush helped Alliance think
21  through the structure of the transaction.  I believe
22  that the engagement agreement was signed -- I mean,
23  we can refer to it.  It says, you know, on it, but I
24  believe it says that a transaction has been
25  identified.  There may be a letter of intent, and the



Page 161

1              Sheldon
2  engagement spelled out the fee that we would get both
3  now and if it closed.
4        Q.  And so in addition to identifying the
5  target, working with Alliance on the structure, what
6  other things just off your memory did you do in
7  connection with the -- by "you" again, I'm referring
8  to SLCS.
9        A.  The biggest value add for almost all
10  these transactions is when Mr. Belica would obtain
11  the tape.
12         Do you remember what that means?
13     Q.  Sorry, I don't.
14     A.  So an electronic transmission of all the
15  details of each student loan in a particular thrust.
16     Q.  Okay.
17     A.  So the biggest value add of our firm to
18  this client, to most of our clients, is receiving
19  that information and using knowledge that we have --
20  proprietary knowledge that we have with respect to
21  how student loans act over their life, calculate the
22  portfolio's characteristics over the next 20 years,
23  let's say, and from all that produce a net cash flow
24  every year what that portfolio is likely to spin off,
25  and then discount that cash flow at a discount rate

Page 162

1              Sheldon
2  which we feel is appropriate given the level of risk
3  of that particular transaction.
4        That's base case.
5     Q.  Okay.
6     A.  Going from base case, we help a client
7  like Alliance try to think through, well, what could
8  happen to that base case?  What risks could come to
9  that portfolio of student loans that would diminish
10  the cash flow?  What good fortune could that
11  portfolio have happen to it that would enhance its
12  cash flow?  If rating agencies ever get involved in
13  the situation, what are they likely to find as risks
14  and how might their analysis affect the valuations
15  that we're talking about here?
16        And so Mr. Belica would be the nucleus
17  of that.  I'm going to say that of the 71 clients
18  that our firm has had the privilege to help, Mr.
19  Belica has been in the middle of a role like that for
20  50 of them.  The reason that's important that I bring
21  it up today is that it's a highly specialized field
22  of endeavor to try to figure out what the portfolio
23  is worth.  What's it worth to the client?  What's it
24  worth after the rating agencies touch it?  What does
25  the competitor who might be competing with us on this

Page 163

1              Sheldon
2  transaction thinks is going to be worth?  All of
3  these things find their way into Mr. Belica's line of
4  work.
5     Q.  Sounds like a valuable employee --
6  partner.
7     A.  He is a key player, yes.
8     Q.  So we've got ID the targets, which you
9  do through all the contacts and the experience and
10  the touches of people through conferences, functions,
11  et cetera, that we talked about, correct?
12     A.  Correct.
13     Q.  And then you've got the structuring of a
14  particular transaction?
15     A.  Yes.
16     Q.  Providing advice and counsel in that
17  respect.
18        And then the biggest portion of your
19  services is that analytical side that Mr. Belica is
20  an expert in.
21     A.  I believe that's our biggest value add,
22  yes.
23     Q.  Can you put a percentage of your
24  services, what percentage of each one of those
25  batches is?

Page 164

1              Sheldon
2     A.  Percentage of our value add to a client?
3     Q.  Or however you want to do it.
4  Percentage of --
5     A.  I mean, there's time spent.
6     Q.  Yes.
7     A.  And there's sort of value add.
8     Q.  So do it on time spent and then value
9  add, if you could.  I know you know what I'm saying.
10  You're a smart man.
11     A.  I would say that if you added up the
12  total hours that Mr. Weadick, Mr. Sheldon and Mr.
13  Belica spent on a particular transaction, that Mr.
14  Belica's time, if he had a clock and he could start
15  it and stop it, would be 60 to 70 percent of the
16  hours worked.
17     Q.  Great.
18     A.  And I would say that value add to the
19  client is probably a similar ratio.
20     Q.  Okay.  And the rest of what you do makes
21  up that ID'ing the target and structuring and advice?
22     A.  That's right.  So if I were negotiating
23  for my bonus at my firm, I would point out that if
24  you can't identify a target, there's nothing for Mr.
25  Belica to work on.



Page 165

Sheldon

1
2     Q.   Okay.
3     A.   So that's how we bring value.
4     Q.   Anything else that you recall doing in
5  connection with Northstar, services provided?
6     A.   Any M&A advisor plays a role of trying
7  to assess what the target is willing to do and learns
8  the goals and objectives of the target, however the
9  advisor might be able to do that, and then gives the
10  client, in this case Alliance, a feel for what's
11  going to be possible to structure the valuation, who
12  might they be talking about as a competitor, things
13  of this nature.
14     Q.   Does that describe the universe again
15  with respect to --
16     A.   I think so.  That ought to cover it.
17     Q.   You did enter into that agreement with
18  Alliance to handle the services you just described
19  with respect to the Northstar acquisition, correct?
20     A.   Yes.
21     Q.   And was the -- you mentioned the
22  Panhandle Plains transaction again this morning?
23     A.   Yes.
24     Q.   Was that a similar transaction as the
25  Northstar, or how did it differ?

Page 166

Sheldon

1
2     A.   It was similar.
3     Q.   Were the services similar?
4     A.   Our services?
5     Q.   Yes.
6     A.   Yes.
7     Q.   Was there anything different -- I'm
8  trying to cut this short because I'm trying to move
9  it forward for you and get you out of here today.
10        Were there any -- your analysis of the
11  services provided, does it differ at all in
12  connection with Panhandle Plains relative to
13  Northstar?
14     A.   My recollection is that it was very
15  similar.
16     Q.   Was the pricing of your services the
17  same on both Northstar and Panhandle Plains pricing
18  to Alliance?
19     A.   It would be a guess.  We could determine
20  that by looking at some papers right here in front of
21  me, but my guess is that they were similar.
22     Q.   What was the approximate economic
23  payment to -- we'll go back to the agreements before
24  we finish here, but just an approximately.  I'm not
25  trying to trick you up here.  Just an approximate.

Page 167

Sheldon

1
2     A.   For each one approximately 125,000.
3     Q.   Other than those two Panhandle Plains
4  and then Northstar, were there other similar
5  transactions you got paid for during that period of
6  time from 2010 through the fall of 2012?
7     A.   Those were two that closed.  I'm not
8  sure whether you're asking were there others that
9  closed or were there others where we performed
10  services.
11     Q.   First of all, were there others that
12  closed?
13     A.   I don't think  so.  I think those were
14  the two.
15     Q.   And were there others that you provided
16  services to Alliance in connection with?
17     A.   Yes.
18     Q.   Did the services on those others differ
19  at all relative to the services we just talked about
20  for Northstar and Panhandle Plains?
21     A.   In broad brush, no.
22     Q.   Did you -- again, when I use "you," I'm
23  talking about you, your partners and your LLC, SLCS,
24  for purposes of these questions.
25        Did you make introduction on behalf of

Page 168

Sheldon

1
2  Alliance to student loan origination companies?
3     A.   Student loan origination companies?
4     Q.   Yes.
5     A.   Well --
6     Q.   Maybe you could describe --
7     A.   They're all student loan origination
8  companies.  They all either originate or acquire
9  portfolios of students loans.
10     Q.   That's a better way of saying what I
11  just asked.
12     A.   I believe all of the entities that we
13  just talked about this morning and that we served
14  Alliance on are all companies that either originated
15  or acquired a pool of student loans.
16     Q.   I said it with the adjective after
17  instead of before, and you did a much better job of
18  clarifying the record.  Thank you.
19        So you have done that, correct?  That's
20  one of the things you did for Alliance during the
21  relevant time period?
22     A.   Introduced them to those companies?
23     Q.   Yes.
24     A.   Yes.
25     Q.   And out of all of the -- do you have any



Page 169

1        Sheldon
2   idea of how many introductions you might have made
3   during that period of time?  I know there was a list
4   that Mr. Golumbic showed you.  Again, it's not a
5   memory contest.  I'm just looking for a rough.
6        A.   I'm going to say fifteen or so, fifteen
7   give or take three or four.
8        Q.   And that's during that two-year period
9   of time?
10        A.   Yes.
11        Q.   Were there -- was Mr. Sefcovic familiar
12   with those companies, those fifteen or so companies
13   that you introduced Alliance to?
14        A.   I'm thinking through the names in my
15   head, but I would say that Mr. Sefcovic was familiar
16   with -- with most.  I don't really know whether Mr.
17   Sefcovic knew Northstar or not, but being a
18   participant in my business, in my industry for so
19   many years, I would guess that Mr. Sefcovic knew most
20   if not all of those entities.
21        Q.   And he would have that knowledge
22   independent of your knowledge, correct?
23        A.   Yes.
24        Q.   Is there a separate term known as a
25   "student loan provider" or is that the same as a

Page 170

1        Sheldon
2   student loan --
3        A.   I would say that's the same as student
4   loan originator.
5        Q.   Okay.  Is there a concept of a student
6   loan service and subservice company?
7        A.   Yes.
8        Q.   Could you describe that for the record?
9        A.   A student loan servicer would be a term
10   of art used to describe a company that bills and
11   collects on student loans, the company that you write
12   your monthly check to if you have a student loan.
13        Q.   Like the way I finished doing that many,
14   many years ago?
15        A.   Sallie Mae would be an example of the
16   largest student loan servicer.  Great Lakes is an
17   example of another very large servicer.  So it's the
18   company that bills and collects a student loan.  And
19   also in the case of the government guaranteed student
20   loan program loans, processes the guarantee if the
21   loan become delinquent and later defaults.
22        Q.   Okay.  Is that -- did you make -- first
23   of all did SLCS provide any of those services?
24        A.   No.
25        Q.   Did you make introductions to any

Page 171

1        Sheldon
2   student loan servicers to Alliance during the
3   relevant time frame?
4        A.   No.  Servicing was not an entity -- was
5   not a segment of the student loan business that
6   Alliance was interested to pursue.
7        Q.   By the way, going back a step, Alliance
8   wasn't a student loan origination company, correct,
9   or was it?
10        A.   I don't think that it was, no.
11        Q.   And it wasn't a student loan provider?
12        A.   I don't believe it was, no.
13        Q.   It didn't have those capabilities,
14   correct?
15        A.   That's my understanding.
16        Q.   Did Alliance have in-house capabilities
17   to be a student loan servicer?
18        A.   Not to my knowledge.
19        Q.   Would Alliance have had to contract with
20   somebody else to provide those types of services?
21        A.   If it owned student loans?
22        Q.   Yes.
23        A.   If Alliance owned student loans, I
24   believe it's correct to say that they would contract
25   with a student loan servicer to bill and collect on

Page 172

1        Sheldon
2   the loans.
3        Q.   Have you heard of a concept -- and
4   again, I'm sorry, I'm not the expert that you are.  I
5   have an expertise, but this is not the one.
6        Subservice companies, does that differ
7   at all from a student loan servicer?
8        A.   Well, correct me if this is what you're
9   asking about, but there's a term of art known as a
10   "master servicer,"  that is basically administrative
11   agent.  A subservicer might be used to describe an
12   arrangement between an entity that is the "servicer,"
13   in quotations, which doesn't have the capability to
14   service loans unless enters into a subservicing
15   agreement.  I believe that's how you're -- that's the
16   type of entity that you're asking about.
17        Q.   That's referring back to the student
18   loan servicer who then hires somebody else to assist
19   it in providing the services of billing and
20   collecting?  Or not?
21        A.   Yes.  If I could use an example?
22        Q.   Yes.  That would be good.
23        A.   If Alliance owned a pool of student
24   loans and was going to service the loans using the
25   Alliance servicing company that -- I forget the name



Page 173

1            Sheldon
2  of the servicing company that Mr. Wanko was president
3  of.  That entity might have been the servicer of the
4  pool of loans, and then that entity might have
5  entered into a subservicing contract with Sallie Mae.
6  So Sallie Mae would be the actual entity billing and
7  collecting on those student loans.  And the Alliance
8  student loan management company, whatever the name
9  is, might be labeled as the servicer, but they
10 actually outsource the actual servicing mechanics.
11       Q.  How big is the universe of outsourcing
12 of entities that could do that work?
13       A.  Entities that are servicers and
14 outsource the actual function?
15       Q.  That and the other way around.  Who are
16 the companies that they outsource their work to?
17       A.  For various historic reasons, there are
18 numerous, I would say, dozens or -- dozen or dozens
19 of entities that are the servicing units.
20       Q.  Okay.
21       A.  Servicing is an economies of scale
22 business, and so most of them would subcontract
23 servicing to one of eight or nine large servicers.
24 So to answer your question on subservicers, there's
25 less than a dozen who service with economies of

Page 174

1            Sheldon
2  scale, and there's probably six today that meet that
3  description.
4        Q.  You mentioned the term "master
5  servicer."  How does that relate to these subservice
6  companies, the eight or nine large ones?
7        A.  A master servicer is a term of art.  It
8  refers to mostly the administrative aspects of a
9  business and sort of connotes the existence of a
10 servicer.
11           In the world of asset-backed securities
12 where a LLC is developed for the sole purpose of
13 owning a pool of loans, that LLC will contract with a
14 master servicer which is usually a related entity of
15 some sort.  And that master servicer will do the
16 administrative work, attendant to owning a pool of
17 student loans, and they will subcontract to a large
18 subservicer or a servicing company to do the actual
19 billing and collecting on student loans.
20       Q.  Now, these services that you've just
21 been describing within the last few minutes, you said
22 -- your entity didn't do student loan servicing,
23 correct?  You weren't a student loan servicer?
24       A.  Correct.
25       Q.  Were you ever -- did you ever provide

Page 175

1            Sheldon
2  subservice services?
3        A.  That's the same question.
4        Q.  Okay.
5        A.  We never were a servicer or subservicer
6  where we billed and collected on student loans.
7        Q.  And you certainly didn't do that for
8  Alliance?
9        A.  Correct.
10       Q.  Did you ever provide that administrative
11 function that you just described?
12       A.  Yes.
13       Q.  For Alliance?
14       A.  No, not for Alliance, no.
15       Q.  How much would you charge for that
16 administrative function?
17       A.  You asked this question earlier, and I
18 said that we provide that service for a major bank.
19       Q.  Oh, is that that one where you're
20 standing by ready to --
21       A.  Well, that is an actual servicing -- an
22 actual -- we do the work.  Then there are other
23 contracts where we stand by.
24       Q.  Of these that we've just been talking
25 about now, these services, are there any other

Page 176

1            Sheldon
2  standby services that you could provide that you get
3  paid for, or an entity that gets paid for without
4  doing --
5        A.  No.
6        Q.  Are you aware of any in-house
7  capabilities that Alliance had to be a student loan
8  servicer?
9        A.  You're asking that they advise as a
10 servicer as opposed to master servicer?
11       Q.  Yes, correct.
12       A.  Yes.  I'm not aware of any thought that
13 Alliance would become a servicer.
14       Q.  Did they have any capabilities that you
15 were aware of during the period of time in question?
16       A.  To be a servicer?
17       Q.  Yes.
18       A.  No.
19       Q.  Did they have any capabilities to
20 provide the administrative functions that you just
21 talked about?
22       A.  They bought administrative companies.
23 There were conversations about well, what if those
24 people all leave?  These companies, Northstar,
25 Panhandle were run by a handful of people.  What if



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
177–180

Page 177

1              Sheldon
2    all those people leave?
3          We discussed with Alliance that we
4    provide those services on a backup basis and actually
5    provide them.  And if that were to be the case, you
6    have an option, you have an option to outsource those
7    to us.
8       Q.   To SL --
9       A.   To SLCS.
10      Q.   -- CS.
11          Did you ever engage in -- you didn't
12   engage in those actual services for Alliance?
13      A.   No.  I felt they were trying to check
14   the box on well, what is our risk?  And one risk
15   would be if the entity were buying, the people all
16   left, what would we do?  And one solution would be
17   contract with Student Loan Capital Strategies to have
18   the actual service.
19      Q.   But you actually didn't do that and get
20   paid for that during that period of time?
21      A.   That's correct.
22      Q.   But you were a backup in case they
23   needed you?
24      A.   We had expertise and personnel available
25   to help them with that.

Page 178

1              Sheldon
2       Q.   That was expertise that Alliance didn't
3    have in-house?
4       A.   Correct.
5       Q.   Did you ever provide any venture capital
6    services to Alliance?
7       A.   We certainly never provided or talked
8    about providing our money to Alliance, if that's your
9    question.
10      Q.   Is that what you considered to be a
11   venture capital service or firm?
12      A.   A venture capital firm would typically
13   be buying equity in an early stage startup.
14      Q.   And you didn't do that?
15      A.   We didn't do anything like that, no.
16      Q.   Did you do that with any of Alliance's
17   entities that they purchased?
18      A.   We are not principals in any way like
19   that.
20      Q.   Are you aware of Alliance doing anything
21   of that nature?
22      A.   Yes.  Your question trips my memory that
23   we thought through and introduced Alliance to several
24   venture capital firms and had meetings with them
25   trying to raise some venture capital financing.

Page 179

1              Sheldon
2       Q.   Did any of those ever come to fruition?
3       A.   No.  It wasn't a major endeavor and
4    nothing ever did pan out.
5       Q.   Anything there pan out related to the
6    student loan industry at all?
7       A.   Where a venture capital firm would buy
8    equity in an early stage?  Yes.
9       Q.   As related to Alliance?
10      A.   No.
11      Q.   Again, is that venture capital or hedge
12   fund type of approach of business, was that something
13   that Alliance had capabilities to engage in?
14      A.   Well, Alliance was looking to make
15   investments in late stage, highly secure financing of
16   equity.  I was not aware of sort of higher risk,
17   early stage business plans.  But I'm not privy to
18   everything that Alliance did.  That's for sure.
19      Q.   Putting aside Mr. Fenkell, was there
20   anybody in-house at Alliance that had that
21   capability, if there was the funding?
22      A.   Capability?
23      Q.   To operate an early stage hedge fund or
24   venture capital fund?
25      A.   Well, you're asking sort of for an

Page 180

1              Sheldon
2    opinion, I think.  I would say the answer is yes.  I
3    would say that Alliance did have the capability to
4    assess the risks and rewards of an early stage
5    company, but to my knowledge that was not their
6    business plan.
7       Q.   And that answer -- again, I excluded Mr.
8    Fenkell from that answer.  So you think there was
9    somebody else at Alliance that had that?
10      A.   My general knowledge is that Mr. Wanko
11   had a rich investment banking career which would have
12   been useful to Alliance in entering that segment of
13   the market, but that's pretty off subject.  I'm not
14   aware of any of that sort of business plan.
15      Q.   As part of Alliance's business plan
16   during the two-year period of time that you worked --
17      A.   Right.
18      Q.   Have you ever heard of the concept of
19   Student Loan Default Aversion Services?  Have you
20   heard of that?
21      A.   Yes.
22      Q.   Would you describe that for the record?
23      A.   Student Loan Default Aversion Services
24   relate to when we're talking about the government's
25   guaranteed student loan program known as FFELP.  It



Page 181

1                          Sheldon
2    relates to a call center type of service giving
3    borrowers who are in trouble and delinquent on their
4    accounts ways to escape that delinquency by obtaining
5    a deferment or a forbearance under various programs
6    of FFELP.  Maybe students aren't aware of these
7    forbearance and deferment programs and so there's a
8    default aversion group would relay to the student
9    caller, "Hey, you're unemployed?  Well, there's a
10   deferment for unemployment."  I think of default
11   aversion services in connection with FFELP, pointing
12   out government programs to escape your trouble.
13           I don't have a good crisp story about
14   so-called private student loan program which is
15   composed of non-guaranteed loans, but there are
16   probably default aversion consulting companies who
17   will tell the student, "Stop buying Starbucks coffee
18   and start paying your student loan."
19        Q.  Let's use that term just because I've
20   used it and you've described it.  Is that the kind of
21   service that your entity provided in the student loan
22   industry?
23        A.  No.
24        Q.  Is that the type of service that
25   Alliance Holdings provided in the student loan

Page 182

1    industry?
2        A.  Well, Alliance Holdings purchased
3    Panhandle Plains Servicing Center and they had a
4    pretty good platform.  I'm not sure if that was
5    housed in the property that Alliance bought or not,
6    but that entity currently has a default aversion
7    product.  So if it was in the property that Alliance
8    purchased, then yes, Alliance was in that business.
9        Q.  But they weren't in it directly with the
10   people at Alliance.  They were in it through
11   purchasing Panhandle Plains?
12        A.  I think that's the case.  I'm no expert
13   on all things Alliance, but that's my understanding.
14        Q.  Do you know how long Alliance held
15   Panhandle Plains?
16        A.  Approximately a year.
17        Q.  When did they -- do you recall when they
18   sold it?
19        A.  Approximately a year ago.
20        Q.  So in terms of now just focusing on
21   Alliance Holdings, the parent entity, was there
22   anybody within Alliance Holdings of the staff there,
23   the small staff that you talked about that had the
24   capabilities to handle those type of services that

Page 183

1                          Sheldon
2    Panhandle Plains did?
3        A.  I'm not aware of any.
4        Q.  Have you ever already -- help me here.
5    Have you already testified about master servicing
6    companies, student loan master servicing companies?
7    Is that that administrative function?
8        A.  That's the administrative function.  The
9    term of art is "master servicer."
10       Q.  Are there student loan guarantors out in
11   the student loan industry?
12       A.  There are student loan guarantors.
13       Q.  Could you describe them for the record?
14       A.  Most are involved in the government's
15   guaranteed student loan program, so called FFELP.
16   And Great Lakes is an example of a large one.  Those
17   loan -- those entities by and large administrator the
18   federal government's guarantee of the subject loan.
19       Q.  How many of those are there out there in
20   those types of entities like Great Lakes?
21       A.  I'll say that there are 20 left.
22       Q.  Is there a high barrier to entry there
23   in that business?
24       A.  Yes.  All of the existing guarantors
25   have existed since the federal government started

Page 184

1                          Sheldon
2    their -- this program in around 1980, and the total
3    was probably approximately 40 to 45.  Basically each
4    state had one.  And there's been consolidation in
5    that industry.
6        Q.  And your company, SLCS didn't provide
7    those types of services, did it?
8        A.  We did not provide the student loan
9    guarantee services, no.
10       Q.  Did you just make referrals to
11   companies -- or not just.  Did you make referrals to
12   those companies?  Do you make referrals to those
13   companies?
14       A.  No.  Referrals -- did we help owners of
15   student loans with who might guarantee them?
16       Q.  Yes.
17       A.  No.
18       Q.  Do you know if that's a function that
19   Alliance had the capability in-house to do?
20       A.  It's a non-sequitur.
21       Q.  Explain.
22       A.  When you buy a portfolio of student
23   loans, they're already guaranteed.
24       Q.  Thanks.
25           Are you familiar with the concept of a



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
185–188

Page 185

1              Sheldon
2   student loan consulting company?
3        A.   Of a student loan consulting company?
4        Q.   What would you describe as a student
5   loan consulting company?
6        A.   Student Loan Capital Strategies is an
7   example of a student loan consulting company.
8        Q.   How many of those are you aware of out
9   there again?
10       A.   Very few.
11       Q.   Is it less than ten?
12       A.   Well, I'm not aware of any companies the
13  sole purpose of which is student loan consulting.
14  There are student loan consultants, usually one and
15  two-man shops at bigger firms, and I've used First
16  Southwest as an example.  There's another example
17  that I still can't remember the name, the example of
18  a larger firm that has a student loan division with
19  one or two people in it.
20       Q.   How many of those exist where the people
21  are in --
22       A.   Probably just those two that I just
23  described.  For the benefit of the doubt, I'll say
24  less than five.
25       Q.   Is your business contracting or

Page 186

1              Sheldon
2   expanding?  I shouldn't say -- I don't want to
3   personalize it.  Your industry.
4        A.   Our industry is contracting.
5            MR. GOLUMBIC:   Can we take a two-minute
6   break?  Would that be okay?
7            VIDEOGRAPHER:   The time is now 3:35
8   p.m.
9            Going off the record.
10            (Recess.)
11           VIDEOGRAPHER:   The time now is 3:43
12  p.m. This marks the beginning of tape number 5.
13           We're back on the record.
14       Q.   We're marching along here, Mr. Sheldon.
15  Thank you for your patience.
16           A few other questions on that area of
17  services here, if I could.
18           The master servicing or administrative
19  function concept that you testified about, what does
20  a master servicer or administrator make?  How do they
21  get paid?
22       A.   Well, you've asked two questions there.
23       Q.   Okay.  Split them up and teach me.
24           Thank you.
25       A.   They get paid from the entity that owns

Page 187

1              Sheldon
2   the student loans, and they typically get paid
3   through the so-called waterfall in the indenture,
4   which specifies that when you get monthly revenue in,
5   here's how you divvy it up.  Where you fall in that
6   waterfall is important as to how secure the payment
7   is.
8        Q.   Can you describe the general ranges of
9   payment in that waterfall as the security is -- go
10  from the most secure to the least secure.
11       A.   So typically it's the trustee.  Then
12  it's probably the servicer, the actual billing and
13  collection guy.  But servicing might take a back seat
14  to the payment of interest and principal.  But in
15  general, those would be the top categories, trustee,
16  servicer, interest and principal.
17       Q.   What are the --
18       A.   The master servicer, the administrative
19  agent would typically fall somewhere below those
20  guys.
21       Q.   And what kind of economics are available
22  for that master servicer?
23       A.   That is sometimes a point of
24  negotiation.  Many times the owner of a trust would
25  try to siphon cash through the administrative service

Page 188

1              Sheldon
2   portion, and so the amount they take out for the
3   master servicer might exceed the actual compensation
4   for master servicer functions, but if you want to ask
5   me how much would be paid for master servicer
6   functions, it's a number like ten to fifteen basis
7   points, one-tenth of one percent per year times the
8   size of the student loan pool.
9        Q.   And on a typical deal -- is there a
10  typical deal or is there not?
11       A.   There's no typical deal.
12       Q.   Can you describe the magnitude of that
13  fee, the ten to fifteen -- is it ten to fifteen basis
14  points?
15       A.   Yes.
16       Q.   Can you describe that on just a
17  theoretical deal that you have closed and a master
18  servicer has gotten paid on?
19       A.   Do you mean make -- get an example?
20       Q.   Yes.  Because I don't want it to be -- I
21  assume that there is not -- you don't have a million
22  dollars worth of loans.  You typically have a lot
23  more loans that are --
24       A.   100 million to a billion dollars worth
25  of loans.



Page 189

Sheldon

1
2      Q.   Yes.  So I'm trying to get the magnitude
3   of the size of the --
4      A.   The dollar amount?
5      Q.   Yes.
6      A.   If it's a $100 million transaction, one
7   percent would be $1 million.  A tenth of one percent
8   would be $100,000.  So if you did a $100 million
9   transaction, the master servicer might make in the
10  neighborhood of $100,000 a year.
11     Q.   And is a $100 million transaction, is
12  that...
13     A.   That's on the low side.
14     Q.   What's on the high side?
15     A.   $2 billion.
16     Q.   And that would just -- would that go
17  symmetrical, so it would be twenty times what you
18  just described?
19     A.   Well, no.  It wouldn't be symmetrical at
20  all.  And for a huge transaction that fee might be
21  four or five basis points, and for a $50 million
22  transaction it might be 25 basis points.
23     Q.   Thanks.
24          I don't know if you testified to this or
25  not.  But was Panhandle a loan servicer, student loan

Page 190

Sheldon

1
2   servicer?
3      A.   Panhandle used to be a loan servicer,
4   but has subcontracted that now to another company.
5      Q.   When Alliance bought Panhandle, were
6   they a loan servicer?
7      A.   No.
8      Q.   At any time?
9      A.   No.
10     Q.   Do you recall what the actual master
11  servicing fee was for the Panhandle deal?
12     A.   Off the top of my head, I don't know.
13     Q.   Do you recall how much the -- what the
14  size of that deal was off the top of your head?
15     A.   Well, if you're talking about -- I think
16  what you're asking about is the underlying trusts
17  that pay the entity that Alliance bought master
18  servicing leads.  And those underlying trusts had in
19  the neighborhood of $1.2 billion of loans and --
20     Q.   For which one now?
21     A.   For Panhandle.  That was the example you
22  were using.
23     Q.   Okay.
24     A.   And probably had a master servicing fee
25  in the neighborhood of 25 basis points.

Page 191

Sheldon

1
2          That's off the top of my head, and
3   helping you to create an example here, I think.
4      Q.   That's perfect.  Thank you.
5          And then could you do the same as it
6   relates to Northstar?
7      A.   I believe approximately the same size
8   and approximately the same fee, but that's a little
9   bit of guess work there and maybe not so reliable for
10  whatever purpose you have here.
11     Q.   But it's guess work by somebody who has
12  33 years experience in the industry, correct?
13     A.   Yes.
14     Q.   So it's not by some huge fraction of
15  error.  It's just an approximate.
16     A.   That's the neighborhood, yes.
17     Q.   We can look at the actual document to
18  get the --
19     A.   That's correct.  I was just going to
20  point out that you could get that in dollars and
21  sense.  Patrick Belica would have laid that out in
22  spades.
23     Q.   Your expert at your company?
24     A.   Right.
25     Q.   Was Great Lakes a student loan guarantor

Page 192

Sheldon

1
2   or is it?
3      A.   Was and is.
4      Q.   Is it a student loan servicer?
5      A.   Was and is.
6      Q.   And you were attempting to get a deal
7   going between Alliance and Great Lakes or not?
8      A.   No.  If you're referring to Mr. George's
9   attendance at the golf outing?
10     Q.   Yes.
11     A.   He's a golfer we've entertained in many
12  venues.  He is a protege of Mr. Thornton, and there
13  was a --
14     Q.   Excuse me for a second.
15          Thornton is where?
16     A.   Mr. Thornton was the CEO of the
17  Northstar entity that Alliance bought.
18     Q.   That's what I thought.
19     A.   And there was always a sense that maybe
20  Alliance could do something with Great Lakes, but
21  there was no, as I recall, no concrete plan.
22     Q.   But they did have loan servicing,
23  student loan servicing capabilities?
24     A.   They were a student loan servicer, yes.
25     Q.   And they were a guarantor of loans?



Page 193

1            Sheldon
2        A.   They were and they are.
3        Q.   Do you know -- what would it surprise
4    you if you found out that Alliance actually made a
5    run at buying Great Lakes?
6        A.   It wouldn't surprise me if they did,
7    although I don't have any knowledge that they did.
8        Q.   Do you know a company by the name of
9    ACS?
10       A.   Yes.
11       Q.   Who is that owned by?
12       A.   Xerox.
13       Q.   How is that entity involved in the
14   student loan industry?
15       A.   They are a large servicer of student
16   loans, and they are a partner of ours in our master
17   servicing business.
18       Q.   Did you ever refer them in any way,
19   shape or form to Alliance?
20       A.   Refer them to Alliance?
21       Q.   Yes.  Or were they involved in any way,
22   shape or form with the Alliance student loan
23   business?
24       A.   I feel -- I feel comfortable in saying
25   that we've discussed with ACS what we do for

Page 194

1            Sheldon
2    Alliance.  Off the top of my head I can't think of
3    how those two might work together, although being a
4    major student loan enterprise they might have found a
5    way.
6            If you could ask me a more pointed
7    question, I might be able to give you a better
8    answer.
9        Q.   I'm going to leave it at that right now.
10       A.   Okay.
11       Q.   Thanks.
12           Bear with me.  You mentioned a meeting
13   you had with Alliance's attorneys?
14       A.   Correct.
15       Q.   Post working with Alliance?
16       A.   Yes.  Yes.
17       Q.   And you recall that was about six months
18   ago you said?
19       A.   Yes.
20       Q.   Could it have been in 2013?  Could it
21   have been that long ago?
22       A.   Well, it could have been.  It was after
23   the lawsuit, Barbie Spear v. these various people and
24   entities.  When was that lawsuit, if I could ask you
25   that question?

Page 195

1            Sheldon
2        Q.   I'm not being rude by saying no.
3        A.   That's fine.  It was after that.  It was
4    after that.
5        Q.   Okay.
6        A.   I would say that lawsuit became public
7    knowledge and the meeting was several months after
8    that.  So if you could put that together, that's
9    about when the meeting was.
10       Q.   Does the name Tejal K. Mehta ring a
11   bell?  T-E-J-A-L, K., M-E-H-T-A.
12       A.   Tejal Mehta?
13       Q.   Yes.  Does that ring a bell?
14       A.   No.
15       Q.   And Hank Hockemier -- Hockemier, does
16   that ring a bell?
17       A.   No.
18       Q.   How about John Roberts of Deloitte
19   Touche?
20       A.   No.
21       Q.   Okay.  Do you recall if Mr. -- do you
22   recall Mr. Sefcovic setting up meetings with a number
23   of banks and yourself and Alliance at any time during
24   your relationship with Alliance, during the relevant
25   time frame, 2010 to fall of 2012?

Page 196

1            Sheldon
2        A.   No.
3        Q.   Would you doubt that Mr. Sefcovic has
4    substantial contacts in the banking industry
5    throughout the United States?
6        A.   I don't doubt that, no.
7        Q.   Would it surprise you if Mr. Sefcovic
8    set up meetings between Alliance and various banking
9    institutions throughout the United States?
10       A.   That would not surprise me.
11       Q.   Would it surprise you if you attended
12   any of those meetings?
13       A.   That would surprise me a little bit, but
14   none are coming to mind.
15       Q.   Do you recall any golf outings involving
16   the Montana company?  I think the word was Montana,
17   and it's Jim Stipich.  Is that the correct
18   pronunciation?
19       A.   Yes.  Well, I entertained Mr. Stipich
20   and his wife at Desert Mountain.  It's possible Mr.
21   Sefcovic played with us.
22       Q.   You wouldn't be surprised if that
23   happened, would you?
24       A.   That would not surprise me.
25       Q.   Would you be surprised if Mr. Sefcovic



Page 197

1              Sheldon
2   had independent relationships with companies like
3   Access and NelNet independent of your entity?
4        A.  That would not surprise me.
5        Q.  And you testified that Mr. Sefcovic, he
6   was counsel to Brazos.  Is that one of the ones you
7   mentioned?
8        A.  Yes.
9        Q.  And he had a pretty substantial
10  relationship with Brazos?
11       A.  He did, yes.
12       Q.  Independent of your relationship with
13  Brazos?
14       A.  Yes.
15       Q.  Do you recall any independent
16  relationships that Mr. Fenkell might have had with --
17  is it Hupalo, is that how you pronounce that?
18       A.  Hupalo.
19       Q.  Who is Hupalo again?
20       A.  Mr. Hupalo worked with me at Smith
21  Barney, went on to other investment banking jobs,
22  went on to other jobs and found himself at Deutsche
23  Bank where I introduced him to Mr. Fenkell, which
24  later turned out to be a financing source.
25       Q.  Are you aware of any independent

Page 198

1              Sheldon
2   relationship that Mr. Fenkell established with Mr.
3   Hupalo?
4        A.  I'm not aware beyond the financing --
5   the relationship that financed one or more entities.
6        Q.  Do you know if Mr. Sefcovic had a
7   relationship with Mr. Hupalo --
8        A.  I don't know.
9        Q.  -- independent?
10             Vinny Cimino?
11       A.  Yes.
12       Q.  Do you know him?
13       A.  Yes.
14       Q.  He used to work with your group?
15       A.  Yes.
16       Q.  Was he a partner at your group?
17       A.  I worked with him at Citigroup.
18       Q.  Okay.  He's with RBC now?
19       A.  He is.
20       Q.  And have you golfed with him -- you've
21  golfed with him at Desert Mountain, too, correct?
22       A.  Yes.
23       Q.  And with Mr. Sefcovic there?
24       A.  Yes.
25       Q.  At these golf outings, you would discuss

Page 199

1              Sheldon
2   business periodically, correct?
3        A.  We would, yes.
4        Q.  And this -- by that I mean the student
5   loan business.
6        A.  Yes.
7        Q.  All three of you were involved in the
8   same business in some way, shape or form?
9        A.  Yes.
10       Q.  You said you didn't recall who SLMRS
11  was.  Or what did you testify about SLMRS?
12       A.  That I didn't know who they are.
13       Q.  You talked about a meeting -- a dinner
14  at Phoenix in February 2010.  Do you remember that?
15       A.  Are we talking here about the dinner at
16  the Sefcovics' house?
17       Q.  Yes.
18       A.  Yes.
19       Q.  Would it surprise you if that predated
20  the formation of SLMRS and the contract between SLMRS
21  and Alliance?
22       A.  I don't have any basis to answer that
23  question.  I don't know SLMRS at all.
24       Q.  You testified about a Seattle dinner or
25  a dinner in Seattle?

Page 200

1              Sheldon
2        A.  Yes.
3        Q.  Who attended that one again?
4        A.  Well, to be specific, there was a large
5   cocktail party that Alliance sponsored, followed by
6   approximately four or five loose targets, more
7   clients of ours in the industry that had an informal
8   dinner.
9             And maybe you could ask your question
10  again?
11       Q.  So you were actively involved in
12  promoting that dinner?
13       A.  Yes.
14       Q.  And Alliance paid for that dinner?
15       A.  I think I paid for it, but I'm not sure.
16  I think that was the whole point.
17       Q.  Would you be surprised if Alliance paid
18  for it?
19       A.  No.
20       Q.  There's that South Dakota entity SLFC,
21  correct?  You testified about that one?  That deal
22  didn't close, did it?
23       A.  It did not.
24       Q.  Did you work hard on getting that deal
25  done?



Page 201

1                    Sheldon
2       A.   No.  I don't recall it being labor
3   intensive.
4       Q.   Do you know if Mr. Sefcovic -- would
5   it surprise you if Mr. Sefcovic were to testify that
6   he -- or you found out that Mr. Sefcovic
7   independently knew Mr. Wozniak?  Do you remember that
8   name, Mr. Wozniak?
9       A.   That wouldn't surprise me at all.
10           MR. JOHANSON:   I'm going to try to move
11  along here quickly.  I've got some documents to go
12  through, so please bear with me.  I'll try not to go
13  over prior territory, with one exception.  Mr.
14  Golumbic asked you questions about documents.  I may
15  ask you different variations of questions about those
16  documents.
17      A.   Okay.
18      Q.   And I'll try to move it along and get
19  you out of here soon.
20           If you could look at Sheldon 1.  I don't
21  know if you want to put these in order or you just
22  want to try to find them as we go.  I'll try to go in
23  order if that helps us move it along.
24      A.   Okay.  1.
25      Q.   Did you know Mr. Sefcovic to have a

Page 202

1                    Sheldon
2   sense of humor?
3       A.   Yes.
4       Q.   Would he joke around once in a while in
5   e-mails?
6       A.   Sure.
7       Q.   Is that atypical for him or not?
8       A.   That would not be atypical.
9       Q.   Do you know when you received a copy of
10  the complaint in this matter, this lawsuit that
11  you're here for this deposition for?
12      A.   The answer is no, I don't know the date.
13  But my recollection, vague, is that it was near the
14  date that the complaint was entered.
15      Q.   Who did you receive it from?
16      A.   I think I received it from the Brazos
17  Group.
18      Q.   Did they say anything to you when they
19  sent it to you?
20      A.   I don't recall anything, no.
21      Q.   Did you call them and talk about it?
22      A.   I'm sure that I did, yes, but I don't
23  recall the conversation.
24      Q.   Did you call anybody about the complaint
25  after you received it?

Page 203

1                    Sheldon
2       A.   I called my partners.
3       Q.   Did you call anybody else outside of
4   your firm?
5       A.   I did not call anyone outside of my
6   firm.  I'm not sure about my partners.
7       Q.   Did you ever talk about the complaint
8   outside of your firm or -- and exclude conversations
9   with your wife.  But outside of your firm, did you
10  talk about the complaint publicly?
11      A.   No.
12      Q.   Are you aware, related to the complaint,
13  did anybody let you know that the complaint in this
14  matter was filed approximately 45 days after Mr.
15  Fenkell brought a -- filed a complaint in the
16  Philadelphia Court of Common Pleas against Alliance
17  Holdings for breach of contract and related claims?
18      A.   As you say that, it trips my memory that
19  there was actions going on.  There might have been
20  more than that.  And I forget when I lost contact
21  with Mr. Fenkell, but it was around the time that he
22  left the firm, and I believe that there was a lawsuit
23  that predated him leaving the firm, but that might be
24  irrelevant to your line of questioning.
25      Q.   Did you get any of that information --

Page 204

1                    Sheldon
2   where did you derive the information that --
3       A.   I think Mr. Fenkell, if I recall
4   correctly.
5       Q.   When?
6       A.   I don't have a crisp recollection.
7       Q.   If you could go to Sheldon 3?  That's
8   the one where Mr. Golumbic had all the names of small
9   players, large players, banks.
10      A.   Yes.
11      Q.   Current or former non-profits.
12           Would it surprise you that others had
13  access to these same entities other than yours, had
14  access to some of these same names and contacts
15  within the student loan --
16      A.   Knowledge of the names?
17      Q.   Yes.
18      A.   No.  I would think that there's a large
19  number of people who knew all of these people.
20      Q.   And would have independent business
21  relationships with these entities and/or people?
22      A.   That's a harder question to answer.
23  Your first question was would others know of the
24  existence of these companies?  That's a large
25  universe.  Would others have -- ask it again, please.



Page 205

Sheldon
2      Q.   Isn't it true that others would have --
3   would you be surprised if others had -- folks other
4   than you, your company, SLCS, your members, your
5   partners would have some access to these individuals
6   and some knowledge of them so that they could make
7   referrals to them as well?
8      A.   Wouldn't surprise me at all.
9      Q.   Did you -- did you ever talk with Paul
10  Sefcovic about the entities on this list?
11     A.   All the time.  He was involved in the
12  conversations that -- when we would have laid this
13  out, et cetera.  He may have been an addressee on
14  this -- he was.  So he was a solid participant in the
15  working group as we tried to develop this business.
16     Q.   And he had expertise in this particular
17  industry, the student loan industry?
18     A.   He was an expert counsel, and I would
19  also say he was a very knowledgeable person in the
20  student loan industry.
21     Q.   Could you go to Sheldon 5?
22     A.   Okay.
23     Q.   Do you see page 1 of Sheldon 5?  By the
24  way, is this your home address here?
25     A.   I have my office in my home, yes.

Page 206

Sheldon
2      Q.   Is there a physical location for the
3   rest of your folks or do they all work out of their
4   homes?
5      A.   They don't all work out of their
6   own homes, but my four partners live in different
7   places -- Cincinnati, Ohio; Westchester, New York;
8   Charleston, South Carolina.  Two have offices.
9   Myself and the South Carolina fellow work out of our
10  homes.
11     Q.   So two of them.  You answered my
12  question before I even had to ask it.
13     A.   Okay.
14     Q.   How about the four support folks?  I'm
15  not diminishing them, but those four support folks,
16  do they work somewhere --
17     A.   They work out of their home.
18     Q.   So on page 1, you see where it describes
19  the services at the bottom of page 1 of Sheldon 5?
20     A.   Yes.
21     Q.   Is there anything inconsistent with that
22  description and your testimony earlier about what you
23  did for Alliance in connection with the Northstar
24  deal?
25     A.   Let me read the scope of engagement.

Page 207

Sheldon
2      Q.   Thank you.
3      A.   Okay.
4      Q.   Do you want me to repeat the question?
5      A.   Please.
6      Q.   So you had testified -- we went through
7   it pretty carefully -- what the scope of services
8   that you're entity did, you and your entity did in
9   general and what you did specifically for Northstar.
10  Do you remember that question --
11     A.   Yes.
12     Q.   -- earlier this afternoon?
13        Is there anything -- referring back to
14  my specific question about what you did for the
15  Northstar deal for Alliance, is this paragraph
16  consistent with what you testified about?
17     A.   Well, I think it is.  A couple comments
18  in that regard, this engagement was signed probably
19  some number of weeks after the identification of the
20  client.  So you recall that I testified that I had a
21  conversation with Jamie Wolfe, and in that telephone
22  conversation he said "we wouldn't be interested to
23  sell a stable cash flow, but would your client be
24  interested to buy the master servicing company?"
25        Do you remember that testimony? Fyou

Page 208

Sheldon
2      Q.   I don't, but that's fine.
3        Again, I'm sorry, I'm not going to
4   answer --
5      A.   And so that conversation predated this
6   engagement by some number of weeks, maybe months.  I
7   don't know.  So as an example of what might not be
8   here in the scope of engagement but that we do
9   regular fair for Alliance would be identifying a
10  target, in answer to your question.
11        Now, there were probably other meetings
12  and maybe memos that we produced, maybe, or telephone
13  conversations where we went through chapter and
14  verse, well, what do these guys do?  How do these
15  guys fit into your business plan?  This is a good
16  example of somebody who there was a competing entity
17  competing for this.  And we were told about it and we
18  made suggestions to Alliance, I think, about their
19  competitive advantage of succeeding in this
20  transaction versus this other.  In fact, there was a
21  point about this in something we read this morning
22  which went to the other company was looking at this
23  as an ongoing concern likely valuing it based on its
24  book value and sort of traditional methods of
25  valuation, whereas Alliance was looking at it as a



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
209–212

1          Sheldon
2  discounted cash flow and utilizing its net operating
3  loss carry forward.  Those conversations and the
4  assessment of that competitive position and whether
5  they could --
6          MR. GOLUMBIC:   Can we go off the record
7  for a second?
8          VIDEOGRAPHER:   The time now is 4:16
9  p.m.
10         Going off the record.
11         (Recess.)
12         VIDEOGRAPHER:   The time now is 4:26
13  p.m.
14         We are back on the record.
15      A.  If I could just finish that answer?
16      Q.  Sure, yes.
17      A.  So as I was saying, this was likely
18  signed into the process.  I think it does accurately
19  describe what we were going to be paid to be doing,
20  but I think this first lead in paragraph that says
21  that we were going to provide general transactional
22  support in connection with the proposed transaction
23  without limitation picks up the various things that I
24  told you that we do.
25      Q.  Great.

1          Sheldon
2          Can I just show you --
3          MR. JOHANSON:   What's our number?  What
4  exhibit are we on?
5          (Exhibit 22 so marked
6          for identification.)
7      Q.  Could you quickly look at that and see
8  if that refreshes your memory about some of the stuff
9  you were just testifying about as it relates to your
10  Northstar engagement with Alliance?
11      A.  Okay.  I have skimmed this e-mail.  It's
12  pretty meaty.  I'm glad to read it closer, but if
13  you'd like to ask me a question, maybe I can answer
14  it.
15      Q.  Does this describe any of the -- again,
16  you've testified about what you did for Northstar
17  earlier and now you were just a few minutes ago I
18  believe testifying about some edges of what you did
19  with respect to the Northstar deal for Alliance,
20  correct?
21      A.  Yes.
22      Q.  Does this describe some of those edges,
23  using my word?
24      A.  Yes.  It's a fairly meaty conversation
25  about what are the risks to this company's -- to this

1          Sheldon
2  purchase.
3      Q.  Does this paragraph on Sheldon 5
4  contemplate doing the things we're talking about
5  here?
6      A.  Yes.  The exact -- this contract was
7  signed on March 15th.  The work that we're talking
8  about that I've already done was dated on March 6th.
9  So that's what I was getting at in the answer to your
10  previous question, that the engagement agreement
11  follows really the important part of my work, which
12  was finding this client.
13      Q.  Yes.
14      A.  I'm going to say 75 percent of my
15  utility to Alliance on this matter happened when I
16  talked to Jamie Wolfe on that phone call.
17         This is a fairly meaty e-mail that I
18  wrote, but probably Mr. Belica had input on.  But I
19  would -- if it had occurred after the date of this
20  engagement, I would have said yes, this is the
21  general transactional support that's envisioned by
22  the engagement agreement.
23      Q.  Great.  I understand and thank you for
24  clarifying that for the record.
25         You can set that down.

1          Sheldon
2          There wasn't anything else, however,
3  that you did in connection with this engagement
4  that's not described in either Sheldon 5 or Sheldon
5  22?
6      A.  There could well be things that we did
7  in furtherance of this engagement that weren't
8  envisioned by this engagement agreement.  I have none
9  in my mind as I say that, but we usually sign an
10  engagement agreement meant to say -- I would often
11  use the term "without limiting the foregoing."  The
12  foregoing would say we're going to advise you --
13  any way we can think of advising you on this
14  transaction -- risks, blah, blah, blah -- without
15  limiting the generality of the foregoing, we'll also
16  do the following.
17         That's how I would read this scope of
18  services section.
19         Does that answer your question or would
20  you want to repeat it?
21      Q.  I'm just trying to make sure that we
22  have it on the record that there's not some big
23  unidentifiable task that you did or services you
24  provided in addition to what's summarized in a broad
25  sense in the engagement letter.



Page 213

Sheldon

1        Sheldon
2        A.   I don't think there is.
3        Q.   That's the question.
4        A.   Okay.
5        Q.   And then I understand that there was
6   some other work that was done before the engagement
7   letter which is summarized in Sheldon 22.
8        A.   Yep.
9        Q.   Which, again, you've indicated here that
10  was 75 percent of value add that you gave on that
11  particular transaction?
12       A.   Right.
13       Q.   Could you look at Sheldon 7 for a
14  minute?
15       A.   Okay.
16       Q.   So this is the letter that you read in
17  depth for the first time this morning, correct?
18       A.   Correct.
19       Q.   Did you have any independent knowledge
20  about these statements from Mr. Stephen W. Jones of
21  SLMRS prior to today?
22       A.   No.
23       Q.   Can you look at the top of page 2?
24            Do you see the first sentence where it
25  says, "By way of further background, Alliance had no

Page 214

1        Sheldon
2   student loan expertise at the time the agreement was
3   executed.  Alliance entered into the agreement with
4   the expectation that SLMRS would help to fill the
5   student loan expertise void at Alliance"?
6            Would you agree that there was a student
7   loan expertise void at Alliance prior to the -- prior
8   to the transaction?
9        A.   Well, I'm not familiar with the
10  agreement -- or you just said "the transaction."  I'm
11  not familiar with a transaction.
12       Q.   A transaction in which Alliance -- I
13  mean, prior to the time that Alliance started working
14  with you and getting into this business, isn't it
15  true that Alliance had no student loan expertise?
16       A.   I believe that's true, but I don't have
17  firsthand knowledge of their expertise prior to our
18  involvement.
19       Q.   Do you have any knowledge of it after
20  your involvement?
21       A.   After our involvement, given the
22  numerous transactions we worked on, Student Loans 101
23  seminar, weekly and daily calls, I believe, that
24  Alliance personnel became quite proficient in the
25  field of student loan finance.

Page 215

Sheldon

1        Sheldon
2        Q.   That was after the time that you started
3   working with Alliance, correct?
4        A.   Correct.
5        Q.   And who at Alliance became proficient?
6        A.   I believe everyone did.  I believe Mr.
7   Fenkell did.  I believe Mr. Wanko did.  I believe Mr.
8   Springer did, Mr. Reppucci.  One more, I apologize to
9   him, that I'm missing.  I believe they became --
10  particularly Mr. Springer became very knowledgeable
11  about running a student loan business and the student
12  loan industry in general.
13       Q.   But they didn't have that before they
14  started working with you?
15       A.   As I say, I don't have firsthand
16  knowledge of what they had before they worked with
17  me.
18       Q.   Do you know Mr. Stephen W. Jones of
19  SLMRS at all?
20       A.   I don't.
21       Q.   Do you have any reason to believe that
22  he would put something down in writing that he didn't
23  agree with?
24       A.   I don't know the man.
25            MR. GOLUMBIC:   Objection.

Page 216

1        Sheldon
2        Q.   Do you know the members of SLMRS?
3        A.   No.
4        Q.   Would it surprise you to find out that
5   SLAMS was a member of SLMRS?
6        A.   I don't know SLAMS.  I don't know SLMRS.
7   I learned of these names and these acronyms when I
8   read the complaint.
9        Q.   Do you know anything about the
10  capabilities of SLMRS or SLAMS to provide services in
11  the student loan industry work that you talked about
12  to Alliance Holdings?
13       A.   Let me make this very clear for you.  I
14  learned of the acronyms which you are now calling
15  SLMRS and SLAMS when I read the complaint, and that's
16  the sum and substance of my knowledge of SLMRS and
17  SLAMS.
18       Q.   Thank you.
19            Could you look at Sheldon 8 for a
20  minute?
21       A.   Okay.
22       Q.   Could you look at the first -- or the
23  last paragraph on page 1 of Sheldon 8?
24       A.   The last paragraph on page 1?
25       Q.   Yes.



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
217–220

Page 217

Sheldon

1
2    A.   Okay.
3    Q.   Can you contrast that at all with the
4  Northstar, the similar paragraph in the Northstar
5  agreement between Alliance and SLCS?
6    A.   You want me to read both and then --
7    Q.   I don't want you to -- I just want to
8  know if there's anything dramatically different.
9    A.   No.  They're similar.
10    Q.   If they're similar, that's all I want.
11    A.   I note that the first paragraph is
12  identical, and the substance of the -- this one,
13  Panhandle looks a little bit longer, but no, they're
14  very similar and the engagement was extremely
15  similar.
16    Q.   And this, again, is intended to
17  encompass the general scope of all the services
18  that --
19    A.   Correct.
20    Q.   -- SLCS would provide to Alliance,
21  correct?
22    A.   Yes.
23    Q.   Could you turn to Sheldon 11?
24       Have you had a chance to --
25    A.   Let me just... Okay.

Page 218

Sheldon

1
2    Q.   So those names on the list, you wouldn't
3  be surprised if Paul Wozniak was someone that Mr.
4  Sefcovic knew independently of you?
5    A.   That would not surprise me.
6    Q.   How about with respect to Mr. Finn of
7  CIT?
8    A.   It wouldn't surprise me, no.
9    Q.   How about Mr. Norg Sanderson of SLFC?
10    A.   It would not surprise me that Mr.
11  Sefcovic knows Norg.
12    Q.   Independently of --
13    A.   Independently of me, that wouldn't be
14  surprising.
15    Q.   -- you and your group.
16       Could you go to 12, Sheldon 12?
17    A.   Okay.
18    Q.   Did you make the introduction to
19  Graduate Leverage and Dan Thiebault?
20    A.   My best recollection is that I did.  It
21  was a client of our firm.  This e-mail tends to imply
22  that I did.  I don't have a crisp recollection of the
23  first time Grad Leverage and Dan Thiebault's name was
24  mentioned to Mr. Fenkell, but I assume it was via
25  this e-mail.

Page 219

Sheldon

1
2    Q.   And you testified earlier that 75
3  percent of value add in the Northstar deal was at the
4  beginning when you wrote that e-mail and you made the
5  introduction and you kind of crystalized how the
6  relationship could work together, correct?
7    A.   Right, yes.
8    Q.   So introductions is one of the things
9  you do to get paid, correct?
10    A.   Yes.  Identifying a target is a part of
11  our service.
12    Q.   Could you go to Sheldon 13?
13       Again, I'm trying not to ask questions
14  that were already asked and I think I have a little
15  bit.  Bear with me.  We're almost done.
16       Referring to the master servicing
17  agreement again for the business?
18    A.   Referring to what again?
19    Q.   Just referring to the concept of the
20  master servicing business?
21    A.   Okay.
22    Q.   And the administrator service business
23  that you testified about.
24    A.   Yes.
25    Q.   That was something that you could

Page 220

Sheldon

1
2  contract out for, correct, is that?
3    A.   Master servicing?
4    Q.   Yes, and administrator.
5    A.   Yes.  The answer is yes.
6    Q.   Okay.  And what types of expertise?  I
7  mean, would it be a CPA or someone else that would
8  have the expertise to assist you with that, with
9  someone with that?
10    A.   A master servicer has an accounting
11  function.  It has a knowledge of the student loan
12  business, generally, function.  It's basically
13  running a student loan business, although typically
14  not the hard part of a student loan business, I.E.,
15  the origination of loans, but rather the control of
16  an existing -- a portfolio of student loans,
17  servicing of it and the financing of it.
18    Q.   So it wouldn't have been contemplated
19  that Alliance would do that type of work in-house?
20    A.   I testified earlier that that was
21  contemplated, particularly in a scenario where master
22  servicers that they owned lost their personnel.
23    Q.   Let me clarify the question.
24    A.   Okay.
25    Q.   The eight or ten people within Alliance



Page 221

1                    Sheldon
2  as a holding company or however many there were
3  wouldn't be doing that work.  They could buy someone
4  or contract with someone who could do that work for
5  them?
6         A.   I can answer the part of that question
7  where you said that they can contract with someone
8  and outsource the master servicing.  It's possible
9  they could do it themselves, but I know it's possible
10  that they could outsource it.
11         Q.   Who would have done that at the time
12  back, you know -- right when you started working with
13  Alliance, who would have done that?
14         A.   This is somewhat speculating, but Mr.
15  Stringer -- Springer, who oversaw this function for
16  their two portfolio companies, was gaining that sort
17  of expertise, if that's helpful.
18         Q.   Did he gain that during the time that
19  you worked with him?
20         A.   Yes.
21         Q.   And he didn't have that expertise prior
22  to the time that you worked with him?
23         A.   That's correct.
24         Q.   Anybody else, other than Mr.  -- is it
25  Springer?  I'm sorry if I got the name wrong.

Page 222

1                    Sheldon
2         A.   I believe it's Springer.  The group of
3  them were becoming -- the group of them were becoming
4  quite knowledgeable in student loan finance.
5         Q.   Over that two-year period of time?
6         A.   Yes.
7         Q.   Could you look at 15, Sheldon 15 for a
8  minute?
9         Before I go on, I was going to ask you
10  this.  Do you know what Mr. Springer's other duties
11  were at Alliance Holdings at the time?
12         A.   I don't recall his other duties.
13         Q.   Did he have other entities to manage or
14  portfolio companies --
15         A.   Yes.  I believe he was portfolio manager
16  for portfolio companies.  I could be incorrect, but
17  that's my recollection.
18         Q.   So he had that to do in addition to this
19  new work that you were talking about, correct?
20         A.   He had that to do -- he certainly had
21  that to do, yes.
22         Q.   Do you recall how many people were
23  employed by the actual holding company at Alliance
24  Holdings during the time frame you worked with them?
25         A.   It might have been a half dozen, in my

Page 223

1                    Sheldon
2  recollection.
3         I might be able to be helpful to you in
4  this way.  Master servicing is not nuclear physics.
5  It's a very straightforward function.  The companies
6  that serve as their own master servicer do it with
7  two or three people.  So what I've been testifying to
8  is if Alliance wanted to, it probably had the
9  expertise to do it themselves.  It certainly had the
10  ability to outsource it.
11         Q.   If they were doing it themselves, they
12  would have to have the person power, the people --
13         A.   The two or three people.
14         Q.   Yes.
15         On 15, did any deal come out of this
16  one, this Chris Cronk e-mail?  Any transaction occur?
17         A.   I believe this meeting was two-fold.
18  One, to look into the possibility of being financed
19  by Bank of America.  And, two, to describe to Mr.
20  Cronk and his colleagues, who are investment bankers,
21  the type of work Alliance was trying to do so that
22  they could send out that word to their various
23  clients.  I don't think this was a meeting to develop
24  some sort of a transaction with Bank of America.
25         Q.   Just continuing to develop the knowledge

Page 224

1                    Sheldon
2  of Alliance and what it wanted to do in the student
3  loan industry?
4         A.   Well, and send out the -- to continue to
5  distribute the information of what Alliance was
6  trying to do to the market.
7         Q.   Yes.  Thank you.
8         MR. JOHANSON:  :  I just want a
9  two-minute break.  I'll be back and may have just a
10  couple more questions and then I'll be done.
11         VIDEOGRAPHER:   The time is now 4:53
12  p.m.
13         Going off the record.
14         (Recess.)
15         VIDEOGRAPHER:   The time now is 5:00
16  p.m.
17         We're back on the record.
18         MR. GOLUMBIC:  Mr. Johanson, did you
19  want to indicate whether you had any --
20         MR. JOHANSON:  I'm tendering the
21  witness back to you.  I reserve subject to whatever
22  you...
23         MR. GOLUMBIC:   Sure.
24         MR. JOHANSON:  :  Thank you.
25  BY MR. GOLUMBIC:



Page 225

1                    Sheldon
2        Q.   Mr. Sheldon, just a few follow-up
3    questions.
4            On your Exhibit 8, the Panhandle
5    engagement between SLCS and Alliance?
6        A.   Yes.
7        Q.   You had testified that this was an
8    accurate description of the scope of services.  But I
9    just want to make sure I understood it.  Did this
10   engagement, like the Northstar engagement, predate
11   the services you had already provided to Alliance?
12       A.   I don't have a crisp recollection of
13   initiating the Panhandle transaction and signing this
14   engagement, but there was very likely to be some
15   conversations with both Panhandle and Alliance about
16   the transaction in that it was so similar to the
17   Northstar transaction.  Those might have been
18   minimal.  I don't know.  But those things, you know,
19   identifying the target necessarily happened before
20   the agreement was signed, and there would have been
21   some things done, but I'm guessing that not that much
22   and that this is the basic stuff we did for
23   Panhandle.
24       Q.   Sure.  But as you were testifying with
25   respect to Northstar and other matters that you work

Page 226

1                    Sheldon
2    on identifying a target and working to bring that
3    target to this stage is part of the services that
4    SLCS provides, correct?
5        A.   A major part, yes.
6        Q.   There were a lot of questions about Mr.
7    Sefcovic.  I know that you had testified that he was
8    a solid participant as part of this working group
9    that was working to identify potential targets in the
10   student loan industry and he was an expert counsel.
11   When you referred to that, as him being an expert
12   counsel, do you mean in his capacity as an attorney
13   for Squire Sanders?
14       A.   Yes.
15       Q.   In his capacity as an attorney for
16   Squire Sanders working for Alliance?
17           MR. JOHANSON:  Excuse me.
18           I'm just to going to object to the form
19   of these questions as being improper.  Thank you.
20   The last few.
21       A.   If you could just repeat that?
22       Q.   It was your understanding that Mr.
23   Sefcovic was an expert counsel as an attorney for
24   Squire Sanders working for Alliance?
25       A.   Correct.

Page 227

1                    Sheldon
2           MR. JOHANSON:  Again same objection as
3    to form.
4        Q.   Did Mr. Sefcovic at any time during this
5    period of time of 2010 to 2012 hold out that he was a
6    member of a student loan advisory company?
7        A.   He did not.
8        Q.   Did he indicate to you that his wife,
9    Lianne Sefcovic, was a member of a student loan
10   consulting or advisory company?
11       A.   No.
12       Q.   This letter, Exhibit 7, from Stephen
13   Jones to Mr. Hockeimer, Exhibit 7, do you know that
14   Mr. Jones is affiliated with Hiram College?
15       A.   I don't know Mr. Jones.  I just know
16   nothing of this entity or Mr. Jones.
17       Q.   Do you have any knowledge that Hiram
18   College was providing services or was ready to
19   provide services to Alliance in connection with
20   student loans?
21       A.   No.
22       Q.   I have no further questions.  Thank you.
23           MR. JOHANSON:  I just have one.
24           Thank you, Mr. Golumbic.
25   BY MR. JOHANSON:

Page 228

1                    Sheldon
2        Q.   So you testified earlier that you didn't
3    have any knowledge — I mean, I'm sorry, because you
4    probably testified this way a number of times.
5        A.   It's all right.  Go ahead.
6        Q.   I may be asking you again.
7            You testified that you didn't have any
8    knowledge of SLMRS?
9        A.   Correct.
10       Q.   You didn't have any knowledge of SLAMS,
11   correct?
12       A.   Correct.
13       Q.   You didn't have any knowledge of who the
14   members of SLMRS or SLAMS were, correct?
15       A.   Correct.
16       Q.   You didn't have any knowledge of who the
17   agents for SLMRS or SLAMS were, correct?
18       A.   Correct.
19       Q.   So it's possible that you may not know
20   in what capacity Mr. Sefcovic was acting when he
21   engaged in certain student loan marketing activity,
22   right?
23       A.   Entirely possible.
24       Q.   Thank you.
25           MR. JOHANSON:  I think we've actually



PAUL SHELDON
SPEAR VS. FENKELL

October 28, 2014
229–232

---

Page 229

1              Sheldon
2  made it through a witness today, Lars.
3          MR. GOLUMBIC:   I have no further
4  questions.
5          Thank you very much for your time, Mr.
6  Sheldon.
7          THE WITNESS:   You're welcome.
8          MR. JOHANSON:  Thank you, Mr. Sheldon.
9          THE WITNESS:   You're welcome.
10          VIDEOGRAPHER:   The time now is 5:05
11  p.m.
12          This marks the end of tape number 5 in
13  the videotaped deposition of Paul Sheldon.
14          We are off the record.
15          (Time noted:  5:05 p.m.)
16
17
                Paul Sheldon
18
19  Subscribed and sworn to
20  before me this      day
21  of         , 2014.
22
23      Notary Public
24
25

---

Page 231

1                  Sheldon
20      Document                      89
21      Document                      93
22      Document                     210

---

Page 230

1                  Sheldon
2          I N D E X
3  WITNESS    EXAMINATION BY        PAGE
4  P. Sheldon  Mr. Golumbic          5, 224
            Mr. Johanson         102, 227
5
6
   EXHIBITS                         PAGE
7
   1        Document                21
8
   2        Document                28
9
   3        Document                32
10
   4        Document                32
11
   5        Document                42
12
   6        Document                46
13
   7        Document                47
14
   8        Document                50
15
   9        Document                52
16
   10       Document                54
17
   11       Document                58
18
   12       Document                66
19
   13       Document                68
20
   14       Document                75
21
   15       Document                77
22
   16       Document                79
23
   17       Document                82
24
   18       Document                85
25
   19       Document                89

---

Page 232

1
2
3          C E R T I F I C A T I O N
4
5          I, PATRICIA GUARINO, a Shorthand
6  Reporter and notary public, within and for the State
7  of New York, do hereby certify:
8          That PAUL SHELDON, the witness whose
9  examination is hereinbefore set forth, was first duly
10  sworn by me, and that this transcript of said
11  testimony is a true record of the testimony given by
12  said witness.
13          I further certify that I am not related
14  to any of the parties to this action by blood or
15  marriage, and that I am in no way interested in the
16  outcome of this matter.
17
18          IN WITNESS WHEREOF, I have hereunto set
19  my hand this 7th day of November, 2014.
20
21
22          PATRICIA GUARINO
23
24
25



**Page 233**

```
1                DEPOSITION ERRATA SHEET
2
3   Our Assignment No.:  220390
4   Case Caption:  Spears vs. Finkell
5
6        DECLARATION UNDER PENALTY OF PERJURY
7
8   I declare under penalty of perjury that I have read
9   the entire transcript of my Deposition taken in the
10  captioned matter or the same has been read to me, and
11  the same is true and accurate, save and except for
12  changes and/or corrections, if any, as indicated by
13  me on the DEPOSITION ERRATA SHEET hereof, with the
14  understanding that I offer these changes as if still
15  under oath.
16        _____
17           Paul Sheldon
18  Subscribed and sworn to on the ____ day of _____,
19  20 ____ before me.
20  _____
21  Notary Public,
22  in and for the State of _____.
23
24
25
```

**Page 234**

```
1                DEPOSITION ERRATA SHEET
2   Page No.____Line No.____Change to:_____
3   _____
4   Reason for change:_____
5   Page No.____Line No.____Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____Line No.____Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____Line No.____Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____Line No.____Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____Line No.____Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____Line No.____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25           Paul Sheldon
```

**Page 235**

```
1                DEPOSITION ERRATA SHEET
2   Page No.____Line No.____Change to:_____
3   _____
4   Reason for change:_____
5   Page No.____Line No.____Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____Line No.____Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____Line No.____Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____Line No.____Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____Line No.____Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____Line No.____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25           Paul Sheldon
```





## Alliance Holdings, Inc. Forms Alliance Student Loan Management, Inc.

ABINGTON, PA, August 15, 2010 — Alliance Student Loan Management, Inc. ("ASLM"), a wholly-owned subsidiary of Alliance Holdings, Inc. ("Alliance"), was formed by Alliance in August, 2010 to invest in and acquire leading entities in the student loan sector. Alliance is a 100% employee-owned holding company (through an ESOP) that invests in market-leading manufacturing businesses and specialized service businesses. Founded in 1994, Alliance Holdings has grown to become one of the largest ESOP holding companies in the country. Alliance Holdings' mission is to create an enduring, diversified ESOP-owned company that maximizes the value of our employee-owners' retirement accounts.

Ken Wanko will serve as the President of ASLM. According to Wanko, "Alliance Holdings has wanted to enter the student loan space for some time, which is now enabled with the creation of ASLM. We have put together a strong team, including Paul Sefcovic, Partner, of Squire Sanders & Dempsey, L.L.P., and Paul Sheldon, Managing Director, of Student Loan Capital Strategies, to assist us in achieving our investment objectives. Our goal is to take the best practices from each of our partners and build a model for student loan servicing and development."

For more information, contact:

Ken Wanko
President, Alliance Student Loan Management, Inc.
Managing Director, Acquisitions, Alliance Holdings, Inc.
1021 Old York Road, 3rd Floor
Abington, PA 19001
(T) 215.706.0873 ext. 126
(F) 215.706.0877
Email us

Visit our website



Copyright © 2014 Alliance Student Loan Management. All Rights Reserved

| From: | Ken Wanko |
|---|---|
| Sent: | Tuesday, March 01, 2011 9:50 AM |
| To: | John Reppucci; 'Patrick Belica'; 'Sefcovic, Paul F.'; 'Paul B. Sheldon' |
| Cc: | David Fenkell; Christopher Springer; John Kolla; TJ Haas |
| Subject: | RE: Student Loan Call tomorrow at 10am |
| Attachments: | Opportunity List and Calendar 3_1_11.pdf |

Please find the attached for our call this morning.

Ken

-----Original Message-----
From: John Reppucci
Sent: Tuesday, March 01, 2011 9:28 AM
To: John Reppucci; 'Patrick Belica'; 'Sefcovic, Paul F.'; 'Paul B. Sheldon'; 'Hughes, Donald W.'
Cc: David Fenkell; Ken Wanko; Christopher Springer; John Kolla; TJ Haas
Subject: RE: Student Loan Call tomorrow at 10am

Gentlemen,

Please find attached the list of invites by status.

Thanks,

John Reppucci

Analyst
Alliance Holdings, Inc.
P: (215) 706-0873 ex130
F: (215) 706-0877

-----Original Message-----
From: John Reppucci
Sent: Monday, February 28, 2011 3:03 PM
To: John Reppucci; 'Patrick Belica'; 'Sefcovic, Paul F.'; 'Paul B. Sheldon'; 'Hughes, Donald W.'
Cc: David Fenkell; Ken Wanko; Christopher Springer; John Kolla; TJ Haas
Subject: Student Loan Call tomorrow at 10am

Gentlemen,

Alliance will be having its weekly student loan call tomorrow morning at 10am. I will be sending around a list of the EFC cocktail party invitees and their respective statuses in advance of the call so please be on the lookout for that file this evening.

We will use the following:
Dial in:  1-877-363-0529
Passcode:    8512360

Thanks,

1

EXHIBIT
Pla·ntiffs
4
10-28-14
PENGAD 800-631-6989

John Reppucci

Analyst
Alliance Holdings, Inc.
P: (215) 706-0873 ex130
F: (215) 706-0877

2

Alliance Student Loan Management
Marketing/Opportunity Tracking

Opportunity Tracking

| | Target | Contact at Target | ASM Responsibility | Update |
|---|---|---|---|---|
| 1) | Access | Chris Chapman | Mark Weadick | will meet at EFC dinner |
| 2) | CoStep (South TX) | Patricia Beard | Paul Sheldon | JOI sent - 2/28 |
| 3) | Montana | Jim Stipcich | Taige Thornton | Taige spoke with Jim - there is now a renewed interest - will meet at EFC |
| 4) | New Hampshire | Renee Bruin | Paul Sheldon | PS to contact |
| 5) | Education Service Foundation (Mississippi) | ? | Mark Weadick | MW to contact |
| 6) | GOAL | Ken Ruggerio/Seamus Garland | John Kolla | Trust info sent over and analyzed - no cash flow until 2029 |
| 7) | GCO | Bob Culnane / Greystone CFO | David Fenkell / Paul Sheldon | Paul Sheldon heard from Greystone CFO that they are looking to exit - David to call Bob |
| 8) | Key Bank | Brian Brennan | Ken Wanko | Had call with Brian and team to discuss subdebt opportunity plus their treasury owned residuals |
| 9) | Iowa | Jim McCullough | John Hupalo | KW requested that John to set up a call with Jim |

Other Initiatives/Meetings

| | | | | |
|---|---|---|---|---|
| 1) | NetNet | Mike Dunlap | John Hupalo | Met out in Aurora on 2/16/11 |
| 2) | Sallie Mae | John Clark (EVP & Treasurer) | John Hupalo | Met with John and Leo on 2/2 in VA |
| 3) | Brazos | Murray Watson | Paul Sheldon/Paul Sefcovic | P Sheldon to call Murray for potential visit |
| 4) | PHEAA | Jim Preston | Mark Weadick | Visit scheduled for 3/2/11 |
| 5) | Great Lakes | Dick George | Taige Thornton | Taige reaching out to Dick George about EFC or visit |
| 6) | Discover | ? | Taige Thornton | Taige to reach out for potential meeting |

Dead/on-hold

| | | | | |
|---|---|---|---|---|
| 1) | CIT | Catherine Bryant | Dan Biery | Only opportunity would be whole loan purchase - speak with Hupalo |
| 2) | North Texas | Tony/John Arnold | John Hupalo | Not a target - Both entities are not for profits - no interest |
| 3) | EdSouth | Rick/Murray | Mark Weadick | MW spoke with them - nothing to discuss at this point |
| 4) | Brazos | | Paul Sheldon / Paul Sefcovic | Not attending and not interested |

## Student Loan Capital Strategies LLC

### 1410 Wolver Hollow Road

### Oyster Bay, New York 11771

## Private and Confidential

March 15, 2010

Mr. David B. Fenkell
President
Alliance Holdings, Inc
1021 Old York Road
Abington, PA  19001

Dear Mr. Fenkell;

Student Loan Capital Strategies LLC ("SLCS") is pleased to confirm the terms of our engagement with Alliance Holdings Inc ("Alliance" or the "Company") to provide analytical support and advice (the "Agreement").  Alliance proposes to acquire assets or stock of Northstar Capital Market Services ("NCMS")(the "Proposed Transaction").   We look forward to working with you on this engagement.

### Scope of Engagement:

SLCS has identified the opportunity to complete the Proposed Transaction.   SLCS will provide Alliance with various types of analysis and general transactional support in connection with the proposed transaction, without limitation.

NCMS has  provided Alliance with information regarding Northstar Education Finance's (Northstar") existing student loan trusts.  This information includes NCMS's estimates for master servicing fees that may accrue to NCMS.  SLCS will model and simulate the receipt of master servicing fees under various, unlimited scenarios, including advice regarding important inputs such as servicing costs, repayment speeds, delinquency and default speeds, etc.  SLCS will advise regarding the risks to these cash flows, the chance that existing trusts could default and be disposed of, and the chance that existing trusts can be refinanced and with permanent financing.  The foregoing constitutes SLCS "Services" under the Agreement.



David B. Fenkell
March 15, 2010

### Term of Engagement:

This engagement is expected to conclude if and when Alliance completes the Proposed Transaction; however the engagement may be terminated by either party on 30 days notice. Notwithstanding any termination of this Agreement, the provisions of this Agreement related to confidentiality and indemnification shall survive the termination of this Agreement.

In the event that this Agreement is terminated prior to completion of the Proposed Transaction, and there is a transaction within 12 months substantially similar to the Proposed Transaction, then Alliance will pay SLCS the fees set forth below.

### Fees and Expenses:

In consideration of providing the Services hereunder, SLCS will be paid a fee equal to one half of one percent (1/2 of 1%) of the value of the Proposed Transaction in two payments. The first payment in the amount of $40,000 will be paid upon the signing of this Agreement. The second payment in the amount of ½ of 1% times the value of the transaction will be paid upon the completion of the transaction. The value of the transaction will equal the cash paid by Alliance to acquire the assets or the stock, plus $5 Million. The $5 Million sum is the assumed value of any earn out or similar feature of the ultimate transaction.

The upfront fee of $40,000 will be credited toward the payment of the final payment.

Alliance will reimburse SLCS for the cost of pre-approved economy air travel, ground transportation and lodging, but only where the travel is directly related to providing the Services hereunder.

### Confidentiality:

SLCS and Alliance agree that the terms of this Agreement are to be kept confidential, and not disclosed to any party.

### Certain Acknowledgements:

The Company acknowledges that SLCS has been retained hereunder solely as an adviser to the Company and not as an advisor to or agent of any officer, director or other person connected with the Company, and that the Company's engagement of SLCS is as an independent contractor and not in any other capacity including as a fiduciary.

The Company acknowledges that it is not relying on SLCS for tax, legal or accounting advice, and that it will seek and rely on the advice of its own legal and accounting professionals and advisors for such matters.

David B. Fenkell
March 15, 2010

The Company further acknowledges that from time to time SLCS represents other persons and entities that participate in the student loan industry. SLCS acknowledges and agrees that it is aware of no conflicts of interest in connection with this engagement and that it will disclose to the Company any engagements with any other person or entity that may reasonably be determined to constitute a conflict of interest due to such person or entity in light of the Services proposed in this letter.

**Indemnity:**

The Company agrees that it will indemnify, defend and hold harmless SLCS and its directors, officers, members and employees (each, an "indemnified party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings (collectively, "losses"), joint or several, (i) related to or arising out of (A) the contents of oral or written information provided by the Company, its employees or its other agents, which information either the Company or SLCS provides to any third party, or (B) any other action or failure to act by the Company, its employees or its other agents or by SLCS or any indemnified party in accordance with and at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of SLCS or any transaction or conduct in connection therewith, except that this clause (ii) shall not apply with respect to any losses to the extent such losses are mutually agreed by the Company and SLCS or are finally judicially determined to have resulted from the negligence or misconduct of such indemnified party. The Company's indemnification obligations shall survive the termination of this Agreement.

SLCS agrees that it will indemnify, defend and hold harmless the Company and its directors, officers, members and employees (each, an "indemnified party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings (collectively, "losses"), joint or several, (i) related to or arising out of (A) the contents of oral or written information provided by SLCS, its employees or its other agents, which information either the Company or SLCS provides to any third party, or (B) any other action or failure to act by SLCS, its employees or its other agents or by the Company or any indemnified party in accordance with and at SLCS's request or with SLCS's consent, or (ii) otherwise related to or arising out of the engagement of SLCS or any transaction or conduct in connection therewith, except that this clause (ii) shall not apply with respect to any losses to the extent such losses are mutually agreed by the Company and SLCS or are finally judicially determined to have resulted from the gross negligence or willful misconduct of such indemnified party. SLCS's indemnification obligations shall survive the termination of this Agreement.

David B. Fenkell
March 15, 2010

**Miscellaneous:**

This Agreement shall be construed and interpreted in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law thereof.

This Agreement represents the entire understanding of the parties and supersedes all written and oral agreements or representations relative to the subject matter involved.

This Agreement may be signed in two counterparts, each of which will be deemed to be an original.

We are delighted to accept this engagement and look forward to working with you.

If the foregoing is in accordance with your understanding, please sign and return one copy of this letter.

Very truly yours,

**Student Loan Capital Strategies LLC**

By: _____
　　Paul B. Sheldon
　　Managing Director

Accepted and Agreed as of the date set forth above:
Alliance Holdings Inc.

By: _____
　　~~David B. Fenkell~~  Kenneth J Wanko
　　~~President~~  Managing Director, Acquisitions

| | |
|---|---|
| **From:** | Paul B. Sheldon <paul.b.sheldon@slcstrategies.com> |
| **Sent:** | Friday, February 19, 2010 9:10 AM |
| **To:** | David Fenkell; Sefcovic, Paul |
| **Cc:** | Patrick Belica |
| **Subject:** | UPDATE |

Here is a brief update:

1. USED: I spoke to Henry Howard to reiterate our need for Borrower Benefit experience. He is all over it, but says it will take several days. On this one, we are putting together a best case cash flow. We will lay in the Borrower Benefit information, and get that around. I would also like to discuss qualitative things regarding USED.

2. Northstar: I have talked to Northstar CEO, and their advisor regarding the operating company. We already have an NDA in connection with an assignment we did with them last year, so they are sending information. They have been working with one party for some time, and it sounds like they are frustrated. My strong sense is that they are not so much seeking a second party to force the first party to action, but rather I don't think they get along with the first party. Will explain. My sense is that the valuation of the business has been basically to discount the future profit that derives from the existing master Servicing business they have with Northstar. So if we believe they have a real business, it should not be too hard to beat that valuation. We will get information today or Monday.

3. I am proceeding with the various calls that we discussed.

I suggest that we table the call we discussed for today, and have it Monday or Tuesday.

Paul B. Sheldon, Managing Director
Student Loan Capital Strategies LLC
516 801 4850 Office
516 647 4705 Cell
paul.b.sheldon@slcstrategies.com

1



## Student Loan Capital Strategies LLC

### 1410 Wolver Hollow Road

### Oyster Bay, New York 11771

## Private and Confidential

June 20, 2010

Mr. David B. Fenkell
President
Alliance Holdings, Inc
1021 Old York Road
Abington, PA 19001

Dear Mr. Fenkell;

Student Loan Capital Strategies LLC ("SLCS") is pleased to confirm the terms of our engagement with Alliance Holdings Inc ("Alliance" or the "Company") to provide analytical support and advice (the "Agreement"). Alliance proposes to acquire assets or stock of Panhandle Plains Service Center ("Panhandle")(the "Proposed Transaction"). We look forward to working with you on this engagement.

### Scope of Engagement:

SLCS has identified the opportunity to complete the Proposed Transaction. SLCS will provide Alliance with various types of analysis and general transactional support in connection with the proposed transaction, without limitation.

Panhandle has provided Alliance with information regarding Panhandle's existing student loan business and prospects for the future. This information includes analysis of Panhandle's estimates for master servicing fees that may accrue to Panhandle. SLCS will model and simulate the receipt of master servicing fees under various, unlimited scenarios, including advice regarding important inputs such as servicing costs, repayment speeds, delinquency and default speeds, etc. SLCS will advise regarding the risks to these cash flows, the chance that existing trusts could default or be disposed of, and the chance that existing trusts can be refinanced with permanent financing. SLCS will foster and facilitate meetings with decision makers at Panhandle, and advise on strategy with respect to these meetings. SLCS will also support efforts to arrange financing for the Proposed Transaction. The foregoing constitutes SLCS "Services" under the Agreement.



Mr. David B Fenkell
June 20, 2010

**Term of Engagement:**

This engagement is expected to conclude if and when Alliance completes the Proposed Transaction; however the engagement may be terminated by either party on 30 days notice. Notwithstanding any termination of this Agreement, the provisions of this Agreement related to confidentiality and indemnification shall survive the termination of this Agreement.

In the event that this Agreement is terminated by Alliance prior to completion of the Proposed Transaction, and there is a transaction within 12 months substantially similar to the Proposed Transaction, then Alliance will pay SLCS the fees set forth below.

**Fees and Expenses:**

In consideration of providing the Services hereunder, SLCS will be paid a fee equal to one half of one percent (1/2 of 1%) of the value of the Proposed Transaction in three payments. The first payment in the amount of $20,000 will be paid upon the signing of this Agreement. The second payment, in the amount of $20,000 will be paid if Panhandle continues to pursue the Proposed Transaction after Alliance presents its initial indication of valuation. (Meetings, telephone calls and due diligence activity by Alliance will constitute further interest by Panhandle.) The third payment in the amount of ½ of 1% times the value of the transaction will be paid upon the completion of the transaction. For purpose of the total value of the Proposed Transaction, any earn out or similar feature will be included, based on a good faith estimate of the probability of the earn out being paid, and this good faith estimate will be discounted to the present using a discount factor of 10%.

The first two fee payments in the amount of $40,000 will be credited toward the payment of the final payment.

Alliance will reimburse SLCS for the cost of pre-approved economy air travel, ground transportation and lodging, but only where the travel is directly related to providing the Services hereunder.

**Confidentiality:**

SLCS and Alliance agree that the terms of this Agreement are to be kept confidential, and not disclosed to any party.

**Certain Acknowledgements:**

The Company acknowledges that SLCS has been retained hereunder solely as an adviser to the Company and not as an advisor to or agent of any officer, director or other person connected

with the Company, and that the Company's engagement of SLCS is as an independent contractor and not in any other capacity including as a fiduciary.

The Company acknowledges that it is not relying on SLCS for tax, legal or accounting advice, and that it will seek and rely on the advice of its own legal and accounting professionals and advisors for such matters.

The Company further acknowledges that from time to time SLCS represents other persons and entities that participate in the student loan industry.  SLCS acknowledges and agrees that it is aware of no conflicts of interest in connection with this engagement and that it will disclose to the Company any engagements with any other person or entity that may reasonably be determined to constitute a conflict of interest due to such person or entity in light of the Services proposed in this letter.

**Indemnity:**

The Company agrees that it will indemnify, defend and hold harmless SLCS and its directors, officers, members and employees (each, an "indemnified party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings (collectively, "losses"), joint or several, (i) related to or arising out of (A) the contents of oral or written information provided by the Company, its employees or its other agents, which information either the Company or SLCS provides to any third party, or (B) any other action or failure to act by the Company, its employees or its other agents or by SLCS or any indemnified party in accordance with and at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of SLCS or any transaction or conduct in connection therewith, except that this clause (ii) shall not apply with respect to any losses to the extent such losses are mutually agreed by the Company and SLCS or are finally judicially determined to have resulted from the negligence or misconduct of such indemnified party.    The Company's indemnification obligations shall survive the termination of this Agreement.

SLCS agrees that it will indemnify, defend and hold harmless the Company and its directors, officers, members and employees (each, an "indemnified party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings (collectively, "losses"), joint or several, (i) related to or arising out of (A) the contents of oral or written information provided by SLCS, its employees or its other agents, which information either the Company or SLCS provides to any third party, or (B) any other action or failure to act by SLCS, its employees or its other agents or by the Company or any indemnified party in accordance with and at SLCS's request or with SLCS's consent, or (ii) otherwise related to or arising out of the engagement of SLCS or any transaction or conduct in connection therewith, except that this clause (ii) shall not apply with respect to any losses to the extent such losses are mutually agreed by the Company and SLCS or are finally judicially determined to have resulted from the gross negligence or willful misconduct of such indemnified party.  SLCS's indemnification obligations shall survive the termination of this Agreement.

## Student Loan Capital Strategies LLC

### 1410 Wolver Hollow Road

### Oyster Bay, New York 11771

### Private and Confidential

January 19, 2010

Mr. David B. Fenkell
President
Alliance Holdings, Inc
1021 Old York Road
Abington, PA 19001

Dear Mr. Fenkell;

Student Loan Capital Strategies LLC ("SLCS") is pleased to confirm the terms of our engagement with Alliance Holdings Inc ("Alliance" or the "Company") to provide analytical support and advice (the "Agreement"). Alliance proposes to acquire assets of U.S. Education Loan Inc (USED) or affiliated companies (the "Proposed Transaction"). We look forward to working with you on this engagement.

#### Scope of Engagement:

USED currently has two trusts which secure various debts, known as Trust III and Trust IV (the "Two Trusts"). Alliance is analyzing the possibility of acquiring ownership of the Two Trusts. Alliance will serve as Master Servicer and Administrator of these assets, and may outsource the administrative duties of the Master Servicer and Administrator. SLCS intends to propose its services as Sub-Master Servicer.

SLCS will provide valuation analysis of the Two Trusts ("Valuation Services"), intended to assess the effect on valuation of various configurations of transaction inputs, such as purchase price, servicing costs, Master Servicing costs, and residual value (the "Services").

Alliance is considering a purchase arrangement which involves a payment at closing, and a payment over time, contingent on the performance of the Two Trusts. Our Valuation Services will allow Alliance to predict the return on its investment based on various scenarios. SLCS will prepare an unlimited number of cash flow analyses to make this assessment.



Mr. David B. Fenkell

January 19, 2010

**Term of Engagement:**

This engagement is expected to conclude if and when Alliance enters into a letter of intent with USED; however the engagement may be terminated by either party on 30 days notice. Notwithstanding any termination of this Agreement, the provisions of this Agreement related to confidentiality and indemnification shall survive the termination of this Agreement.

SLCS may provide further service to Alliance after signing a letter of intent, including matters relating to master servicing, however these services will be the subject of a second engagement.

**Fees and Expenses:**

In consideration of providing the Services hereunder, SLCS will be paid a fee of $50,000 in two payments. The first payment in the amount of $25,000 will be paid upon the signing of this Agreement. The second payment in the amount of $25,000 will be paid at the time of Alliance entering into a letter of intent with USED, and will be subject to a full execution of a letter of intent by both parties.

Alliance will reimburse SLCS for the cost of pre-approved economy air travel, ground transportation and lodging, but only where the travel is directly related to providing the Services hereunder.

**Confidentiality:**

SLCS and Alliance agree that the terms of this Agreement are to be kept confidential, and not disclosed to any party.

**Certain Acknowledgements:**

The Company acknowledges that SLCS has been retained hereunder solely as an adviser to the Company and not as an advisor to or agent of any officer, director or other person connected with the Company, and that the Company's engagement of SLCS is as an independent contractor and not in any other capacity including as a fiduciary.

The Company acknowledges that it is not relying on SLCS for tax, legal or accounting advice, and that it will seek and rely on the advice of its own legal and accounting professionals and advisors for such matters.

Mr. David B. Fenkell

January 19, 2010

The Company further acknowledges that from time to time SLCS represents other persons and entities that participate in the student loan industry. SLCS acknowledges and agrees that it is aware of no conflicts of interest in connection with this engagement and that it will disclose to the Company any engagements with any other person or entity that may reasonably be determined to constitute a conflict of interest due to such person or entity in light of the Services proposed in this letter.

**Indemnity:**

The Company agrees that it will indemnify, defend and hold harmless SLCS and its directors, officers, members and employees (each, an "indemnified party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings (collectively, "losses"), joint or several, (i) related to or arising out of (A) the contents of oral or written information provided by the Company, its employees or its other agents, which information either the Company or SLCS provides to any third party, or (B) any other action or failure to act by the Company, its employees or its other agents or by SLCS or any indemnified party in accordance with and at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the engagement of SLCS or any transaction or conduct in connection therewith, except that this clause (ii) shall not apply with respect to any losses to the extent such losses are mutually agreed by the Company and SLCS or are finally judicially determined to have resulted from the negligence or misconduct of such indemnified party.     The Company's indemnification obligations shall survive the termination of this Agreement.

SLCS agrees that it will indemnify, defend and hold harmless the Company and its directors, officers, members and employees (each, an "indemnified party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings (collectively, "losses"), joint or several, (i) related to or arising out of (A) the contents of oral or written information provided by SLCS, its employees or its other agents, which information either the Company or SLCS provides to any third party, or (B) any other action or failure to act by SLCS, its employees or its other agents or by the Company or any indemnified party in accordance with and at SLCS's request or with SLCS's consent, or (ii) otherwise related to or arising out of the engagement of SLCS or any transaction or conduct in connection therewith, except that this clause (ii) shall not apply with respect to any losses to the extent such losses are mutually agreed by the Company and SLCS or are finally judicially determined to have resulted from the gross negligence or willful misconduct of such indemnified party.   SLCS's indemnification obligations shall survive the termination of this Agreement.

Mr. David B. Fenkell

January 19, 2010

**Miscellaneous:**

This Agreement shall be construed and interpreted in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law thereof.

This Agreement represents the entire understanding of the parties and supersedes all written and oral agreements or representations relative to the subject matter involved.

This Agreement may be signed in two counterparts, each of which will be deemed to be an original.

We are delighted to accept this engagement and look forward to working with you.

If the foregoing is in accordance with your understanding, please sign and return one copy of this letter.

Very truly yours,

**Student Loan Capital Strategies LLC**

By: _____

    Paul B. Sheldon
    Managing Director

Accepted and Agreed as of the date set forth above:
Alliance Holdings Inc.

By: _____

    David B. Fenkell
    President

| From: | Paul B. Sheldon <paul.b.sheldon@slcstrategies.com> |
|-------|------|
| Sent: | Friday, February 12, 2010 2:29 PM |
| To: | David Fenkell; Sefcovic, Paul |
| Cc: | patrick Belica |
| Subject: | update |

Here's a quick update. I have been in touch with several targets:

CLC, Paul Wozniak Chairman, said they would like to talk. He said he would send an NDA. They have three trusts, two of which are releasing cash, so unclear how desperate they might be.

CIT, David Finn, said things are on hold with Thian coming in, but could be something of interest once Train gets to his group for review.

SLFC, Norg Sanderson, says they are very interested to talk. Asked that we set up call mid- next week. Very complicated picture which we can lay-out when we talk.

I expect to talk to others Tuesday, so let's catch up Wednesday when we meet regarding USED.

Paul B. Sheldon, Managing Director
Student Loan Capital Strategies LLC
516 801 4850 Office
516 647 4705 Cell
paul.b.sheldon@slcstrategies.com

1

| From: | Mark Weadick <mark.weadick@slcstrategies.com> |
|---|---|
| Sent: | Tuesday, May 04, 2010 1:55 PM |
| To: | David Fenkell |
| Cc: | 'Sefcovic, Paul F.'; 'Paul Sheldon' |
| Subject: | RE: Upcoming Student Loan Conference |

David – look forward to meeting you in person. Is there a time Monday afternoon (after 3:00) or Tuesday (breakfast through lunch) that works for you? On financing I think you should consider meeting with the following folks at the conference: 1) Morgan Stanley (Michael Brown who manages their principal investments book), Scott Kaysen, 2) Cross Point Capital (he has a client that just completed a similar, though more leveraged, financing backed by FFELP Resids – 7 year term at L+700), 3) the remaining usual suspects – BAML, Citi, Credit Suisse and JPM – though I wouldn't hold my breath that any of them have appetite, and perhaps 4) CarVal – I don't know them, but curious they are attending. Perhaps you've already set up meetings with some of these folks. Certain regional banks may be the best bet for this size facility, though not many have undertaken this type of financing recently. I do know First Tennessee has made a very similar loan in connection with a student loan company buyout that has performed well and remains on their books.

I'm pretty sure that most industry participants will quickly deduce from the Teaser that Northstar is the target given the Org Chart and portfolio balances disclosed. Not that big a deal, just confirming that you're aware of this.

Maybe a call to discuss how you'd like to proceed and confirm logistics is in order?

Mark Weadick
Managing Director
Student Loan Capital Strategies LLC
312 Walnut Streeet, 16th Fl.
Cincinnati, OH 45202

(513) 762-7611 (o)
(513) 218-8900 (c)

**From:** David Fenkell [mailto:Fenkell@allianceholdings.com]
**Sent:** Tuesday, May 04, 2010 11:41 AM
**To:** mark.weadick@slcstrategies.com
**Cc:** Sefcovic, Paul F.
**Subject:** Upcoming Student Loan Conference

Mark:

By way of introduction, my name is David Fenkell and I am CEO/President of Alliance Holdings, Inc. I believe Paul Sheldon has told you that we are working together on a number of student loan related fronts. In fact, we received an executed Letter of Intent from NorthStar Capital late yesterday. I also believe that Paul told you that Paul Sefcovic and I will be attending the student loan conference in Washington, D.C. next week. I was hoping that we could meet to discuss our student loan initiative. I was also hoping that you would be able to make some introductions on our behalf with potential lenders for our NorthStar transaction. I have attached a financing teaser that we have prepared for the transaction. The teaser will provide you with a basic framework of the financing we are seeking.

1

EXHIBIT
Plain 1
14
0-28-14
PENGAD 800-631-6989

I will be arriving in Washington Sunday night and will be leaving at the conference's conclusion mid-day Wednesday.  I have dinner plans for Monday evening but am otherwise free.  Once you have had an opportunity to review the attached it would be appreciated if you could give me a call to discuss our getting together at the conference.

Thanks, David Fenkell

Office:  215-706-0873 ext. 112
Cell:  267-253-8896

2

**From:** David Fenkell
**Sent:** Friday, February 11, 2011 9:58 AM
**To:** Paul Sheldon
**Subject:** RE: Chris Cronk

Yes. Please let me know where and what time.

David

David B. Fenkell
CEO/President
Alliance Holdings, Inc.
Third Floor
1021 Old York Road
Abington, PA 1901
P 215-706-0873 x 112
F 215-706-0877
fenkell@allianceholdings.com

**From:** Paul Sheldon [mailto:paul.b.sheldon@slcstrategies.com]
**Sent:** Friday, February 11, 2011 9:46 AM
**To:** David Fenkell
**Subject:** Chris Cronk

Chris is coming in earlier next week, and can have lunch on Tuesday, feb 15.  Can you still do that?

1

EXHIBIT
Plaintiff 55
15
10-24-14

| From: | Paul B. Sheldon <paul.b.sheldon@slcstrategies.com> |
| Sent: | Thursday, September 30, 2010 11:36 AM |
| To: | Ken Wanko; Patrick Belica |
| Cc: | David Fenkell |
| Subject: | Thursday |

Yes on all fronts. I'll get to work on meetings with DB, CS, and UBS.

----- Original Message -----
**From:** Ken Wanko
**To:** Patrick Belica ; paul.b.sheldon@slcstrategies.com
**Cc:** David Fenkell
**Sent:** Thursday, September 30, 2010 11:21 AM
**Subject:** RE: Norg

Patrick,

Thursday morning works for us – we could meet at Squire Sanders again.  Would you or Paul be able to join us?

Also, Paul – since David and I are going to be in NYC, do you think you could try to set up a meeting or two with some of the financing sources you mentioned (Deutchebank, Credit Suisse & UBS)?

Let us know when you can.

Thanks
Ken

**From:** Patrick Belica [mailto:patrick.belica@slcstrategies.com]
**Sent:** Wednesday, September 29, 2010 11:24 PM
**To:** Ken Wanko
**Subject:** RE: Norg

Norg has a couple of options.  He is due to fly back to South Dakota Thursday morning but is willing to switch to a later flight to meet in NY.  That makes a morning meeting Thursday in NYC best I assume.  Seems like this suits you best but I will also mention the other options he gave me:

Meet in Minneapolis Monday morning.  Meet in Minneapolis Thursday around noon.  Meet just with Steve (not Norg) anytime in Minneapolis Mon, Tues or Wed.

Let me know which you would like to do and if NY on Thursday morning what time suits you best.  I think it needs to be no later than mid-morning in order for Norg to get to SD the same day.

Thanks,
Patrick

**From:** Ken Wanko [mailto:Wanko@allianceholdings.com]
**Sent:** Wednesday, September 29, 2010 4:29 PM
**To:** patrick.belica@slcstrategies.com
**Subject:** RE: Norg

1

EXHIBIT
Plaint.555
16
10-24-14

Patrick,

Thursday in NYC would actually work better for us if that works for Norg. Also, then maybe you or Paul could join.

Let me know
Ken

**From:** patrick.belica@slcstrategies.com [mailto:patrick.belica@slcstrategies.com]
**Sent:** Wednesday, September 29, 2010 3:37 PM
**To:** Ken Wanko
**Subject:** Re: Norg

Change in plans for Norg. He has to be in New York now next week. He proposes that if you want to keep the Minneapolis meeting Steve Kohles the CFO can meet you there. As an alternative he may have some time later in the week in NY. Sorry about the change, he told me yesterday that tuesday in msp was good, now his assistant gives this news. Let me know what you'd like to do.

Sent via BlackBerry by AT&T

**From:** "Ken Wanko" <Wanko@allianceholdings.com>
**Date:** Wed, 29 Sep 2010 12:21:37 -0400
**To:** Patrick Belica<patrick.belica@slcstrategies.com>
**Subject:** Re: Norg

Did u get my email?

We r in - can do a 1pm at their attorneys
Ken

Sent from my iPhone

On Sep 29, 2010, at 11:54 AM, "Patrick Belica" <patrick.belica@slcstrategies.com> wrote:

Ken,

Just wanted to follow up. Norg and Steve Kohles (CFO) can meet in Minneapolis next Tuesday. They are asking for a time and place that suits you.

Thanks,

Patrick

**From:** Ken Wanko [mailto:Wanko@allianceholdings.com]
**Sent:** Tuesday, September 28, 2010 12:35 PM
**To:** Patrick Belica
**Subject:** Norg

2

Patrick,

Let me know when you've made contact with Norg.

Thanks

Ken

**Kenneth J. Wanko**

Managing Director, Acquisitions

Alliance Holdings, Inc.

1021 Old York Road, 3rd Floor

Abington, PA 19001

(215) 706-0873 x126 (t)

(215) 285-7190 (c)

(215) 706-0877 (f)

wanko@allianceholdings.com