## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SPEAR, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FENKELL, et al. | : | NO. 13-2391 |

## MEMORANDUM

## Contents

I.   STATEMENT OF FACTS ............................................................. 7
  a.   The parties. ................................................................................ 7

  b.   The Spread Transactions. ......................................................... 8

  c.   The Stonehenge/DBF Consulting Agreement. .......................... 12

  d.   Alliance's advisory services agreement with SLMRS. .............. 15

  e.   Fenkell's termination, the internal investigation, and litigation. ............ 16

  f.   AH III payments to Stonehenge, and the plan assets issue. .......... 18

II.   ALLIANCE AND FENKELL ..................................................... 19
  a.   The standard of review. ............................................................ 19

  b.   Fenkell's receipt of fees from Stonehenge, through DBF, violated ERISA § 406(b)(3) as a matter of law. ............................................... 20

    i.   Fenkell was an ESOP fiduciary. ............................................ 22

    ii.   Fenkell received consideration for his own account. ................ 22

    iii.   Stonehenge was "dealing with the plan in connection with a transaction involving the assets of the plan." ........................................ 23

      1.   Stonehenge was "dealing with the plan." ........................... 23

      2.   The 1999 ESOP funding transaction was "a transaction involving the assets of the plan." .......................................... 24

      3.   The Stonehenge/DBF fees were "in connection with" the funding transaction. .................................................................. 27

  c.   Negotiating and accepting the $4,000,000 in fees from Stonehenge violated Mr. Fenkell's fiduciary duty of loyalty under ERISA § 404(a)(1)(A) as a matter of law. ................................................................ 32

  d.   Fenkell's use of plan assets to generate the DBF fees violated 29 U.S.C. § 1106(a)(1)(D) as a matter of law. ............................................ 34

e.   Fenkell's dealing with plan assets in his own interest and for his own account violated 29 U.S.C. § 1106(b)(1) as a matter of law. ...................................................35

f.   Mr. Fenkell's defenses preclude entry of partial summary judgment for either party with respect to the DBF fees. ...................................................36

   i.   Questions of fact exist whether the statute of limitations, 29 U.S.C. § 1113, bars plaintiffs from recovering against Fenkell. .......................................36

      1.   Questions of fact exist whether Alliance had "actual knowledge" of the nature of Fenkell's kickbacks. .......................................38

      2.   Questions of fact exist whether the six year "fraud or concealment" statute applies, and when the limitation period under the statute begins to run. .......................................39

g.   ERISA provides an equitable remedy against DBF Consulting, as well as Fenkell. .......................................41

h.   Stonehenge arguments. .......................................42

i.   Alliance's motion concerning counterclaims and third-party claims. .......................42

   i.   Questions of fact exist whether Fenkell is entitled to indemnification. ............42

   ii.   Summary judgment is granted, dismissing Fenkell's contribution claims against the Alliance parties. .......................................43

   iii.   Summary judgment is granted, dismissing Fenkell's third-party claim asserting prohibited transactions by Spear .......................................45

   iv.   Fenkell's proposed amended pleading alleging breach of duty by Alliance to the shareholders is denied, and Fenkell's tenth third-party claim is dismissed. .......................................46

   v.   Summary judgment is granted, dismissing Fenkell's eleventh third-party claim for breach of duty to monitor .......................................48

j.   Theories of liability that depend upon a determination that Alliance's assets were "plan assets" are not ripe for summary judgment. .......................................50

k.   Fenkell's motions against the Alliance Parties. .......................................51

   i.   Fenkell's motion for summary judgment as to Alliance's first through third claims for relief is denied. .......................................52

   ii.   Fenkell's motion for summary judgment dismissing Alliance's sixth claim for relief seeking declaratory judgment that Fenkell is not entitled to indemnification is denied. .......................................52

iii.   Fenkell's motion for summary judgment dismissing Alliance's seventh claim for relief for contribution is denied. ................................................................ 53

iv.   Fenkell's motion for summary judgment dismissing Alliance's eighth claim for relief for indemnification is denied. ........................................................... 53

v.   Fenkell's motion for summary judgment dismissing Alliance's ninth claim for relief for fraud is denied. .............................................................................. 54

vi.   Fenkell's motion for summary judgment dismissing Alliance's tenth claim for relief for breach of fiduciary duties is denied. ........................................... 55

vii.   Summary judgment is granted, dismising Alliance's thirteenth and fourteenth claims for civil conspiracy. .................................................................. 56

viii.   Fenkell's motion for summary judgment dismissing Alliance's fifteenth claim for relief for unjust enrichment is denied. ....................................................... 56

ix.   Fenkell's motion for summary judgment based on various statute of limitations theories is denied. .................................................................................... 57

III.   ALLIANCE AND STONEHENGE ................................................................ 57
a.   Fourth and Fifth Claims for Relief. ................................................................ 57

i.   Questions of fact exist whether Stonehenge knowingly participated in a breach of fiduciary duty. ................................................................................... 61

ii.   If Stonehenge knowingly participated in Fenkell's fiduciary violations, accounting and disgorgement are appropriate equitable remedies. ........................ 65

iii.   Stonehenge's Defenses  Sounding in Prohibited Transactions ........................... 70

1.   Questions of fact exist whether Fenkell, as a fiduciary, caused the plan to engage in unlawful transactions in violation of Section 406(a)(1)(C) and (D). ........................................................................................................ 72

2.   Questions of fact exist whether the payments to Stonehenge are entitled to exemption under ERISA Section 408(b)(2). ....................................................... 73

3.   Questions of fact exist whether Stonehenge was a party in interest under ERISA Section 406(a)(1) ................................................................................. 76

4.   Questions of fact exist whether Stonehenge's payments came out of plan assets. ................................................................................................................ 77

5.   Questions of fact exist whether Fenkell was acting as an ERISA fiduciary, under ERISA Section 406(b)(3), when he approved fees to be paid from AH III to Stonehenge. ......................................................................................... 78

6.    There was a connection between Fenkell's receipt of consideration from Stonehenge and the ESOP's participation in the 1999 ESOP Loan Transaction. ................................................................................ 78

b.    Questions of fact exist whether Stonehenge is liable as a gratuitous transferee of plan assets under Alliance's fifth claim for relief. ............................................................ 80

i.    The origin of the gratuitous transferee theory .................................................... 80

ii.    What does "no value" mean? ............................................................................ 82

iii.   The burden of proof ............................................................................................ 86

c.    Whether Alliance and AH III assets were "plan assets". ................................................. 91

i.    Questions of fact exist whether Alliance's assets were assets of the ESOP ........ 91

ii.    Questions of fact exist whether payments from AH III to Stonehenge involved plan assets ................................................................................................. 97

iii.   Statements by Alliance executives, and by professionals assisting Alliance, create fact issues, not undisputed facts .............................................................. 100

d.    Questions of fact exist whether Alliance is estopped from making its plan assets arguments. ......................................................................................................... 101

i.    Questions of fact exist whether regulatory estoppel applies to the plan assets argument. ................................................................................................. 101

ii.    Questions of fact exist whether quasi-estoppel applies to the plan assets argument. ................................................................................................. 102

iii.   Questions of fact exist whether judicial estoppel applies to the plan assets argument. ................................................................................................. 103

e.    Questions of fact exist whether the statute of limitations bars certain claims. ....................................................................................................................... 105

f.    Summary judgment is granted, dismissing the "veil-piercing" theory as a means of holding individual Stonehenge defendants liable. ................................... 105

g.    Questions of fact exist whether the state statute of limitations bars Alliance's state law civil conspiracy and aiding and abetting claims. ............................ 111

h.    Questions of fact exist whether Stonehenge knew Fenkell was committing fiduciary violations, and the aiding and abetting claim must be tried. ......................... 112

i.    Summary judgment is granted, dismissing Alliance's fourteenth claim for relief for civil conspiracy because Alliance cannot prove malice, as required under Pennsylvania law. ........................................................................................... 114

j.   Questions of fact exist whether Fenkell is entitled to contribution from Stonehenge. ......................................................................................................... 119

IV.   ALLIANCE AND THE SEFCOVIC PARTIES ....................................................... 121
a.   SLMRS, SLAMS and the Sefcovics. ................................................................. 121

b.   Alliance's motion for summary judgment. ...................................................... 123

i.   Questions of fact exist whether the Sefcovic parties are liable under ERISA Section 502(a)(3). ................................................................................. 123

ii.   Alliance's state law claims. ...................................................................... 123

1.   Questions of fact exist whether the Sefcovic parties aided and abetted a fiduciary conflict of interest in violation of Pennsylvania state law. ................. 124

2.   Summary judgment is granted establishing Alliance's claim that Fenkell violated his fiduciary duty of prudence. ............................................................ 125

3.   Questions of fact exist whether Paul Sefcovic's conduct amounted to "substantial" encouragement or assistance as to Alliance's state law fiduciary duty of prudence claim. ............................................................................ 129

4.   Questions of fact exist whether Lianne Sefcovic aided and abetted Fenkell's violation of his fiduciary duty of prudence. ........................................... 131

5.   Questions of fact exist as to SLAMS' fourth counterclaim for breach of contract against Alliance. ............................................................................ 132

6.   Questions of fact exist whether Paul Sefcovic is entitled to indemnification against Alliance. ................................................................................... 133

c.   The Sefcovics' motion for summary judgment. .............................................. 133

i.   Questions of fact exist whether the Sefcovics are liable. .................................. 133

ii.   Questions of fact exist whether the settlement with Squire Sanders precludes a claim against Paul Sefcovic for knowingly participating in a fiduciary breach. ................................................................................................ 134

iii.   Questions of fact exist whether Lianne Sefcovic and SLAMS were knowing participants in Fenkell's ERISA fiduciary violations. ................................ 136

iv.   Questions of fact exist whether Alliance's assets were plan assets under the fifth claim for relief; but summary judgment is granted limiting ERISA recovery under the fourth and fifth claims to relief for the period before August 2011. ..................................................................................................... 138

v.   Questions of fact exist whether the Sefcovic Parties aided and abetted Fenkell's state law fiduciary violations. .......................................................... 140

vi.   Summary judgment is granted, dismissing Alliance's thirteenth claim for relief for civil conspiracy against the Sefcovic Parties. .....................................140

vii.   Questions of fact exist whether the statute of limitations bars the eleventh cause of action...........................................................................................141

IV.   CONCLUSION.........................................................................................................142

The parties seek summary judgment on a number of grounds. This memorandum rules on them all. Part I of this Memorandum is a statement of facts that provides overall context. Because of the number of issues and transactions, I have reserved more detailed discussions of the facts for those portions of the Memorandum that require them. In part II of this Memorandum, I will discuss the claims the Alliance Parties have asserted against the Fenkell Parties, and those asserted by the Fenkell Parties against the Alliance Parties. In part III, I will discuss the claims asserted by both Alliance and the Stonehenge Parties against each other. In part IV, I will discuss the claims between Alliance and the Sefcovic Parties.

## I.     STATEMENT OF FACTS

### a.   *The parties.*

In their primary roles the parties in this case are:

- Plaintiffs: Barbie Spear, in her capacity as trustee of the Alliance Holdings, Inc. Employee Stock Ownership Plan (Spear); Alliance Holdings, Inc. (Alliance), in its capacity as Fiduciary of the Alliance Holdings, Inc. Employee Stock Ownership Plan (the ESOP); AH Transition Corp., and A.H.I. Inc.

- Defendants: David B. Fenkell (Fenkell); Karen Fenkell; DBF Consulting, LLC. (DBF); Stonehenge Financial Holdings, Inc. (Stonehenge); John P. Witten; Barry Gowdy; Ronald D. Brooks; Student Loan Management and Research Services, LLC (SLMRS); Student Loan Advisory Management Services, LLC (SLAMS); Paul Sefcovic; and Lianne Sefcovic.

- Third-party defendants:  Kenneth Wanko, Eric Lynn, and Barbie Spear, individually.

7

These parties appear in various capacities throughout the many intertwined pleadings: cross-claimants, cross-defendants, counter-claimants, counter-defendants, and third-party plaintiffs and defendants. For convenience I sometimes will refer to the plaintiffs and third-party defendants, above, all of whom are associated in one way or another with Alliance Holdings, Inc., as the "Alliance Parties," or simply "Alliance." On occasion I will refer to the Fenkells and DBF together as the "Fenkell Parties." Stonehenge, Witten, Gowdy, and Brooks are often referred to as the "Stonehenge Parties," or "Stonehenge." Sometimes I will refer to the Sefcovics, SLMRS, and SLAMS as the "Sefcovic Parties."

### b. *The Spread Transactions.*

Alliance's claims against Fenkell and Stonehenge arise out of a complex set of transactions that the parties have referred to as the "Spread Transactions." *See* Stonehenge Mem. at 15. It is useful to recount some of the history of these transactions in order to put the current disputes in context.

The Spread Transactions were designed to take advantage of a now-repealed section of the Internal Revenue Code ("IRC"). Section 133 of the IRC permitted a lender to exclude from taxable income 50% of the interest paid on a loan to an employee stock ownership plan (ESOP)[1]. See 26 U.S.C. § 133. This section was designed to promote and subsidize the use of ESOPs. *See, e.g.*, *Martin v. Feilen*, 965 F.2d 660, 664 n. 5 (8th Cir. 1992) (discussing the "lure of tax benefits" that drove these transactions). This favorable tax treatment was repealed on August 20, 1996. *See* Small Business Job Protection Act

---

[1] An ESOP is short for Employee Stock Ownership Program. This is a defined contribution plan invested in employer stock.

8

of 1996 § 1602(c)(1), P.L. 104-188, (codified as amended in scattered section of 26 U.S.C.); Grien Report at 58[2] ("The primary motivating catalyst for the whole [Spread] transaction was the 50% Interest Exclusion, which produced a tax benefit to Bank One.").

Until 2012, Fenkell was the CEO of Alliance. During all periods relevant to this suit, Alliance was the fiduciary for the ESOP. *See* Fenkell Dep. at 110:23-111:8. As the door was closing on favorable tax treatment under IRC § 133, Alliance executed two loan deals. On July 16, 1996, Bank One Capital Markets ("BOCM") facilitated a $100 million non-recourse loan from Bank One Capital Funding Corporation ("BOCFC") to the Alliance ESOP. *See* July 16, 1996 Loan Agreement at SP0001311-12. BOCFC served as a qualified ESOP lender pursuant to Section 133 of the IRC, which made the interest on that loan eligible for the 50% interest exclusion. *See* Grien Report, Appendix C, at 1.  On July 29, 1996, BOCM facilitated another non-recourse loan from Bank One Capital Holdings Corporation ("BOCHC") to the Alliance ESOP of approximately $450 million. *See* Grien Report, Appendix C, at 1. These two amounts, $100 million and the $450 million, make up the 1996 Section 133 Loan. *Id.*

The tax benefits of these loans were substantial. Bank One was permitted under the law to deduct half of the interest income it received from the ESOP borrower, while AH III and Alliance Holdings could deduct from their income qualified plan contributions that they made to the ESOP itself. *See* Stonehenge Mem. at 15-16. Bank One acted as a critical party on two sides of this Transaction: first, by serving as a

---

[2] I cite to the Grien Report only for its factual value and do not, in this section, take any position on the merits of the report's findings.

"qualified lender" pursuant to Section 133 and second, through various affiliates, as the seller of Participation Interests[3] in pools of bank-owned financial receivables sold to AH III in exchange for the loan proceeds. *Id. at 16.*

The income from the proportional interest in the auto loan pools was more than the sum required to make payments on the ESOP/Bank One loan. *Id.* The "Spread" represented the difference between income from the receivable pools less the loan payments. *See id.* (citations omitted). The loan remained outstanding until July of 2011, which was the end of the maximum period allowed under Section 133. *See id.* at 17 (citing 26 U.S.C. § 133(b)(1)(B)).

With the $550 million in loan proceeds, the ESOP purchased stock[4] in Alliance Holdings. *Id.* at 18. From 1996 to 1998, Alliance Holdings used the proceeds from the ESOP in 1996 to purchase capital stock in four Alliance Holdings' subsidiaries.[5] *Id.* Those four subsidiaries of Alliance Holdings purchased a non-managing interest in four different LLCs managed by BOCP, an affiliate of Bank One Capital Markets. *Id.* Those LLCs then bought interests in different pools of notes and other financial assets that were originally sold by BOCM and its various affiliates. *Id.* Sometime in 1998, the four Alliance Subsidiaries merged into one: AH III. *Id.* at 19. AH III became an owner of the

---

[3] These participation interests were effectively ownership interest in a pool of loans. *See* 12/18/2014 Witten Dep. at 305-08; *see also* Stonehenge Mem. at 16 n. 6 (citing BLACK'S LAW DICTIONARY, 1021-22 (9th ed. 2008)).
[4] Stonehenge explains that this stock in Alliance Holdings constituted so-called "employer securities" of Alliance Holdings. Had the money been used by the ESOP for any other purpose, the favorable tax deduction would have been disqualified pursuant to 26 U.S.C. § 133(b)(1).
[5] These subsidiaries consisted of AH II, AH III, AH V, and AH VI, each of whom bought and held participation interests in the auto loan pools.

non-managing portions of each of the four BOCP LLCs.[6] *Id.* at 19. Through these deals, Alliance Holdings took approximately $10 million and acquired a number of manufacturing companies. *Id.*

In November of 1998, Bank One announced that it was merging with First Chicago. *See* 12/18/2014 Witten Dep. at 18-19. This merger compromised the 1996 deal because the qualified Section 133 lender was leaving Bank One. *See* 3/31/2015 Deposition of Barry Gowdy ("Gowdy Dep.") at 67; *see also* 12/18/2014 Witten Dep. at 108-09 (identifying Bank One Capital Funding Corporation as a "qualified lender" under Section 133). Qualified lenders were needed, otherwise the transaction would not be grandfathered under the now-repealed Section 133 of the tax code. Id. at 127-28. Stonehenge Financial Holdings, Inc., formerly BOCM, stepped in to find a new qualified lender. Stonehenge secured Bank One, Texas, N.A. and Bank One, Arizona, N.A. to serve as the new qualified lenders. *See* Stonehenge's Supplemental Response to Interrogatory No. 7 at 7-8. Another affiliate of Bank One, Finance One Corporation, provided the pool of assets in which the loan proceeds would be invested. *Id.* at 8. Stonehenge incorporated in April of 1999 and began to ramp up operations sometime in early May. 12/18/2014 Witten Dep. at 131-32.

On September 1st, 1999, approximately $535 million of Section 133 loans owned by BOCFC transferred to Bank One Texas and Bank One, NA. *Id.* at 125; *see also* Sept. 1, 1999 Closing Binder at SQUIRE-SH_00001411 (defining "The Loan" and 15-year

---

[6] It appears from the deal documents provided by Stonehenge that the Alliance Subs provided a capital contribution of $100,000,000 for a 99% interest in the LLC, while BOCP contributed approximately $1,000,000 for an interest of 1%. *See* Stonehenge Mem. at 18 (citing BOCP/AH III Operating Agreement at SP0001539).

repayment period). These banks were the "qualified lenders" for Section 133 purposes. 12/18/2014 Witten Dep. at 127.  With the loan proceeds, the ESOP purchased qualifying employer securities in Alliance Holdings, pursuant to Section 133 guidelines. As collateral for the refinanced loan, the  ESOP pledged its Alliance Holdings shares to the lender and Alliance Holdings pledged all its shares of AH III stock. AH III used the loan money to purchase participation interests in a $900 million pool of auto loan receivables designed by Bank One. Sept. 1, 1999 Closing Binder at SQUIRE-SH_00001521 (describing the "background" of the transaction); *see also id.* at 00001526-27 (defining "Participation Interest").

The Participation Interest in these loans ran until August 31, 2000, providing that "each September 1 [after 2000], the term of this Agreement and the Participation hereby shall be automatically extended for an additional one year term. . . ." *See id.* at 00001527. Stonehenge, now up and running, continued to perform duties for Alliance related to the different transactions and ensured that the spread deal kept renewing for the benefit of all parties. *See* Stonehenge's Supplemental Response to Alliance Holdings' Interrogatory No. 7 at 9. The deal with the various parties ended in July 2011, when the Section 133 loan period of 15 years ended. *See* 12/8/2014 Witten Dep. at 123-24. The deal made the parties a total of $115.4 million. *See* 4/17/2015 Deposition of Kenneth J. Wanko ("Wanko Dep.") at 297.

### c.  *The Stonehenge/DBF Consulting Agreement.*

David Fenkell formed DBF Consulting in 1998.  DBF and Bank One entered into a consulting agreement in April of 1998. *See* 1/26/2015 Witten Dep. at 253. This agreement, Fenkell and Stonehenge argue, was not related to the ESOP loan deal from

12

1996. *See id.* at 257; *see also* 7/18/2014 Fenkell Dep. at 345-346 ("If you read the

consulting agreement . . . there is no mention of the consulting agreement being tied to

any Alliance Holdings or Alliance Holdings ESOP transaction.").

Following the merger of Bank One and First Chicago, along with the formation of

Stonehenge, Stonehenge and DBF Consulting entered into a consulting agreement on

August 7, 1999, which Stonehenge writes "was nearly identical to the 1998 agreement."

*See* Stonehenge Mem. at 65 (citing Stonehenge-DBF Consulting Agreement). In this

agreement, Stonehenge paid DBF Consulting $240,000 per year until 2006. *See*

1/26/2015 Witten Dep. at 76; Stonehenge-DBF Consulting Agreement at

ALESOP01284. That amount increased to $500,000 a year starting in 2006. 1/26/2015

Witten Dep. at 76-77.

The details of how this 2006 increase came about are significant. Alliance

Holdings asked Stonehenge to share the increased costs of purchasing payroll option

contracts. *See id.* at 143. In 2006, Stonehenge agreed that "we would increase what was

being paid to DBF Consulting." *Id.* at 144; *see also* 7/18/2014 Fenkell Dep. at 352. This

agreement increased the fees paid to DBF to $500,000, and ran from 2006 to July 2011.

*See* 7/18/2014 Fenkell Dep. at 352. In his deposition, Fenkell provided a little more

explanation for the increase:

> So beginning in 2006 through 2011, the amount of amortization [of the Section
> 133 loan] that was required stepped up significantly. So did the payroll
> requirement. Because the loan balance or the participation balance was
> significantly reducing each year and the payroll requirement was increasing each
> year, the amount of money realized by Alliance Holdings from these transactions
> began to go down significantly.

*Id.* at 394. Fenkell testified that the 2006 increase served to share some of the increased

costs associated with servicing the ESOP loan. *See id.* at 394-95. Other witnesses claim

that Fenkell provided a number of consulting and advisory services not related to the ESOP loan transaction. *See* 12/18/2014 Witten Dep. at 242; 4/27/ 2015 Deposition of James Henson ("Henson Dep.") at 26-27. Fenkell admitted that he did not have any records to indicate that he did any other work for different companies. *See* 7/18/2014 Fenkell Dep. at 367-69. DBF did not have an office or other employees. *Id.* at 370-71. Fenkell was DBF Consulting's only shareholder, director, and employee. *See id.* at 371.

A condition of the DBF consulting agreement was that the arrangement could terminate during any fiscal year "in which the total revenues derived by Stonehenge from ESOP related transactions is less than $2 million. . . ." *See* Stonehenge-DBF Consulting Agreement at ALESOP01284. DBF Consulting fees were paid from Stonehenge's general revenue.[7]

Numerous communications point to awareness among Alliance employees, of DBF Consulting's existence, Ken Wanko, Barbie Spear, and David Fenkell frequently worked together. *See* 9/14/2014 Deposition of Donald W. Hughes ("Hughes Deposition"), at 40-41. Barbie Spear knew about the payments to DBF at least by 2008. *See* 2/25/2015 Deposition of Barbie Spear ("Spear Dep."), at 151.

A number of outside companies and organizations knew about the relationship between Alliance and DBF. Stonehenge points to information in the record demonstrating that Squire Sanders, KPMG, and Deloitte all knew about payments from

---

[7] Though there is a disagreement on almost every detail in this case, this is a particularly thorny issue. James Henson, who was Stonehenge's general counsel, testified that DBF Consulting was paid from the Spread Transaction. *See* Henson Dep. at 82. This was apparently a misstatement. *See* Stonehenge Resp. Mem. at 43-44 (noting corrections to the transcript via an errata sheet pursuant to Fed. R. Civ. P. 30(e)). And in their defense, John Witten testified that Stonehenge paid DBF "out of its corporate funds." *See* 12/18/2014 Witten Dep. at 167.

14

Stonehenge to DBF. *See* Stonehenge Mem. at 68 (citations omitted). Furthermore, there was testimony and other evidence that:

- Stonehenge paid checks to DBF Consulting at the Alliance Holdings address,

- Alliance Holdings employees conflated DBF Consulting with Alliance,

- Alliance Holdings checked in with Stonehenge about payments to DBF consulting, and

- Alliance Holdings sent Stonehenge invoices for DBF Consulting fees.

*See id.* at 69-70 (citations omitted).

### d. *Alliance's advisory services agreement with SLMRS.*

The Alliance Parties assert causes of action against Fenkell, Paul Sefcovic, an attorney who advised Fenkell for years, and his wife Lianne Sefcovic, for their involvement in two companies: Student Loan Management and Research Services, LLC ("SLMRS") and Student Loan Advisory Management Services, LLC ("SLAMS"). *See* FAC ¶¶ 170-83.

In 2010, Alliance hired Paul Sheldon, an expert in the student loan business, to design and structure different student loan transactions through his company, Student Loan Capital Strategies ("SLCS")[8]. *See* 10/28/2014 Deposition of Paul Sheldon ("Sheldon Dep.") at 16-17. Sheldon was not aware of SLMRS or SLAMS. *See id.* at 25-26.

---

[8] SCLS is not a party to this action.

Alliance bought the two companies identified by SLCS. *See id.* at 55-56. SLMRS and SLAMS were established to provide advisory services to Alliance. *See* Alliance Mem. at 35. SLMRS was established in such a way that 90% of its profits would go to Paul and Lianne Sefcovic, while the remaining 10% would go to Hiram College. *See id* (citing to 4/14/2014 Deposition of Carl Draucker ("Draucker Dep.") at 154-55). Simultaneously, the Sefcovics created SLAMS, which held an ownership interest in SLMRS; 99% of SLAMS was owned by Lianne Sefcovic, while the remaining 1% was owned by Lianne's friend. *Id.* at 35-36 (citations omitted).

Fenkell, along with Draucker and the Sefcovics, created an Advisory Services Agreement ("ASA") under which Alliance paid SLMRS $27,500 per month to consult on student loans. *Id.* at 36. Alliance argues that the two LLCs provided no services to Alliance. These payments raised suspicions among members of Alliance. *See* 1/15/2015 Deposition of Kenneth J. Wanko ("Wanko Dep.") at 323; *see also id.* at 255 ("I had no idea who [SLMRS] was."). Sheldon did not know of any work done by SLMRS or SLAMS. *See* Sheldon Dep. at 97-100. Alliance alleges that the ASA was simply a device to siphon money to the Sefcovics, as neither SLMRS nor SLAMS provided any services to Alliance or the ESOP. *See* Alliance Mem. at 36; *see also* 11/19/2014 Deposition of Stephen Jones ("Jones Deposition") at 37 (testifying that, to Jones' knowledge, SLMRS never performed any services).

### e. *Fenkell's termination, the internal investigation, and litigation.*

This lawsuit, filed on May 1, 2013, is one of many involving Alliance Holdings and Fenkell. There is a case in the Western District of Wisconsin arising out of a sale of a former Alliance Holdings' subsidiary ("Trachte") in 2007. *See Chesemore v. Alliance*

*Holdings, Inc.*, 886 F. Supp. 2d 1007 (W.D. Wis. 2012), *affirmed sub nom Chesemore et. al. v. Fenkell et. al.*, Nos. 14-3181, 14-3215, 15-3740, 2016 WL 3924308 (7th Cir. July 21, 2016). David Fenkell filed a lawsuit on March 22, 2013 against Alliance Holdings in Philadelphia County on a number of grounds. *Fenkell v. Alliance Holdings, Inc.*, No. 03417 (Phila. Ct. Com. Pl. Mar. 22, 2013). Fenkell filed another lawsuit against other Alliance Holdings employees in 2014. *Fenkell v. Wanko, et al.*, No. 3515 (Phila. Ct. Com. Pl. Sept. 2, 2014). Alliance Holdings sued Squire Sanders over its conduct arising out of the same facts in this case. *See Alliance Holdings, Inc., et al. v. Squire Patton Boggs (US) LLP,* No. 14-05780 (E.D. Pa. Oct. 10, 2014).

In the *Chesemore* litigation in the Western District of Wisconsin, Fenkell was found to have committed fiduciary violations under ERISA. *Chesemore*, 886 F. Supp. 2d at 1059-60. Alliance placed Fenkell on administrative leave on September 25, 2012, shortly after the opinion in the *Chesemore* litigation. *See* 1/15/2015 Wanko Dep. at 336. After the Chesemore decision, Spear and Wanko retained the law firm of Ballard Spahr, along with Deloitte Touche, to conduct an internal investigation into the issues surrounding Fenkell's departure. *See* 2/3/2015 Spear Dep. at 345. According to Alliance, the investigation uncovered a pattern of misconduct on Fenkell's part. This included allegations of mishandling reimbursements and using company funds to pay for Barbie Spear's wedding in 2005. *See* Alliance Mem. at 55 n. 35 (citations omitted). The *Chesemore* case and internal strife culminated in the October 1, 2012 firing of David Fenkell, See *Spear Dep.* at 325.

### f.  *AH III payments to Stonehenge, and the plan assets issue.*

Though the parties disagree at length[9] on many things, there are a few instances where they agree:

- AH III was the entity responsible for paying Stonehenge's fees. *See* Stonehenge Rep. Mem. at 6; Alliance Opp. at 13-14. Alliance argues that "the corporate form of AH III must be disregarded." *See* Alliance Opp. at 13. The fact that the money came directly from AH III, and not the ESOP itself, bears on later analysis.

- Stonehenge supplied some value to the Spread Deal. *See* Stonehenge Rep. Br. at 10 (citing Alliance Mem. at 2; 4/17/2015 Witten Dep. at 377). This directly relates to Alliance's fifth claim for relief, which is a gratuitous transferee claim that requires that Alliance have received "no value" in exchange for a transfer of plan assets.

The parties are in almost perfect disharmony on the issue of whether Alliance's assets are assets of the ESOP, *i.e.,* "plan assets." Stonehenge insists that they are not. *See* Stonehenge Mem. at 81. Alliance insists that they are. *See* Alliance Opp. at 44-45. The parties marshal volumes of financial facts in support of their arguments.[10] Stonehenge

---

[9] The summary judgment briefing is Homeric. Alliance's briefs total 348 pages, Stonehenge's 327, and Fenkell's 264. The Sefcovics, SLMRS and SLAMS together have contributed a mere 72 pages. That pales in comparison to the discovery in this case, which includes 2 million pages of discovery documents and hundreds of hours of depositions. *See* Fenkell Rep. Mem. at 1.

[10] For an overview of the factual disputes, *see* Stonehenge Mem. at 1-81. For a taste of the invective, *see* Stonehenge Rep. Mem. at 84 n. 67 (sparring with Alliance over allegations David Fenkell frequently quoted *The Godfather*); Alliance Opp. at 29 (noting that "[o]nce the smoke and misdirection are blown away, the Fenkell/Stonehenge

notes that if Alliance's theory is correct, then Alliance may run afoul of IRS regulations and expose itself to half a billion dollars in tax liability, as well as fiduciary violations by a number of Alliance employees. *See* Stonehenge Mem. at 97 (citing 26 U.S.C. § 4975(c)(1)(B); 26 C.F.R. § 54.4975-7(b)(1)(iii)).

Having described the background of the case, I will discuss first the claims Alliance has asserted against Fenkell. Next, I will discuss the claims Alliance has asserted against Stonehenge. Finally, I will discuss the claims against SLMRS.

## II.   ALLIANCE AND FENKELL

### a.  *The standard of review.*

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual issue is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party must show the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). I "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA,* 418 F.3d 265, 267 (3d Cir. 2005). Nevertheless, I may disregard allegations that are without evidentiary support. *See Celotex,* 477 U.S. at 322-23 ; *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000)

---

scheme could not be more clear or more illegal"); Fenkell Rep. Mem. at 8 (insisting that plaintiffs have deliberately mischaracterized evidence).

("unsupported allegations" cannot defeat summary judgment). Absent a genuine issue of material fact, summary judgment is appropriate. *Celotex,* 477 U.S. at 322.

I must evaluate whether there is a material issue of disputed fact through the lens of the applicable burden of proof. *Anderson,* 477 U.S. at 247-48. The inquiry is akin to the determination, on a motion for judgment at trial, whether a reasonable finder of fact, correctly applying the burden of proof, could decide against the moving party based on the available evidence. *Id.* at 252. The fact that I would be the ultimate fact finder at a trial, not a jury, affects the assessment of certain issues of fact on summary judgment. *Id.* at 253-54. There may be different kinds of factual disputes in a case: disputes about what the ascertainable historical facts are, and disputes about the appropriate inferences to be drawn from those facts. *See id.* at 253 (citing *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947)). If the ultimate fact finder is a jury, the jury must resolve both at trial. *Id.* at 255. If the court, rather than a jury, is the ultimate trier of fact, the court is free to draw inferences from undisputed historical facts at the summary judgment phase. *Id.* at 255-56. If there is a factual dispute for which a trial would actually serve a benefit, such as weighing witness credibility, a judge should not dispose of the case on summary judgment. *Id.* at 255.

### b. *Fenkell's receipt of fees from Stonehenge, through DBF, violated ERISA § 406(b)(3) as a matter of law.*

The Alliance Parties allege that Fenkell, a fiduciary, was prohibited from receiving approximately $4,000,000 in fees from Stonehenge through Fenkell's company, DBF Consulting. Alliance contends that these fees represented a kickback to Fenkell in violation of ERISA § 406(b)(3). I agree.

ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a fiduciary of the plan from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." There is no dispute that Fenkell was a fiduciary of the ESOP. Mr. Fenkell argues that the DBF fees did not amount to Fenkell 1) receiving consideration 2) for his own personal account 3) from a party (Stonehenge) "dealing with the plan in connection with a transaction involving the assets of the plan."

In addition, Mr. Fenkell argues that the ERISA statute of limitations bars the Alliance claims, and that the equitable doctrines of laches, estoppel, and unclean hands also bar the Alliance claims.[11]

Alliance contends the statute of limitations does not bar their claims, both because the scheme adopted by Mr. Fenkell occurred, at least in part, within the relevant statutory periods, and because the statutes are tolled by the "discovery rule" as a result of Mr. Fenkell's fraud and concealment. Alliance also argues that Mr. Fenkell's misconduct disqualifies him from asserting his various equitable defenses, such as laches, estoppel, and unclean hands.

I will discuss Fenkell's liability under ERISA § 406(b)(3), as well as under other ERISA sections, and then the various defenses he asserts.

---

[11] Although Fenkell does not make the argument in his briefs, the Stonehenge Parties have argued that the type of remedy sought by Alliance is prohibited by ERISA. At oral argument Mr. Fenkell's counsel adopted Stonehenge's argument. I have concluded elsewhere that the remedies sought by Alliance – accounting and disgorgement – may be employed under ERISA against a non-fiduciary. In any event, the remedies against a fiduciary, such as Mr. Fenkell, under ERISA are broader in scope than those available against a non-fiduciary. *See re Unisys Corp. Retiree Medical Ben. ERISA Litigation*, 57 F.3d 1255, 1268 (3d Cir. 1995).

### i. *Fenkell was an ESOP fiduciary.*

Under ERISA law, a fiduciary is anyone who exercises discretionary authority or control related to the management or disposition of assets of an employee benefit plan. *See* 29 U.S.C. § 1002(21)(a). David Fenkell was a fiduciary for the Alliance ESOP until at least December 31, 2011. *See* Fenkell Dep. at 110:23-111:8.

### ii. *Fenkell received consideration for his own account.*

Fenkell "received consideration" from Stonehenge. His corporation, DBF, received about $4,000,000 from 1999 to 2011. There is no question Fenkell was the sole shareholder and director of DBF. *See* Alliance Mem. at 12 (citing 7/8/14 Fenkell Dep. at 320:2-7). Profits from DBF were distributed to Mr. Fenkell. The language under the statute does not require that Fenkell received consideration "directly." The language only asks if he received "consideration." *See Nat'l Sec. Sys., Inc. v. Iola*, CIV- 00- 6293AET, 2007 WL 2868634 (D.N.J. Sept. 26, 2007), *aff'd in part, vacated in part sub nom. Natl. Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 86 (3d Cir. 2012); 29 U.S.C. § 406(b)(3).

To argue that Fenkell did not receive "consideration for his own account" from Stonehenge because of the intermediation of DBF is to argue that one has not drunk water from a well because of the intermediation of a cup. Fenkell was the sole shareholder, employee, officer, and director of DBF. The focus of the statute is not on whether Mr. Fenkell used DBF or not, but whether the fees were on "his own account" rather than on account of the ESOP. There is no dispute that the ESOP did not get the $4,000,000 in fees paid by Stonehenge to DBF. The money wound up in Fenkell's pocket. Hence, he "received consideration for his own account[,]" rather than on the ESOP's account.

>    iii.  *Stonehenge was "dealing with the plan in connection with a transaction involving the assets of the plan."*

Fenkell's more serious argument is that Stonehenge received its fees, from which Fenkell's fees were paid, from AH III, not the ESOP. Therefore, Fenkell argues, Stonehenge was not "dealing with the plan," but with AH III. In addition, Mr. Fenkell contends that the fees were not paid from "assets of the plan," but from Stonehenge income. I will discuss his argument in light of the statutory language.

>    1.  *Stonehenge was "dealing with the plan."*

The 1999 agreement under which the Alliance parties agreed to pay Stonehenge a fee for its services says that the parties are Alliance, the ESOP, and AH III, and that the counterparty is Stonehenge. In an August 27, 1999 letter outlining each parties' responsibility, the signatories agreed Stonehenge would be paid in exchange for advice rendered to the "Alliance Holdings, Inc., the Plan and Alliance SPE. . ." defined to include the ESOP. *See* Ltr. of Aug. 27, 1999, at 1. Under the plain language of the Stonehenge agreement, it was "dealing with the plan." Alliance Mem. at 6 (citing DX 43, at 1511, 1521-38).[12] *See* 29 U.S.C. § 406(b)(3).

Mr. Fenkell points to the fact that it was AH III that actually paid Stonehenge the fees. That is not the question under the statute. The question is whether Stonehenge was a party "dealing with the plan in connection with" the 1999 "transaction." It was.

---

[12] This citation refers to documents shown to David Fenkell related to the 1999 Spread Deal from his July 8, 2014 deposition.

> ### 2. The 1999 ESOP funding transaction was "a transaction involving the assets of the plan."

The 1999 ESOP funding transaction contemplated multiple steps and parties. Nevertheless, it was "*a* transaction," that is, the entire set of steps and all the parties were united in a single purpose and plan. Mr. Fenkell spends a great deal of time trying to unspool the transaction, as if the half-billion in loan proceeds arrived in AH III's coffers by a series of independent market events that serendipitously coalesced into a profitable whole. The funding transaction's multiple documents contradict this claim. A few make the point:

- All of the separate "transactions" took place at once, on September 1, 1999.

- Each transaction was dependent on the one before it and the one after it.

- The various steps in the transaction were negotiated as one deal.

- Without the first step – the $535,000,000 loan to the ESOP – none of the secondary steps made sense.

- There was one closing binder.

- Fenkell controlled and signed for the ESOP, Alliance, and AH III.

- All of the various agreements had cross-default clauses, making a default in any of the arrangements a default of the entire transaction.

*See* Sept. 1, 1999 Closing Binder *et seq.*

The point of the funding transaction was to take advantage of the lucrative tax benefit available to the Bank if it lent money to an ESOP: 50% of the interest income from the loan repayment was tax deductible. See 26 U.S.C. § 133(a). The more money the Bank lent to the ESOP, the bigger the tax benefit to the Bank. The ingenious aspects

of the funding transaction were that the parties agreed to share the tax benefit, and that the parties found a way to make the loan to the ESOP almost risk free. The benefit sharing was accomplished through a calculation of the value of the tax benefit over the years the loan was repaid, and a splitting of the benefit in accordance with an agreed formula.

The parties reduced the risk of the loan to almost zero by a security arrangement under which a) the ESOP used the loan proceeds to buy Alliance shares from Alliance, b) Alliance used the proceeds to buy shares in AH III from AH III, and c) AH III used the loan proceeds to buy "Participation Interests" in a pool of the Bank's auto loans. The Participation Interests were secured by a UCC filing by the Bank. Neither of the intermediary steps – the Alliance share purchase or the AH III share purchase – made any sense without the beginning and end points: the loan to the ESOP and the purchase of the Participation Interests. Carl Draucker, a partner at Squire who represented Bank One during the transactions,[13] testified that AH III, constructed as a bankruptcy remote entity, "was an important part of this transaction, this September 1, 1999 loan transaction. Bank One would not have done it without that." *See* 4/14/2015 Draucker Dep. 239:11-14.

The loan risk was further reduced by a requirement that the Bank maintain a healthy rate of return on the Participation Interests by regularly culling out under performing or paid off loans from the pool of loans in which AH III had purchased a Participation Interest, and replacing them with healthy loans, measured by standards

---

[13] Draucker provided some detail about his role as legal advisor in these transactions in other depositions. *See* 9/11/14 Draucker Dep 21:22-25:8.

agreed upon by the parties in the funding transaction documents. Sept. 1, 1999 Closing Binder at SQUIRE-SH_00001524-00001524. The Bank itself ensured that the assets securing the loan were maintained in prime condition.

In the end, the essence of this complex transaction was that the Bank funded a purchase of an interest in its own automobile receivables, and in the process earned itself a hefty premium over the income it otherwise could have earned on those receivables.

AH III was merely a lockbox in which title to the Participation Interests was stored for the duration of the loan. The company had no business purpose, other than holding the Participation Interests, getting paid by the bank, and distributing fees. Sept. 1, 1999 Closing Binder at SQUIRE-SH_00001540-00001549. It was left with no discretion: it could not sell its own shares, or take any other action affecting the Participation Interests, without Bank approval. Nor could it do anything with the proceeds of the Participation Interests except make payments dictated by the funding transaction documents. Sept. 1, 1999 Closing Binder at SQUIRE-SH_00001556-00001560.These payments included a payment to the ESOP to cover repayment of the principal and interest on the loan, a payment to Alliance representing its cut of the underlying tax benefit, and a payment to Stonehenge representing its consulting fees. The payments by AH III, in three separate tranches, one to the ESOP, one to Alliance, and one to Stonehenge, were mutually dependent. The ESOP had first call on the participating interest income from AH III; Alliance had the second priority; and Stonehenge's fee came last. All were paid on the annual payment date of August 31 of each year. All the payments were established by the original loan documents.

26

In summary, the funding documents created and joined together a number of components into a unitary whole for the purpose of lending money to the ESOP and securing the loan. The parties' incentive to do the deal was the fact that it turned an inchoate, illiquid asset – the tax benefit – into cash, which was split among the parties. Absent this final step, the splitting of cash among the parties, none of the four prior steps - the loan, the transfer of loan proceeds through two stock purchase transactions (Alliance and then AH III), and the purchase of the Participation Interests, using the loan proceeds, made any business sense.

The security arrangement with AH III was a crucial inducement motivating the Bank to make the loan. The Bank already had the pool of receivables safely in its own possession, and was getting paid interest from them. Absent the safekeeping afforded by the AH III arrangement, the Bank was not interested in parting with its lucrative pool of receivables. *See* Fenkell Dep. at 94:13-96:9; Grien Rep. at App. C. ¶ 22.

In this case the entire funding transaction "involved" assets of the plan. The multi-tiered transaction was unified in time, place, motivation, and effect. Fenkell's theory would have me ignore what actually happened and treat each step in this unitary transaction as a separate transaction. Fenkell's theory is not supported by the facts or the statutory language.

### 3. The Stonehenge/DBF fees were "in connection with" the funding transaction.

Mr. Fenkell argues that he did not receive fees from Stonehenge "in connection with" the funding transaction. I disagree. Fenkell's argument is contradicted by the record evidence.

27

Fundamental to Fenkell's argument is his notion, unsupported by the case law, that Alliance is under a burden to establish that his receipt of fees from Stonehenge was "in connection with" the funding transaction. That is incorrect. It is Mr. Fenkell's burden, as a fiduciary, to proffer evidence that would establish that the receipt of fees was not "in connection with" the funding transaction, by clear and convincing evidence. *See Lowen v. Tower Asset Mgt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987). He has not satisfied his burden.

Neither is it Alliance's burden to demonstrate that the fees he received from Stonehenge were paid *solely* "in connection with" the funding transaction. Nothing in the statute suggests such a requirement. Mr. Fenkell has produced facts that suggest that some of his fees may have been paid in consideration of matters not "in connection with" the funding transaction. Fenkell Mem. at 21-22. But he has produced no facts that clearly and convincingly demonstrate that the DBF fees were not "in connection with" the funding transaction, at least in substantial part.

I must evaluate Alliance's summary judgment motion through the lens of the heightened "clear and convincing" burden of proof. *Anderson,* 477 U.S. at 247-48. And while I may not resolve disputes about the underlying facts, I am free to draw inferences from undisputed historical facts at the summary judgment phase, because I am the trier of fact at trial. *Id.* at 255-56.

Fenkell's heightened burden of proof, and the fact that I may draw inferences from undisputed historical facts, have an impact on my evaluation of the section 406(b)(3) claim involving DBF's fees. The facts paint a "clear and convincing" picture in

28

favor of Alliance's theory, rather than Mr. Fenkell's. On Alliance's side of the ledger, a number of facts are undisputed:

- Fenkell's fees were fixed by the DBF agreement at the same time as the funding transaction. 1/27/15 Fenkell Dep. at 467-68;

- The fees were payable to DBF after Stonehenge received its annual fee from AH III for services rendered in connection with the ESOP funding transaction. *See* 12/18/2014 Witten Dep. at 199-200;

- The fees stopped when the ESOP loan was paid off in 2011. 1/27/15 Fenkell Dep. at 489-91;

- Fenkell repeatedly communicated with Stonehenge about the DBF fees in conjunction with discussions about the details of the ESOP funding transaction[14] 1/26/2015 Witten Dep. at 55-56;

- After the DBF agreement lapsed, in 2006, the fees continued and even increased, until the loan was paid off, when the DBF fees stopped. *See* 12/18/2014 Witten Dep. at 168-69; 7/8/2014 Fenkell Dep. at 352;

- The fees to DBF were increased in 2006 as a result of a negotiation over how much Alliance was to receive out of the pool of money generated by the Participation Interests in the hands of AH III. *See* 12/18/2014 Witten Dep. at 168-69; and

---

[14] Which included numerous emails between individual Stonehenge parties and Fenkell. *See* Alliance Mem. at 19-20 (citations omitted).

- Fenkell's account of the time spent on deals – other than the ESOP funding transaction – worked with Stonehenge is dwarfed by the fees paid to DBF 7/8/2014 Fenkell Dep. at 350.

In opposition, Fenkell points to several facts:

- The DBF arrangement with a corporate entity controlled by the principals of Stonehenge[15] preceded the 1999 ESOP funding agreement. 7/8/2014 Fenkell Dep. at 323-25; 1/28/2015 Brooks Dep. at 82;

- Fenkell consulted with Stonehenge on other deals besides the ESOP funding agreement 7/8/2014 Fenkell Dep. at 367; 1/25/2015 Witten Dep. at 74-75; 1/16/2015 Volegesang Dep. at 56-57; and

- Fenkell consistently told anyone who asked that the DBF relationship had nothing to do with Alliance and the ESOP. 12/18/14 Witten Dep. at 211.

When a party's testimony or affidavits are contradicted by a transaction's contemporaneous records, a judge is not bound to credit the party's after-the-fact version of events. *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007). Otherwise, any party could create a material issue of fact simply by denying a contract's clear terms. *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)). When the material historical record is actually ambiguous, or can be accessed only through disputed human memories, trial is necessary. *See Anderson*, 477 U.S. at 249.

---

[15] But not Stonehenge, which was only incorporated in the late part of 1999, as the 1999 loan transaction was nearing closing.

I treat as undisputed that 1) the DBF arrangement with Stonehenge's principals preceded the 1999 ESOP funding agreement, but was modified in light of the 1999 transaction, 2) Fenkell consulted with Stonehenge on other deals besides the ESOP funding agreement, and 3) Fenkell told anyone who asked at Alliance that the DBF relationship had nothing to do with Alliance and the ESOP. *See* Alliance Mem. at 111 (citations omitted). The question is whether these facts, taken with their reasonable inferences, are enough to meet Fenkell's burden to establish clearly and convincingly that he did not receive the DBF fees "in connection with" the ESOP funding transaction. They are not.

Mr. Fenkell is a fiduciary. He is responsible to demonsrate by clear and convincing evidence that the DBF fees were not "in connection with" the ESOP funding. While Mr. Fenkell may be able to prove he did some consulting work for Stonehenge that was not "in connection with" the ESOP funding transaction, there is no disputing the fact that the DBF fees were negotiated in connection with, in light of, and in consideration of the Stonehenge fees from the ESOP funding transaction. If there is some commingling of the reasons for paying Mr. Fenkell, *i.e.*, that he was paid for work done "in connection with" other deals, in addition to the ESOP funding transaction, it is immaterial as to his liability. It may be of equitable concern when fixing a remedy. Fenkell has not clearly and convincingly excluded his fees from being "in connection with" the ESOP funding transaction.

I conclude that Mr. Fenkell violated ERISA section 406(b)(3) as a matter of law, through the negotiation and receipt of approximately $4,000,000 in fees kicked back from Stonehenge in connection with the ESOP funding transaction. This does not end

the discussion, as Fenkell has raised a number of affirmative defenses, which I discuss

below. Before discussing Fenkell's affirmative defenses, I will turn briefly to Alliance's

alternative theories of liability for the kickback scheme.

### c. *Negotiating and accepting the $4,000,000 in fees from Stonehenge violated Mr. Fenkell's fiduciary duty of loyalty under ERISA § 404(a)(1)(A) as a matter of law.*

Alliance argues that Fenkell violated ERISA § 404(a)(1)(A) by accepting the DBF

fees from Stonehenge. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) requires a

fiduciary to "discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits

to participants and their beneficiaries; and (ii) defraying reasonable expenses of

administering the plan[.]" Alliance alleges that the DBF fee agreement violated Fenkell's

fiduciary duty of loyalty under section 404(a)(1)(A).

The duty of loyalty under section 404(a)(1)(A) requires that a fiduciary act in the

interests of the plan participants and beneficiaries. Not all breaches of the duty of loyalty

involve self-dealing. *See, e.g., Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483, 489

(5th Cir. 2011) (withholding of material information from beneficiary was a breach of

the duty of loyalty). But self-dealing by its nature is a breach of the duty of loyalty. *See

LaScala v. Scrufari*, 479 F.3d 213, 221 (2d Cir. 2007) (noting that an ERISA fiduciary

who gave himself raises without board approval was liable both for self-dealing and for

breach of his duty of loyalty).

Mr. Fenkell argues that his receipt of DBF fees did not involve the "discharge [of]

his duties with respect to a plan," since he received the DBF fees from Stonehenge, and

Stonehenge was entitled to its fees from AH III under its own agreement with Alliance,

the ESOP, and AH III. Mr. Fenkell argues that because he was not wearing his "fiduciary" hat when he negotiated and accepted fees from Stonehenge, he cannot have been in violation of his fiduciary duty of loyalty under section 404(a)(1)(A). Fenkell Memorandum ("Fenkell Mem.") at 47.

Mr. Fenkell's "two hats" argument is interesting, but avoids the most important point - that the hats were perched simultaneously on Fenkell's head as he dealt with a unitary transaction. See *Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000) (ERISA does require, however, that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."). Wearing two hats does not entitle the fiduciary to play a shell game, with his fiduciary hats serving as the shells and his fiduciary duty as the disappearing pea. Fenkell, in his capacity as fiduciary of the ESOP, violated his duty of loyalty when he negotiated and closed a deal between the ESOP, Alliance, and AH III, on one side, and Stonehenge on the other. The crucial fact is that closing this deal triggered an enormous fee payable to him from Stonehenge, a fee that was not disclosed to, or authorized by, the ESOP. Whatever Mr. Fenkell's exact status *vis a vis* Stonehenge, and whatever pot of money Stonehenge used to pay Fenkell, is beside the point. The relevant facts are that Stonehenge was *not* the ESOP, Stonehenge stood to gain from a transaction involving ESOP assets, and Fenkell owed a duty of undivided loyalty to the ESOP. That duty was hopelessly compromised by the promise and payment of millions in fees from Stonehenge to DBF, Fenkell's wholly controlled corporate entity, in connection with the ESOP funding transaction.

I find Fenkell violated his duty of undivided loyalty to the ESOP by entering into the Stonehenge/DBF fee agreement.

**d.** ***Fenkell's use of plan assets to generate the DBF fees violated 29 U.S.C. § 1106(a)(1)(D) as a matter of law.***

29 U.S.C. § 1106(a)(1)(D) prohibits a fiduciary the "use, by or for the benefit of a party in interest, of any assets of the plan." Fenkell, the ESOP trustee, was a "party in interest." 29 U.S.C. § 1002(14)(A). Fenkell, as the ESOP trustee, approved the ESOP Loan Transaction, which generated profits to Alliance but also generated fees for Fenkell, through the Stonehenge/DBF consulting agreement. Thus, the Alliance Parties argue, Fenkell used plan assets to benefit himself, in violation of section 1106(a)(1)(D). Alliance Mem. at 71.

Fenkell argues that this theory is "dependent on Plaintiff's allegations that . . . Alliance's assets were plan assets of the Alliance ESOP." Fenkell Mem. at 46. I have found that a genuine issue of material fact attends the plan asset question,[16] but I do not agree that this particular theory of liability depends upon a finding that Alliance assets were ESOP assets. Alliance must prove the following five elements, under ERISA section 406(a)(1)(D) (29 U.S.C. § 1106 (a)(1)(D)):

> (1) the person or entity is '[a] fiduciary with respect to [the] plan'; (2) the fiduciary 'cause[s]' the plan to engage in the transaction at issue; (3) the transaction 'use[s]' plan assets; (4) the transaction's use of the assets is 'for the benefit of' a party in interest; and (5) the fiduciary 'knows or should know' that elements three and four are satisfied.

*Reich v. Compton*, 57 F.3d 270, 278 (3d Cir. 1995), *amended* (Sept. 8, 1995). Only the fourth element is at issue here. Fenkell is a fiduciary who caused the plan to engage in the ESOP Loan Transaction, which used plan assets. As a fiduciary he is a party in

---

[16] *See infra,* at 91-96.

interest. The question is whether the "transaction's use of the assets is 'for the benefit of' a party in interest[.]'"

The entire ESOP Loan Transaction was one "transaction." The fees to DBF were a direct consequence, and in consideration of, the ESOP Loan Transaction. Fenkell clearly intended to benefit from the transaction through the DBF fees. That this benefit was indirect is of no consequence, since the statute explicitly prohibits "direct or indirect" benefits that the fiduciary knows about. 29 U.S.C. § 1106(a)(1). Neither does the statute or the case law require that the use of assets in a transaction be for the "sole" benefit of the party in interest.

There is no dispute that the ESOP Loan Transaction occurred, that it was managed by Fenkell in his fiduciary capacity, and that loan assets were used in the transaction. Nor is there any genuine dispute that Fenkell benefitted personally from the use of the plan's assets in this transaction. Although Fenkell has maintained throughout that the DBF fees had nothing to do with the ESOP Loan Transaction, his "say so" does not create a genuine issue of material fact, because his narrative is completely undercut by contemporaneous documents, and the reasonable inferences drawn from those contemporaneous records.

I find that Fenkell violated 29 U.S.C. § 1106(a)(1)(D) by spinning off fees from the ESOP Loan Transaction to benefit DBF.

     **e.** ***Fenkell's dealing with plan assets in his own interest and for his own account violated 29 U.S.C. § 1106(b)(1) as a matter of law.***

29 U.S.C. § 1106(b)(1) bars a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account[.]" Alliance claims that the DBF fees

represented a violation of section 1106(b)(1). Alliance Mem. at 71-72. Fenkell claims that

this liability theory is dependent on Alliance assets being plan assets. Fenkell Mem. at

46-47. I disagree, at least with respect to the deal to make payment of fees to DBF by

Stonehenge. As the ESOP's trustee, Fenkell "deal[t] with the assets of the plan" through

the ESOP Loan Transaction. Because the deal was designed to generate fees to Fenkell

through DBF, the deal was "in his own interest or for his own account[.]"

### f.  *Mr. Fenkell's defenses preclude entry of partial summary judgment for either party with respect to the DBF fees.*

#### i.  *Questions of fact exist whether the statute of limitations, 29 U.S.C. § 1113, bars plaintiffs from recovering against Fenkell.*

Mr. Fenkell contends that 29 U.S.C. § 1113(2) bars plaintiffs from recovering

against him. Fenkell Mem. at 67. The statute bars claims for breach of fiduciary duty

unless they are brought within "three years after the earliest date on which the plaintiff

had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). Mr. Fenkell claims

that the plaintiffs "knew well before May 1, 2010 [three years before the filing of this

lawsuit] that Alliance (through A.H. III) was paying fees to Stonehenge pursuant to the

Alliance-Stonehenge Agreement." Fenkell Mem. at 67. Fenkell also claims that plaintiffs

knew before May 1, 2010 that Stonehenge was paying fees to DBF pursuant to the

Stonehenge/DBF agreement. *Id.*

The Alliance Parties argue that their claims are timely under 29 U.S.C. § 1113(1).

Alliance Opp. at 60-65. The Alliance Parties also contend that they did not have "actual

knowledge" of all the relevant facts concerning Fenkell's wrongdoing within three years

of the filing of their complaint. *See id.* at 65-71; 29 U.S.C. § 1113(2). Plaintiffs contend

that Fenkell fraudulently concealed his kickbacks and breaches of fiduciary duty, such

that the statute of limitations ran for six years from the date plaintiffs discovered

Fenkell's violations. *See* 29 U.S.C. § 1113. Alliance Opp. at 52-60. Finally, the plaintiffs

argue that the limitations period was tolled because Fenkell "adversely dominated"

Alliance up until 2012. *Id.* at 74-78.[17]

> The ERISA statute of limitations, 29 U.S.C. § 1113, provides as follows:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

>> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

>> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

>> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

*See* 29 U.S.C. § 1113. Section 1113 "creates a general six year statute of limitations,

shortened to three years in cases where the plaintiff has actual knowledge, and

potentially extended to six years from the date of discovery in cases involving fraud or

concealment." *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996). The

"fraud or concealment" exception in 29 U.S.C. §1113 requires "evidence that the

defendant took affirmative steps to hide its breach of fiduciary duty." *Id.* at 1552. The

final paragraph of section 1113 provides that in the instance of "fraud or concealment"

an "action may be commenced not later than six years after the date of discovery of such

breach or violation."

---

[17] I need not resolve the issue of adverse domination because I have concluded on other grounds that fact issues preclude summary judgment.

        1.   *Questions of fact exist whether Alliance had "actual*
            *knowledge" of the nature of Fenkell's kickbacks.*

Fenkell argues that there is evidence that Alliance personnel, other than Fenkell, had actual knowledge of the DBF payments long before May of 2010, three years before this lawsuit. Fenkell Mem. at 66-69. This is not enough to trigger application of the 3-year statute of limitations under 29 U.S.C. § 1113(2).

Fenkell must show that "plaintiffs actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA." *Intl. Union of Elec., Elec., Salaried, Mach. and Furniture Workers, AFL-CIO v. Murata Erie N.A., Inc.*, 980 F.2d 889, 900 (3d Cir. 1992). This requirement puts Fenkell in the "unenviable position" of showing that his conduct was a kickback, and that plaintiffs actually knew this before May, 2010. *See Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 250 (3d Cir. 2001). Fenkell ignores this requirement. Fenkell's argument is that knowledge of Stonehenge payments to DBF suffices to trigger the 3-year statute. He cites to *Koert v. GE Group Life Assur. Co.*, 416 F. Supp. 2d 319 (E.D. Pa. 2005) *aff'd*, 231 Fed. Appx. 117 (3d Cir. 2007) (unpublished). Fenkell Mem. at 68. However, *Koert* simply held that plaintiff "had actual knowledge of the exact facts giving rise to her cause of action at the time her benefits were terminated[.]" *Id.* at 325. A full appreciation that these facts triggered ERISA liability was not required. Fenkell has not produced facts that establish that Alliance had knowledge of the crucial fact necessary to turn Fenkell's "consulting fees" into prohibited "kickbacks:" that the fees were paid in consideration of the ESOP Loan Transaction, and not for other deals.

38

There is substantial evidence in the record that Fenkell repeatedly insisted that the fees paid to DBF had nothing to do with the ESOP Loan Transaction, a position that he continues to take. *See* Fenkell Mem. at 21-22. There is little doubt that he regularly assured personnel at Alliance that this was so.[18] *See* 2/25/2015 Spear Dep. at 150. These facts alone create a genuine issue of material fact about whether Alliance employees knew Fenkell was receiving a kickback, in violation of ERISA, from Stonehenge. In any event, this is an inherently fact-specific inquiry. *See Mathews,* 260 F.3d at 250.

Fenkell's motion to bar plaintiff's claim under 29 U.S.C. § 1113(2) must be denied.

> 2. *Questions of fact exist whether the six year "fraud or concealment" statute applies, and when the limitation period under the statute begins to run.*

The "fraud or concealment" exception contained in the last paragraph of 29 U.S.C. §1113 requires that plaintiff produce "evidence that the defendant took affirmative steps to hide its breach of fiduciary duty." *Kurz,* 96 F.3d at 1552; *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 204 (3d Cir. 2006). "[T]here must be conduct beyond the breach itself that has the effect of concealing the breach from its victims." *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 503 (3d Cir. 2001), *as amended* (Mar. 20, 2001) (*"Unisys III"*). Here, plaintiffs point to evidence that on several occasions Fenkell told personnel at Alliance that the DBF fees had nothing to do with the ESOP Loan. Alliance Mem. at 110-11. There is no dispute by Fenkell that he said this on more than one occasion. *Id.* Fenkell's statements were incorrect. The fees paid to DBF were "receive[d]" in consideration of the loan deal. 29 U.S.C. §§ 1106(b)(3). That

---

[18] It could hardly be otherwise. If Fenkell acknowledged that the fees from Stonehenge were in consideration of, and arose in connection with, the ESOP Loan Transaction, the game would have been up.

Fenkell communicated incorrect information about the DBF fees to Alliance personnel may qualify as "concealment," under section 1113. Providing false information is the type of "affirmative step[]" that can trigger application of the "fraud or concealment" limitations period. *See Ranke*, 436 F.3d at 204 ("responding to questions in a manner that diverted the beneficiary from discovering" the fiduciary's wrongdoing was sufficient to trigger the fraud or concealment section) (citing to *Unisys III*, 242 F.3d at 505); *Chaaban v. Criscito*, 468 Fed. Appx. 156, 160 (3d Cir. 2012) (not precedential) (false information provided by retiring trustee triggered application of "fraud or concealment" section of the statute).

"The statute of limitations is tolled until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment."[19] *Kurz,* 96 F.3d at 1552. In this case, the Alliance Parties plausibly point to evidence that they only discovered the true nature of the DBF payments after Fenkell stepped down as trustee, in 2012. *See* Alliance Mem. at 109. At that point Alliance initiated an in-depth investigation. *See id.* (citing Wanko Dep. at 361:10-362:19; Lynn Dep. at 86:20-87:4,

---

[19] *Kurz* formulated the test as when the "fraud or concealment" was discovered. *Id.* It seems clear that the date the "fraud or concealment" is discovered would be the same time the underlying violation is discovered. The statute itself says "such action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. *Kurz* held that the last sentence of section 1113 was an application of the fraudulent concealment doctrine, or "discovery rule," which "postpones the beginning of the limitation period from the date when the plaintiff is injured to the *date the injury is discovered.*" *J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1253 (1st Cir. 1996) (cited to in *Kurz*, 96 F.3d 1544, 1552) (quoting *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir.1990)). Strictly speaking it is the discovery of the "breach or violation," not the discovery of the "concealment," that marks the beginning of the limitations period. *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 613 (3d Cir. 2015) (date the injury is discovered marks the beginning of the limitations period).

193:2-7). Fenkell disputes the date of discovery. Fenkell Mem. 67. When, exactly, the Alliance Parties should have discovered—or did discover—the fiduciary violations by Fenkell is a genuinely disputed fact question that remains for trial. *Cf. In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litig.*, 543 F.3d 150, 161-74 (3d Cir. 2008) *aff'd sub nom. Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010) (close analysis of a variety of facts bearing on whether plaintiffs should have been on notice of securities fraud).[20]

### g. *ERISA provides an equitable remedy against DBF Consulting, as well as Fenkell.*

Fenkell argues that ERISA provides no remedy in this case against DBF, because Fenkell, the fiduciary, did not violate the statute. Fenkell Mem. at 50. Mr. Fenkell is correct that *Iola* provides for an equitable remedy against DBF, a non-fiduciary, if it knowingly participated with Fenkell in violating the statute. *See* Fenkell Mem. at 50-51; *Iola*, 700 F.3d at 101 ("The trustee or beneficiaries may … maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.") (quoting *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000)). If trial results in a remedy against Fenkell for having violated ERISA,

---

[20] Because there is a genuine issue of material fact as to when plaintiffs should have discovered the nature of Fenkell's kickbacks, I need not resolve the question of when the last action or omission in Fenkell's scheme occurred. *See, e.g., Ranke,* 436 F.3d 197 (determining when last action occurred under section 1113(1)(A)). Nor must I answer the question whether Fenkell's continuing duty to review and monitor investments made section 1113(1)(B) applicable, opening the possibility that the statute began to run only at the end of his term as a fiduciary, quite apart from any question of the fraudulent concealment doctrine. *See Tibble v. Edison Intern.*, 135 S. Ct. 1823, 1828 (2015).

appropriate equitable relief can be sought against DBF, a non-fiduciary to whom all knowledge possessed by Mr. Fenkell is attributable.

### h. *Stonehenge arguments.*

At oral argument Mr. Fenkell joined in a variety of arguments by his co-defendants, the Stonehenge Parties. I have addressed those arguments separately, in section III of this opinion, and I need not address them here.

### i. *Alliance's motion concerning counterclaims and third-party claims.*

The Alliance Parties have moved for summary judgment as to a variety of Fenkell's counterclaims and third-party claims. Alliance Mem. at 97.

#### i. *Questions of fact exist whether Fenkell is entitled to indemnification.*

Fenkell's first counterclaim and first third-party claim seek indemnification against Alliance for his expenses in this litigation and expenses in his state court suit in Philadelphia, which seeks recovery under his employment contract with Alliance. Alliance Mem. at 98. I previously dismissed Fenkell's claims for indemnification arising out of the *Chesemore* litigation, based on Pennsylvania's policy against indemnification for an intentional tortfeasor. Doc. No. 432 at 8; reconsideration denied Doc. No. 481 at 6-7.[21] Alliance now urges me to enter summary judgment denying Fenkell's

---

[21] I will deny Fenkell's second motion for reconsideration. Doc. No. 489. Fenkell's second motion reiterates his disagreement with my initial decision and with my denial of his first motion for reconsideration. "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). Neither basis presents itself. I see no reason to reconsider my opinion. Doc. No. 481. Motions for reconsideration must have a limit, and Mr. Fenkell has reached it. *See, e.g.,* A FEW

indemnification claims. Alliance Mem. at 99. Alliance's motion is predicated on Fenkell's liability in this case. Because Fenkell's liability has, for the most part, yet to be determined, I will deny Alliance's motion and take up the matter of Fenkell's indemnification after a complete determination of liability at trial.

> ii.  *Summary judgment is granted, dismissing Fenkell's contribution claims against the Alliance parties.*

Alliance asks me to enter summary judgment denying Fenkell's contribution claims. Alliance Mem. at 102. Alliance makes a number of arguments in support of its motion:

- that Fenkell is judicially estopped from seeking contribution because he argued that contribution is not available in the *Chesemore* appeal (*id.* at 102);

- that Fenkell was the most culpable party in the *Chesemore* litigation (*id.* at 103-05);

- that Wanko, Lynn, and Spear did not have knowledge of Fenkell's breaches with regard to the Trachte deal, which is at the heart of the *Chesemore* litigation, and so they cannot be liable for contribution (*id.* at 105-06);

- that Spear did not act as a fiduciary with regard to the Trachte deal (*id.* at 106-08);

---

GOOD MEN (Columbia Pictures 1992) (Lt. Weinberg: "I strenuously object?" Is that how it's done? Hm? "Objection, your Honor!" "Overruled" "No, no. I STRENUOUSLY object." "Oh! You strenuously object. Then I should take some time and reconsider."); *cf.* Red Smith, *The Champ Throws in the Towel* (N.Y. Times, November 25, 1980) ("No mas, no mas" Roberto told the referee. "No more box.") (accessed August 19, 2016) http://www.nytimes.com/packages/html/sports/year_in_sports/11.25.html.

- that Wanko, Lynn, and Spear did not have a fiduciary role in the 1999 ESOP Loan Transaction or the DBF/Stonehenge fee arrangement (*id.* at 108-12); and

- that Wanko, Lynn, and Spear did not know of the illegality of Fenkell's conduct, either in the Trachte deal or in the case of the DBF kickbacks from Stonehenge (*id.* at 112-13).

I will not apply judicial estoppel to preclude Fenkell's contribution claims. Fenkell's appeal was rejected by the Seventh Circuit. "[J]udicial estoppel[] 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)  (quoting from *Pegram,* 530 U.S. at 227, n. 8).  "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' *United States v. C.I.T. Constr. Inc.,* 944 F.2d 253, 259 (5th Cir. 1991), and thus poses little threat to judicial integrity." *Id.* at 750-51. The doctrine is a flexible and discretionary equitable remedy. *New Hampshire,* 532 U.S. at 750. I see no reason to apply it here, where the ordinary basis for its application – the opposing party's prior litigation success – is missing.

I agree with Alliance that contribution between fiduciaries – if it exists at all under ERISA[22] – is not available to Fenkell for liability arising from the *Chesemore* case. He was "far and away the most culpable party," as Judge Conley put it. *Chesemore,* 948

---

[22] I have previously noted that whether a right of contribution exists between ERISA fiduciaries is an open question. Doc. No. 432 at 16 n.9. If such a right exists, it would likely be derived from historical equitable principles. The Supreme Court has often consulted the Restatements and other authorities on equity and trust law to define rights under ERISA. *See, e.g., CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011).

F. Supp. 2d at 946.[23] He took a position in the *Chesemore* litigation that he was the only fiduciary. Alliance Mem. (Statement of Undisputed Facts) at 47 (citing to June 27, 2011 Proposed Findings of Fact, *Chesemore* Doc. No. 308 ¶¶ 50-54). Fenkell certainly was the one pulling all the strings. "If the fault between or among trustees is sufficiently disproportionate, a trustee who is significantly more at fault is not entitled to contribution, and the trustee(s) significantly less at fault are entitled to a full indemnity." Restatement (Third) of Trusts, Volume 4, § 102 (2012) (clarifying Restatement (Second) of Trusts § 258(1)(a), (2)).

I will grant summary judgment denying Fenkell a contribution remedy against any of the Alliance Parties arising out of the *Chesemore* litigation.

> ### iii.   *Summary judgment is granted, dismissing Fenkell's third-party claim asserting prohibited transactions by Spear.*

Alliance requests summary judgment dismissing Fenkell's third third-party claim. Alliance Mem. at 113. Fenkell seeks recovery on behalf of the ESOP and other plan participants, alleging that Spear engaged in a a prohibited transaction by receiving payments related to the Trachte transaction. *Id.* Alliance contends that 1) Fenkell is

---

[23] I "must take judicial notice if a party requests it and the court is supplied with the necessary information[,]" about a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201(a)(1) and (c)(2). An opposing party must be given an opportunity to be heard. As to facts from the *Chesemore* litigation, the requisites of Fed. R. Evid. § 201 have been met. Alliance has requested judicial notice in its brief and supplied me with the requisite information. The facts are not subject to reasonable dispute because they may be determined from a court record, a "source[] whose accuracy cannot reasonably be questioned." *See In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 205–06 (3d Cir. 1995) (judicial notice of bankruptcy court records). Fenkell has had ample opportunity to be heard through the briefing process in this case.

disqualified from suing Spear or others because of his malefactions in *Chesemore* (*id.* at 114); and 2) that Fenkell cannot demonstrate that Spear was a fiduciary, or that she knowingly participated in prohibited transactions *Id.* at 117. I agree that Fenkell is disqualified from pursuing a remedy on behalf of the ESOP. He posted his ESOP plan account – and status as a plan participant – to secure his *supersedeas* bond in the *Chesemore* appeal, and forfeited that account – and his standing as a plan participant - once he lost his appeal. *See* Doc. No. 585-1 ¶ 6 (Agreed Consent Order); "Notice of Filing," Doc. 585 ¶ 5.

I will grant summary judgment dismissing Fenkell's third-party claim asserting prohibited transactions by Spear.[24]

> iv.  *Fenkell's proposed amended pleading alleging a breach of duty by Alliance to its shareholders (proposed tenth third-party claim) is denied.*

Alliance asks me to dismiss Fenkell's tenth third-party claim. Alliance Mem. at 124. The tenth third-party claim alleges that Alliance's Board of Directors breached their duties to the shareholders by asserting the plan assets position in this litigation. *Id.* I dismissed this claim previously for failure to meet the pleading standard of Fed. R. Civ. Pro. 23.1, but granted leave for Fenkell to move to amend. Doc. No. 432. Fenkell moved to amend his claim. Doc. No. 445. Alliance opposed his amendment. Doc. No. 452. I explained my reasons for reserving ruling on the motion until the summary judgment stage. *See* Doc. No. 432 at 52.

Fenkell is no longer an ESOP participant. His standing to sue was based on his status as an ESOP participant. This is grounds enough to deny his motion to amend. In

---

[24] I need not rule on Alliance's other bases for summary judgment.

the alternative, there is no dispute that Fenkell failed to provide pre-suit notice as required under Fed. R. Civ. Pro. 23.1. Fenkell argues that pre-suit demand was not required because Alliance is a closed corporation. He cites to section 7.01(d) of the American Law Institute's Principles of Corporate Governance, which provides that a "court in its discretion may treat an action raising derivative claims as a direct action[] [and] exempt it from restrictions and defenses applicable only to derivative actions" if the court finds that such an exemption will not 1) unfairly expose the defendants to multiple actions, 2) materially prejudice corporate creditors, or 3) interfere with fair distribution of recovery among all interested parties. *See Warden v. McLelland*, 288 F.3d 105, 112 (3d Cir. 2002).

While Alliance is a closely held corporation, since all of its stock is held by the ESOP, I am convinced I should not exercise my discretion to exempt Fenkell from the notice requirements of Fed. R. Civ. Pro. 23.1. The point of the exemption for closely held corporations is that they ordinarily do not face the possibility of multiple conflicting lawsuits from a large number of shareholders. Here, there are many participants in the ESOP, any of whom might bring a derivative action seeking remedies for alleged fiduciary violations. Nothing in these circumstances counsels me to waive the ordinary requirements of Rule 23.1. Fenkell has twice been found to have violated his fiduciary duties to ESOP participants, once by Judge Conley and now by me. Fenkell is not a suitable candidate to represent those same ESOP participants in a dispute with Alliance.

There is no dispute that Fenkell did not satisfy the pre-suit notice requirement. There are many reasons not to exercise my discretion to excuse the failure. I will deny

Fenkell's proposed amended pleading concerning his tenth third-party claim. Doc. No. 445.[25] I need not rule on Alliance's other contentions.

> *v.   Summary judgment is granted, dismissing Fenkell's eleventh third-party claim for breach of duty to monitor.*

The Alliance Parties ask me to dismiss Fenkell's eleventh third-party claim, in which he seeks to hold Spear, Wanko, Lynn and other directors liable for instituting this lawsuit. Alliance Mem. at 127. Fenkell's theory is that Alliance's fundamental litigating premise, that Alliance and AH III assets are plan assets, is so fraught with adverse consequences and so devoid of merit that it represents a breach of the directors' duty to oversee and monitor its corporate officers and affairs. Fenkell Mem. at 80.

Alliance argues that the decision to institute and pursue this lawsuit was (and is) protected under the business judgment rule. *See* Alliance Mem. at 128. Pennsylvania's version of the business judgment rule insulates a director from liability for a business decision made (1) in good faith; (2) where the director or officer is not interested in the subject of the business judgment; (3) is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances; and (4) rationally believes that the business judgment in question is in the best interests of the corporation. *In re Lampe*, 665 F.3d 506, 516-17 (3d Cir. 2011).

The Pennsylvania Supreme Court has encouraged courts to apply the business judgment rule prior to full litigation on the merits, in order to avoid excessive judicial

---

[25] If the policy of liberality toward amended pleadings required me to permit the amended pleading – I do not think it does, in this case -  I would have permitted the amendment and then granted summary judgment dismissing Fenkell's derivative claim.

involvement in second guessing business decisions. *See Cuker v. Mikalauskas*, 692 A.2d 1042, 1048 (Pa. 1997). As the court stated,

> The court might order limited discovery or an evidentiary hearing to resolve issues respecting the board's decision. Factors bearing on the board's decision will include whether the board or its special litigation committee was disinterested, whether it was assisted by counsel, whether it prepared a written report, whether it was independent, whether it conducted an adequate investigation, and whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith). If all of these criteria are satisfied, the business judgment rule applies and the court should dismiss the action.

*Id.* In this case, four of the five Alliance directors are disinterested outside directors appointed after Fenkell left. Alliance Mem. at 127 (citing to facts of record). Fenkell asserts that Wanko, Lynn, and Spear had an interest in preserving their jobs, which motivated them to file the lawsuit, an allegation for which there is precious little evidence. Fenkell Opp. at 109. More to the point, there is no evidence that the outside directors filed the lawsuit in their own interest. *Id.* Alliance was assisted by competent counsel – both Ballard Spahr, in the internal investigation, and Morgan, Lewis, in the litigation. *Id.* The internal investigation was more than adequate: it was exhaustive. *Id.* There is a ratonal basis for the lawsuit. Whether it proves entirely successful or not, a trial will tell, but success in the lawsuit is not the criteria for application of the business judgment rule. *Cuker*, 692 A.2d at 1047. Summary judgment is appropriate as to this component of Fenkell's eleventh third-party claim.

Fenkell also claims that the directors breached their duty to monitor by failing to insist on filing the shareholder derivative suit described in Fenkell's tenth third-party claim. *See* Alliance Mem. at 127. Alliance argues that if the tenth third-party claim is dismissed, to the extent the eleventh is predicated on the tenth, it should follow. *Id.*

Given the derivative nature of Fenkell's liability theory, in this instance, for the same reasons I have granted liability under the tenth cause of action, summary judgment is appropriate as to this component of Fenkell's eleventh third-party claim for relief.

A final fact convinces me that summary judgment is appropriate as to both components of Fenkell's eleventh third-party claim. Events have overtaken this cause of action. Mr. Fenkell is no longer an ESOP participant, and so has no standing to pursue this claim, if ever he did. *See* Doc. 214 ¶¶ 161, 164 (Fenkell alleges he is a participant and therefore entitled to bring the cause of action). There appears to be no other ground upon which Fenkell would have standing to pursue his eleventh third-party claim. This undisputed fact strongly counsels in favor of summary judgment dismissing Fenkell's eleventh third-party claim in its entirety.

For all these reasons I will grant summary judgment dismissing Fenkell's eleventh third-party claim.

> **j.  *Theories of liability that depend upon a determination that Alliance's assets were "plan assets" are not ripe for summary judgment.***

The Alliance Parties have moved for summary judgment against Fenkell based on several other theories founded on the premise that Alliance's assets are "plan assets." I explain in section III of this opinion why genuine issues of material fact preclude summary judgment on this basis. As a result, I will deny plaintiffs' motion for summary judgment insofar as it is predicated on a "plan assets" theory of liability. *See* Alliance Mem. at 73-83 (theories of liability against Fenkell under 29 U.S.C. §§ 1104(a)(1) (duty of single loyalty); 1106(b)(1) (duty not to deal with assets in his own interest); 1106(b)(3) (duty not to receive consideration from a party dealing with the plan); 1106(a)(1)(D)

(duty not to transfer plan assets to a party in interest). The allegations concerning the Brookdale[26] transactions are premised on a "plan assets" theory, *see* Alliance Mem. at 74-75,[27] as are the ERISA claims arising out of the SLMRS Advisory Services Agreement. *See* Alliance Mem. at 33-45, 83-90. Therefore, I will deny plaintiffs' motion for summary judgment insofar as it is predicated on a theory that Alliance or AH III assets were plan assets.

### k. *Fenkell's motions against the Alliance Parties.*

The Fenkell Parties have moved for summary judgment as to all claims by Alliance against them. Doc. No. 505. A number of the Fenkell Parties' arguments are simply the flip side of arguments by Alliance; hence, my discussion of the Alliance motion is in many respects dispositive of Fenkell's motions. Most of the Fenkell Parties' arguments can be disposed of for reasons already elaborated upon during my discussion of the Alliance motion.

---

[26] Brookdale Living Communities, Inc. is a company that developed and managed senior care and assisted living facilities. Alliance took title to Brookdale real estate in order to obtain the benefit of extensive tax losses that Alliance could use to offset against Alliance profits. Alliance Mem. at 31-32.

[27] At page 72 of the Alliance brief, there is a single line reference to the "Brookdale transaction where Fenkell obtained compensation by directing payments to himself via DBF rather than to Alliance." This reference is in the midst of a longer discussion of Fenkell's liability, apart from a "plan assets" theory, under 29 U.S.C. § 1106(b)(1). I cannot deduce from this how exactly Fenkell "deal[t] with the assets of the plan in his own interest or for his own account[.]" Based on Alliance's statement of undisputed facts, the Brookdale investments were funded entirely by Alliance, not the ESOP. *See* Alliance Mem. at 31-32. Thus, it appears that ERISA liability for the Brookdale transactions would depend on Alliance assets being "plan assets."

> i. *Fenkell's motion for summary judgment as to Alliance's first through fifth claims for relief*[28] *is denied.*

The Fenkell Parties have moved to dismiss the various ERISA claims contained in the first through fifth claims for relief. *See* Fenkell Mem. 25-50. Alliance has established that Fenkell violated various ERISA sections with regard to the fees paid by Stonehenge to DBF. I have held that Alliance may have a remedy against both Fenkell and his corporation, DBF, depending on the outcome of a trial on various affirmative defenses interposed by Fenkell. I have also held that any theory of liability predicated on Alliance's plan asset theory will be resolved at trial. I will therefore deny the Fenkell Parties' motion to dismiss Alliance's first through fifth claims for relief, under ERISA.

> ii. *Fenkell's motion for summary judgment dismissing Alliance's sixth claim for relief seeking declaratory judgment that Fenkell is not entitled to indemnification is denied.*

---

[28] Alliance's fist claim for relief against Fenkell alleges a breach of the fiduciary duties owed by Fenkell to the Alliance ESOP participants and beneficiaries pursuant to ERISA § 404. The Alliance parties allege that Fenkell acted in his own self-interest at the expense of, and to the detriment of, the Alliance ESOP participants and beneficiaries. The second claim for relief alleges violations of ERISA § 406(a). Alliance alleges Fenkell caused the Alliance parties to enter into contracts for services with parties in interest, which resulted in the transfer of plan assets to a party in interest, which caused the Alliance parties to engage in prohibited transactions. Alliance's third claim for relief alleges violations of ERISA § 406(b). Subsection (1) prohibits a fiduciary of an employee benefit plan from dealing with the assets of the plan in his own interest or for his own account. Subsection (2) prohibits a fiduciary from acting in a transaction involving a plan on behalf of a party whose interests are adverse to the interests of the plan, its participants, or its beneficiaries. Subsection (3) prohibits a fiduciary from receiving any consideration for his own personal account from any party dealing with the plan in connection with a transaction involving the assets of the plan. Alliance alleges violations of all three subsections. The fourth claim for relief alleges that DBF, among others, is liable for knowing participation in Fenkell's ERISA fiduciary violations, under ERISA § 502(a)(3). The fifth claim for relief alleges that DBF and other are liable as gratuitous transferees of plan assets, under ERISA § 502(a)(3).

I will deny the Fenkell Parties' motion for judgment dismissing Alliance's sixth claim for relief. Fenkell Mem. at 52-54. Under their sixth claim for relief, the Alliance Parties seek a declaratory judgment that Fenkell is not entitled to indemnification, under Alliance by-laws and his employment agreement, for his defense costs and attorneys' fees in the *Chesemore* action. Doc. No. 68, at 44-45. I have explained that Fenkell is not entitled to indemnification, under Pennsylvania law, for intentional misconduct, and that "Judge Conley made findings that Mr. Fenkell's fiduciary violations were the product of design and deliberation. *See Chesemore,* 886 F. Supp. 2d at 113, 1052-53. The *Chesemore* opinion is rife with findings of Mr. Fenkell's intentional state of mind." Doc. 510 at 2.

### iii. *Fenkell's motion for summary judgment dismissing Alliance's seventh claim for relief for contribution is denied.*

The Fenkell Parties assert that Alliance cannot sue Fenkell for contribution. Common law contribution may or may not be available, but Alliance is entitled to assert co-fiduciary liability against Fenkell for the $13 million Alliance paid to settle the *Chesemore* case, under 29 U.S.C. § 1105.[29] I will deny the Fenkell Parties' motion for summary judgment as to the seventh claim for relief.

### iv. *Fenkell's motion for summary judgment dismissing Alliance's eighth claim for relief for indemnification is denied.*

---

[29] Whether there is a federal common law right of contribution between co-fiduciaries under ERISA is an unsettled question. *See* note 22, *supra.* The statute itself provides for relief against a co-fiduciary, although its language does not track common law contribution principles. 29 U.S.C. § 1105.

ERISA limits indemnification among fiduciaries. *See* 29 U.S.C. §§ 1110, 1105. Whether a federal common law right of co-fiduciary indemnification exists under ERISA is unsettled. I have refused to extend such a federal common-law right of indemnification, if it exists, to a non-fiduciary sued for ERISA violations. *See Spear v. Fenkell*, CIV.A. 13-02391, 2015 WL 518235, at *4 (E.D. Pa. Feb. 6, 2015). I will reserve to trial, after sorting out the underlying liabilities upon which co-fiduciary liability might be based, whether I should use principles drawn from the common law of contribution and indemnification to define the nature and extent of the relief afforded under 29 U.S.C. § 1105(a). I will deny the Fenkell Parties' motion for summary judgment as to the plaintiffs' eighth claim for relief.

> ### v.  *Fenkell's motion for summary judgment dismissing Alliance's ninth claim for relief for fraud is denied.*

The Fenkell Parties ask me to grant summary judgment dismissing plaintiffs' ninth claim for relief, which sounds in fraud. Fenkell Mem. at 56. Fenkell argues that plaintiffs have not met their burden of establishing the elements of fraud by clear and convincing evidence. Fenkell Mem. at 56 (citing to *Blumenstock v. Gibson,* 811 A.2d 1029, 1034 (Pa. Super. Ct. 2002)). Alliance argues that, to the contrary, a wealth of facts developed during discovery demonstrate that Fenkell failed to tell the Alliance Compensation Committee about his true level of compensation, omitting, for instance, his DBF fees received from Stonehenge. Alliance Opp. at 121. Fenkell claims the pertinent information about his compensation was well known by everyone at Alliance who mattered. Fenkell Mem. at 57-58.

Under Pennsylvania law, "fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991). "The concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement." *Id.* There are genuine issues of material fact concerning Fenkell's disclosure, or lack of it, to the Compensation Committee, and as to his intent. *See* Alliance Opp. at 121-25.  There are also genuine issues of material fact about whether the facts of Fenkell's compensation were so well known to others that either Mr. Fenkell's intent to defraud, his duty to disclose, or Alliance's reliance on Fenkell's alleged omissions, are vitiated. Who knew what, and when, and issues of intent, are all the type of factual disputes that should be sorted out at trial. I will deny Fenkell's motion for summary judgment as to the plaintiffs' ninth claim for relief.

### vi. Fenkell's motion for summary judgment dismissing Alliance's tenth claim for relief for breach of fiduciary duties is denied.

The Fenkell Parties ask me to grant summary judgment dismissing the plaintiffs' tenth claim for relief sounding in breach of corporate fiduciary duties. Fenkell Mem. at 62. The Fenkell Parties' argument boils down to this: "[t]he record is replete with testimony of Mr. Fenkell regarding the good faith and diligence that he applied to the exercise of his corporate duties. . ." *Id.* at 63. The record is also replete with documentary and testimonial evidence about his fiduciary misdeeds. *See* Alliance Opp. at 126-27. As there are genuine issues of material fact surrounding the question whether Fenkell breached his fiduciary duties to Alliance, I will deny summary judgment.

> ### vii.   *Summary judgment is granted, dismissing Alliance's thirteenth and fourteenth claims for civil conspiracy.*

The Fenkell Parties ask me to grant summary judgment dismissing Alliance's thirteenth and fourteenth claims for relief. Fenkell Mem. at 63-64. The thirteenth claim for relief alleges that Fenkell and the Sefcovic Parties engaged in a civil conspiracy to commit fiduciary and ERISA violations. Doc. No. 68, at 56-57. The fourteenth claim for relief alleges a civil conspiracy between Fenkell, DBF and the Stonehenge defendants to pay excessive fees to Stonehenge and kickbacks to Fenkell, in violation of state law fiduciary standards and ERISA. Doc. No. 68, at 58-59.

As I discuss in more detail elsewhere,[30] under Pennsylvania law "[m]alice 'will only be found when the *sole* purpose of the conspiracy is to cause harm to the party who has been injured.'" *See Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 423 (E.D. Pa. 2014). Alliance has not made the requisite showing of unadulterated malice here. Fenkell was clearly motivated by his own financial gain, and his sole purpose was not to cause harm to Alliance, which benefitted financially from the 1999 ESOP loan transaction. I will therefore grant summary judgment as to the thirteenth and fourteenth  claims of relief.

> ### viii.   *Fenkell's motion for summary judgment dismissing Alliance's fifteenth claim for relief for unjust enrichment is denied.*

The Fenkell Parties ask me to grant summary judgment dismissing the fifteenth claim for relief. Fenkell Mem. at 64. Fenkell argues that there were employment contracts between the parties, so there can be no unjust enrichment remedy. *Id.* at 65 (citing to *Benefit Life Ins. Co. v. Union Nat'l Bank*, 776 F.2d 1174, 1177 (3d Cir. 1985)

---

[30] *See infra*, at 114 at section III of this opinion, dealing with conspiracy claims against the Stonehenge Parties.

(quoting *Schott v. Westinghouse Electric Corp.,* 259 A.2d 443, 448 (Pa. 1969)). The Alliance Parties point out that their claims extend outside the terms of the employment contracts, and that there is a dispute whether Fenkell had a valid contract. *See* Alliance Opp. at 127 (citing to *Grudkowski v. Foremost Ins. Co.,* 556 F. App'x 165, 170 n.8 (3d Cir. 2014); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 936 (3d Cir. 1999); *Batoff v. Charbonneau,* No. 12-05397, 2013 WL 1124497, at *9 (E.D. Pa. Mar. 19, 2013)). I agree with Alliance: its claims involve more than the employment contracts, and there is a legitimate dispute over whether the contract was valid. I will deny defendants' motion for summary judgment as to the fifteenth claim of relief.

> ix. *Fenkell's motion for summary judgment based on various statute of limitations theories is denied.*

The statute of limitations defenses in this case present fact issues that will be resolved at trial. I will therefore deny the Fenkell Parties' motion for summary judgment based on various statute of limitations theories. Fenkell Mem. 65-80.

## III.   ALLIANCE AND STONEHENGE

### a. *Fourth and Fifth Claims for Relief.*

Alliance's fourth claim for relief alleges that Stonehenge is liable for its knowing participation in Fenkell's fiduciary violations. This claim arises under *Harris Trust, discussed infra.* In its fifth claim for relief, Alliance alleges that the Stonehenge fees amounted to a gratuitous transfer of plan assets, because Stonehenge provided no value in exchange for the fees. This, Alliance alleges, violated 29 U.S.C. § 502(a)(3). *See* Alliance Mem. at 65. Stonehenge claims that Alliance cannot establish the necessary grounds for either claim. In support of this position, Stonehenge argues that 1) Alliance

cannot show that the Stonehenge Defendants participated, knowingly or otherwise, in a prohibited transaction, 2) the fourth and fifth claims for relief do not seek appropriate equitable relief, and 3) Alliance cannot establish the elements of the underlying prohibited transaction. *See* Stonehenge Mem. at 105. Alliance disagrees, stating that Stonehenge is liable, under the fourth and fifth claims for relief, because they received plan assets[31] and were knowingly participating in a prohibited transaction under ERISA. *See* Alliance Mem. at 65. Alliance explains further that not only were the Stonehenge Parties knowing participants, they were "co-schemers" who, with Fenkell's assistance, exploited the ESOP Structured Finance Program. *Id.* at 66.

 In *Harris Trust* the Supreme Court held that a fiduciary could pursue a claim against a non-fiduciary entity for knowingly participating in a transaction that was prohibited under ERISA. 530 U.S. at 241. The Court's opinion rested on its reading of 29 U.S.C. § 1132(a)(3), which provides that a civil action may be brought:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of [ERISA Title I] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations . . .

*Id.* at 246; 29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)). The Court reasoned that this section permitted an action by a defined class of individuals, "participant[s], beneficiar[ies], or fiduciar[ies]," to pursue  "appropriate equitable relief" against any person, not just against fiduciaries. *Id.* at 246-47. The Court construed section

---

[31] Alliance argues that while their plan asset argument is meritorious, the material facts show that Fenkell and Stonehenge violated ERISA Section 406(b)(3)'s prohibition regardless of whether the Alliance assets are plan assets. *See* Alliance Rep. Mem. at 5. Stonehenge complains that this is "a late hour switch," considering the positions advanced in the First Amended Complaint and various pleadings already presented to this Court. *See* Stonehenge Rep. Mem. at 20 n. 6 (citing Alliance Rep. Br at 1, 5, 23, 33-34). I will analyze the argument and resolve it.

1132(a)(3) (ERISA § 502(a)(3)) to permit an action against non-fiduciaries who "knowing[ly] particip[ate]" in a fiduciary breach. *See Harris Trust*, 530 U.S. at 248-49.

Stonehenge's primary argument is that it never received plan assets, because it was always paid by AH III, not Alliance Holdings or the Alliance ESOP. Stonehenge Mem. at 84. This, Stonehenge argues, means that it never "participated" in a fiduciary violation, in the sense required under *Harris Trust. Id.* at 105. The argument rests on the premise that *Harris Trust* liability only attaches if a non-fiduciary receives plan assets. I disagree. Receiving plan assets through a prohibited transfer is one way, but not the only way, a non-fiduciary can "knowingly participate" in a fiduciary violation. It happens to be the type of fiduciary violation at issue in *Harris Trust.* 530 U.S. at 241. By serving as the means through which Mr. Fenkell received the DBF fees in connection with the 1999 ESOP Loan Transaction, Stonehenge "participated" in Mr. Fenkell's violation of section ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

Section 1106(b)(3) prohibits a fiduciary of the plan from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." The language of section 406(b)(3) does not limit the prohibited consideration to receipt of plan assets. Nor does section 406(b)(3) require that the party that pays consideration to the fiduciary be a recipient of plan assets. Rather, to fall under the statute's ban, the consideration paid must be "in connection with a transaction involving assets of the plan," and the party paying the consideration must be "dealing with the plan" in connection with such a transaction. *See Iola*, 700 F.3d at 94 (noting 406(b)(3) "commands that fiduciaries 'shall not' receive consideration in connection with a transaction involving plan

assets").Section 502(a)(3) permits a fiduciary to obtain "appropriate equitable relief" against "*any act or practice which violates any provision* of [ERISA Title I] or the terms of the plan . . ." (emphasis supplied). The statute does not limit relief to only those violations involving receipt of plan assets by a non-fiduciary. As I held in section II of this Memorandum, Fenkell committed ERISA fiduciary violations in connection with his receipt of fees from Stonehenge.

The resolution of this preliminary point leaves several questions in its wake. First, did Stonehenge "knowingly" participate in a fiduciary breach, that is, was Stonehenge aware of facts that should have alerted it that Fenkell was committing fiduciary violations? Second, is there "appropriate equitable relief" available to Alliance against Stonehenge, if Stonehenge knowingly participated in Fenkell's violations? Third, are there any affirmative defenses, such as the statute of limitations, which would bar relief even if liability otherwise attaches?

I conclude there is a genuine issue of material fact that precludes summary judgment on the issue whether Stonehenge "knowingly" participated in Fenkell's breach of fiduciary duty, although there is evidence that Stonehenge knew or should have known that payments to DBF amounted to a kickback. I also conclude that there may be "appropriate equitable relief" available to Alliance, in the form of disgorgement and an accounting. I conclude as well that genuine issues of fact preclude summary judgment on the various affirmative defenses asserted by Stonehenge. These defenses turn on questions of knowledge and intent, and the factual disputes that attend them are genuine and material.

Finally, the parties have devoted a substantial amount of time to the question whether assets of Alliance Holdings or AH III were "plan assets." If Alliance's or AH III assets are "plan assets," both Fenkell and Stonehenge face more significant liability, and some of the defenses asserted by Stonehenge and Fenkell would tend to become less viable. I conclude that there are genuine issues of material fact that make summary judgment inappropriate.

> i. *Questions of fact exist whether Stonehenge knowingly participated in a breach of fiduciary duty.*

Stonehenge argues that they only provided investment banking services for a set fee, which "is legally insufficient to subject [them] to liability for relief under ERISA Section 502(a)(3)." Stonehenge Mem. at 117.

Under *Harris Trust*, liability only attaches to a non-fiduciary if they knowingly participated in a prohibited transaction. *See* 530 U.S. at 246. The participation prong, Stonehenge assures me, does not cover an individual who enabled or caused a prohibited transaction to occur. *See* Stonehenge Mem. at 118 (citing *Mellon Bank, N.A. ex rel. Weiss Packing Co., Inc. Profit Sharing Plan v. Levy*, 71 Fed. Appx. 146, 149 (3d Cir. 2003) (non-precedential)). But I find that is far too narrow a reading of *Mellon Bank*.

In *Mellon Bank*, Levy acted as a lawyer in a transaction involving a profit sharing plan. *See id.* at 147. One of the trustees of the plan sold property to the plan for $450,000. *Id.* The Plan took out a loan and mortgage against that property for $450,000. Before the deal went through, the bank requested that the plan provide it an opinion letter saying that state or federal law which could affect the bank's mortgage did

not prohibit the sale from the owner of the property to the plan, where he sat as a co-fiduciary. *Id.* Levy wrote the opinion letter, the bank accepted it, and the loan went through. *Id.* The loan was later found to have violated ERISA. *Id.*

The Third Circuit held that "[i]t is not alleged that Levy ever participated in the actual exchange of money for property, ever saw profit from the transaction, or ever possessed title or right to the property or money involved." *See id.* at 149. Stonehenge, by contrast, received "a number in the vicinity of $30 million" for its services. *See* Witten Dep. 187:4-5; *see also* Alliance Mem. at 13 (concluding that $34,475,553.72 was the total of the fees Stonehenge received vis-à-vis the Spread Deal). It is quite a stretch to argue that Stonehenge, which was paid $34 million for its part in facilitating the Spread Deal, is indistinguishable from an attorney who issued an ultimately incorrect opinion letter and got no share of the profits. Unlike the attorney in *Mellon Bank*, Stonehenge's fee was contingent on the profitability of the Spread Deal, and was paid through AH III via the same "waterfall" that generated fees for the ESOP and Alliance. *See* Stonehenge Mem. at 21 (citing Sept. 1, 1999 Fee Agreement).

*Mellon Bank*, which mentioned some factors that cut against a finding of "participation," did not hold that only those factors may define "participation," and no others. "Participation" means "[t]he act of taking part in something, such as a partnership, a crime, or a trial." Black's Law Dictionary (10th ed. 2014). "Participate" means to "take part in an activity or event." Compact Oxford English Dictionary (3d Ed., Rev'd, 2008). It is difficult to see how Stonehenge did not "participate" in the Spread Deal under the ordinary meaning of the word. A salesman who "actively assisted" a deal, and thereby earned commissions, was a "knowing participant." *See Iola*, 700 F.3d at 80.

Barrett, the salesman in *Iola*, did not receive trust assets. Stonehenge's active involvement in arranging and managing the deal, and its $34 million in fees, is not materially different than Barrett's commissions in *Iola*.[32]

Whether Stonehenge "knowingly" participated is a murkier question. *Harris Trust* requires actual or constructive knowledge of the facts that made the underlying transaction at issue unlawful. *See* 530 U.S. at 251.

The Third Circuit has held that actual knowledge[33] "requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists,

---

[32] Bogert on Trusts, cited to regularly by the Supreme Court when interpreting ERISA, *see, e.g., Amara*, 563 U.S. at 442, supplies these examples of knowing participation, a number of which (italicized below) do not involve direct receipt of trust property by the non-fiduciary:

> Thus liability as a participant has been decreed by reason of the following acts: *aiding the trustee to deceive the beneficiaries of an investment trust as to the financial stability of the trust;* unlawfully borrowing trust funds from the trustee; *unlawfully continuing the settlor's business in partnership with the trustee; persuading the trustee to pay an outlawed claim; inducing the trustee to make a non-legal investment;* paying the price of trust property to another than the trustee; paying trust funds over to a fiduciary with knowledge that he intended to misappropriate them; *aiding the trustee in a scheme to eliminate a beneficiary by foreclosure; assisting the trustee to buy realty for himself with trust funds;* taking part in a sale of the trust property to the trustee; *bribing the trustee;* as a contract creditor of the trustee accepting payment from the trustee when the trustee was known to be in default; *aiding the trustee to leave trust funds on deposit in a bank known to be insolvent; assisting the trustee to speculate with the trust funds or to use them for other illegal purposes.*

GEORGE G. BOGERT, GEORGE T. BOGERT, AMY M. HESS, THE LAW OF TRUSTS AND TRUSTEES § 901 (internal citations omitted).

[33] The Third Circuit was assessing the standards under the statute of limitations rules found in ERISA under 29 U.S.C. § 1113(2) and the "actual knowledge" requirement found in that statute. That section of the statute does not discuss "constructive knowledge," because "section 1113 calls for actual knowledge. Other ERISA limitations periods do not demand as much." *See Gluck*, 960 F.3d at 1176.

which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *See Gluck v. Unisys Corp.*, 960 F.3d 1168, 1177 (3d Cir. 1992) (internal citations omitted). A party has constructive notice where they "*should have known* of the existence of the trust and the circumstances that rendered the transder in breach of the trust." Harris Trust, 530 U.S. at 251 (emphasis supplied).

The parties have lined up a host of facts and arguments on either side of the question.[34] Alliance claims that Stonehenge obviously knew about what was going on:

> The Stonehenge defendants also say that they did not knowingly participate in Fenkell's violations. This assertion is predicated on Stonehenge's erroneous view that they had to have received plan assets for there to be a Section 406(b)(3) violation. *Id.* But just like Barrett in *Iola* and the defendants in *Lowen*, the Stonehenge defendants received fees or paid kickbacks to Fenkell, and therefore knowingly participated. They certainly had 'actual or constructive knowledge of the circumstances that rendered the transactions unlawful.' *Harris Trust*, 530 U.S. at 251. This is basic: do not do business by paying kickbacks. Particularly because Witten, a former law partner at Squire Sanders was both negotiating and designing the deal with Fenkell and guiding Stonehenge on legal matters.

*See* Alliance Opp. Mem. at 28.

There are genuine issues of material fact about whether Stonehenge and its agents actually or constructively knew of Fenkell's fiduciary breaches. The resolution of the issue will hinge, to a significant extent, on the credibility of witnesses at trial.

---

[34] *See* Stonehenge Mem. at 48 (noting that not only was Stonehenge not aware that the Alliance assets were plan assets, but "[n]one of Alliance Holdings' numerous professional advisors – including Deloitte, KPMG, BDO, McGladrey, Stout Risius Ross, or Crowe Horwath – ever advised Alliance Holdings or the ESOP that the assets of Alliance Holdings or AH III were assets of the ESOP."). Alliance points to emails and other declarations showing Stonehenge knew all about how to "split the pot" with Fenkell. *See* Alliance Opp. Mem. at 98.

> ### ii. *If Stonehenge knowingly participated in Fenkell's fiduciary violations, accounting and disgorgement are appropriate equitable remedies.*

*Harris Trust* held that ERISA relief against non-fiduciaries must be equitable and appropriate under the law. *See* 530 U.S. at 250. Equitable relief, under ERISA, means "something less than all relief." *See Great-West Life & Annuity Ins. Co v. Knudson*, 534 U.S. 204, 209 (2002). The Third Circuit has cautioned that calling damages an equitable remedy[35] does not make them so. *See Central States, Southeast and Southwest Areas Health and Welfare Fund v. Bollinger, Inc.*, 573 Fed. Appx. 197, 201-02 (3d Cir. 2014) (not precedential). Stonehenge argues that because it did not receive plan assets, no "appropriate equitable relief" is available. Stonehenge Mem. at 107. The Alliance Parties contend that disgorgement and equitable accounting are appropriate and available equitable remedies that would permit recovery. Alliance Opp. Mem. at 82-83.

Stonehenge cites to a line of cases that permit the restitution of trust assets in the hands of a transferee. Stonehenge Mem. at 107. But the fact that equitable relief is available in these cases does not prove that no equitable relief is available if the assets have been dissipated and are no longer in the hands of the transferee. The question is whether disgorgement and an accounting are appropriate equitable remedies, under the language of 29 U.S.C. § 1132(a)(3). The Supreme Court has interpreted the statute to permit only those remedies "typically" available from a court of equity before the equitable and legal jurisdictions of the federal courts were joined in 1938. *See Sereboff*

---

[35] This would include "using terms such as restitution, equitable lien, constructive trust, and declaratory judgment." *See Central States*, 573 Fed. Appx. at 201.

*v. Mid Atlantic Medical Services, Inc.,* 547 U.S. 356, 362 (2006); *Knudson,* 534 U.S. at 212; *Mertens v. Hewitt Associates*, 508 U.S. 248, 256 (1993).

In *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406 (3d Cir. 2013) the Court of Appeals held that "Edmonson's claim for disgorgement, which is akin to an accounting for profits, is an equitable remedy available under ERISA and *Great–West Life*." *Id.* at 420. That could end the discussion, but Stonehenge urges me to distinguish *Edmonson.*

The subject of what remedies qualify as "equitable" under *Knudson*[36] has engendered a great deal of uncertainty. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 440-42 (2011) (describing a variety of equitable remedies available under section 502(a)(3) in response to a lower court's uncertainty about the scope of relief); *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 465-66 (3d Cir. 2003) (Becker, J. concurring); John H. Langbein, *What ERISA Means By 'Equitable': The Supreme Court's Trail Of Error In Russell, Mertens, And Great-West*, 103 COLUM. L. REV. 1317 (2003).  The Supreme Court has often reiterated its test for what constitutes "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) (ERISA section 502(a)(3)):

> Our cases explain that the term "equitable relief" in § 502(a)(3) is limited to "those categories of relief that were *typically* available in equity" during the days of the divided bench (meaning, the period before 1938 when courts of law and equity were separate). *Mertens v. Hewitt Associates,* 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

*Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657 (2016) (emphasis in the original).

---

[36] The Supreme Court has cited to the *Great-West Life* case as "*Knudson." See Sereboff,* 541 U.S. at 362.

The Supreme Court's concerns about permitting damage-like remedies in equitable guise are well documented. *See Knudson*, 534 U.S. at 210. These concerns may be in tension with its "typically available in equity" test, when it comes to accounting and disgorgement. Nevertheless, the Supreme Court has endorsed accounting and disgorgement as an equitable remedy at least three times, without actually ruling on the subject. *Knudson,* 534 U.S. at 215 (quoting *Harris,* 530 U.S. at 250-51); *Mertens*, 508 U.S. at 262 ("Professional service providers . . . must disgorge assets and profits obtained through participation as parties-in-interest in transactions"); *see Edmonson*, 725 F.3d at 419 ("'an accounting for profits, a form of equitable restitution,' is a 'limited exception' to [the Supreme Court's] rule defining the nature of equitable remedies." (quoting *Knudson*, 534 U.S. at 214 n. 2).

Accounting, along with its cohort, disgorgement,[37] are equitable remedies that have a pedigree well predating 1938. *See S.E.C. v. Cavanagh*, 445 F.3d 105, 120 (2d Cir. 2006). The disgorgement remedy, and its logical predicate, an accounting, were available in equity not only before 1938 but before the founding of the United States. *Id.* The mid-18th century English cases analyzed in *Cavanagh* make it clear that an accounting and disgorgement were appropriate exactly when a trust *res* had disappeared, whether through waste or fraud.[38] *Id.* As *Cavanagh* explained, the remedy

---

[37] *See Edmonson,* 725 F.3d 406, 420.

[38] *Cavanagh's* analysis has been criticized, but the criticism is that the equitable remedy was available only in breach of fiduciary duty cases and only in instances of equitable waste. *See* Francesco A. DeLuca, *Sheathing Restitution's Dagger Under the Securities Acts: Why Federal Courts Are Powerless to Order Disgorgement in SEC Enforcement Proceedings,* 33 REV. BANKING & FIN. L. 899, 924 (2014). This criticism misses the mark, at least under ERISA law. The federal courts have used the "typically available in equity" test to make categorical distinctions between historically "legal" and "equitable"

is not "compensatory" in nature: "In the words of Judge Friendly, '[T]he primary purpose of disgorgement is not to compensate [victims]. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched.'" *Id.* at 117 (quoting *Securities and Exch. Commn. v. Cmmw. Chem. Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)); *accord S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) ("[d]isgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating" the law) (quoting *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989)).

Loss to the victim is not the measure or limit of a disgorgement remedy, in contrast with a compensatory damage remedy. *Cavanagh*, 445 F.3d at 117. The accounting and disgorgement remedies are designed to account to the trust for profit made through a fiduciary's misuse of trust assets. It forces a wrongdoer to disgorge the profit, even if the trust has suffered no loss – or perhaps made a lot of money – as a result of the breach of fiduciary duty. And the remedy is available against non-fiduciaries who knowingly participate in a fiduciary breach. *See Duncan*, 82 U.S. at 169 (a non-fiduciary was forced to account for the value of pledged shares he sold).

---

remedies, not to wrap an equitable remedy of conceded pedigree within a web of 18th century contextual gauze. *See Harris Trust*, 530 U.S. at 252 (rejecting the "unsupported suggestion that remedial principles of the common law are tethered to the precise contours of common-law duty."). Under *Mertens, Knudson*, and *Sereboff*, it suffices to know that equity permitted accounting and disgorgement against a non-fiduciary for participation in a fiduciary breach, when the trust *res* had been dissipated. *See Duncan v. Jaudon*, 82 U.S. 165, 169 (1872) (non-fiduciary forced to account for the value of shares he sold to pay off a personal loan to the trustee, where the shares had been wrongly pledged to the lender in breach of trust); *Haldane v. Duche's Ex'rs*, 2 U.S. 176, 178 (1792) (permitting an account in equity for rents paid to the wrong person).

Our Court of Appeals plainly held that accounting and disgorgement are available equitable remedies. *See Edmonson*, 725 F.3d at 419-20. In *Iola*, there were no traceable assets in the hands of a non-fiduciary, a salesman who had earned and distributed commissions generated by a transaction that violated ERISA; nevertheless the court approved a disgorgement remedy against him. *See* 700 F.3d at 102;[39] *Nat'l Sec. Sys., Inc. v. Iola*, CIV- 00-6293AET, 2007 WL 2868634, at *3 (D.N.J. Sept. 26, 2007), *aff'd in part, vacated in part sub nom. Natl. Sec. Sys., Inc. v. Iola*, 700 F.3d 65 (3d Cir. 2012) (denying summary judgment to the non-fiduciary, who claimed that there was no appropriate equitable remedy).

Stonehenge, in a supplemental memorandum, argues that the Supreme Court's recent opinion in *Montanile* undercuts the notion that disgorgement or accounting are available where there is no specific, traceable property in defendant's possession. *See* Stonehenge Defendants' Statement of Supplemental Authority, Doc. No. 563, at 2.[40] I do

---

[39] Stonehenge notes that I stated previously that damages were not available under a 502(a)(3) action, but only restitution. *See Spear v. Fenkell*, 13-cv-2391, 2015 WL 3643571, at *21 (E.D. Pa. June 12, 2015) (citations omitted); Stonehenge Mem. at 106. That sentence used restitution in its broad sense, to refer to equitable remedies generally. *See Edmonson,* 725 F.3d at 419 n.10. The point was that compensatory damages are not permitted, not that restitution, in the narrow sense, is the one and only available equitable remedy. The case cited, *Iola*, said that:

> the common law of trusts . . . had long countenanced suits for *restitution or disgorgement* against third parties who knowingly took trust property from a trustee in breach of the trustee's fiduciary duty.

700 F.3d at 89 (emphasis supplied) (citing to *Harris Trust*, 530 U.S. at 250). The language in my June 12, 2015 opinion did not take disgorgement or accounting off the table as available equitable remedies.

[40] The other parties responded to this letter brief. *See* Doc. No. 569 (Alliance's reply); Doc. No. 574 (Fenkell's reply).

69

not agree. *Montanile* concerned the enforceability of an equitable lien. 136 S. Ct. at 656. *Montanile* had nothing to say about a disgorgement remedy; certainly the Supreme Court did not overrule *Edmonson* explicitly. At best, Stonehenge can argue that the rationale of *Montanile* is in tension with accounting and disgorgement as equitable remedies, because by definition they are employed where trust assets have been dissipated. But that tension is nothing new. The Court in *Knudson* noted that accounting was an exception to its general rule that ERISA section 502(a)(3) allows recovery only against specifically identifiable assets subject to a trust or equitable lien. *Knudson*, 534 U.S. at 214 n. 2. In *Montanile* the Court did not retract or even address its language in *Mertens, Harris,* and *Knudson* endorsing accounting and disgorgement. Accounting and disgorgement neatly fit the Supreme Court's oft-repeated test: they were "typically available in equity." *Montanile,* 136 S. Ct. at 657.

I find that *Montanile* overruled neither the holding nor the rationale of *Edmonson*. Absent clear language from the Supreme Court overruling the holding or rationale of *Edmonson*, I must follow the Court of Appeals. *See United States v. Mitlo,* 714 F.2d 294, 298 (3d Cir. 1983) (quoting *Allegheny Gen. Hosp. v. NLRB,* 608 F.2d 965, 970 (3d Cir. 1979)); *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1508 (11th Cir. 1987). If Stonehenge knowingly participated in Fenkell's fiduciary violations, accounting and disgorgement may be appropriate equitable remedies.

### iii.   *Stonehenge's Defenses  Sounding in Prohibited Transactions.*

The Stonehenge Parties make a number of arguments that focus on ERISA's various definitional requirements concerning prohibited transactions. Stonehenge Mem. at 125.

70

- Stonehenge claims that AH III, not Fenkell, "caused" the payments to Stonehenge. *Id.* Since AH III is not a fiduciary, there can be no violation of ERISA Sections 406(a)(1)(C) and (D), both of which require that a fiduciary caused the plan to engage in a prohibited transaction. *Id.*

- The Stonehenge Parties claim that they are entitled to an exemption under ERISA Section 408(b)(2), because compensation was not paid by the plan, but by AH III. *Id.* at 126. Therefore, the argument runs, by definition they did not receive "more than reasonable compensation" from the plan, and are entitled to exemption under section 408(b)(2).

- Stonehenge claims it was never a "party in interest," and that because ERISA Sections 406(a)(1)(C) and (D) only prohibit transactions between the plan and a party in interest, there can be no liability. *Id.* at 126, n.42.[41]

- Stonehenge argues that there were no § 406(b)(3) violations because the "transactions that Plaintiffs challenge did not 'involve the assets of the plan.'" Stonehenge. Mem. at 128. Since the statute only covers transactions

---

[41] Stonehenge also argues that there were no § 406(b)(3) violations because the "transactions that Plaintiffs challenge did not 'involve the assets of the plan.'" Stonehenge. Mem. at 128 (citing to 29 U.S.C. § 1106(b)(3)). This seems is an iteration of the "plan assets" argument, already dealt with, but I will reiterate that (a) the "plan assets" argument cannot be resolved on summary judgment and (b) the various facets of the 1999 ESOP Loan Transaction were all part of one "transaction," the entirety of which involved "assets of the plan." *See* discussion at p. 24 of this opinion. Stonehenge also argues that there was no connection between Fenkell's receipt of consideration and the ESOP's participation in the transaction. I have rejected this argument, and found that the DBF fees were received by Fenkell in consideration of the 1999 ESOP Loan Transaction, at least in part.

involving assets of the plan, Stonehenge argues there can be no liability. *Id.*

- Stonehenge argues that Fenkell was wearing another "hat," not that of an ERISA fiduciary, when he authorized payments to Stonehenge out of AH III assets. *Id.* at 131-32. Thus, the argument goes, the ERISA fiduciary did not cause the transaction; hence, there can be no liability under section 406(b)(3).

- Stonehenge argues that there was no connection between Fenkell's receipt of consideration and the ESOP's participation in the transaction. *Id.* at 133.

I will address each of these arguments in turn.

1. *Questions of fact exist whether Fenkell, as a fiduciary, caused the plan to engage in unlawful transactions* in violation of *Section 406(a)(1)(C) and (D).*

To prove a section 406(a)(1)(C) or (D)[42] violation, "a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction." *See Lockheed Corp. v. Spink*, 517 U.S. 882, 888-89 (1996) (citing ERISA § 3(21)(A)). Stonehenge claims that "because AH III's three-member Board of Directors, rather than Mr. Fenkell individually, authorized all payments to Stonehenge, Mr. Fenkell cannot be deemed to have 'caused' any violation of ERISA Section 406(a)(1) in connection with payments to

---

[42] In section II of this memorandum, I held that there was no genuine issue of material fact that Fenkell violated ERISA section 406(a)(1)(D). My opinion in that regard is limited to liability arising from Fenkell's actions in negotiating and concluding the 1999 loan transaction and the Stonehenge/DBF fee agreement. *See supra*, at 34-35. Alliance's theory of liability, and Stonehenge's motion for summary judgment, deal with much more, including Fenkell's activities over the years in authorizing payments by AH III.

Stonehenge." Stonehenge Mem. at 125. There are two reasons why this argument does not succeed. First, "cause" is a remarkably broad word. Stonehenge points to action of the AH III board in approving Stonehenge fees, as if that action conclusively ends any other causal inquiry. But the AH III board's discretion was bound to a remarkable degree by the 1999 ESOP Loan documents. If the requisite representations or payments were made, AH III had to approve the disbursal of fees in accordance with the Loan Documents. It could not have been otherwise: the ESOP depended upon the distribution of fees in order to pay the Bank. The Bank was not interested in having the AH III board exercise discretion in making disbursements from the income earned through the Participation Interests. AH III was little more than a vending machine. Certain inputs generated certain outputs. The question of causation must go behind AH III to the 1999 ESOP loan documents.

Fenkell negotiated the 1999 ESOP loan deal. He caused the ESOP, Alliance, and AH III to enter into the deal. He signed the loan documents for all three of them. In the broad sense of the word, there is a genuine issue of material fact whether Mr. Fenkell "caused" the payments to Stonehenge. The issue must be resolved at trial.[43]

> 2. *Questions of fact exist whether the payments to Stonehenge are entitled to exemption under ERISA Section 408(b)(2).*

---

[43] Alliance points out that 1) there is a fact question whether AH III assets were "plan assets" 2) there are facts that suggest Fenkell controlled the AH III board, and that any action taken by that board was at his direction. *See* Alliance Mem. at 6 (citations omitted). I need not rule on this argument, as I have already found the causation issue requires a trial.

Stonehenge also claims that they are entitled to an exemption under ERISA Section 408(b)(2), because compensation was not paid by the plan, but by AH III. *Id.* at 126. Section 408(b)(2) provides that the prohibitions of Section 406 are inapplicable to "reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." *See* 29 U.S.C. § 1108(b)(2). Stonehenge argues that even if it was deemed to have provided services to the ESOP, and as a consequence to have been a party in interest, it was paid by AH III, and thus not by "a plan." *Id.* at 126.  Stonehenge argues that "reasonable compensation," under Section 408(b)(2), means compensation paid by a plan, not by a party to an agreement. *See id.* (citing *Iola*, 700 F.3d at 95; *Lowen,*829 F.2d at 1216 n. 4 (2d Cir. 1987)). The result, Stonehenge argues, is that it is entitled to the exemption under Section 408(b)(2) as a matter of law, because Stonehenge did not receive "more than reasonable compensation" from *the plan. Id.* at 126-27.

Stonehenge's argument is not convincing. Section 406(a) provides that a plan fiduciary "shall not *cause the plan* to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities *between the plan* and a party in interest" (emphasis supplied). While Section 408(b)(1) provides an exemption for "loans made by the plan" under certain circumstances, Section 408(b)(2) exempts "reasonable arrangements with a party in interest[,]" to provide services for the "establishment or operation of the plan," without specifying that the plan be a party to the "reasonable arrangements[.]" 29 U.S.C. § 1108(b)(2); ERISA Section 408(b)(2). *Iola* did not hold that Section 408(b)(2)

74

contains an independent requirement that reasonable compensation be paid by a plan, not some other entity. And if Section 408(b)(2) did have such a requirement, the effect would be to make the exemption provision inapplicable *except* when compensation was paid by a plan. *See Lowen*, 829 F.2d at 1216 (Section 408 "does not exempt the fees and other compensation that defendants received from companies in which the Plans' assets are invested."). This exactly contradicts Stonehenge's argument, and is consistent with the Third Circuit's holding, in *Iola,* that Section 408 is not a broad ranging, stand-alone exemption for "reasonable compensation." *See Iola,* 700 F.3d at 95.

Stonehenge's argument is not only gainsaid by the statute's language. Stonehenge claims that it did not provide any services to the plan other than the initial work on the funding transaction in 1999. *See* Stonehenge Mem. at 58-59, 126 n. 42. Yet an August 27, 1999 letter plainly contradicts this narrative. The letter identifies Stonehenge as "an advisor to Alliance Holdings, Inc., the Plan,[44] and Alliance SPE ('Alliance') in structuring, maintaining and implementing the Alliance Holdings ESOP Structured Finance Program on an ongoing basis until such time as Alliance and the Banks elect to terminate such Program." *See* Exhibit 153 Stonehenge Mem., Aug. 27, 1999 Lt. Agr. at 2. The letter goes on to say that "Stonehenge agrees that it will continue to provide consulting and advisory assistance to Alliance and Finance One, as requested by either or both of them from time to time in order to implement the Alliance Holdings ESOP Structured Finance Program and to restructure or modify such program from time to time." *See* Exhibit 153 Stonehenge Mem., Aug. 27, 1999 Lt. Agr. at 2. The letter also

---

[44] Defined in the deal documents as "Alliance Holdings, Inc. Employee Stock Ownership Plan and Trust." *See* Exhibit 153 Stonehenge Mem., Aug. 27, 1999 Lt. Agr. at 1.

stated that "Alliance shall cause AH III to pay Bluestone Investors, L.P. . . ., an affiliate of Stonehenge, the Initial Fee, the Contingent Fee, and the Success Fee. *See* Exhibit 153 Stonehenge Mem., Sept. 1, 1999 Lt. Agr. at 2.

The letter alone would create a triable issue of fact. Alliance also claims that AH III assets were plan assets and that Stonehenge's fees were not "reasonable arrangements" involving "reasonable compensation." All these issues should be resolved at trial, not on summary judgment.

> 3. *Questions of fact exist whether Stonehenge was a party in interest under ERISA Section 406(a)(1).*

ERISA § 406(a)(1) imposes liability on a fiduciary for engaging in a set of prohibited transactions with a party in interest, unless the transaction comes under an exception in ERISA § 408. 29 U.S.C. § 1106(a)(1)(A)-(E). "Prohibited Section 406(a) transactions between a plan and a party in interest are those 'commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length.'" *Danza v. Fid. Mgt. Trust Co.*, 533 Fed. Appx. 120, 125 (3d Cir. 2013) (non-precedential) (quoting *Lockheed Corp.*, 517 U.S. at 893). Both a fiduciary and a party in interest may be liable for a prohibited transaction under ERISA Section 406(a)(1).[45] Stonehenge argues that it "did not provide any services to the ESOP

---

[45] Liability of the fiduciary arises directly under Section 406(a)(1), while a party in interest's liability depends upon whether it was a "knowing participant" under Section 502(a)(3). *See Spink,* 517 U.S. at 889 ("[a] party in interest can be held liable for Section 406(a) transactions and be required to disgorge its profits under the remedy provisions of Section 502(a)(3).") While *Spink* held that a fiduciary must be the individual who caused the unlawful transaction under Section 406(a), *see* 517 U.S. at 889, "[a] party in interest can be held liable for Section 406(a) transactions and be required to disgorge its profits under the remedy provisions of Section 502(a)(3)." *Id.; see Danza v. Fidelity Mgmt. Trust Co.*, 533 Fed. App'x. 120, 125 (3d Cir. 2013). Parties in interest under

after the 1999 refinancing and, thus, was not in fact a 'party in interest' under ERISA." *See* Stonehenge Rep. Mem. at 63 (citations omitted).[46]

The question is whether Stonehenge provided services to the plan and received payment from plan assets,[47] notwithstanding the fact that it was paid by AH III. Stonehenge's services a) were contemplated and intended by the ESOP when it negotiated the 1999 funding transaction; b) benefitted the ESOP by facilitating the continued "waterfall" of money under the 1999 funding transaction; c) were paid for out of the same waterfall. The statute provides for liability whether the transaction was "direct or indirect[.]" 29 U.S.C. § 1106(a)(1). Whether Stonehenge provided services directly or indirectly to the plan is a question for trial.

4.  *Questions of fact exist whether Stonehenge's payments came out of plan assets.*

Stonehenge argues that under 29 U.S.C. § 1106(b)(3), no violation occurred because the transactions at issue did not implicate plan assets. *See* Stonehenge Mem. at 128. This is another invocation of the "plan assets" argument, already dealt with. I reiterate that (a) the "plan assets" argument cannot be resolved on summary judgment and (b) the various facets of the 1999 ESOP Loan Transaction were all part of one "transaction," the entirety of which involved "assets of the plan." *See* discussion at p. 24 of this opinion and at page 91-100 of this opinion.

_____

ERISA include (among others) fiduciaries and their employees and a person providing services to the plan and their employees. *See* 29 U.S.C. § 1002(14).

[46] In their initial briefing, Stonehenge reserved the right to challenge these alleged prohibited transactions on the grounds that they were not "parties in interest." *See* Stonehenge Mem. at 126 n. 42.

[47] Alliance claims that AH III assets were plan assets, a claim I have previously noted must be tried.

5. *Questions of fact exist whether Fenkell was acting as an ERISA fiduciary, under ERISA Section 406(b)(3), when he approved fees to be paid from AH III to Stonehenge.*

Stonehenge argues that Fenkell was not acting in his role as a fiduciary when he acted as an AH III board member to approve fees to Stonehenge. Stonehenge Mem. at 131 (citing to *Payonk v. HMW Industries, Inc.,* 883 F.2d 221, 225 (3d Cir. 1989). But this is wrong. The premise of Stonehenge's argument is that there are reasons other than its "plan assets" argument that warrant summary judgment. *Id.* at 125 ("independent of the plan assets issue, Plaintiffs cannot establish that any prohibited transactions . . . occurred."). Under this premise I must assume that there is a fact issue about whether AH III assets were "plan assets." There is no question that Fenkell, as an AH III board member, was acting as a fiduciary with respect to AH III assets. If there is a fact issue about whether AH III assets were plan assets, then there is a fact issue about whether Fenkell was acting as a "functional" fiduciary concerning assets of the plan when he approved payment of Stonehenge fees out of AH III assets. *See* 29 U.S.C. § 1002(21)(A); *Pegram*, 530 U.S. at 225-26. Summary judgment is not appropriate.

6. *There was a connection between Fenkell's receipt of consideration from Stonehenge and the ESOP's participation in the 1999 ESOP Loan Transaction.*

Stonehenge insists that because there was no connection between David Fenkell's compensation from Stonehenge and the Spread Deal, no 406(b)(3) violation occurred. *See* Stonehenge Mem. at 133. This argument is grounded in Department of Labor regulations that require a cognizable connection between the fiduciary's receipt of money and the fiduciary's decision to allow the plan to participate in the transaction. *See id.* at 133-34 (citing 45 Fed. Reg. 51194-95) (additional citations omitted).

78

Stonehenge notes that the ESOP participated in the Spread Deal only by entering into the 1996 loan agreement and then refinancing those loans in 1999. *Id.* at 134. Alliance seeks to draw a connection between the DBF Consulting agreement and the fees paid to Stonehenge, but that is improper, according to Stonehenge, because the ESOP never paid Stonehenge's fees: AH III did. *Id.* (citations omitted). Stonehenge insists that Alliance has never alleged a connection between David Fenkell receiving money through DBF Consulting and the Alliance ESOP's participation in the 1996 deal or the 1999 refinancing. *Id.*

Alliance relies on *Lowen* in addressing this argument. They write that this situation, where a number of corporate forms are used to mask some wrongdoing, is precisely what *Lowen* contemplated: "[a]s *Lowen* makes clear, ERISA violators cannot hide behind convenient corporate formalities to defeat ERISA's protections of benefit plan participants." *See* Alliance Opp. at 26. Factually, Alliance alleges the Stonehenge defendants always knew that they were receiving so-called "ESOP fees" from the 1996 deal, and regularly discussed their splitting of those funds with Fenkell, DBF Consulting, and Alliance. *Id.* at 27; *see also id.* at 26 n. 17 (citing Purchase Agreement And Consulting Agreement (Dkt. 502-34, Ex. 204, SP0002626 *et seq.*)).

I have rejected Stonehenge's argument in Section II of this Memorandum, and found that Fenkell violated various ERISA provisions by negotiating and accepting the DBF fees in consideration of the 1999 ESOP Loan Transaction. *See supra* at 20-36. What remains for trial is whether Stonehenge "knowingly participated" in these fiduciary violations. That question will likely implicate a variety of evidence, such as the various corporate convolutions, the particulars of each deal, statements in emails and

other documents, and any number of other facts that can be brought to bear on the question of whether Stonehenge "knowingly participated" in Fenkell's fiduciary violations. This is a question that must be left for trial.

### b. *Questions of fact exist whether Stonehenge is liable as a gratuitous transferee of plan assets under Alliance's fifth claim for relief.*

Stonehenge has moved for summary judgment as to Alliance's fifth claim for relief, arguing that neither the company, nor the individual defendants, were gratuitous transferees of plan assets. *See* Stonehenge Mem. at 134. A bit of background is necessary to assess this claim.

#### i. *The origin of the gratuitous transferee theory.*

In a footnote to their memorandum, the Alliance Parties explain the theory of liability in their fifth claim for relief. Alliance Mem. at 67, n.42. They read *Harris Trust* to provide for a cause of action against a non-fiduciary who takes trust property without providing value. *Id.* (citing to *Harris Trust,* 530 U.S. at 250). This theory of liability is premised on a transfer of trust assets. *Id.* Thus, unless Stonehenge received plan assets, the liability theory is not applicable. The argument is that a third-party recipient of trust property who supplies no value for the property is liable to the trust in equity, even if the recipient was entirely unaware of the breach of trust. *See, e.g.,* Restatement (Second) of Trusts § 289 (1959).

Stonehenge argues that it 1) never received plan assets, 2) the Alliance Parties have not met their tracing burden, and 3) no underlying prohibited transaction ever

occurred. *Id.* These arguments have been dealt with.[48] I will focus on Stonehenge's alternative basis for relief: that because Stonehenge concededly provided *some* value, it cannot be held liable under Alliance's gratuitous transfer theory. In support, Stonehenge cites to the Restatement (Second) of Trusts, under which Stonehenge would be liable only if it provided no value for plan assets it received. *See id.* at 135 (citing §289 cmt. a (1959)).[49]

Stonehenge points to record evidence that shows it provided at least some value. For instance, Stonehenge identified lenders, secured a new asset pool of auto receivables, calculated the cash flow yield of various assets in that pool, persuaded bank personnel to participate in the transaction, and took a number of other actions to encourage the success of the Spread Deal. *See* Stonehenge Mem. at 135-36 (internal citations omitted). Alliance acknowledges that the Stonehenge services were worth approximately $100,000 to $250,000 per year. *See* Mittelman[50] Rep. at 16. In consequence, Stonehenge argues, any money it received, regardless of the money's plan assets status, could not be considered a gratuitous transfer under Restatement § 289.

---

[48] 1) There are material facts that require trial on the plan assets argument; 2) accounting and disgorgement provide equitable remedies where the trust *res* has been dissipated; 3) I have found that Fenkell engaged in some prohibited transactions, while some prohibited transaction allegations require a trial.

[49] "If the trustee in breach of trust transfers trust property and no value is given for the transfer, the transferee does not hold the property free of the trust, although he had no notice of the trust." Restatement (Second) of Trusts § 289 (1959).

[50] Michael Mittelman was an expert witness retained by Alliance. His "expert report concentrates on compensation paid by Alliance Holdings, Inc. and A.H. III, Inc. to Stonehenge Financial Holdings, Inc. and whether this compensation was commensurate with or was justified by the services provided by Stonehenge Financial Holdings, Inc. from 1999-2011." *See* Mittelman Rep at 1.

Alliance argues that the Stonehenge defendants have failed to satisfy their burden that they provided "value" in exchange for receipt of plan assets, and have failed to prove they were without notice of a fiduciary breach. *See* Alliance Opp. at 93 (citing *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1383 (3d Cir. 1994)). Alliance also argues that because all inferences must be drawn in favor of the non-moving party, Stonehenge should lose. *See id.* at 94 (citing *Kowalski v. L&F Prods.*, 82 F.3d 1283, 1288 (3d Cir. 1996)).

### ii.   What does "no value" mean?

Stonehenge has come forward with facts that demonstrate it provided some value. *See* Stonehenge Mem. at 137 (citing Mittelman Rep. at 16). Alliance argues that the value provided by Stonehenge was a fraction of the fees Stonehenge took, and brought no value to Alliance. *See* Alliance Opp. at 95 n. 59. Alliance also argues that the kickback scheme by which David Fenkell received $4 million "infects the whole transaction and [Stonehenge's] purported rendering of services."[51] *See id.* at 94.

Alliance does not cite much in the way of convincing authority. *See id.* at 94 n. 57. Stonehenge argues that the opinions cited by Alliance are inapposite, because the cases refer to Pennsylvania's inheritance tax and the meaning of "reasonably equivalent value" under the Bankruptcy Code. *See* Stonehenge Rep. Mem. at 54 n. 42 (citing *Estate of*

---

[51] Alliance's "infection" argument makes some sense, but Alliance has not provided any authority that illustrates how the argument would play out in practice. I suspect the answer lies in the doctrine of unclean hands, which can be applied to bar a defense as well as a claim. *See Seller Agency Council, Inc. v. Kennedy Ctr. for Real Est. Educ., Inc.*, 621 F.3d 981, 986-87 (9th Cir. 2010); *Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*, 679 F. Supp. 2d 512, 521-22 (D. Del. 2010). This issue will have to wait for trial.

*Beck*, 414 A.2d 65, 69 (Pa. 1980); *In re Riley*, 305 B.R. 873, 882 (Bankr. W.D. Mo. Jan. 29, 2004)).

The Restatement (Second) of Trusts states that: "The interest of the beneficiary in the trust property is not cut off by a transfer by the trustee in breach of trust to a third person if *no value* is given for the transfer, although the transferee had no notice that the transfer was in breach of trust; and the beneficiary can in equity compel the third person to restore the property to the trust. *See* Restatement (Second) of Trusts § 289 cmt. a (emphasis added). Stonehenge is linguistically correct: "some value" is not the same as "no value." Alliance's expert admitted that the services Stonehenge performed would amount to approximately $100,000 to $250,000 per year. *See* Stonehenge Mem. at 137 (citing Mittleman Rep. at 16).

If Stonehenge's argument is correct, a dollar of value would kill a gratuitous transfer claim because it was more than "no value." Alliance points to several cases, among them *Hans*, in which the District of North Dakota held that the transferee had to prove the value amounted to "adequate consideration." *Hans,* 3:05-CV-115, 2011 WL 7179644, at *16. This is *dicta; Hans* turned on whether the transferee had notice, not on whether the transferee provided value. *Keach*, cited to in *Hans* and cited to by Alliance, phrased the test as whether "the transaction was not gratuitous but rather involved more than nominal consideration[.]" *Keach v. U.S. Trust Co., N.A.*, 244 F. Supp. 2d 968, 974 (C.D. Ill. 2003).[52]

---

[52] Alliance also cites to a bankruptcy case that held that a 70% return on the value of a transferred asset was not "manifestly inadequate," and did not show a fraudulent conveyance. *See In re Riley*, 305 B.R. 873, 882 (W.D. Mo. 2004). The fact that Alliance

The Supreme Court has relied on the Restatements[53] to provide insight into equitable principles at play under ERISA. *Harris Trust*, 530 U.S. at 250; *see also Knudson*, 534 U.S. at 217 (calling for recourse to the Restatements to flesh out the contours of equitable remedies under ERISA). At common law, the bona fide transferor defense required 1) an exchange for value 2) a lack of knowledge of a breach of trust and 3) abstention from knowing participation in an illegal transaction. Restatement (Second) of Trusts § 284(1) (1959) ("a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction").

Section 289[54] of the Restatement says that:

> If the trustee in breach of trust transfers trust property and *no value* is given for the transfer, the transferee does not hold the property free of the trust, although he had no notice of the trust.

(Emphasis supplied).

Section 289 cross-references to Section 298 for a definition of value. Section 298 says that "[i]f money is paid or other property is transferred or services are rendered as

---

is citing to a fraudulent conveyance case out of the Western District of Missouri confirms my view that authority on the subject is limited.
[53] Stonehenge references various Restatements. In addition to discussing the Restatement (Second) of Trusts, Stonehenge in its reply also cites to Restatement (First) of Restitution. *See* Stonehenge Rep. Mem. at 53.
[54] Cases citing to Section 289 are of limited value. *See Otis v. Otis*, 45 N.E. 737, 737 (Mass. 1897) (a constructive trust may be imposed on people who receive funds from a trustee without consideration); *see also Demoulas v. Demoulas Super Markets, Inc.*, 677 N.E.2d 169, 190 (Mass. 1997) (same); *United States v. Parcel of Land, Bldgs., Appurtenances and Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 142 (1993) ("a transferee who acquires property from a good-faith purchaser for value or one of his lawful successors obtains good title, even if the transferee did not *pay value* or act in good faith.") (emphasis added) (citations omitted); *see Viewcrest Co-op. Ass'n, Inc. v. Deer*, 422 P.2d 832, 834 (Wash. 1967) (a constructive trust may be placed on a defendant who misappropriated funds and disbursed them for no consideration). None of these cases precisely answers the question in this case.

84

consideration for the transfer of trust property, the transfer is for value." Restatement

(Second) of Trusts § 298 (1959). Comment (*i*) to Section 298 goes on to say this:

> *Adequacy of consideration.* The transfer is for value although the consideration
> is of less value than the trust property. The difference in value, however, may be
> evidence that the transferee had notice that the transferor was committing a
> breach of trust in making the transfer.
>
> The fact that the value of the consideration is insignificant as compared with the
> value of the trust property is evidence that the transaction was not a bargain but a
> gift.

*Id.,* comment (*i*). Comment (*i*) seems to draw a distinction between consideration that is

of "less value than the trust property" and consideration that is "insignificant."

Consideration of "less value" does not disqualify the transfer on grounds that it had "no

value," under Section 289, but may be "evidence that the transferee had notice that the

transferor was committing a breach of trust in making the transfer." Consideration that

is "insignificant," by contrast, may be proof that "the transaction was not a bargain but a

gift." It seems "insignificant" consideration is something different from consideration of

"less value:" the first is evidence of a gratuitous transfer, while the second is not, but the

second can be evidence that the transferee had notice of a breach of trust.

    *Keach* and the Restatement[55] appear to agree. If the consideration provided by

Stonehenge was "nominal" or "insignificant," the fees paid to Stonehenge may constitute

---

[55] Though helpful, the Restatements cannot be dispositive. *See generally* Kristen David
Adams, *Blaming the Mirror: The Restatements and the Common Law,* 40 IND. L. REV.
205 (2007) (collecting criticisms of the various Restatements); *cf. Tincher v. Omega
Flex, Inc.*, 104 A.3d 328, 354 (Pa. 2014) ("Moreover, because the language of a provision
of the restatement, even to the extent it was adopted by the Court verbatim, has not
been vetted through the crucible of the legislative process, a court applying the
restatement formulation should betray awareness that the language of an adopted
restatement provision is not considered controlling in the manner of a statute.")
(quotations omitted).

a gratuitous transfer. If the services were merely of less value than the fees paid, that fact may tend to prove that the transferee knew of the fiduciary breach, but cannot serve as a basis of liability on its own, without proof of knowing participation.

### iii.   The burden of proof.

The next question is who has the burden of proving that the trust assets were conveyed for a nominal or insignificant price. The answer to the question "is about as clear as mud." *Keach*, 244 F. Supp. 2d at 972. *Harris Trust*, the foundation upon which this theory of liability must be based, explicitly reserved decision on who bore the burden of proof. 530 U.S. at 251 n.3. Carefully examining *Harris Trust*, as well as trust law sources, the court in *Keach* made a case for imposing the burden of proof on the defendant to show that trust property was exchanged for "value," once the plaintiff proved a transfer in breach of trust. *Keach,* 244 F. Supp. 2d at 972-76. The court in *Keach* went on to hold that if the defendant met this burden, then the burden of proof reverted to the plaintiff to prove that the defendant took the trust property knowing of the breach of trust. *Id.* at 974; *see Carlson v. Principal Fin. Group*, 320 F.3d 301, 308 (2d Cir. 2003) (in an ERISA case, imposing the burden of proving knowledge on the plaintiff); *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 132 (S.D.N.Y. 1999), *aff'd,* 205 F.3d 1321 (2d Cir. 2000) (same).

The rule in *Keach* attempts to balance the historical allocation of the burden of proof (on the defendant) with language in *Harris Trust* that suggests that the plaintiff must prove "knowing participation" under § 1132(a)(3). As the court in *Keach*

concluded, the line in *Harris Trust* – that "the transferee must be demonstrated to have

had actual or constructive knowledge" –

> would be nonsensical if the party-in-interest had the burden of proof on this
> question; if that were the case, one would reasonably have expected the
> requirement to have been stated in the negative, such as "the transferee must
> demonstrate that it did not have actual or constructive knowledge."

244 F. Supp. 2d at 974 (quoting *Harris Trust*, 530 U.S. at 251).

At common law, the trust applied to assets transferred in breach of trust unless

the transferee established the defense of bona fide transferor for value without notice.

*See* Restatement (Second) of Trusts § 304 (1959). Whether the transferee gave value, or

knew of the breach, was a matter of affirmative defense, and the burden rested with the

defendant. *See Volante,* 16 F.3d at 1383-85. *Volante*, cited by Alliance, was not an

ERISA case.  It involved goods subject to a trust under The Perishable Agricultural

Commodities Act of 1930 ("PACA"). *See* 16 F.3d at 1377-79. While the Third Circuit

relied on the Restatement (Second) of Trusts throughout the opinion in resolving

questions of liability, *see, e.g.*, *id.* at 1380 (citing § 304); 1383 (citing § 297(a)), *Volante*

did not actually address the argument Stonehenge is making. In *Volante* there was no

dispute that the lender had given value for the trust property. *Id.* at 1380. The case

turned on the lender's knowledge of the breach of trust. *Id.* at 1384. *Volante* does not

actually explain why Stonehenge should bear the burden of proving it paid more than

nominal or insignificant value. *Id.* at 1383.

The language in *Harris Trust* cited to by the Court in *Keach* does seem to place

the burden on plaintiff to prove that the transferee had knowledge of the breach of trust.

*See Keach*, 244 F. Supp. 2d at 973-74. There is no guidance on the burden of proving a

gratuitous transfer, because there was no question of gratuitous transfer in *Harris*. The

burden shifting scheme proposed in *Keach* works if liability for the asset transfer is treated as one cause of action, as it was in *Keach*. *See id.* at 976-77. The problem here is that Alliance has attacked the asset transfer via two causes of action, one seeking to prove that Stonehenge was a knowing participant in the breach of trust (fourth claim for relief), the other seeking to prove that the transfer was gratuitous (fifth claim for relief). This is not unreasonable. As an equitable defense, defendant had to prove *both* that the transfer was for value *and* that defendant had no knowledge of the breach. This meant plaintiff could defeat the defense by disproving either of the two elements. If *Harris Trust* meant to cast the issue as a cause of action, plaintiff need prove only one or the other fact to trigger liability: *either* there was no value, *or* defendant had knowledge of the breach.

Alliance's theory responds to Judge Conley's observations, in *Chesmore*, about Karen Fenkell's potential liability as a gratuitous transferee. *See Chesmore v. Alliance Holdings*, No. 09-cv-413-WMC, 2013 WL 6989526, at *1 (W.D. Wis. Oct. 16, 2013).  In *Chesmore*, Karen Fenkell filed a motion to dismiss any gratuitous transferee liability as a result of money that was shifted from David Fenkell's accounts to her accounts following the Trachte deal in 2007. *Id.* In denying the motion to dismiss, Judge Conley refused to modify his previous interpretation of *Harris Trust* liability. *Id.* at *4; *see Chesmore v. Alliance Holdings, Inc.*, 284 F.R.D. 416, 421 n.5 (W.D. Wis. 2012).[56]

---

[56] In a previous opinion, Judge Conley relied on language from *Harris Trust* to conclude that proof of a gratuitous transfer obviated the need to prove that the transferee had knowledge of the breach of trust. *Id.* Judge Conley pointed to two passages from *Harris Trust*:

Because Karen Fenkell performed no services at all, the judge refused to dismiss a gratuitous transfer claim leveled against her by the *Chesemore* plaintiffs. *Id.* The situation is not so clear cut here: Stonehenge provided *some* services. *See* Stonehenge Mem. at 34-35 (citations omitted).

The Court of Appeals has identified five factors I must weigh when allocating the burden of proof under a statutory scheme:

> (1) whether the defense is framed as an exception to a statute's general prohibition or an element of a prima facie case; (2) whether the statute's general structure and scheme indicate where the burden should fall; (3) whether a plaintiff will be unfairly surprised by the assertion of a defense; (4) whether a party is in particular control of information necessary to prove or disprove the defense; and (5) other policy or fairness considerations.

*Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 361 (3d Cir. 2015). The challenge in applying the *Evankavitch* factors to this case is that ERISA is not the explicit source of the gratuitous transfer and knowing participation issues. Those issues derive from trust law, the clay from which ERISA was molded. *Harris Trust*, 530 U.S. at 250.

---

> [I]t has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value *and* without notice of the fiduciary's breach of duty.
>
> *Harris Trust,* 530 U.S. at 250, 120 S.Ct. 2180.
>
> Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (*assuming he has purchased for value*) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust.
>
> *Id.* at 251, 120 S.Ct. 2180 (emphasis added).

I will address the *Evankavitch* factors in order. First, the issues are not framed at all by the statute, but by the common law, which treats a bona fide transfer without notice of the breach of trust as an exception to the general rule that the terms of a trust follow trust assets through a transfer to a third party. This factor weighs in favor of imposing the burden on the defendant, since that was the ordinary burden at common law. Second, ERISA's "general structure and scheme" do not clearly indicate where the burden should fall, but the common law does: on the defendant. *See Volante*, 16 F.3d at 1383. Third, a plaintiff would not be "unfairly surprised by the assertion of [these issues]" absent a rule requiring their assertion as an affirmative defense. *See Evankavitch*, 793 F.3d at 364-65. The case which raised these issues to prominence, *Harris Trust*, is well known to the ERISA bar, as the present dispute makes painfully clear. This is not an issue that would sneak up on a plaintiff at trial if not raised explicitly by the defendant.

*Evankavitch's* fourth factor weighs in favor of imposing the burden on the defendant: "whether a party is in particular control of information necessary to prove or disprove the defense[.]" *Id.* at 361. The value of the services that the Stonehenge Parties supplied is information within the "particular control" of the defendants. Finally, *Evankavitch's* fifth factor, "other policy or fairness considerations," suggests the burden should be placed on the defendant in this case. Stonehenge is not an ordinary business vendor who wandered into a transaction involving trust assets without the first hint of what it was getting into. Stonehenge participated in the creation and servicing of the ESOP funding transaction. It was well versed in the nuances and hazards of dealing with an ERISA fiduciary.

90

In addition, the variation in burden of proof between the fourth and fifth claims for relief makes sense on a wider view of equity. Where the evidence suggests that a transfer of assets was gratuitous, there seems nothing unfair about requiring the transferee to prove consideration. The fact that the transferee got something for nothing – or nominal or insignificant value – supplies an equitable basis for believing that he was on notice that something was amiss. But where the transferee has provided significant value for the trust assets – even if not full value – equity should be more solicitous of the transferee, and require proof by the party seeking return of the assets that the transferee knowingly participated in a breach of trust. Analysis of the *Evankavitch* factors suggests it is appropriate to impose the burden of demonstrating value on Stonehenge, as to the fifth claim for relief.

To summarize, to prove its fourth claim for relief, Alliance bears the burden of showing that assets of the plan were transferred in breach of trust, and that Stonehenge "knowingly participated" in a fiduciary breach. To prove the fifth claim for relief, Alliance bears the burden of showing that assets of the plan were transferred in breach of trust. If it does so, Stonehenge bears the burden of proving that it provided more than "nominal" or "insignificant" value for the transfer.  Whether the services provided by Stonehenge were "nominal," "insignificant," or merely of "less value" than the fees paid are issues that should be resolved at trial.

### c.  *Whether Alliance and AH III assets were "plan assets".*

#### i.  *Questions of fact exist whether Alliance's assets were assets of the ESOP.*

If assets of Alliance Holdings and AH III are ESOP plan assets, a host of transactions become subject to ERISA. *See* Alliance Opp. at 41. If the assets of Alliance

91

Holdings and AH III are not ESOP plan assets, the scope of ERISA liability in this case is reduced. *See* Stonehenge Mem. at 36-37. The parties have spent a great deal of effort battling over this question. I conclude that a trial will be necessary to resolve the issue.

The Alliance ESOP owns Alliance Holdings stock. This stock is clearly a plan asset. Stonehenge argues that while the Alliance stock is a plan asset, the assets which underlie that stock, *i.e.* the assets of Alliance Holdings, are not plan assets. *See* Stonehenge Mem. at 85.

A DOL regulation provides that a plan's investment in a non-public[57] entity includes an equity interest in that entity's underlying assets unless the entity qualifies as an "operating company." *See* 29 C.F.R. § 2510.3-101(a)(2)(i) (assets of a non-publicly traded entity in which a plan invests are included as "plan assets" unless the "entity is an *operating company*") (emphasis supplied); (c)(1) ("An '*operating company*' is an entity that is *primarily engaged*, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital") (emphasis supplied); (j)(1) – (12) (examples). If Alliance Holdings qualifies as an operating company, its assets are not plan assets. If it does not qualify as an operating company, its assets are plan assets.

Section 2510.3 defines an operating company as one "primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital." *See* 29 C.F.R. § 2510.3-101(c).

---

[57] "Non-public," as used in this part of the Regulations, consists of companies that are not publicly traded. In the words of the Regulations, this means "neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940. . . ." *See* 29 C.F.R. § 2510.3-101(a)(2). There is no dispute that Alliance and AH III are "non-public."

The dispute between the parties boils down to the meaning of two words: "primarily engaged." The regulation supplies no definition of "primarily engaged." The parties supply very different definitions. Alliance focuses on what percentage of its assets were engaged in production or sales, as opposed to investment. *See* Alliance Mem. at 29. Stonehenge disputes Alliance's calculation, on its own terms, but also argues that the measure should not be an asset comparison, but a measure of what proportion of the company's activities are devoted to production, as opposed to investment. *Id.* I will refer to Alliance's theory as the "asset" theory and Stonehenge's theory as the "activity" theory.

Alliance argues that through the first half of 2011, it "primarily engaged" in passive investment, not the selling of goods or the performing of services that would qualify Alliance as an operating company. *See* Alliance Mem. at 28. Alliance provides an analysis of its assets to prove its point: "[i]n 2010, 25.82% of Alliance's assets, valued at cost, were invested in the production or sale of a product or service." *See id.* at 29 (citing 4/15/15 Spear Dep. Ex. 578). Thus, Alliance argues, its primary focus was on passive investments, and not operating companies.[58] *See id.* at 28.

---

[58] Plaintiffs acquired a number of operating companies to increase their payroll to satisfy a number of statutory and regulatory requirements. *See* Alliance Mem. at 29. (citation omitted). These acquisitions to increase their payroll numbers were taken because of advice provided by their legal counsel at the time. *See id.* at 30. Alliance's foray into different payroll option contracts served as a means to increase their payroll numbers for a certain time period even if they never exercised the payroll option. *See id.* (citations omitted). Alliance further explains that "[a]s these [payroll] contracts involved only an option to purchase a company, these 'employees' did not work for any Alliance-owned operating company and were not engaged on behalf of Alliance in the production or sale of goods." *See id.* at 30-31 (emphasis in original). These so-called employees were only taken to help further compliance with the statutory and regulatory guidelines

Stonehenge argues that Alliance was in fact an operating company. *See* Stonehenge Mem. at 86 (citing 51 Fed. Reg. 41262 at Section VI(A)(1) (Nov. 13, 1986)). Stonehenge relies in the main on one case, *Middleton v. Stephenson*, No. 2:11-CV-313, 2011 WL 6131334, **2-3 (D. Utah Dec. 8, 2011)).[59] *See* Stonehenge Mem. at 86-87. *Middleton* held that a company was not primarily in the business of capital investment, meaning that it was an operating company. *See Middleton*, 2011 6131334, at *3. *Middleton* also held that because the vast majority of the company's employees were involved in operational activities and most of the revenue came from operational actions, the entity was an operating company. *Id.* at *3.

Stonehenge points out that Alliance carried on an active trade or business. *See* Stonehenge Mem. at 87 (citing  51 Fed. Reg. 41262 at Section VI(A)(1) (Nov. 13, 1986)). Stonehenge also cites to various deposition transcripts that show that Alliance was involved in helping to buy and sell operating entities, and highlights the fact that Alliance was an ESOP "collective" that gathered many ESOPs under its umbrella. *See id.* (citations omitted). Stonehenge puts great emphasis on Form 5500s filed with the

---

surrounding the spread transaction, but the company at no point considered itself an "operating company." *Id.* at 31 (citations omitted).

[59] According to one recent journal article, "*Stephenson [Middleton]* is the only court decision recognizing that the plan asset rule operating company exception denies plan asset definition to the operating company's underlying assets." *See* David Randall Jenkins, *Building Prohibited Transaction Chinese Walls for Retirement Plan Investment Structures*, J. Tax'n., Nov. 2015, at *9.

Department of Labor and Internal Revenue Service, which state that Alliance Holdings was in the business of managing companies.[60]

There is little case law to inform my analysis of what an operating company is. The only guidance Stonehenge can provide comes from *Middleton.* The opinion, though helpful, does not carry the weight of a case decided in this jurisdiction. *See, e.g., Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 92 (3d Cir. 2013) (discussing use of Ninth Circuit case law in defamation case); *Karlo v. Pittsburgh Glass Works, LLC*, No. 2:10–cv–128, 2014 WL 1317595, at *17 n. 16 (W.D. Pa. Mar. 31, 2014) (citing cases outside of the Third Circuit and noting they had "little persuasive value")). Alliance distinguishes *Middleton* from this case, arguing that the corporate make-up of the companies involved in *Middleton* was entirely different from the ones currently before me. *See* Alliance Mem. in Opp. at 38. (citing *Middleton*, 2011 WL 613334, at *2).

It cannot be that in all cases the operating company definition should hinge only on the number of employees who are committed to operating company activities versus those employees engaged in investment activities. *See id.* at 39. Otherwise the Department of Labor would not have used an "asset" test, in one particular circumstance, to determine whether a company is "primarily engaged" as an ordinary operating company. Plan Assets Reg. § 2510.3-101(d).

I agree with the Department of Labor that, "[i]n general, whether a particular company is, or is not, an operating company . . . *is a factual question* to be resolved taking into account the particular characteristics of the entity under consideration."

---

[60] The full list of manufacturing companies includes everything from sport boat dealers, mailing services processors, the maker of industrial products, and student loan servicers. *See* Stonehenge Mem. at 35-36.

Final Regulation Relating to the Definition of Plan Assets, 51 FR 41262-01, *41271, 1986 WL 116042 (emphasis supplied). In this particular instance, neither the "assets" theory nor the "activities" theory is clearly more reasonable than the other. Assets and activities together make up a business. A legislative or administrative body might reasonably choose to pick one theory over the other, for various reasons, including ease of administration, but that has not happened in this instance. In large measure a decision here will involve the weighing of incommensurables, a task generally better suited to trial. *Cf. Conway v. O'Brien*, 111 F.2d 611, 612 (2d Cir. 1940), *rev'd,* 312 U.S. 492 (1941) (After observing the difficulty of weighing incommensurables, and the ordinary practice of leaving such a task to a jury, Judge Learned Hand elected to decide a gross negligence issue as a matter of law. He was reversed by the Supreme Court, which sent the case back for trial.).

The law consists of deriving general principles from the experience of cases, and then applying those principles to a particular set of facts. It is a kind of dialectic. Typically the particular facts of a case are variable or novel, while the legal principles have been developed over time and are well known. In those instances summary judgment may be appropriate, because detailed, well-developed legal standards permit more confident judgments about which facts are material. In the absence of well developed legal principles, assurance about what facts are material is harder to come by. It is appropriate, in that instance, to test the facts through the rigors of trial, so that at least one side of the dialectic is carefully grounded in reality. I conclude that the plan assets issue needs to be decided at trial. I will deny summary judgment for any party to the extent the motion requires a resolution of the plan assets issue.

> ii. *Questions of fact exist whether payments from AH III to Stonehenge involved plan assets.*

Stonehenge argues that assets of AH III, the entity that actually paid Stonehenge, could not be considered ESOP assets even if Alliance Holdings was an operating company. *See* Stonehenge Mem. at 89. Stonehenge argues that 29 C.F.R. § 2510.3-101(a)(2)[61] "does not state—or even suggest—that an undivided interest in an asset held by a second entity owned by the entity in which the plan invested could qualify as a plan asset." *See id.* This was no accident, argues Stonehenge, because the DOL knew how to write a regulation permitting disregard of a corporate structure. *See id.* (citing as examples 29 C.F.R. §§ 2510.3-101(f); 2510.3-101(g)). Stonehenge declares that "we are not aware of a single instance in the three decades since the passage of the plan asset

---

[61]  29 C.F.R. § 2510.3-101(a)(2) provides that:

> Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, in the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that—
> (i) The entity is an operating company,

29 C.F.R. § 2510.3-101(c)(1) provides that:

> An "operating company" is an entity that is primarily engaged, directly or through a majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital. The term "operating company" includes an entity which is not described in the preceding sentence, but which is a "venture capital operating company" described in paragraph (d) or a "real estate operating company" described in paragraph (e).

regulation in 1986 where a court or federal agency has applied the 'operating company'
test as Plaintiffs request here." *Id.*

Alliance argues that assets of Alliance were plan assets, based on the DOL rule
that if an ESOP owns 100% of the stock of an entity, and the entity is not an "operating
company," then the entity's underlying assets are "plan assets." Alliance Mem. at 76
(citing to 29 C.F.R. § 2510.3-101(a)(2)(i) and (c)(1)). Alliance argues that the DOL rule
should be applied to both Alliance and AH III. Alliance Op. at 40-41. Alliance points to
the DOL application of its plan assets rule and exemptions to certain types of
downstream entities, an application that would make no sense if the plan assets rule
applied to only the first layer of corporate subsidary, as Stonehenge suggests. *Id.* at 41
(citing to Final Regulation Relating to the Definition of Plan Assets, 51 Fed. Reg. 41262-
01, 41262 (Nov. 13, 1986).

Alliance argues that 1) Alliance Holdings, and all its assets, are plan assets
belonging to the ESOP; 2) AH III's assets constitute plan assets unless AH III is an
"operating company" or the Participation Interest in AH III "is not significant." *See*
Alliance Opp. at 42. (citing Final Regulation Relating to the Definition of Plan Assets, 51
Fed. Reg. 47,226 (Dec. 31, 1986)).  Stonehenge has not contended that AH III qualifies
as an operating company, nor can Stonehenge demonstrate that Alliance Holdings'
equity participation in AH III was insignificant. *See id.* at 42-43. Since these two
qualifying requirements cannot be met, Alliance argues, AH III's assets are plan assets.
*Id.* at 43.

Alliance's interpretation of the regulation is not unreasonable. Under the
language of the 29 C.F.R. § 2510.3-101(a)(2), if the plan invests in the stock of company

98

"A," and "A" is not an operating company, "A's" underlying assets are assets of the plan. If "A's" assets include stock in "B," then the stock of "B" is a plan asset. The plan has "invested in" the stock of "B," in the sense that the plan has paid for and owns stock of company "B." But if this is so, the stock of company "B" is subject to rule of Section 2510.3-101(a)(2): if it is not an operating company, then "B's" underlying assets are plan assets, as well. *See* 29 C.F.R. § 2510.3-101(c)(1) ("An 'operating company' is an entity that is primarily engaged, directly or through a majority owned *subsidiary or subsidiaries,* in the production or sale of a product or service other than the investment of capital") (emphasis supplied); (j)(1) – (12) (examples). The emphasized language in Section 2510.3-101(c)(1), "subsidiary or subsidiaries," can just as sensibly be read to include subsidiaries of subsidiaries as to include multiple direct subsidiaries. It may well mean both.

Stonehenge concludes that 29 C.F.R. § 2510.3-101(c)(1) categorically cannot extend to AH III assets. I find Stonehenge's argument – that 29 C.F.R. § 2510.3-101(c)(1)'s definition of plan assets categorically cannot apply to a second level subsidiary such as AH III – unconvincing. Since I disagree with Stonehenge on this point, I need not address its consequential argument, based on *Secretary of Labor v. Doyle*, 675 F.3d 187, 203 (3d Cir. 2012). *Doyle* held that if there is no applicable regulation, then plan assets should be identified "on the basis of ordinary notions of property rights under non-ERISA law." *See Doyle,* 675 F.3d at 203 (citing *In re Luna*, 406 F.3d 1192, 1999 (10th Cir. 2005)). This extends to tangible and intangible property. *See id.* at 203-04 (citing Department of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993); *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d

639, 647 (8th Cir. 2007)).  Since I conclude that 29 C.F.R. § 2510.3-101(a)(2) may apply,
I need not engage in Doyle's analysis.

If the facts at trial convince me that Alliance was not an operating company,
under Section 2510.3, then AH III's assets may be in play, as well. If at trial I determine
that AH III's assets are not affected by Section 2510.3, then it may or may not be
necessary to apply the teaching of *Doyle*.

> iii.  *Statements by Alliance executives, and by professionals assisting
> Alliance, create fact issues, not undisputed facts.*

Stonehenge argues that none of the Alliance executives and independent
advisors[62] ever asserted that the assets of Alliance Holdings or AH III constituted plan
assets. Stonehenge Mem. at 92. For instance, Kenneth Wanko, at his deposition, stated
that he never represented prior to November or December 2012 that Alliance Holdings'
assets or AH III's assets were plan assets.[63] *See id.* at 93 (citing Alliance Holdings
30(b)(6) Dep. 348:18-349:6). Squire Sanders never raised any red flags regarding the
possibility that Alliance assets were plan assets. *See id.*

While it is certainly the case that the opinions or representations of Alliance
executives are probative, they cannot be dispositive, in the face of contradictory facts
adduced by Alliance, *i.e.*, the devotion of a huge proportion of Alliance assets to
investment, rather than production. The possibility remains that Alliance Executives
were incorrect.

---

[62] Including companies such as Crowe Horwath, Deloitte, KPMG, and Stout Risius Ross,
among others, none of whom advised Alliance Holdings that it was dealing in plan
assets. *See* Stonehenge Mem. at 48.
[63] Wanko never said that other plaintiffs thought the same thing. *See* Alliance Holdings
30(b)(6) Dep. 349:7-349:13.

**d.  *Questions of fact exist whether Alliance is estopped from making its plan assets arguments.***

Stonehenge urges that the plaintiffs are estopped from arguing that the assets of Alliance Holdings and AH III were plan assets. *See* Stonehenge Mem. at 94. Each of the three estoppel arguments hinge on questions of fact.

  i.  *Questions of fact exist whether regulatory estoppel applies to the plan assets argument.*

Regulatory estoppel prevents a party from reporting a transaction to a government body as one type of transaction, then later characterizing that transaction in a different way during litigation. *See id.* at 95. For instance, a debtor who classified monthly payments as alimony for the purposes of tax deduction cannot categorize those transactions as something else under the Bankruptcy Code. *See id.* at  95 n. 26 (citing *Robb-Fulton v. Robb (In re Robb)*, 23 F.3d 895, 899 (4th Cir. 1994)). Stonehenge argues that years of tax and regulatory filings by Alliance were consistent with the position that its assets were not ESOP assets.

Alliance insists that "a party must have made a statement to a regulatory agency and then taken an opposite position to the one presented to the regulatory agency and *possessed some level of culpability* in doing so. *See id.* (citing *Simon Wrecking Co. v. AIU Ins. Co.*, 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008)) (additional citations omitted) (emphasis in original). Alliance states that they should not be bound by statements made on, for instance, tax filings at Fenkell's direction. *Id.*

Regulatory estoppel requires, among other things, that I closely examine the deductions and claims made to the IRS regarding what are or are not plan assets. Forms

101

signed by Alliance representatives, under pain of perjury, made representations to various governmental agencies that Alliance assets were not plan assets. *See* Stonehenge Mem. at 11. It was not just David Fenkell who made these "misclassifications." There is evidence that Ms. Spear signed Forms 5500 in 2004-05 and again in 2009-12. *See id.* at 41-42 (citations omitted). Ken Wanko also signed these Form 5500s in 2011-12. *See id.* at 42 (citations omitted). I cannot form a clear picture of Alliance's intent in filing these allegedly mistaken Form 5500s, or of the evidentiary significance of these filings on the issue of estoppel, on a summary judgment record. Whether Mr. Fenkell, Ms. Spear and Mr. Wanko were correct, mistaken but acting in good faith, or mendacious when they signed off on these documents are determinations best left for trial.

### ii. *Questions of fact exist whether quasi-estoppel applies to the plan assets argument.*

Stonehenge argues that quasi-estoppel bars Plaintiffs from making the plan assets argument. *Id.* at 99. In support, Stonehenge notes that this doctrine "applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." *Id.* (citing *Girard Estate Area Residents v. Def. Realty, LLC,* No. 2:08-CV-2456, 2009 WL 1967220, at \*17 (E.D. Pa. Mar 17, 2009)). Stonehenge describes this doctrine as disabling a party's ability to "blow both hot and cold." *See id.* (citing *Erie Telecom., Inc. v. City of Erie*, 659 F. Supp. 580 585 (W.D. Pa. 1987) (further citations omitted). Stonehenge explains that Alliance suddenly changing its position on the plan assets issue for the purposes of this litigation, after reaping a substantial tax benefit through the Section 133 loan program, "is textbook estoppel-barred conduct." *See* Stonehenge Mem. at 100.  Courts in this

jurisdiction note "[t]he doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit." *Id.*

Alliance disagrees, arguing that Fenkell was in control of Alliance at the time and that it is inappropriate for me to rule on summary judgment on these quasi-estoppel grounds. *See* Alliance Opp. Mem. at 47. Specifically, they take issue with the applicability of quasi-estoppel, pointing out that the doctrine requires a position to be "unconscionable." *Id.* (citations omitted).

Quasi-estoppel requires that I examine whether Alliance took a truly "inconsistent position" with regard to the plan assets question previously, such that it would be unconscionable to permit Alliance to maintain their current position. The theory requires a fact-specific inquiry into the intent of various agents of a corporate entity, Alliance, while that entity took tax and litigating positions involving complex financial and legal judgments, all while (somehow) excluding Fenkell's influence, knowledge, and intent. Summary judgment is inappropriate.

### iii.   *Questions of fact exist whether judicial estoppel applies to the plan assets argument.*

Stonehenge contends that Plaintiffs are judicially estopped from asserting their plan assets position. Stonehenge Mem. at 102. In the *Chesemore* litigation, the Plaintiffs claimed that the assets of the ESOP were shares of Alliance Holdings and AH Transition stock. *See* Stonehenge Mem. at 102 (citing Proposed Findings of Fact by Defendants Alliance Holdings, Inc., David B. Fenkell, AH Transition Corp. and Alliance Holdings,

Inc. Employee Stock Ownership Plan and Trust, 3:09-cv-00413 (Doc. 527) at ¶ 187)).

Alliance argues that "estoppel is inappropriate, *See* Alliance Opp. Mem. at 44.

I have already stated that judicial estoppel may be appropriate when a party has adopted inconsistent positions in bad faith and no lesser sanction is sufficient.[64] *Spear v. Fenkell*, No. CIV. A. 13-02391, 2015 WL 1649981, at *2 (E.D. Pa. Apr. 13, 2015) (citing *Chao v. Roy's Const., Inc.* 517 F.3d 180, 186 (3d Cir. 2008)). To be bound by judicial estoppel, the inconsistent positions taken by a party must rise to the level of knowing misrepresentation or fraud on the court. *See Spear*, 2015 WL 1649981, at *1-3 (E.D. Pa. Apr. 13, 2015) (further citations omitted). Because of its bad faith component, judicial estoppel is a difficult theory to prove without the taking of evidence and weighing of credibility. *See Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 n.5 (3d Cir. 2001). A finding of judicial estoppel is typically a fact specific inquiry into the circumstances under which a previous position was taken, and the intent with which assertions were uttered. *See In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010) (noting the fact-specific nature of judicial estoppel). Summary judgment is not appropriate.

All this is not to say that Stonehenge's arguments are without weight. Alliance's position on the plan assets issue raises an eyebrow. If Fenkell and Alliance misclassified Alliance and AH III assets, and they are indeed plan assets, then the Spread Transaction may have been illegal. *See* Stonehenge Rep. at 29. That Alliance's litigating theory may fly in the face of fifteen years of various representations in tax forms or other documents, and may result in grave discomfiture to the ESOP and its participants, are

---

[64] The Third Circuit has noted that "judicial estoppel can be a draconian sanction. . . ." *See Klein v. Stahl GMBH & Co. Mashinefabrik*, 185 F.3d 98, 111 (3d Cir. 1999).

facts that cannot be dispositive in themselves at the summary judgment phase. Nevertheless, they may have probative weight when assessing at trial whether the theory will prevail, or whether estoppel is appropriate.

### e. *Questions of fact exist whether the statute of limitations bars certain claims.*

For reasons I explained in Section II of this opinion, dealing with Fenkell's statute of limitations arguments, I conclude that there are genuine issues of material fact that preclude summary judgment against the Alliance Parties based on the statute of limitations.

The same fact questions that lead me to conclude that neither estoppel nor the statute of limitations bar plaintiffs' claims as a matter of law also lead me to conclude that equitable defenses, such as estoppel and laches, do not render plaintiffs' requested relief inappropriate as a matter of law, under 29 U.S.C. § 1132(a)(3). *See* Stonehenge Mem. at 111-116. Whether and what kind of equitable relief might be appropriate is dependent in large part on the exact nature of liability – and culpability - proven at trial. The decision on whether to order equitable relief, and the exact contour of that relief, will await trial.

### f. *Summary judgment is granted, dismissing the "veil-piercing" theory as a means of holding individual Stonehenge defendants liable.*

In addition to the arguments already discussed, Stonehenge argues on behalf of the individual defendants that "Third Circuit ERISA law makes clear that individuals acting in their corporate capacity, like the Individual Stonehenge Defendants, cannot be liable under Counts [IV] and [V]." *See id.* at 150. Alliance argues that under ERISA section 502(a)(3) the individual defendants face liability for knowingly participating in

105

ERISA violations, under *Harris Trust. See* Alliance Opp. at 87. Alliance also argues that common law *alter ego* theories, while "instructive, do not end the inquiry when a breach of fiduciary duty and knowing participation under ERISA are involved. *Id.* at 89-90 (citing *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 388 (2d Cir. 1989); *Sasso v. Cervoni,* 985 F.2d 49, 50 (2d Cir. 1993) (explaining the holding in *Lowen*, 829 F.2d at 1220-21 (additional citations omitted))).

Defendants Ronald Brooks, Barry Gowdy, and John Witten were employed in various roles for Stonehenge. Each of them was involved in some fashion in the transactions that form the basis of the complaint. Brooks is a Stonehenge principal responsible for signing the August 27, 1999 letter regarding which party would pay for Stonehenge fees. Gowdy had relationships with Alliance and other parties involved in the Spread Transaction. *See* Stonehenge Mem. at 6 (citations omitted). Gowdy worked in numerous roles for Stonehenge related to accounting, tax, and other financial reporting aspects of the company. *See id.* at 8. Witten served as a senior vice president and general counsel in various Stonehenge iterations.[65] *See id.* at 7.

ERISA Section 502(a)(3) provides for a type of accomplice liability when the accomplice knowingly participates in an ERISA violation. *Alter ego* or "veil piercing" theories are a different animal. Such theories impose liability on an individual shareholder, director, or officer for corporate wrongdoing based on a wide variety of factors, many of which have less to do with the culpability of the individual defendant for the wrongdoing, and more to do with defects in the maintenance of the corporate entity. These defects undercut the justifications for the limitation of liability that is at

---

[65] These individuals had more duties than I describe.

106

the heart of corporate law. *See, e.g., United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (adopting multi-factor test from *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir. 1976)); Franklin A. Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil*, 76 OR. L. REV. 853, 854 (1997).

The Third Circuit is clear that piercing the corporate veil is not to be taken lightly and that the standards for doing so are demanding. *See American Bell Inc. v. Federation of Telephone Workers of Pennsylvania*, 736 F.2d 879, 886 (3d Cir. 1984); *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967) (a "court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.") (citation omitted); *DeWitt*, 540 F.2d at 683 ("This power to pierce the corporate veil, though, is to be exercised "reluctantly" and "cautiously" and the burden of establishing a basis for the disregard of the corporate fiction rests on the party asserting such claim.") (citations omitted). The standards for veil piercing include gross undercapitalization, failure to observe corporate formalities, not paying dividends, corporate insolvency, siphoning of funds by a dominant stockholder, non-functioning officers and directors, absence of corporate records, and the probability that the corporation is a façade used by stockholders for his or her personal gain. *Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (citing to *DeWitt*, 540 F.2d at 687). Corporate protection is not absolute, and veil-piercing is available in order to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik*, 384 F.2d at 272. Alliance bears the burden of demonstrating that the corporate form should be

disregarded. *See Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979).

Stonehenge cites to a number of cases in this jurisdiction which hold that officers cannot be held personally liable for the actions of their corporations, in the context of ERISA claims. *See Confer v. Custom Engineering Co.*, 952 F.2d 34 (3d Cir. 1991); *Solomon v. Klein*, 770 F.2d 352 (3d Cir. 1985); *Local Union No. 98 IBEW v. RGB Servs., LLC*, No. 10-3486, 2011 WL 292233 (E.D. Pa. Jan. 28, 2011).

In *Solomon*, the Court of Appeals held that a corporate executive, Klein, could not be held liable for the delinquent retirement contributions of his employer, A.J.I.D., Inc. 770 F.2d at 354. The Court rejected plaintiff's theory of liability, which was that Klein fit the definition of "employer" under ERISA Section 515 (29 U.S.C. § 1145). *Id.* What the Court of Appeals did not do was decide that Klein could not be held liable, under *Harris Trust* and ERISA Section 502(a)(3), for knowingly participating in an ERISA violation. The same is true of *Loc. Union No. 98 Intern. Broth. of Elec. Workers v. RGB Services, LLC*, CIV.A. 10-3486, 2011 WL 292233, at (E.D. Pa. Jan. 28, 2011). Plaintiffs sought to recover missing retirement contributions from a corporate entity and two of its corporate officers, claiming that the officers were "employers" under ERISA Section 515. *Id.* at *3. The district court relied on *Solomon* and refused to hold the corporate employees liable, noting that unless the corporate veil could be pierced, under common law, corporate employee liability was unavailable. *Id.* at *4.

The theory of liability in this case is not that Witten, Gowdy, and Brooks were ERISA fiduciaries because of their corporate position with Stonehenge. Thus, *Confer v. Custom Engr. Co.*, 952 F.2d 34 (3d Cir. 1991) is of no help, since there the Court of

Appeals held that corporate employees could not be deemed fiduciaries merely because they held high corporate offices in a corporate fiduciary. *Id.* at 35.

Alliance argues that Stonehenge's corporate form may be disregarded because 1) the fees Stonehenge received passed through different entities; 2) Stonehenge used non-employees to do some of the work for Alliance; 3) the fees that Stonehenge received were the result of unlawful conduct; and 4) Stonehenge allowed its insurance to lapse in 2009 as part of winding down its business. *See* Alliance Opp. at 91. None of these facts match the factors mentioned in *Solomon*:

> the failure to observe corporate formalities; non-payment of dividends; the insolvency of the debtor corporation at the time; siphoning of funds of the corporation from the dominant stockholder; nonfunctioning of other officers or directors; absence of corporate records; and the fact that the corporation is merely a facade for the operation of the dominant stockholder or stockholders.

770 F.2d 353-54 (citing to *Pisani,* 646 F.2d at 88, and *DeWitt Truck Brokers, Inc.,* 540 F.2d 681).

The only *Solomon* factor that could apply in this case is the first: "the failure to observe corporate formalities." Yet the facts proffered by Alliance do not demonstrate a failure to observe corporate formalities.  That fees passed through different entities has nothing necessarily to do with a failure to observe corporate formalities. Nor does the use of non-employees to do corporate work. Nor does the fact that a corporation received fees for "unlawful conduct." As for dropping insurance as part of a business wind-down, Alliance cites to a non-precedential 11th Circuit case to argue that "[a]llowing insurance to lapse is indicative of a failure to observe corporate formalities, justifying a piercing of the corporate veil." Alliance Opp. at 91 (citing *Samuels & Associates, Inc. v. Boxcar Foods USA, Inc.*, 286 F.App'x 708, 715 (11th Cir. 2008)). That

is not what *Samuels & Associates* held. Instead, the fact that the corporation had no assets, even insurance, from which to satisfy a judgment, was a factor weighed by the court in assessing whether to disregard the corporate form. *Id.* There is no indication Stonehenge would be unable to pay a judgment. Certainly, Alliance does not make that representation in its briefing.

Stonehenge acted as a private equity firm and served as an investment manager to different funds. *See* Stonehenge Mem. at 5. Seven individuals had some kind of ownership interest in Stonehenge during the life of the Spread Deal. *See* Ex. 8, Stonehenge Response to Second Set of Interrogatories at 16. According to documents provided by the Grien Report, Stonehenge's total revenues ranged from $7 million in 1999 to more than $60 million in 2001. *See* Grien Report Appendix F-1. These total revenues from 1999 to 2011 were more than $300 million which, after calculated expenses, left the company with $129 million for shareholder distribution purposes. *Id.*

To the extent that Alliance's theory of liability is that that Stonehenge's corporate form should be disregarded, and liability imposed under a common law veil piercing theory, I reject it. Alliance has made no serious demonstration of the various factors emphasized in *alter ego* cases. The notion that Stonehenge is undercapitalized, did not observe corporate formalities, or that any of the factors outlined in *Solomon* call for disregarding Stonehenge's corporate entity is not borne out by the record. *See* 770 F.2d at 353.

I will grant summary judgment dismissing the veil piercing theory. The only surviving theory against individual defendants, under the fourth and fifth claims for relief, is their own knowing participation in an ERISA violation. 29 U.S.C. §1132(a)(3).[66]

### g. *Questions of fact exist whether the state statute of limitations bars Alliance's state law civil conspiracy and aiding and abetting claims.*

Stonehenge argues that it is entitled to summary judgment as to Alliance's twelfth and fourteenth claims for relief. *See* Stonehenge Mem. at 153-168.  The twelfth claim for relief alleges that the Stonehenge Parties aided and abetted Fenkell's state law fiduciary duties. Doc. No. 68, at 54. The fourteenth claim for relief alleges that the Stonehenge Parties conspired with Fenkell to violate Fenkell's state law fiduciary duties. *Id.* at 57. Stonehenge argues that not only can Alliance not prove the underlying elements of each claim, but that these state law actions are barred under the two-year statute of limitations under Pennsylvania law. *See id.* at 154. Alliance argues that, with regard to

--------

[66] To the extent that Alliance argues that there is some less demanding federal "veil piercing" standard applicable in ERISA cases, I do not agree, nor do I foresee the Third Circuit adopting such a rule. *See* Alliance Opp. at 89. *Leddy v. Standard Drywall, Inc.* 875 F.2d 383 (2d Cir. 1989), relied upon by Alliance, stands for the unremarkable proposition that "at least to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA, 29 U.S.C. § 1132," whether or not the conditions for veil piercing exist. *Id.* at 388. *See also Lowen,* 829 F.2d at 1220  (individual defendants were liable under ERISA Section 502(a)(3) "because they acted in concert with the [corporate entity] in causing the prohibited investments."); *Sasso,* 985 F.2d at 51 (rejecting individual liability and explaining that "[i]n . . . *Lowen,* the individuals potentially or actually held liable for aiding fiduciary breaches were acting in concert with fiduciaries."). None of these cases actually relied upon a more relaxed ERISA veil piercing theory to impose liability. Each case simply imposed liability on a corporate employee or officer if she violated ERISA Section 502(a)(3) by knowingly participating in an ERISA violation.

Stonehenge, there are issues of material fact that require denying the summary judgment motions.

As a preliminary matter, and for reasons I have already explained in the context of arguments about the ERISA statute of limitations defenses, I find that there are genuine issues of material fact that preclude entry of summary judgment based on applicable Pennsylvania statutes of limitation. I will turn to Alliance's twelfth claim for relief, alleging that Stonehenge aided and abetted Fenkell's state law fiduciary duties.

**h.   *Questions of fact exist whether Stonehenge knew Fenkell was committing fiduciary violations, and the aiding and abetting claim must be tried.***

I previously concluded that Pennsylvania would recognize a cause of action for aiding and abetting a tort. *See Spear v. Fenkell*, CV 13-02391, 2015 WL 5005117, at *4 n.3  (E.D. Pa. Aug. 20, 2015) (citing to *Matlack Leasing, LLC v. Morison Cogen, LLP*, No. CIV.A. 09–1570, 2010 WL 114883, at *11 (E.D.Pa. Jan. 13, 2010)). *Reis v. Barley, Snyder, Senft & Cohen LLC*, 667 F. Supp. 2d 471, 492 (E.D. Pa. 2009) (not precedential) (citations omitted). A plaintiff must show "that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002) (citing to *Resolution Trust Corp. v. Spagnoli*, 811 F. Supp. 1005, 1014 (D.N.J. 1993)).

Stonehenge argues that Pennsylvania law requires actual knowledge – not constructive knowledge - of fiduciary violations.. *See Reis,* 426 F. App'x. at 84; Stonehenge Mem. at 164. Stonehenge also cautions that Pennsylvania's Supreme Court has yet to recognize aiding and abetting a fiduciary duty as a cause of action. *Official*

*Comm. Of Unsecured Creditors of Allegheny Health Educ. & Research Fund v. Price Waterhouse Coopers LLP*, 989 A.2d 313, 327 n. 14 (Pa. 2010); Stonehenge Mem. at 164 n. 64.

The Alliance Parties argue that the facts surrounding the doubling of the DBF fees in 2006 would permit me to infer that the Stonehenge Parties actually knew Fenkell was committing a fiduciary violation. *See* Alliance Mem. at 79, n. 44, and at 117. I agree.

In the context of the ERISA claim under Alliance's fourth claim for relief I have already held that there is a genuine issue of material fact whether Stonehenge knew that Fenkell was committing fiduciary violations by receiving fees, through DBF, from Stonehenge. *See supra,* at 61. The parties' discussions of the state law aiding and abetting claims are focused exclusively on the Stonehenge and DBF fees.[67] *Compare* Alliance Opp. at 117 (discussing Stonehenge and Fenkell fees) *with* Stonehenge Mem. at 165-68 (focusing on Stonehenge and DBF fees). I see no reason to come to a different conclusion here than I did when discussing the ERISA claim for knowing participation, under Alliance's fourth claim for relief. There is a genuine issue of material fact whether Stonehenge knew Fenkell was committing a fiduciary violation when he received fees from Stonehenge through DBF. Hence, the aiding and abetting claims will have to be resolved at trial.

---

[67] If Alliance succeeds in proving its ERISA claim concerning the DBF fees, preemption may require dismissal of the state law claims concerning these fees. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52 (1987) (claim under ERISA Section 502(a) was exclusive, and preempted state claims concerning the same transactions). The parties have not briefed this issue, and it is appropriate to sort it out after a determination at trial of whether ERISA Section 502(a)(3) provides a remedy.

### i. *Summary judgment is granted, dismissing Alliance's fourteenth claim for relief for civil conspiracy because Alliance cannot prove malice, as required under Pennsylvania law.*

Alliance asserts, in its fourteenth claim for relief, that David Fenkell, DBF Consulting, and Stonehenge conspired together to pay kickbacks to Fenkell, through DBF, that were breaches of fiduciary duty that Fenkell owed to Alliance. *See* FAC ¶ 261. The action underlying the conspiracy included Fenkell's breaches of fiduciary duty and Stonehenge's payments to DBF Consulting through alleged illegal kickbacks. *See id.* ¶ 264.

In Pennsylvania, civil conspiracy requires 1) a combination of two or more people acting with a common purpose to perform an unlawful act or to do an act by unlawful means, 2) an overt act done in pursuit of that common purpose, and 3) actual legal damage. *See Strickland v. University of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. 1997) (citing *Smith v. Wagner*, 588 A.2d 1308, 1311-12 (Pa. Super 1991)); *see also Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 262 (3d Cir. 2004). *Strickland* also requires that "[p]roof of malice or an intent to injure is essential to the proof of a conspiracy." *See id.* at 988 (citing *Skipworth ex rel. Williams v. Lead Indus. Assoc.*, 690 A.2d 169, 174 (Pa. 1997)).

Federal courts have relied upon *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466 (Pa. 1979) for the proposition that "[m]alice 'will only be found when the *sole* purpose of the conspiracy is to cause harm to the party who has been injured.'" *See Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 423 (E.D. Pa. 2014) (collecting cases) (alteration in original). In addition, the object of a civil conspiracy must be an act for

which there is a viable cause of action. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 884 F. Supp. 181, 184 (E.D. Pa. 1995).

Stonehenge argues that under Pennsylvania law it is clear that the malice element of civil conspiracy has been defined narrowly: unless a party's sole purpose was to injure, a claim for civil conspiracy will not lie. *See Sarpolis*, 26 F. Supp. 3d at 423 (citations omitted); *see also Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 559 (E.D. Pa. 2010) (noting that a plaintiff must allege that the sole purpose of the conspiracy was to damage the defendants; maximizing profit for a company undermines such claims). As the purpose of the ESOP loan transaction was not to harm Alliance Holdings, but to make money – lots of it – for all involved, Stonehenge argues that the civil conspiracy claim must fail as a matter of law. Stonehenge Mem. at 162. Alliance argues that *Thompson*, the foundation upon which all the authority cited to by Stonehenge's argument rests, does not support the proposition that plaintiff must prove the defendant's *sole* motive was to injure. Alliance Opp. at 115. I disagree with Alliance.

Citing to *Rosenblum v. Rosenblum*, 181 A. 583, 585 (1935), for the "proper test," the Court in *Thompson* noted that "[t]here are no facts of record which indicate that [defendant] acted solely to injure appellants. To the contrary, there are many facts which indicate that [defendant] acted solely to advance the legitimate business interests of his client and to advance his own interests." *Thompson*, 412 A.2d at 472. The court in *Thompson* noted that plaintiffs had not provided facts that established a combination or agreement. *Id.* at 473. The court concluded that plaintiffs failed to show facts "which would substantiate the allegation that Johnston combined with Ralph and Pike Coal with the unlawful intent to injure appellants." *Id.*

Alliance points to cases that have permitted a state law conspiracy allegation to go to trial where the harm to plaintiff was not simply a "side-effect" of lawful activity, but the intended consequence of improper activity. *See, e.g., See RDK Truck Sales and Serv. Inc. v. Mack Trucks, Inc.*, CIV.A. 04-4007, 2009 WL 1441578, at *32–33 (E.D. Pa. May 19, 2009) (Buckwalter, S.J.) ("Mack is not alleging that the legitimate business actions of RDK and Worldwide form the basis of its civil conspiracy claim. Instead, it is the improper actions of RDK and Worldwide that - while economically beneficial to them - form the basis of Mack's civil conspiracy claim."); *Power Restoration Intern., Inc. v. PepsiCo, Inc.*, CIV.A. 12-1922, 2014 WL 1725041, at *6 (E.D. Pa. Apr. 30, 2014) (Pratter, J.) (quoting *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.,* 187 F.Supp.2d 400, 412 (W.D. Pa. 2002) (holding that because the "injuries [from the conspiracy] were not simply an accidental side-effect of [the conspirators'] otherwise legitimate business interests" the injured party had adequately alleged an intent to injure) (alterations in the original)); *Doltz v. Harris & Associates*, 280 F. Supp. 2d 377, 389–90 (E.D. Pa. 2003) (Buckwalter, J.) (holding that plaintiff had made a sufficient showing of malice and denying summary judgment where defendants reaped substantial profits by diverting corporate opportunities and wasting corporate assets to the benefit of corporate officers).

Stonehenge points to federal cases that read *Thompson* to require unadulterated malice.[68] Applying *Thompson* in this way amounts to a rule that excludes liability for

---

[68] The federal cases in this district applying *Thompson's* malice standard to dismiss conspiracy counts are legion. *See, e.g., Church Mut. Ins. Co. v. All. Adjustment Group*, CV 15-461, 2016 WL 3762713, at *5 (E.D. Pa. July 11, 2016) (Sanchez, J.); *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 679–80 (E.D. Pa. 2015) (Leeson, J.); *Sarpolis v.*

civil conspiracy unless the defendant intended to harm plaintiff without benefitting himself. Civil conspiracy has a short shelf life under this standard – the claim must fail if there is any business justification at all, notwithstanding some intent to injure a party. *See id.* (citing *WM High Yield Fund v. O'Hanlon*, No. 04–3423, 2005 WL 1017811, at *14 (E.D. Pa. April 29, 2005)).This reading of *Thompson* may not be compelled, given the facts and holding in *Thompson*, but it is the reading adopted by most of the district courts that have considered the matter, and with good reason.

First, the court in *Thompson* elected to extend *Rosenblum's* malice standard to a conspiracy predicated on fraud, an underlying tort, even though the conspiracy alleged in *Rosenblum* was not based on an underlying tort, but on non-tortious conduct, a so-called "conspiracy to injure." *See Rosenblum,* 181 A. at 585 (plaintiff alleged a conspiracy among several creditors to harm him by enforcing judgments); *see, e.g.,* Thomas J. Leach, *Civil Conspiracy: What's the Use?*, 54 U. MIAMI L. REV. 1, 9–10 (1999) (discussing the historical roots of the "conspiracy to injure"); *see also Morris Run Coal Co. v. Barclay Coal Co.*, 68 Pa. 173, 187 (1871) (suggesting that the object of a conspiracy

---

*Tereshko*, 26 F. Supp. 3d 407, 423 (E.D. Pa. 2014) (Tucker, C.J.), *aff'd*, 625 Fed. Appx. 594 (3d Cir. 2016) (unpublished); *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 735–36 (E.D. Pa. 2014) (Rufe, J.); *Parkland Services, Inc. v. Maple Leaf Foods, Inc.*, CIV.A. 12-6788, 2013 WL 1688871, at *5 (E.D. Pa. Apr. 18, 2013) (Baylson, J.); *Ferki v. Wells Fargo Bank, Nat. Ass'n*, CIV.A. 10-2756, 2010 WL 5174406, at *7 (E.D. Pa. Dec. 20, 2010) (Buckwalter, J.); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 418–19 (E.D. Pa. 2009) (Rufe, J.); *Morilus v. Countrywide Home Loans, Inc.*, 651 F. Supp. 2d 292, 313 (E.D. Pa. 2008) (Stengel, J.); *WM High Yield Fund v. O'Hanlon*, CIV.A. 04-3423, 2005 WL 1017811, at *14 (E.D. Pa. Apr. 29, 2005), *opinion amended and superseded*, CIV.A. 04-3423, 2005 WL 6788446 (E.D. Pa. May 13, 2005) (Davis, J.); *Bristol Tp. v. Indep. Blue Cross*, CIV. A. 01-4323, 2001 WL 1231708, at *5–6 (E.D. Pa. Oct. 11, 2001) (Newcomer, S.J.); *Am. Indep. Ins. Co. v. Lederman*, CIV.A. 97-4153, 2000 WL 1209371, at *20 (E.D. Pa. Aug. 25, 2000) (Kelly, J.); *Spitzer v. Abdelhak*, CIV. A. 98-6475, 1999 WL 1204352, at *9 (E.D. Pa. Dec. 15, 1999) (Buckwalter, J.).

need not have been unlawful). The conspiracy alleged in *Thompson* was an amorphous hodgepodge that simply incorporated by reference all the disparate facts and theories recounted in the indictment and then alleged a conspiracy to defraud. 412 A.2d at 472. The Supreme Court of Pennsylvania's obvious concern, in *Thompson*,  was not that civil conspiracies be nutured, but that they should be pruned back.

Second, one is hard-pressed to find cases in which conspiracy is not a  make-weight. Under Pennsylvania law conspiracy must be predicated on an underlying tort. *See McKeeman v. Corestates Bank, N.A.*, 751 A.2d at 660; *Lackner v. Glosser*, 892 A.2d 21, 35–36 (Pa. Super. 2006) (plaintiff failed to allege an underlying fraud, an essential element of his conspiracy claim). Why the tort of fraud, for instance, requires an overlay of expansive civil conspiracy liability is not immediately, or mediately, apparent. Aiding and abetting or concert of activities theories cover the field well enough.[69] Even those who advocate civil conspiracy theories acknowledge the general lack of utility and the difficult problems that attend broad ranging civil conspiracy liability. *See* Leach, 54 U. Miami L. Rev. at 2 ("But if we ask, instead, what is the use of the concept of civil conspiracy, the going gets more difficult.") If a case arises in which a conspiracy theory is essential to prevent injustice between the parties, or to promote the public welfare[70],

---

[69] *See Skipworth v. Lead Industries Assoc., Inc.,* 690 A.2d 169, 174–75 (1997) (adopting the Restatement (Second) of Torts § 876(a), which provides for tort liability of those acting in concert with the primary tortfeasor). Similarly, in the case of fiduciary violations, it seems that knowing participation liability on the part of non-fiduciaries suffices.

[70] The justifications for criminal conspiracy liability, and the criticisms of its scope and consequences, are familiar enough. *See Iannelli v. U. S.*, 420 U.S. 770, 778–79 (1975) (discussing the justifications for criminal conspiracy liability); Neal Kumar Katyal, *Conspiracy Theory*, 112 Yale L.J. 1307, 1398 n.7 (2003) (collecting articles critical of

it might warrant an exception to the unadulterated malice rule. This is not that case. Here, as in most reported cases, civil conspiracy adds nothing but unnecessary confusion to a case already fraught with unavoidable complexities.

I will grant summary judgment and dismiss the fourteenth claim for relief.

### j.  *Questions of fact exist whether Fenkell is entitled to contribution from Stonehenge.*

In addition to its various bases for summary judgment against Alliance, Stonehenge seeks dismissal of Fenkell's cross-claim for contribution under ERISA and state law. Stonehenge Mem. at 169-170. Fenkell's cross-claim seeks contribution under ERISA and under state law, based on allegations that Stonehenge knowingly participated in Fenkell's alleged fiduciary breaches. Doc. No. 154 at 11. Stonehenge argues that 1) Fenkell may not pursue a contribution remedy against a non-fiduciary, Stonehenge, and 2) Stonehenge is not liable as a knowing participant in Fenkell's fiduciary violations. Stonehenge Mem. at 169-170. Fenkell has not responded to Stonehenge's motion. *See* Fenkell Opp. at 2-4 (Doc. No. 520).

As to the first ground, Stonehenge cites to and quotes from a previous opinion in this case for the proposition that there is no contribution remedy against a non-fiduciary. Stonehenge Mem. at 169 (quoting from *Spear v. Fenkell*, CIV.A. 13-02391, 2015 WL 3643571, at *8 (E.D. Pa. June 12, 2015), *motion for relief from judgment denied*, CV 13-02391, 2015 WL 5582761 (E.D. Pa. Sept. 21, 2015) ("a party seeking contribution in the context of an ERISA claim must plead facts that demonstrate that

conspiracy liability). The utility of conspiracy liability lessens, and its acknowledged drawbacks loom larger, in the civil context.

the target of the contribution claim was acting as an ERISA fiduciary concerning the events that gives rise to the claim.")

The quoted language is inapt. It was a recitation of Alliance's argument that contribution should only be available against fiduciaries, not a holding by me. As I explained in footnote 9, appended to the sentence quoted, "I have previously ruled that contribution is not available to non-fiduciaries who are facing claims under ERISA. *See* Doc. No. 281, at 5–19." *Id.* That is not the same as holding that there is no right of contribution by a fiduciary *against* a non-fiduciary alleged to have knowingly participated in fiduciary violations, under ERISA section 502(a)(3). I went on to deny Alliance's motion to dismiss the contribution claims against individuals aligned with Alliance. I will deny Stonehenge's motion for summary judgment.

As to the second ground in Stonehenge's motion, I have found elsewhere that there are genuine issues of material fact on the question whether Stonehenge was a knowing participant in Fenkell's fiduciary violations. I will deny Stonehenge's motion on this ground, as well.[71]

---

[71] Fenkell's stated basis for standing to assert this claim is as an ESOP participant. *Id.* at ¶ 3. That participation ended after briefing and oral argument of the motions for summary judgment. Doc. No. 585. Since Fenkell is no longer an ESOP participant, his stated basis for standing to assert a claim for contribution apparently no longer exists. Nevertheless, because he has been sued in an ERISA fiduciary capacity he may have another basis for standing. Because the parties have not briefed the issue I will not address it.

## IV.   ALLIANCE AND THE SEFCOVIC PARTIES

The Sefcovic Parties[72] have moved for summary judgment on the fourth, fifth, eleventh, and thirteenth claims for relief in the First Amended Complaint.[73] The Alliance Parties have moved for summary judgment against Fenkell and the Sefcovic Parties, contending that Fenkell breached his fiduciary duties by funneling plan assets to his friends, the Sefcovics, through an Advisory Services Agreement ("ASA") between Alliance Holdings and Student Loan Management and Research Services ("SLMRS"). The Alliance Parties have also moved for summary judgment against SLAMS' fourth counterclaim, which alleges that Alliance breached a contract to extend the ASA for two months. Alliance Mem. at 128.

### a.   *SLMRS, SLAMS and the Sefcovics.*

---

[72] I group Paul Sefcovic, Lianne Sefcovic, SLAMS, and SLMRS together for ease of reference. On December 23, 2015, there was a stipulation of dismissal filed of claims between the Fenkell Parties, SLMRS, and the Hiram Parties. This meant that 1) any claims by the Fenkell Parties against Hiram were dismissed 2) claims brought by the Hiram Parties against the Fenkell Parties were dismissed and 3) claims brought by SLMRS against the Fenkell Parties were dismissed. *See* Doc. No. 552. Also filed on December 23 was a stipulation of dismissal as to 1) any claims brought by SLMRS against the Sefcovic Parties and 2) any claims brought by the Hiram Parties against the Sefcovic Parties were dismissed. *See* Doc. No. 553.
There are factual distinctions between each of the parties, but for the most part it serves brevity to group them together. Where it makes a difference, I will address individual parties by name.
[73] In its fourth claim for relief, Alliance alleges that the Sefcovic Parties knowingly participated and profited in David Fenkell's fiduciary breaches. *See* FAC ¶ 183. In its fifth claim for relief, Alliance claims that the Sefcovic Parties received money in connection with transactions they knew, or should have known, violated ERISA. *Id.* ¶ 186. In the eleventh claim for relief Alliance alleges that the Sefcovic Parties aided and abetted Fenkell's fiduciary breaches. *See id.* ¶ 230. Finally, in its thirteenth claim for relief, Alliance claims that the Sefcovic Parties engaged in a civil conspiracy. *See id* ¶ 251.

Lianne Sefcovic and Louise Bistrick formed Student Loan Advisory Management Services (SLAMS) in August of 2010. Sefcovic Statement of Material Facts Not in Genuine Dispute (SMF) ¶ 17; Sefcovic Mem. at 13. Sefcovic owned 99% of the company, Bistrick 1%. SMF ¶ 17. Carl Draucker, an attorney for Squire, formed SLMRS in the same month, August of 2010. *Id.* at 18. SLAMS was a 90% member and Hiram Ventures was a 10% member. *Id.* Hiram Ventures was the managing member of SLMRS. *Id.* at 19. In September of 2010 SLMRS and Alliance entered into the ASA. *Id.* at ¶ 20. Fenkell negotiated on behalf of Alliance, Draucker on behalf of SLMRS. *Id.*

Under the ASA SLMRS was to provide various services in connection with Alliance's plan to acquire companies in the student loan business. *Id.* at ¶ 24. Alliance did not actually acquire any student loan companies. *Id.* at 26. The term of the agreement was one year. *Id.* at 21. The ASA was renewed for an additional year. *Id.* Alliance agreed to pay SLMRS $27,500 per month.[74] *Id.* at 28. SLMRS then made payments of $24,750 per month to SLAMS, for a total of $573,291.91 between November 9, 2010 and September 19, 2012. *Id.* at 28. $247,500 of that amount was paid prior to August of 2011. *Id.* ¶ 29. SLAMS distributed the funds to Ms. Sefcovic and Ms. Bistrick in proportion to their ownership interests. *Id.* at 29.

---

[74] Alliance paid $330,000 to SLMRS from September 1, 2010 through September 1, 2011, and an additional $330,000 from September 1, 2011 to September 1, 2012. Because the parties are agreed that Alliance assets were not plan assets after August 2011, the second year's payment of $330,000 is not affected by ERISA claims, but only by Alliance's state law claims. *Id.* SLMRS and Alliance have settled. *See* Doc. 492. I will enter summary judgment dismissing Alliance's ERISA claims as to fees paid after August 2011.

**b.   *Alliance's motion for summary judgment.***

      i.   *Questions of fact exist whether the Sefcovic parties are liable under ERISA Section 502(a)(3).*

Alliance argues that the Sefcovic Parties are liable under ERISA Section 502(a)(3), both as knowing participants in fiduciary breaches and as gratuitous transferees of plan assets. Alliance Mem. at 88. The focal point of the Alliance theory is that the Advisory Services Agreement (ASA) of September 2010 was just a means of siphoning $600,000 from Alliance to SLMRS, and then ultimately to the Sefcovics, and that Alliance received nothing in return for the $600,000 it paid. Alliance Mem. at 33-43.

There is a genuine issue of material fact about whether Alliance assets were plan assets before August of 2011. *See supra*, at 91-96. Alliance paid $330,000 to SLMRS under the ASA before August of 2011. *See* Alliance Opp. at 105. There is no dispute that the Sefcovic Parties were paid by Alliance, not by the ESOP. *See* Stonehenge Rep. Mem. at 6; Alliance Opp. at 13-14. Whether assets of Alliance were plan assets will have to be answered at trial. If the Alliance assets used to pay the Sefcovic Parties were not plan assets, no ERISA liability, whether for knowing participation or gratuitous transfer, attaches. I need not reach the other arguments raised by the parties in connection with Alliance's motion for summary judgment against the Sefcovic Parties under ERISA Section 502(a)(3), and will deny Alliance's motion for summary judgment as to its fourth and fifth claims for relief.

      ii.   *Alliance's state law claims.*

  1. *Questions of fact exist whether the Sefcovic parties aided and abetted a fiduciary conflict of interest in violation of Pennsylvania state law.*

Alliance contends that the Sefcovic Parties "caused losses to Alliance and the ESOP while violating Pennsylvania state law."[75] Alliance Mem. at 90. Alliance claims that it is indisputable that Fenkell breached his fiduciary duties under Pennsylvania law by causing Alliance to enter into the ASA. Alliance Mem. at 92. Alliance argues that Fenkell did this as payback to Paul Sefcovic and Carl Draucker "for their help inflating his annual compensation over the years and [to] ensure that they would serve his interests at the expense of Alliance in the future." Alliance Mem. at 84. This theory of benefit to Fenkell is important, as Alliance's theory of fiduciary self-dealing depends upon it. The cases cited to by Alliance make this clear. Both *Crawford v. Sambrano,* 478 F.R. 670, 678, 686-87 (Bankr. W.D. Pa. 2012) and *Camerer v. Doebler Farmland, Inc.,* 2006 Pa. Dist. & Cnty. Dec. LEXIS 366, at *11-12 (Pa. Cnty. Ct. Feb. 21 , 2006) involved self-dealing by a fiduciary: either payments to pay himself (*Camerer*), or to an entity in which he had an interest (*Crawford*). Alliance Mem. at 91. Here, Fenkell did not receive fees, as he did under the DBF/Stonehenge agreement. Alliance posits that the ASA was dance Fenkell used to ensure Sefcovic's and Draucker's continued loyalty. Alliance Mem. at 84. Sefcovic and Draucker were both on the Alliance Compensation Committee. *Id.*

---

[75] Alliance seeks to recover the $330,000 paid under the ASA after August 2011 under a state law, not ERISA, theory of liability. *See* Alliance Mem. at 90-91. If Alliance's assets are determined not to have been  plan assets, then Alliance would seek recovery of the $330,000 paid before August of 2011 under a state law theory, as well.

Alliance's payback theory is no more than that: a theory. It is not an undisputed fact, and it is certainly material. I will deny summary judgment based on Alliance's self-dealing theory.

> ### 2. Summary judgment is granted establishing Alliance's claim that Fenkell violated his fiduciary duty of prudence.

Alliance contends that Fenkell violated his duty of prudence by causing Alliance to enter into the ASA, because it overpaid for any services actually provided to Alliance. Alliance Opp. at 84. I agree.

There is little to recommend the ASA, from Alliance's standpoint. Under this agreement, Alliance paid about $660,000 to SLMRS over two years for almost nothing. Alliance Mem. at 38.[76] By "almost nothing," I mean this:

- SLMRS admitted it was "ready, willing and able to provide services when requested to do so." Alliance Mem. at 36 (citing to Doc. No. 87 at 2, ¶ 3; Jones Dep. 36:21 to 37:14; 62:1-20).

- No one at SLMRS performed any work under the ASA during the period September 2010 to September 2011. Alliance Mem. at 37 (citing to Jones Dep. Ex. 2 at Sefcovic 00089; Jones Dep. at 17:13-24; Sheldon Dep. at 96:12 to 101:9).

---

[76] SLMRS received $660,000 over the two years of the contract. Hiram Ventures got $66,000 (representing 10%), while SLAMS received 90% of the money paid to SLMRS, $594,000. Lianne Sefcovic got 99% of the money paid to SLAMS, or $588,060. *See* Alliance Mem. at 38, n.24 (citing to SLMRS Responses to Plaintiffs' First Set of Interrogatories, Response to Interrogatory 11; L. Sefcovic Dep. Ex 33 at Sefcovic 00083).

- No one at SLMRS performed any work under the ASA during the period September 2011 to September 2012. *Id.* (citing to Jones Dep. Ex. 3 & 13; Jones Dep at 62:1 to 63:5; 10/28/14 Sheldon Dep. at 96:12 to 101:9).

- Lianne Sefcovic did not capitalize SLMRS until September 20, 2012, two months before she dissolved SLAMS. *Id.* at 38 (citing to L. Sefcovic Dep. Ex 40; Valitsky Dep. Ex. 6).

- Because of concerns about the late capitalization, Hiram College employees[77] decided not to cash the check from Lianne Sefcovic for SLMRS' capitalization. *Id.* at 39 (citing to Jones Dep. at 32:18 to 35:1; Valitsky Dep. at 117:3-21).

- Paul and Lianne Sefcovic drafted a letter in response to Ballard Spahr's[78] request for proof of services that SLMRS was supposed to have performed. *Id.* (citing to Jones Dep. at 34:2-11; Jones Dep. Ex. 6; P. Sefcovic Dep. at 192:8 to 193:15; P. Sefcovic Dep. Ex. 30). This letter was copied and sent verbatim by SLMRS in response to the Ballard Spahr request for information. The letter made a variety of apparently false claims about services provided under the ASA.

- Sheldon was not aware that SLMRS or SLAMS had been retained, and was not aware of any work done by either entity or the Sefcovics. *Id.* at 41 (citing to Sheldon Dep. at 25: 3 to 27:7; 96:12 to 101:9).

---

[77] Hiram Ventures was a for-profit venture of Hiram College. Alliance Opp. at 35, n.23 (citing to Draucker Ex. 529. Hiram Ventures received 10% of SLMRS' income from the ASA. Alliance Opp. at 35 (citing to 4/14/14 Draucker Dep. at 154:20 to 155:1; Valitsky Ex. 1 at Sefcovic 00082).

[78] Ballard Spahr conducted an investigation at the request of Alliance.

- Lianne Sefcovic was unable to provide any details about services provided, except for some "inconsequential" services such as "picking scotch and reminding Paul to talk to Fenkell about something student loan related." *Id.* at 42 (citing to L. Sefcovic Dep. at 108:21 to 112:8).

- Draucker, the attorney who conceived, negotiated, and drafted the ASA,[79] was ignorant of any services provided by SLMRS, SLAMS, or the Sefcovics. *Id.* (citing to Draucker Dep. at 40:20 to 45:13).

- Alliance paid about $28,000 per quarter to Paul Sheldon's consulting firm, SLCS. *See id.* at 86 n. 49 (citing Sheldon Dep. at 118:14-119:12). Sheldon was a recognized industry expert, and his company concededly rendered services to Alliance. *See id.* (citing Sheldon Dep. at 118:14-119:12).

The Sefcovic Parties argue that 1) only SLMRS – not SLAMS, Lianne Sefcovic, or Paul Sefcovic – was a party to the ASA; 2) the ASA was a "standby" agreement, not uncommon in the student loan industry, under which SLMRS "was compensated whether or not [it] ever provided services" to Alliance; 3) SLMRS did provide services to Alliance, in the form of "introductions and hosted events by SLAMS;" 4) Paul Sheldon's testimony is "inapposite" because he and SLCS were "not aware of and was not a party to SLAMS, SLMRS or the ASA." Sefcovic Opp. at 8 (RSF ¶ 27), 12 (the major portion of Sheldon's testimony lacked "foundation."); 5) Sheldon and SLCS were hired to do different work than SLMRS. Sefcovic Opp. at 7-8 (RSF ¶¶ 24, 26).

---

[79] *See* Sefcovic Opp. at 5-6. Draucker represented both Hiram and Alliance. Sefcovic Opp. at 6 (Sefcovic's Responsive Statement of Material Facts (RSF) ¶ 19.

The Sefcovic Parties' argument on the services provided by SLMRS is revealing. The Sefcovic Parties do not spend time detailing the services they provided. They claim that Alliance admits that SLMRS provided services to Alliance. Sefcovic Opp. at 14 (citing to Doc. No. 500 (Plaintiff's Motion at pp. 33-48)).[80] The main thrust of the Sefcovic Parties' argument is not that SLMRS, SLAMS or the Sefcovics actually did much for Alliance, but rather, that they were available on "stand-by" if needed. Sefcovic Opp. 13.

I have summarized the services purportedly admitted by Alliance. Since the Sefcovic Parties have not suggested any actual services in addition to the Alliance summary, I will take it that there is nothing more to offer: the Alliance summary constitutes the universe of actual services provided by SLMRS, along with an unquantifiable readiness to perform additional services if called upon. I say unquantifiable because there is no evidence that, even if called upon, the Sefcovic Parties were bound to perform a certain amount of work, whether measured by hours or some other measure of labor.

Under Pennsylvania law, a fiduciary "must exercise common prudence, common skill, and common caution in the performance of his duties, or shortly stated, due care in the circumstances." *In re Pearlman's Est.*, 35 A.2d 418, 419 (Pa. 1944) (internal quotations and citation omitted). A corporate officer is subject to this fiduciary duty *vis a vis* the conduct of the corporation's business. *Ciampa v. Conversion Scis., Inc.*, 2752

---

[80] The reference must be not to Doc. 500, which consists of a 6-page motion followed by a large number of exhibits, but to Doc. No. 503, Alliance's Memorandum in Support. Pages 33-48 consist of facts and argument in support of Alliance's motion for summary judgment against the Sefcovic Parties.

EDA 2014, 2015 WL 8196712, at *10 n.13 (Pa. Super. Dec. 8, 2015) (citing to 15 Pa.
C.S.A. § 1712.).

Alliance uses the Sheldon agreement as a bench-mark for reasonableness,
pointing out that Alliance paid out three times more money to SLMRS than it did to
Sheldon, a recognized student loan industry expert who actually performed services. *See*
Alliance Reply at 49 (Sheldon's rate was $28,000 per *quarter,* SLMRS was $27,500 per
*month* (citing to Sefcovic. Opp. at 14, Fenkell's Opp. at 67, Sheldon Dep. at 16:3-6 (Doc.
No. 500-58)); Alliance Mem. at 34-35 (detailing Sheldon's company's services); 36
("SLMRS admitted that it provided no services but "was ready, willing and able to
provide services when requested to do so.")).

The material historical facts about this particular dispute are fixed. There is
nothing to be gained by a trial. Since I am the trier of fact I may draw such reasonable
inferences as are appropriate from the undisputed record. *Anderson*, 477 U.S. at 255;
*Tiggs Corp v. Dow Corning Cop.*, 822 F.2d 358, 361 (3d Cir. 1987). I find that paying
SLMRS $330,000 for dinner parties and introductions was unreasonable, and a breach
of Fenkell's fiduciary duty of prudence to Alliance.[81]

> 3. *Questions of fact exist whether Paul Sefcovic's conduct
> amounted to "substantial" encouragement or assistance as
> to Alliance's state law fiduciary duty of prudence claim.*

---

[81] Should I conclude at trial that the payment of $330,000 to SLMRS during the period
September 2010-2011 did not violate ERISA, that money would also fall within the
ambit of this summary judgment on state grounds. At trial I will also decide whether the
payments to SLMRS violated Fenkell's duty of loyalty, either under ERISA or state law
fiduciary standards.

Alliance requests that I enter summary judgment against Paul Sefcovic for aiding and abetting Fenkell's state law fiduciary violations.[82] Sefcovic was aware of Fenkell's fiduciary position *vis a vis* Alliance, and the prudence[83] the position required of Fenkell. Alliance Mem. at 89. He knew that SLMRS was getting paid $330,000 for the period September, 2011-2012 for doing essentially nothing.[84] *Id*; *cf.* 7/3/2014 L. Sefcovic Dep. at 32:25-33:7. He asked Fenkell to structure the ASA to renew automatically so that unless Alliance took action it would continue in effect. *See id.* at 55 (citations omitted)[85]. This certainly sounds like "encouragement," in the ordinary sense of the word. *See Reis* 667 F. Supp. 2d at 492 (aiding and abetting requires "substantial assistance or encouragement in effecting the breach[]").

Nevertheless, I do not think that Mr. Sefcovic's conduct indisputably amounted to "substantial" encouragement or assistance. He had some input into the drafting of the ASA agreement, but Draucker seems to have had the laboring oar. Alliance Mem. at 36 (citing to 4/14/14 Draucker Dep. 157:18 to 158:1; Jones Ex. 2; Draucker Ex. 529 and 531). Sefcovic had some input into the structure of SLMRS; again, Draucker seems to

---

[82] Aiding and abetting liability requires (1) a breach of a fiduciary duty; (2) knowledge of the breach; and (3) "substantial assistance or encouragement by the aider and abettor in effecting that breach." *Reis*, 667 F. Supp. 2d at 492.

[83] I have concluded there are fact issues which preclude summary judgment on the duty of loyalty issue. I discuss only the reasonable prudence theory of fiduciary liability.

[84] It is not plausible to believe that a sophisticated attorney such as Sefcovic could see this as anything but imprudence on Fenkell's part.

[85] In Paul Sefcovic's deposition, a voicemail left on David Fenkell's phone by Paul Sefcovic stated Sefcovic "wanted to ask you a question about the college thing, whether or not we could potentially do it for whatever remaining term of the NorthStar deal is and make it cancellable annually, terminable annually, you know, upon 30 days' notice. That way, you're not involved in the future, whoever is your successor can cancel it. But at least I don't have to ask you next year, and if no one sees it or does anything with it, then it continues. Just a thought." *See* 7/2/14 P. Sefcovic Dep. at 182:17-183:2.

have done most of the work, and Sefcovic's role is not undisputed. Alliance Mem. at 35 (citing to 4/14/14 Draucker Dep. at 154:20 to 155:1; Valitsky Ex. 1 at Sefcovic 00082). Sefcovic asked Fenkell to structure the ASA so that it would automatically renew, but asking for money is not necessarily substantial assistance or encouragement. Sefcovic aided Lianne Sefcovic in providing allegedly inaccurate information about SLMRS' services in response to the Ballard Spahr investigation, but it was Lianne Sefcovic who was the corporate officer who signed and sent the letter, and the truth about who provided those services is not undisputed. *See* 7/3/2014 L. Sefcovic Dep. at 29:6-10.

Certainly Sefcovic's conduct might amount to substantial encouragement or assistance. *See Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 413 (3d Cir. 2003) (attorneys who participated in the formation of a sham corporation to avoid a debt, and sent a letter to the marshals to aid the scheme, might be liable for aiding and abetting a fraud). Nevertheless, even if I find that Paul Sefcovic's liability is established, the trial will inquire into whether the Squire/Alliance settlement should extinguish his liability, if there is any. Answering that question will require close examination of the underlying conduct allegedly covered by the Squire/Alliance settlement. Thus, the relevant facts will be litigated at trial regardless of my decision here. Under the circumstances I will deny summary judgment against Paul Sefcovic for the state law aiding and abetting claims.

4. *Questions of fact exist whether Lianne Sefcovic aided and abetted Fenkell's violation of his fiduciary duty of prudence.*

As I mention below during the discussion of the Sefcovic Parties' summary judgment motion, there are genuine issues of material fact as to Lianne Sefcovic's knowledge that Fenkell was committing a fiduciary violation, and the extent to which

her knowledge, if culpable, was imputable to SLAMS or SLMRS.  Those issues will be

taken up at trial. Thus, summary judgment is inappropriate on the theory that Lianne

Sefcovic aided and abetted Fenkell's violation of his fiduciary duty of prudence. I have

already concluded that genuine issues of material fact preclude summary judgment

against the Sefcovics on Alliance's duty of loyalty theory.

> 5.  *Questions of fact exist as to SLAMS' fourth counterclaim for breach of contract against Alliance.*

Paragraph 30 of the Fourth Counterclaim reads as follows:

> 30. Upon information and belief, Alliance's Board of Directors approved a two month extension of the Advisory Services Agreement between Alliance and SLMRS on September 25, 2012. Alliance never executed an extension of the Advisory Services Agreement resulting in a total of $55,000 not being paid to SLMRS for that two-month period of time and a loss of 90% of that dollar amount to SLAMS.

Alliance asks me to grant summary judgment dismissing the Fourth

Counterclaim. Alliance Mem. at 128. Alliance argues two points: 1) that the ASA was "at

the center of torts and fraud committed by Fenkell, Draucker, and the Sefcovics against

Alliance; 2) that "no renewal to the ASA was executed and, therefore, SLAMS cannot

state a breach of contract claim." Alliance Mem. at 128-29.

Alliance does not provide any elaboration or authority for its first argument. I

treat this as an argument that SLAMS has unclean hands and therefore cannot enforce

whatever right it may have had as a third-party beneficiary under the ASA. Under

Pennsylvania law,  the doctrine of unclean hands requires that a litigant "act fairly and

without fraud or deceit as to the controversy in issue." *Terraciano v. Com., Dept. of

Transp., Bureau of Driver Licensing*, 753 A.2d 233, 237–38 (Pa. 2000). Equitable

defenses may be interposed against asserted contract liability. *See Blessing v. Miller*,

132

102 Pa. 45, 48–49 (1883) (defendant to a contract action was entitled to raise, as an equitable defense, injuries arising from the same transaction, although distinct from the contract) (citation omitted).

Whether SLAMS is guilty of unclean hands would depend, if not exclusively, then for the most part, on the conduct of Lianne Sefcovic. I have held that there are issues of fact that preclude entry of summary judgment against Ms. Sefcovic based on Alliance's theory that she aided and abetted fiduciary violations by Fenkell. For the same reason, whether SLAMS was guilty of unclean hands will have to be resolved at trial.

I previously rejected Alliance's second argument, holding that in the absence of an executed contract, the Alliance Board of Directors' minutes approving the two-month extension of the ASA might serve as sufficient evidence of a contract. *See* Doc. No. 305, at 19-20. Alliance does not point to any facts that might change this analysis. *See* Alliance Mem. at 128-29. I will deny Alliance's motion for summary judgment as to SLAMS' fourth counterclaim.

6.   *Questions of fact exist whether Paul Sefcovic is entitled to indemnification against Alliance.*

Alliance asks me to enter summary judgment rejecting Paul Sefcovic's indemnification claims. Alliance Mem. at 100-101. Because I have denied Alliance's motion for summary judgment on its affirmative claims against Paul Sefcovic, I will deny Alliance's motion for summary judgment on Sefcovic's claims for indemnification against Alliance. Sefcovic's indemnification claims will be resolved at trial.

c.   ***The Sefcovics' motion for summary judgment.***

i.   *Questions of fact exist whether the Sefcovics are liable.*

The Sefcovic Parties have moved for summary judgment against Alliance on several grounds. They contend that because Fenkell is not liable, they cannot be liable. Sefcovic Mem. at 17. For the same reasons I have denied Mr. Fenkell's motion for summary judgment in Section II of this memorandum, I reject the Sefcovic Parties' derivative position.

> ii. *Questions of fact exist whether the settlement with Squire Sanders precludes a claim against Paul Sefcovic for knowingly participating in a fiduciary breach.*

The Sefcovic Parties next argue that Paul Sefcovic is not liable for knowingly participating in a fiduciary breach because, as a lawyer at Squire Sanders,[86] any and all claims against him were settled as a result of a settlement agreement in the case of *Alliance Holdings, Inc., et al. v. Squire Patton Boggs (US) LLP*, No. 14-05780 (E.D. Pa. Oct. 10, 2014). *See* Sefcovic Mem. at 18-19. Sefcovic argues that his services "were provided in his capacity as a partner with Squire." *See id.* at 19. The Sefcovic Parties point to evidence that Paul Sefcovic was never paid by Alliance or SLMRS, but by Squire Sanders. *Id.* The brief continues by noting that "[a]ny settlement entered into by [Squire Sanders], therefore, necessarily addresses the conduct of its attorneys and settles the question of liability as to those individuals." *Id.* at 20.

Alliance entered into two different settlement agreements in July of 2015. *See* Alliance Opp. at 101. There was a malpractice action against Squire Sanders and a separate agreement with SLMRS, Hiram College, and Hiram Ventures. *Id.* According to deposition testimony, Paul Sefcovic was not charging SLAMS for his time, either

---

[86] Squire Sanders is now Squire Patton Boggs. Because the parties refer to Sefcovic as a Squire Sanders lawyer, that is how I will refer to him.

individually or on behalf of Squire Sanders. *See id.* (citing 7/2/2014 P. Sefcovic Dep. at 157). This arrangement was confirmed by Lianne Sefcovic in her deposition. *See id.* (citing 7/3/2014 L. Sefcovic Dep. at 36-37). Lianne Sefcovic stated in her deposition that Squire Sanders did not provide any legal services in forming SLAMS, only legal advice as to forming SLMRS. *See* L. Sefcovic Dep. at 37. She further explained that SLAMS was a member of SLMRS and SLMRS had an ASA with Alliance to provide consulting advice as to the student loan business to Alliance. *Id.* at 39-40.

The Sefcovic Parties provide some background into the different entities' corporate structure:

> SLAMS became a member of SLMRS in August 2010. SLMRS subsequently entered into the [Advisory Services Agreement] with Alliance. Under the ASA, Alliance agreed to pay SLMRS $27,500 per month. As a 90% member of SLMRS, SLMRS made payments to SLAMS of $24,750 per month for a total of $573,291.91 over the course of the ASA and its extensions and specifically from November 9, 2010, and September 29, 2012.

*See* Sefcovic Mem. at 23.

Paul Sefcovic's argument is unconvincing.  Even if Sefcovic was acting within the scope of his employment – a fact disputed by Alliance, which plausibly points to facts suggesting he was acting on his own account - an injured plaintiff can sue "the principal, the agent, or both" until it receives "full satisfaction." *Natl. Union Fire Co. of Pittsburgh, PA v.* Wuerth, 913 N.E. 2d 939, 944 (Ohio 2009) (internal quotations and citations omitted).[87] Under Ohio law,

---

[87] Both parties cite to Ohio law on the subject of the effect of the release on Sefcovic's liability. Alliance Opp. at 103; Sefcovic Mem. at 19. Neither party points to any difference between Ohio law and Pennsylvania law on the subject. I need not engage in conflicts of law analysis.

if the master has paid part of [a claim], the servant is under obligation to reimburse the master and pay the plaintiff the balance of his claim.

*Losito v. Kruse*, 24 N.E.2d 705, 707 (Ohio 1940). I will deny summary judgment based on the settlement with Squire Sanders.

### iii.   *Questions of fact exist whether Lianne Sefcovic and SLAMS were knowing participants in Fenkell's ERISA fiduciary violations.*

I have previously concluded that there is a genuine issue of material fact whether Alliance assets were plan assets. Lianne Sefcovic and SLAMS claim there is another ground under which they are entitled to dismissal of the ERISA claim in Alliance's fourth claim for relief: that they did not knowingly participate in ERISA fiduciary breaches by Fenkell. *See* Sefcovic Mem. at 20 (citing *Harris Trust*, 530 U.S. at 251). To recover under *Harris Trust*, Alliance must prove that Lianne Sefcovic knowingly participated with Fenkell in the commission of ERISA fiduciary violations. *Harris Trust,* 530 U.S. at 251.  Lianne Sefcovic and SLAMS argue that SLMRS – not SLAMS or the Sefcovics – provided services to Alliance under the ASA. Sefcovic Mem. at 20-21. The advisory services agreement was structured so that the Sefcovics and SLAMS were not parties. *Id.* at 21. "The services that Ms. Sefcovic and SLAMS agreed to provide on behalf of SLMRS to Alliance were determined by the SLMRS Operating Agreement." *Id.*

Alliance points to numerous facts from which the Sefcovic Parties' (including Lianne Sefcovic, Paul Sefcovic, and SLAMS) knowledge of Fenkell's fiduciary breaches might be inferred. Alliance Reply at 47-53. The facts presented by Alliance clearly create

a genuine dispute of material fact as to Paul Sefcovic.[88] Lianne Sefcovic's knowledge is a closer question. Alliance brings to the table the following facts:

- Lianne Sefcovic decided to provide golf outings and dinner meetings at no cost without consulting with Hiram Ventures, the managing member of SLAMS.  *See* Alliance Opp. at 47-48;

- Paul and Lianne Sefcovic "lied and claimed that SLMRS and SLAMS had provided services to Alliance that SLCS actually performed. *Id.* at 50;

- Lianne Sefcovic did not provide "specific details of when, where, and to whom Lianne Sefcovic introduced Alliance;" *id.* at 51; and

- Lianne Sefcovic provided specific details about dinner parties she hosted for Alliance's benefit. *Id.*

What is not pinned down is the extent to which Lianne Sefcovic was aware that Fenkell was operating as an ERISA fiduciary when he caused Alliance to enter into the ASA. The facts produced by Alliance to prove that Lianne Sefcovic had knowledge that Fenkell was committing a fiduciary breach are exceedingly thin. Nevertheless, if Lianne Sefcovic knowingly provided false information to Ballard Spahr in an effort to deceive its investigators about the services provided by SLMRS to Alliance under the ASA, I might infer that she was aware that the ASA deal amounted to fiduciary wrongdoing. *See Ashcraft v. Tennessee*, 327 U.S. 274, 277 (1946) (A [w]ilful concealment of material facts has always been considered as evidence of guilt[]); *United States v. Kemp*, 500 F.3d 257,

---

[88] Sefcovic's intimate knowledge of the Spread Deal, the details of the DBF fees, his service on the Compensation Committee, and his detailed knowledge of the SLMRS arrangement supply a series of facts from which his knowledge of Fenkell's fiduciary lapses could be inferred. *See* Alliance Reply at 52-53 (citing to record evidence).

296–97 (3d Cir. 2007) (untrue grand jury testimony was probative of the defendant's consciousness of wrongdoing). Such a finding would require evaluation of her testimony at trial. Even if I find that Lianne Sefcovic lied to Ballard Spahr, it is conceivable that such a lie was motivated by knowledge of Fenkell's fiduciary status gained after the fact, as a result of the Alliance investigation.

As for SLAMS, its knowledge must be imputed from Lianne Sefcovic. The parties have not pointed to a genuine conflict between Ohio's imputation law and Pennsylvania's. State law, not federal law, governs the issue of whether Lianne Sefcovic's knowledge may be imputed to SLAMS. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83–84 (1994). Under either Ohio or Pennsylvania law, "knowledge of a corporate officer is knowledge of the corporation," except under unusual circumstances. *Gordon v. Contl. Cas. Co.*, 181 A. 574, 576 (Pa. 1935); *Arcanum Nat. Bank v. Hessler*, 433 N.E.2d 204, 211 (Ohio 1982) ("the knowledge of the officers of a corporation is at once the knowledge of the corporation.") (citation omitted).

I will deny the Sefcovic Parties' motion for summary judgment as to the fourth claim for relief.

> ### iv.   *Questions of fact exist whether Alliance's assets were plan assets under the fifth claim for relief; but summary judgment is granted limiting ERISA recovery under the fourth and fifth claims to relief for the period before August 2011.*

The Sefcovic Parties argue that in order to prove Paul Sefcovic was a gratuitous transferee of plan assets, under the fifth claim for relief, Alliance must show that he actually received plan assets. *See* Sefcovic Mem. at 22 (citations omitted). The Sefcovic Parties argue that this cannot be proven, because Squire Sanders paid Paul Sefcovic, not

Alliance or the Alliance ESOP. *Id.* Nor is there any evidence in the record that Lianne Sefcovic transferred money received from SLAMS to her husband. *Id.*

The Sefcovic Parties point out that because Alliance stated in the FAC that the assets of Alliance were only plan assets until August of 2011, ERISA relief is impossible for any money received by SLAMS/SLMRS after that date. *See* Sefcovic Mem. at 23 (citing FAC ¶¶ 18-22). The relief due to Alliance under ERISA would be limited to money received before August, 2011. *See id.* at 24. Alliance does not dispute this state of affairs, and I will enter summary judgment limiting any ERISA recovery under both the fourth and fifth claims for relief to the period before August of 2011. *See* Footnote 74, supra.

As for the period before August, 2011, while discussing Alliance and Stonehenge's cross-motions, I explained my reasons for allowing Alliance's gratuitous transfer claims to go to trial. *See supra,* at 80. I find that there are genuine issues of material fact as to whether Alliance's assets were plan assets.[89]

---

[89] If the assets are plan assets, the burden will be on the Sefcovic Parties to demonstrate they acquired the assets for more than nominal value. *See supra,* at 86-91. Whether a remedy for accounting or disgorgement will be available against all or some of the Sefcovic Parties has not been addressed by the parties, and it seems advisable to address it after – not before – the plan assets issue has been resolved at trial.

### v.  *Questions of fact exist whether the Sefcovic Parties aided and abetted Fenkell's state law fiduciary violations.*

The Sefcovic Parties have also moved for summary judgment related to claims that they aided and abetted Fenkell's fraud and breach of corporate fiduciary duty under Pennsylvania state law, the eleventh cause of action in the Alliance complaint. *See* Sefcovic Mem. at 24-25. The Sefcovic Parties argue that Paul Sefcovic was at most a messenger,[90]  and that there is no evidence that he had anything to do with the formation of SLAMS/SLMRS. *See id.* at 25. The Sefcovics also argue that the evidence shows that Lianne Sefcovic formed SLAMS, and that there is no evidence in the record to show that any party "had the authority to be a substantial factor in Alliance's decision to enter into [the ASA] that would result in the alleged fraud or breach." *Id.*

As I explained in my discussion of Alliance's motion on the aiding and abetting claim,  there are genuine issues of material fact that preclude summary judgment on the issue of whether the Sefcovics aided and abetted Fenkell's breach of fiduciary duty.

### vi.  *Summary judgment is granted, dismissing Alliance's thirteenth claim for relief for civil conspiracy against the Sefcovic Parties.*

The Sefcovic Parties argue that they are not liable for civil conspiracy, as alleged in the thirteenth cause of action in Alliance's complaint. Sefcovic Mem. at 26-27. I agree.

---

[90] The "messenger" example comes from the Restatement of Torts related to the tort of aiding and abetting. The example, quoted by the Sefcovics is: "A is employed by B to carry messages to B's workmen. B directs A to tell B's workmen to tear down a fence that B believes to be on his own land but that in fact, as A knows, is on the land of C. A delivers the message and the workmen tear down the fence. Since A was a servant used merely as a means of communication, his assistance is so slight that he is not liable to C." *See* Sefcovic Mem. at 25 n. 1 (citing Restatement (Second) of Torts § 876, Comment on Clause B, ill. no. 9. If Paul Sefcovic were employed merely to carry messages, this example would be apt, but the evidence suggests he did more than transmit messages.

Alliance has submitted no evidence that would satisfy the heightened malice standard under Pennsylvania civil conspiracy law. *See Thompson,* 412 A.2d at 472. It is undisputed that the Sefcovic Parties, to the extent they participated in the ASA, were doing so to advance their own economic interests, and not solely to injure Alliance. I will enter summary judgment dismissing the thirteenth claim for relief. *See supra*, at 56 (summary judgment on Fenkell's motion as to the thirteenth claim for relief).

> vii.  *Questions of fact exist whether the statute of limitations bars the eleventh cause of action.*

The Sefcovic parties argue that the statute of limitations should bar the the eleventh cause of action. *See* Sefcovic Mem. at 28-29. Under Pennsylvania law, the statute of limitations for claims in tort is two years. *See* 42 Pa. C.S.A. § 5524(7). The Sefcovic Parties argue that all of Alliance's claims are time-barred. The Sefcovic Parties note that Alliance signed the ASA in September of 2010. *See* Sefcovic Mem. at 29. There is evidence that Spear and Alliance were well aware of the payments made pursuant to the ASA as early as October 2010. *Id.* This suit was commenced in May of 2013, more than two years from each of these events.

Alliance argues that "Pennsylvania's discovery rule applies to toll the statute of limitations where, as here, 'plaintiff cannot, despite the exercise of due diligence, know of his injury or its cause.'" *See* Alliance Opp. at 108 (citing *Foulke v. Dugan*, 187 F. Supp. 2d 253, 258 (E.D. Pa. 2002)). The Third Circuit has noted that Pennsylvania law "favors strict application of statutes of limitations." *See Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011) (citing *Glenbrook Leasing Co. v. Beausang*, 839 A.2d 437, 441 (Pa. Super. 2003), *appeal granted in part*, 582 Pa. 101, 870 A.2d 318 (2005) *and order aff'd*

*without opinion*, 584 Pa. 129, 881 A.2d 1266 (2005)); *see also New York Cent. Mut. Ins. Co. v. Edelstein*, 637 Fed. Appx. 70, 72 (3d Cir. 2016).

Alliance points to Barbie Spear's deposition testimony that she asked Fenkell the purpose of SLMRS. *See* Alliance Opp. at 108 (citing 2/3/15 Spear Dep. at 326-27). According to that testimony, Fenkell told her not to worry about it. *See id.* (citations omitted). Alliance claims that Spear did not give the matter any additional thought until she and Wanko discovered the payments to SLMRS in August of 2012. *See id.* at 108-09.

As with other statute of limitations arguments in this case, I find that questions of who knew what and when, the extent of Fenkell's influence on Alliance, and the credibility of the various witnesses on the subject are fact issues better left for resolution at trial. I will deny summary judgment to the Sefcovic Parties on the basis of the statute of limitations, as to Alliance's eleventh claim for relief. The statute of limitations argument is moot, as to the conspiracy count (the thirteenth claim for relief), because I have decided to grant summary judgment on separate grounds.

## IV.    CONCLUSION

An order granting summary judgment in certain instances, and denying it in others, will enter.

BY THE COURT:

  *s/Richard A. Lloret*
HON. RICHARD A. LLORET
U.S. Magistrate Judge